## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MOHAMMEDOU OULD SLAHI, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 06-CV-0597 (JR) |
| U.S. DEPARTMENT OF DEFENSE, | ) |
| Defendant. | ) |

### DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, defendant, the United States Department of Defense, respectfully moves for partial summary judgment on the claims of plaintiff Mohammedou Ould Slahi.  In support thereof, the Court is respectfully referred to the accompanying Memorandum in Support of Defendant's Motion for Partial Summary Judgment, the Defendant's Statement of Material Facts, and the supporting declarations and exhibits.

Dated: October 1, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

JEFFREY A. TAYLOR
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

TERRY HENRY
Senior Trial Counsel

_____/s/ Jean Lin_____
JEAN LIN
Trial Attorney
Federal Programs Branch, Civil Division

United States Department of Justice
20 Massachusetts Ave., N.W.
Washington, D.C. 20530

Counsel for Defendant

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

MOHAMMEDOU OULD SLAHI,              )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )        Civil Action No. 06-CV-0597 (JR)
                                    )
U.S. DEPARTMENT OF DEFENSE,         )
                                    )
        Defendant.                  )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff Mohammedou Ould Slahi, an alien detained as an enemy combatant by

defendant, the Department of Defense ("DoD"), at the Guantanamo Bay Naval Base in Cuba

("Guantanamo") filed this action against DoD alleging that DoD has improperly withheld agency

records responsive to his Freedom of Information Act ("FOIA") request seeking all records

relating to him. *See* 5 U.S.C. § 552. Pursuant to this Court's of Order of September 4, 2007, as

clarified by the Order of September 5, 2007, DoD now moves for partial summary judgment with

respect to information redacted or otherwise withheld from responsive documents located in the

United States Southern Command ("Southern Command"), including some 600 documents DoD

recently released to plaintiff and certain medical records and other materials released to plaintiff

in 2006.

As demonstrated by the accompanying declarations of Rear Admiral Mark H. Buzby, the

Commander of Joint Task Force-Guantanamo ("JFT-GTMO"), and William T. Kammer, Chief

of DoD's Office of Freedom of Information, DoD has discharged its statutory obligations under

FOIA:  it has conducted a reasonably adequate search and withheld only information protected from disclosure by a FOIA exemption.  Specifically, DoD has withheld information under FOIA Exemptions 1, 2, 3, 5, 6 and 7 (the "Withheld Information").  5 U.S.C. § 552(b)(1), (2), (3), (5), (6) & (7).  The majority of the Withheld Information is classified and is withheld under Exemption 1.  Such information includes intelligence data regarding Slahi and his activities, and concerning other persons and organizations; intelligence assessments and conclusions; information relating to intelligence methods and codes; information concerning military plans and operations; photographs of Slahi; Slahi's specific detention cell location; and intelligence information provided by a foreign government.  As the original classification authority, Rear Admiral Buzby, has determined, the disclosure of this information reasonably could be expected to result in damage to the national security and compromise the United States' defense against transnational terrorism.

A substantial amount of the Withheld Information also falls within Exemption 2, which protects internal agency guidelines and practices, the disclosure of which may risk circumvention of the law.  The Withheld Information in this category, which overlaps significantly with information already protected from disclosure under Exemption 1, includes DoD's internal agency guidelines and instructions for assessing the threat level and intelligence value of detainees and other individuals and organizations of intelligence interest; for making recommendations regarding the disposition of detainees; for the handling of sensitive information; and for coordinating intelligence gathering and analysis among agencies and DoD components.  It also includes details of disciplinary matters in which Slahi was involved.

In addition, DoD has withheld from the responsive records the personally identifying

2

information of DoD personnel.  Such information is protected from disclosure by statute and thus

is exempt under Exemption 3.  It is also exempt under Exemption 6 because there is no public

interest in having this information made public, while the disclosure would constitute a clearly

unwarranted invasion of personal privacy.

Further, DoD has invoked Exemption 5 to protect privileged information under the

deliberative process privilege.  This information includes assessments of plaintiff's intelligence

value and threat level; recommendations concerning whether plaintiff should be designated an

enemy combatant and whether, as an enemy combatant, he should be released, transferred, or

continued in detention by the United States.  It also includes intra-agency deliberations on policy

or future actions concerning treatment of detainees, including interrogation policies.  Disclosure

of this category of Withheld Information is likely to chill full, frank, and open discussions within

the agency and impair the quality of decisionmaking regarding the designation, treatment, and

disposition of detainees.

Finally, the Withheld Information includes law enforcement records, including

information regarding techniques and procedures for law enforcement investigations or

prosecutions, which are protected from disclosure by Exemptions 7(A) and (E).  The

investigation of detainees for potential prosecution for violations of laws of war is ongoing.  Trial

by military commission remains a possibility for Guantanamo detainees.  Disclosure of this

category of information would reveal techniques, procedures and guidelines used during these

investigations and prosecutions and pose significant harm to the interests of the United States in

its ongoing terrorism-related investigations and prosecutions.

3

## BACKGROUND

Plaintiff Slahi is an alien who is currently detained by DoD at Guantanamo as an enemy combatant, which is defined as an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. *See* CSRT Implementation Order (July 14, 2006), Encl. (1), sec. B. (available at http://www.defenselink.mil/news/Combatant_Tribunals.html); Declaration of William T. Kammer ["Kammer Decl."], ¶ 3. By letter dated May 26, 2005, plaintiff's counsel in his habeas corpus case submitted a FOIA request to DoD's FOIA office seeking "records relating to Mohamedou Ould Slahi aka Mohammedou Ould Salahi, born in Mauritania in approximately 1970." Kammer Decl., ¶ 4, Ex. A. The request includes "memoranda, inter-agency communications, case summaries, notes, indexes, jottings, message slips, letters, facsimile transmissions, diaries, E-Mails and calendars." *Id.*

On or about June 30, 2005, DoD's FOIA office informed plaintiff's counsel that it had referred the FOIA request to Southern Command, the DoD component that encompasses Joint Task Force-Guantanamo. *Id*. ¶ 5, Ex B. Southern Command acknowledged receipt of the FOIA request on July 13, 2005. *Id*. ¶ 5. Plaintiff's counsel later wrote Southern Command on January 3, 2006 that she was particularly interested in plaintiff's medical records. *Id.* ¶ 6; Declaration of Rear Admiral Mark H. Buzby ["Buzby Decl."], ¶ 5.

On March 31, 2006, while DoD was still processing plaintiff's FOIA request, plaintiff filed the present action, alleging that DoD has improperly withheld responsive agency records. *See* Compl. ¶ 1. On or about April 14, 2006, Southern Command informed plaintiff's counsel

4

that it had located approximately 600 documents[1] responsive to her request, which had been

referred to DoD's FOIA office for further review, and that Southern Command was still working

on the request for plaintiff's medical records.  Kammer Decl. ¶ 8.  Subsequently, on April 20,

2006, Southern Command advised plaintiff's counsel that it had located approximately 200 pages

of medical records, which similarly had been referred to the DoD FOIA office for further review.

*Id.*

On May 31, 2006, DoD released to plaintiff's counsel a redacted version of the medical

records.  *See* Declaration of Jean Lin ["Lin Decl."], Ex. 1.  On July 28, 2006, DoD, through

counsel, requested that plaintiff's counsel remit $252 for the search and reproduction of those

records as well as for some 30 pages of material to be released on August 1, 2006.  *See* Lin Decl.,

Ex. 2.   In addition, DoD informed plaintiff that it had located approximately 600 other

documents which would be almost wholly redacted and that the cost for reproducing those

documents would be $.15 per page.  *Id.*  Pursuant to regulation, DoD requested that the fee for

those 600 documents be paid in advance.  *Id.*  Plaintiff's counsel declined, however, to pay the

requested $252 because she previously had asked for advance notice if the reproduction fee was

to exceed $25, and DoD did not provide such notice.  *See* Lin Decl., Ex. 3.  Plaintiff's counsel

further stated that she had no interest in receiving the approximately 600 documents at that time.

*Id.*  Thereafter, on August 1, 2006, DoD released to plaintiff's counsel 22 pages (previously

estimated at approximately 30 pages) of partially redacted documents.  *See* Lin Decl., Ex. 4.

---

[1]  The number of pages was initially estimated to be 1,200, and later 2,500.  The
estimated number of documents, however, was consistently approximately 600.  Ultimately, the
actual number of pages was determined to be 1,560.  *See* Kammer Decl., ¶ 15.  To avoid
confusion, this brief will use the estimated number of documents in discussing responsive
documents located by Southern Command.

On May 17, 2007, after certain litigation activities in this case, including the stay, dismissal and reinstatement of this case, DoD advised plaintiff's counsel that it would accept a payment of $25, in lieu of the assessed $252, for the materials already produced to plaintiff.  *See* Lin Decl., Ex. 5.  DoD again reminded plaintiff's counsel that if she wished to receive the approximately 600 documents located in Southern Command, she would need to pay the reproduction cost in advance.  *See* Lin Decl., Ex. 5.

   On May 21, 2007, plaintiff's counsel remitted $25 to DoD, and requested a full waiver of additional fees for the approximately 600 Southern Command documents and for records of any polygraph examinations and interrogations logs if those documents were not among the already identified documents.  *See* Kammer Decl., ¶ 10; Lin Decl., Ex. 6.  The parties ultimately resolved the fee issue on June 28, 2007, and agreed to an extension of time to allow DoD to process the 600 documents already located, and to conduct the additional search regarding records of interrogations logs and polygraph examinations.  Kammer Decl., ¶¶ 11-12.

Before DoD filed its extension motion, plaintiff's counsel raised for the first time that she wished DoD to search for responsive documents in DoD components beyond U.S. Southern Command.  *Id.* ¶ 13.  As DoD previously had requested on several occasions, *see* Lin Decl., Ex. 2, 5, plaintiff's counsel committed to pay for such searches on June 29, 2007,[2] and the parties

_____

   [2]  DoD previously had provided plaintiff with a chart listing the record systems most likely to have the largest number of responsive records concerning detainees held at Guantanamo Bay, Cuba.  *See* Lin Decl., Ex. 5.  The chart informed plaintiff that DoD does not maintain a uniform or centralized record system, and thus, a thorough search based on the record descriptions contained in a plaintiff's FOIA request may require searches at multiple organizations, commands or offices.  *See id.*  The chart also set forth DoD's established search rates per hour for different levels of DoD personnel and the estimated average search times for different DoD organizations and commands.  *See id.*  Plaintiff's counsel requested on June 29, 2007 that all DoD components listed on the chart be searched.  *See* Kammer Decl., ¶ 13.

agreed to a 60 day stay.  Kammer Decl., ¶ 13.  DoD also agreed, in the meantime, to produce

responsive, nonexempt documents to plaintiff as they become available on a rolling basis.  *Id.*

On July 3, 2007, this Court granted a 60-day stay.  Plaintiff's counsel, however, moved to

vacate the stay on August 14, 2007, because she had not yet received any of the 600 Southern

Command documents.  In the meantime, on August 24, 2007, DoD produced 205 partially

redacted pages from the approximately 600 documents found at Southern Command, and on or

about September 4, 2007, it produced another 247 pages.  *See* Kammer Decl., ¶ 15.

By Order dated September 4, 2007 (dkt. #17), this Court ordered DoD to complete its

production of Southern Command documents by September 17, 2007, and to file a dispositive

motion with respect to any withheld information by October 1, 2007.  The next day, the Court

granted DoD's motion clarifying that the October 1, 2007 dispositive motion need only cover (1)

those 600 documents located in Southern Command, which were the central focus of plaintiff's

motion to vacate, and (2) certain medical records and other materials also located in Southern

Command that were released to plaintiff in 2006.  (Dkt. #18).  DoD is also to propose a

production and briefing schedule by October 1, 2007 with respect to materials located or to be

located in other DoD components.  (Dkt. #18).

On or about September 17, 2007, DoD produced the remainder of the approximately 600

Southern Command documents.  Kammer Decl., ¶ 15.  The total number of pages for the

approximately 600 documents is 1,560.  *Id.*  DoD now files this motion for partial summary

judgment with respect to information withheld from those pages and from the approximately 200

pages of medical records and 22 pages of other material released to plaintiff's counsel in 2006.

In addition, this motion addresses four polygraph documents, and some additional 13 documents

recently located in Southern Command relating to interrogation plans.  DoD's status report regarding the other DoD components is being filed separately.

## ARGUMENT

**DEFENDANT IS ENTITLED TO PARTIAL SUMMARY JUDGMENT WITH RESPECT TO SOUTHERN COMMAND BECAUSE IT HAS CONDUCTED A REASONABLE SEARCH AND HAS WITHHELD ONLY INFORMATION EXEMPT FROM DISCLOSURE UNDER FOIA**

## I.    STANDARD OF REVIEW

FOIA generally mandates disclosure, upon request, of government records held by an agency of the federal government except to the extent such records are protected from disclosure by one of nine exemptions.  "[P]ublic access to Government documents" is the "fundamental principle" that animates FOIA.  *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989). The Act is designed "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978).  At the same time, Congress recognized "that legitimate governmental and private interests could be harmed by release of certain types of information and provided nine specific exemptions under which disclosure could be refused."  *FBI v. Abramson*, 456 U.S. 615, 621; *see also* 5 U.S.C. § 552(b). While these exemptions are to be "narrowly construed," *Abramson*, 456 U.S. at 630, courts must not fail to give the exemptions "meaningful reach and application."  *John Doe Agency*, 493 U.S. at 152.  The FOIA thus "represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential." *Center for Nat'l Sec. Studies v. Department of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003).

8

Summary judgment is the procedure by which courts resolve nearly all FOIA actions. "In order to obtain summary judgment the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). "There is no requirement that an agency search every record system." *Id.* Failure to uncover a responsive document does not render the search inadequate; "the issue to be resolved is not whether there might exist any . . . documents possibly responsive to the request, but rather whether the search for those documents was adequate." *Weisberg v. Department of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (internal quotations omitted); *see also Meeropol v. Meese,* 790 F.2d 942, 952-53 (D.C. Cir.1986) (search is not presumed unreasonable simply because it fails to produce all relevant material); *Perry v. Block,* 684 F.2d 121, 128 (D.C. Cir. 1982) (agency need not demonstrate that all responsive documents were found and that no other relevant documents could possibly exist).

In evaluating the adequacy of a search, courts accord agency affidavits "a presumption of good faith which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Services, Inc. v. SEC,* 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks and citation omitted); *see also Grounds Saucer Watch v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981) (same). Declarations should be "sufficiently detailed," but "[t]he standard, however, is not 'meticulous documentation [of] the details of an epic search.'" *Texas Independent Producers Legal Action Ass'n v. IRS*, 605 F. Supp. 538, 547 (D.D.C. 1984) (*Perry*, 684 F.2d at 127). "[A]ffidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with

9

the obligations imposed by the FOIA." *Meeropol,* 790 F.2d at 952.

As for sustaining its burden of justifying nondisclosure of information, *see* 5 U.S.C. § 552(a)(4)(B), the agency must provide declarations that identify the information at issue and the bases for the exemption(s) claimed. *See Summers v. Department of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998). Courts review *de novo* the agency's use of a FOIA exemption to withhold documents. *Wolf v. C.I.A*, 473 F.3d 370, 375 (D.C. Cir. 2007). "Yet in conducting *de novo* review in the context of national security concerns, courts must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record." *Id.* (citations and internal quotation marks omitted) (emphasis in original); *see also Krikorian v. Dep't of State,* 984 F.2d 461, 464 (D.C. Cir. 1993) (noting deference to expertise of agencies engaged in national security and foreign policy). Indeed, "[s]ummary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail" and "are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Wolf*, 473 F.3d at 375 (citations and internal quotation marks omitted). Moreover, "a reviewing court 'must take into account . . . that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm.'" *Id.* (quoting *Halperin v. CIA,* 629 F.2d 144, 149 (D.C. Cir. 1980)). "Ultimately, an agency's justification for invoking a exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.*

As discussed below, DoD's declarations demonstrate that DoD has fully satisfied its burden under FOIA.

10

## II.    DOD HAS CONDUCTED A REASONABLE SEARCH OF SOUTHERN COMMAND

As the accompanying agency declarations demonstrate, DoD has conducted a search reasonably calculated to locate all records responsive to plaintiff's FOIA request.  In June 2005, DoD's FOIA office referred plaintiff's FOIA request to Southern Command because it had determined that the requested records, if they existed, were likely in the possession of that DoD component.  Kammer Decl., ¶ 5.  Southern Command, the parent command of JTF-GTMO, in turn, determined that responsive records most likely are located in JTF-GTMO's records.  Buzby Decl., ¶ 5.  Thus, in July 2005, Major General Jay W. Hood, then the Commander of JTF-GTMO, tasked all divisions within JTF-GTMO reasonably likely to have responsive records to search for such records; these divisions included the Joint Medical Group, the Joint Detention Group, the Joint Intelligence Group, and the Staff Judge Advocate's Office.  *Id.* ¶¶ 5-10.  All four divisions were directed to conduct searches reasonably calculated to retrieve all records responsive to plaintiff's request, including manual and/or electronic searches of both classified and unclassified records.  *Id.* ¶ 6.

On February 23, 2006, the Joint Medical Group located approximately 200 pages of medical records pertaining to plaintiff, after conducting manual and electronic searches of all the medical records maintained by the JMG.  *Id.* ¶ 7.  On or about September 30, 2005, the Joint Detention Group, whose function is to ensure the security and safety of the detainees and JTF-GTMO personnel, and the humane treatment of detainees, located approximately 30 pages of detention records relating to plaintiff.  *Id.* ¶ 8.  It had conducted manual and electronic searches of all the detention records maintained by the JDG.  *Id.*  Then, on or about October 28, 2005, the

11

Staff Judge Advocate's office, which provides legal counsel in support the JTF-GTMO mission, found 8 responsive documents after searching the electronic database for documents referencing plaintiff. *Id.* ¶ 10.

The vast majority of the responsive records, however, was found in the Joint Intelligence Group ("JIG"), whose function is to conduct strategic counter-terrorism interrogation operations, detainee assessments, all-source analysis and productions, and detainee screening operations to collect and exploit intelligence in support of the Global War on Terror. *Id.* ¶ 9. Utilizing a search feature in JTF-GTMO's intelligence database, JIG personnel searched for documents referencing plaintiff and found approximately 600 documents. *Id.* Further, on May 24, 2007, after plaintiff's counsel further requested records of polygraph examinations and "interrogation logs," *see* Lin Decl., Ex. 6, JIG was tasked to conduct a supplemental search because it has primary responsibility for conducting interrogations and assessing the results of interrogations. Buzby Decl., ¶ 11. JIG conducted a manual and electronic search of its records and found 4 polygraph documents. *Id.* It did not find any "interrogation logs." *Id.*[3]

As the above discussion makes clear, DoD has conducted a reasonable search of Southern Command in response to plaintiff's FOIA request.

---

[3] In July 2007, while JTF-GTMO was in the process of examining documents for production, it located 13 "interrogation plans" relating to plaintiff which it did not locate during its prior search. JTF-GTMO processed those documents and referred them to DoD's FOIA office on September 24, 2007 for further review. The releasable portions of these documents are being produced on or about October 1, 2007. *See* Buzby Decl., ¶ 12.

## III.    DOD HAS PROPERLY WITHHELD INFORMATION PURSUANT TO FOIA EXEMPTIONS

### A.    DoD Properly Withheld Information Under Exemption 1

The vast majority of the Withheld Information falls within Exemption 1, which protects records that are:  (A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy, and (B) in fact properly classified pursuant to an Executive Order.  5 U.S.C. § 552(b)(1).  The relevant Executive Order ("E.O.") is E.O. 12958, "Classified National Security Information," as amended.[4]  Information may be classified pursuant to E.O. 12958 if it meets the following four conditions:

(1)    an original classification authority is classifying the information;

(2)    the information is owned by, produced by or for, or is under the control of the United States Government;

(3)    the information falls within one or more of the categories of information listed in section 1.4 of th[e] order; and

(4)    the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

E.O. 12958, § 1.1(a).  Substantial weight is accorded to an agency's determination that potential harm merits classification of particular information, and a court should be reluctant to second-guess such agency determinations in a national security FOIA case.  *See, e.g., Students Against Genocide v. Dep't of State*, 257 F.3d 828, 837 (D.C. Cir. 2001); *Frugone v. CIA*, 169 F.3d 772,

---

[4]  Executive Order 12958 was amended by Executive Order 13292.  *See* E.O. 13292, 68 Fed. Reg. 15315 (Mar. 25, 2003).  All citations in this brief to Executive Order 12958 are to the Order as amended.

13

775 (D.C. Cir. 1999); *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990); *Taylor v. Dep't of the Army*, 684 F.2d 99, 109 (D.C. Cir. 1982); *Military Audit Project*, 656 F.2d at 745; *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980).

Moreover, the Court should be mindful that classification decisions are not made in a vacuum, but must be examined in the context in which the information is found. While it is true that whenever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter, the inherent risk of disclosure involved in trying to separate classified and unclassified information is significant. As the D.C. Circuit put it: "[t]housands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate." *Halkin v. Helms*, 598 F.2d 1, 8 (D.C. Cir. 1978); *cf. Center for Nat'l Sec. Studies*, 331 F.3d at 928-29 (in deferring to agency determination that withheld information would allow knowledgeable persons to piece together a "composite picture" of September 11 investigation and enable terrorists to evade investigation and devise countermeasures, court states that "[w]hile the name of any individual detainee may appear innocuous or trivial, it could be of great use to al Qaeda in plotting future terrorist attacks or intimidating witnesses in the present investigation"). Thus, facts that are in isolation unclassified, may be classified because when aggregated and discussed in the context of the responsive records, they would reveal another underlying fact, association, or relationship that is classified. *Halperin*, 629 F.2d at 150 (observing that "[e]ach individual piece of intelligence information, much like a piece of a jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself"); *see also* E.O. 12958, § 1.7(e).

14

All of the Southern Command information withheld by DoD pursuant to Exemption 1 was properly classified by an original classification authority at the time of plaintiff's FOIA request and remains so today.  *See* Buzby Decl., ¶¶ 16, 20, 25, 33, 38, 39, 45; E.O. 12958, § 1.1(a)(3)-(4).  The vast majority of that information concerns "intelligence activities" or "intelligence sources or methods" within the meaning of E.O. 12958, § 1.4(c).  The remainder consists of information provided by a foreign government within the meaning of E.O. 12958, § 1.4(b).  As set forth below, the original classification authority, Rear Admiral Buzby, has determined that the disclosure of the information withheld under Exemption 1 in this case could be expected to result in damage to the national security.

### 1.    Intelligence Data About Slahi, His Activities and Other Individuals or Organizations

Certain of the Withheld Information consists of JTF-GTMO's compilation of intelligence data about Slahi and summaries regarding that data.  Buzby Decl., ¶ 23.  Such intelligence data includes Slahi's biographical information; his travel; his affiliations with individuals and organizations of intelligence interest; how those affiliations came about; the actions he took while associated with those individuals and organizations; his activities in support of those organizations; information about those individuals and organizations; the circumstances of Slahi capture; and the circumstances and date of his transfer to Guantanamo.  *Id.* ¶¶ 23, 26a.

Disclosure of this data reasonably could be expected to damage the national security because it would reveal details about the intelligence DOD has gleaned regarding individuals and organizations of intelligence interest, the sources of that intelligence, and the specific information obtained from such sources.  *Id.* ¶ 26.  Revealing the extent of intelligence gathered concerning

Slahi would show, among other things, what the United States knows about certain individuals and organizations; what the government does not know; and the leads it followed or did not follow based on the intelligence it obtained. *Id.* ¶ 26b. It would also reveal intelligence concerning other individuals and organizations, which then could be pieced together with other information that has entered the public domain to reveal details about the government's intelligence. *Id.* ¶ 26a. Similarly, release of information about the circumstances of Slahi's capture and the date of his transfer to Guantanamo, if pieced together with other, similar information about other detainees, would provide a composite picture of how detainees come into U.S. custody, which detainees were transferred to Guantanamo on which dates and through what means, and the routing of planes and movement of detainees on the ground in the theater of operations. *Id.* ¶ 26c. Ultimately, release of the withheld intelligence data would aid persons hostile to the United States in hiding their activities, finding other means to thwart the United States' intelligence-gathering efforts, evading capture by U.S. authorities, and otherwise frustrating U.S. counterterrorism efforts. *Id.* ¶ 26d.

Additionally, if the withheld intelligence data were released publicly, it would reveal the sources of government intelligence about Slahi and other persons and organizations. *Id.* ¶ 27. As explained in the declaration of Rear Admiral Buzby, human intelligence is the most essential piece of the strategic intelligence being gathered in the Global War on Terrorism. *See id.* ¶¶ 28-29. The cooperation of human intelligence sources is an indispensable requirement in the fight against terrorist activity.[5] Releasing the withheld intelligence data would reveal publicly who has

---

[5] As Rear Admiral Buzby discussed in his declaration, in strategic interrogations such as those conducted at JTF-GTMO, the cooperation of human intelligence sources is crucial to the on-going human intelligence efforts. Detainees at JTF-GTMO continue to provide useful

cooperated with interrogators at Guantanamo and elsewhere, and the information they provided. *Id.* ¶ 27. It would place those sources, or individuals who are perceived by others as sources, at risk of retribution. *Id.* It would also dissuade other sources from cooperating with ongoing intelligence collection efforts, thus impeding the government's ability to gather actionable intelligence. *Id.* ¶¶ 27-29.

The potential chilling effect on human intelligence collection is not theoretical. Cooperating Guantanamo detainees have specifically voiced concerns for their families' safety, as well as their own, as a result of their cooperation or perceived cooperation with the U.S. government. Such detainees often request that they not be associated with the information they are providing or identified as the source of the information. *Id.* ¶¶ 14, 30. While such concerns arise in a variety of settings in which the government relies on cooperating witnesses, they are particularly acute in the context of sources linked to terrorist activity. *Id.* ¶ 31. Intelligence sources can be expected to furnish information only when confident that they are protected from retribution through the secrecy surrounding their relationship to the U.S. government. *Id.* Alleviating cooperating individuals' perceived or genuine concerns about reprisal is an essential

---

information about a variety of subjects, including how al Qaeda, the Taliban and other terrorist organizations are organized and funded; their leadership structures; how these organizations recruit, train and retain members; and how they plan, command and control their operations. These detainees also continue to provide useful intelligence about the physical areas of operations in which the Global War on Terrorism is conducted; the locations of training facilities and safe houses; travel patterns and routes used for smuggling people and equipment; and the identities of newly-captured fighters. The Joint Intelligence Group gains useful information from detainees on nearly a daily basis. Some of this information contributes pieces to the mosaic of how terrorist organizations operate. Other information supports real-time operations in the ongoing war. Given the nature of JTF-GTMO's intelligence operations, even individuals who have been detained for a period of years continue to possess and provide information that is useful to the U.S. government and its allies in the Global War on Terrorism. *See* Buzby Decl. ¶ 15.

part of developing human intelligence sources and gathering useable information. *Id.*

For all of these reasons, the withheld intelligence data discussed above is properly classified and protected from disclosure under Exemption 1. *See Schrecker v. U.S. Dep't of Justice*, 254 F.3d 162, 166 (D.C. Cir. 2001) (upholding Exemption 1 withholding based on FBI determination that "release of the information in question would damage national security by dissuading current and future sources from cooperating"); *Hogan v. Huff*, No. 00 Civ. 6753, 2002 WL 1359722, at *8 (S.D.N.Y. June 21, 2002) (sustaining withholding of information "fall[ing] into the category of intelligence activities that were compiled through interviews with intelligence sources").

### 2.    Intelligence Assessments and Conclusions

The Withheld Information also includes intelligence assessments and conclusions reached by analysts and other personnel at JTF-GTMO and Southern Command pertaining to Slahi and other individuals and organizations of intelligence interest. This includes assessments and conclusions concerning Slahi's intelligence value and threat level, as well as assessments of intelligence data obtained from particular intelligence sources. *See* Buzby Decl., ¶ 33.

As explained by Rear Admiral Buzby, these assessment and conclusions are vital to DoD's assessment of Slahi's activities and to its ongoing efforts to obtain intelligence on other individuals and organizations. Disclosure of the information, especially in conjunction with the specific intelligence data that is necessarily intertwined with them, would reveal how analysts evaluate intelligence information and the conclusions they reach. Specifically, an analyst's selection of or emphasis on particular intelligence data in his assessment would reveal what intelligence was important to the United States as well as how the government analyzes

intelligence in general. Knowledgeable individuals could discern the methods used by the government to make intelligence value and threat level assessments concerning Guantanamo detainees and others. Revelation of those internal methods would in turn reveal a critical aspect of DoD's intelligence activities and permit persons hostile to the United States to tailor their behavior to thwart the government's intelligence gathering and to circumvent U.S. counterterrorism efforts. *See* Buzby Decl., ¶ 33.

Accordingly, the withheld intelligence assessments and conclusions are properly classified and exempt from disclosure under Exemption 1. *See Wolf v. CIA*, 473 F.3d 370, 376-77 (D.C. Cir. 2007) (upholding CIA's refusal to confirm or deny Agency interest in foreign national because doing so "could damage sources and methods by revealing CIA priorities, thereby providing foreign intelligence sources with a starting point for applying countermeasures against the CIA and thus wasting Agency resources").

### 3.    Information Concerning Intelligence Methods

Information reflecting intelligence methods used by JTF-GTMO personnel in gathering, analyzing, and coordinating intelligence data has also been withheld under Exemption 1. Included in this category of withholdings are interrogation techniques and plans; tools and methods for analyzing intelligence data; tools and requirements for coordinating intelligence gathering and analysis among DoD components and other agencies; and plans for further intelligence gathering based on specific intelligence data obtained from intelligence sources. *See* Buzby Decl., ¶ 37.

Intelligence methods are the means by which the Joint Intelligence Group at JTF-GTMO and other intelligence agencies collect intelligence data to support military operations and to

19

assess and counter terrorist and military threats.  These methods and practices must be protected

because their public release would be of material assistance to those who seek to penetrate,

detect, prevent, avoid or otherwise damage the intelligence operations of the United States.  The

actual loss to the United States if such methods are revealed is not only the cost of developing the

initial methods, but also the loss of intelligence while new methods are being developed.  *See*

Buzby Decl., ¶ 39a.  In particular, public disclosure of specific methods used with sources of

human intelligence, whose identities are themselves classified as described above, would allow

individuals of intelligence interest to anticipate and immunize themselves from those methods.

Of particular concern is an individual's ability to anticipate particular interrogation techniques.

The Withheld Information includes interrogation techniques used in connection with sources of

human intelligence.  *Id.* ¶ 39a.

Similarly, the government's methods of coordinating intelligence gathering and analysis

among agencies and components are central to its effort to counter acts of terrorism and support

military operations.  Effective military and counterterrorism strategy depends on the coordination

of intelligence gathering among agencies and components responsible for gathering and

analyzing intelligence data.  Revealing the nature of that coordination and how agencies and

components work together could reveal their areas of relative competence or the distinct

intelligence tools they employ, thereby permitting persons hostile to the United States to tailor

their behavior and adopt means to thwart the government's counterterrorism efforts.  *See id.* ¶ 40.

For all of these reasons, the withheld intelligence methods are properly classified and

exempt from disclosure under Exemption 1.  *See, e.g., Hogan*, 2002 WL 1359722, at *8

(upholding Exemption 1 withholding of information that "would potentially harm the agency by

exposing its methods").

### 4.    Codes Indicating Intelligence Sources or Other Intelligence Information

The Withheld Information also contains internal codes that reflect sources of intelligence, intelligence activities, and the interplay between various U.S. government agencies in collecting intelligence.  Buzby Decl., ¶¶ 43, 45.  This includes classification codes, which generally appear near the bottom of a page; codes indicating intelligence sources or information; encoded titles of exhibits used in Slahi's Combatant Status Review Tribunal and Administrative Review Board proceedings;[6] and codes describing a type of communication.  *Id.* ¶ 43.  If these codes were to be made public, abbreviations contained in the codes, which in some cases resemble the information they are meant to stand for, could reveal the sources of intelligence.  *Id.* ¶ 45.  Those abbreviations could also be pieced together with other public information to identify the significance of the codes to DoD's intelligence activities.  *Id.*

Accordingly, these internal codes are properly classified and exempt from disclosure under Exemption 1.  *See, e.g. Jones v. FBI*, 41 F.3d 238, 244 (6th Cir. 1994) ("numerical designators that are exclusively assigned to national security sources" properly withheld under Exemption 1 because "disclosure of this information could reveal the identity of national security sources reporting foreign counterintelligence information to the FBI").

---

[6]  A CSRT determines whether a detainee may be properly classified as an enemy combatant; while an ARB determines whether an enemy combatant may be released or transferred from United States custody.  *See* Buzby Decl., ¶ 59; See Implementation of Administrative Review Board Procedures (July 14, 2006) (available at http://www.defenselink. mil /news/Combatant_Tribunals.html); CSRT Implementation Order (July 14, 2006), Encl. (1), sec. B. (available at http://www.defenselink.mil/news/Combatant_ Tribunals.html).

### 5.    Identification Photographs of Slahi

The Withheld Information contains several identification photographs of Slahi taken during his detention at Guantanamo.  Buzby Decl. ¶ 13.  At the direction of Rear Admiral Buzby, photographs clearly identifying the face of a Guantanamo detainee are classified at the SECRET level.  *Id.* ¶¶ 13, 16.  As determined by Rear Admiral Buzby, official public release of U.S. government photographs of detainees that depict their detention in U.S. custody is likely to deter current and future intelligence sources, including detainees currently held at Guantanamo and elsewhere, from providing intelligence information to the United States, thus substantially impeding U.S. intelligence collection efforts.  *Id.* ¶ 16.

This is so because the public release by the government would negatively impact the government's ability to provide assurances of confidentiality to future human intelligence sources and send a message that detainees who cooperate and provide information cannot be protected.  *Id.* ¶¶ 16, 17.  The process of gaining actionable intelligence from a human intelligence source is built around trust and confidentiality, and a key part of those sources' comfort in providing information is a sense of anonymity.  *Id.* ¶ 29.  Indeed, some of the Guantanamo detainees have used multiple names and aliases in the past to conceal their real identities.  *Id.* ¶ 30.  As discussed before, people who cooperate with capturing authorities are subject to reprisals from those who believe the source provided information about them, and concern about these reprisals and retaliation are particularly acute in the case of individuals linked to terrorist activity.  *Id.* ¶ 14.

As one court has held, "release of the photos would allow conclusive identification of some such detainees in a manner that disclosure of names and other identifying information

would not," and "would both increase the risk of retaliation against the detainees and their

families and exacerbate the detainees' fears of reprisal, thus reducing the likelihood that

detainees would cooperate in intelligence-gathering efforts."  *See Associated Press v.*

*Department of Defense*, 462 F. Supp. 2d 573, 575-76 (S.D.N.Y. 2006).  Accordingly, the

photographs are properly classified and exempt from disclosure under Exemption 1.

### 6.    Cell Location

The information withheld under Exemption 1 also includes the cell block and number

where Slahi resides, which is classified at the SECRET level.  Rear Admiral Buzby has

determined that releasing the precise location of where Slahi is housed within the detention

facility would create an undue security risk.  Detainees in Guantanamo are all enemy combatants

associated with al-Qaeda and the Taliban.  These organizations remain engaged in hostilities

against the United States.  Releasing the precise location of given detainees within the

Guantanamo detention facilities reduces the difficulty that such groups would have in forcibly

freeing such detainees, thereby increasing the risk that such an act could occur.  *See* Buzby Decl.

¶ 18.  Accordingly, the information is properly withheld under Exemption 1.

### 7.    Information Provided by a Foreign Government

Certain of the Withheld Information consists of information provided by a foreign

government about Slahi.  As part of its ongoing intelligence gathering operations, JTF-GTMO

routinely solicits and receives information from foreign governments about detainees, including

intelligence and law enforcement information.  Such information is provided to JTF-GTMO in

confidence and with the expectation that it will not be publicly released by DoD.[7]  Official public

release of such information, in contravention of such expectations of confidentiality, would

substantially impair DoD's ability to secure cooperation by foreign governments in providing

information about detainees or otherwise.  Foreign governments will be less likely to cooperate

with U.S. intelligence collection and other counterterrorism efforts if they cannot be confident

that the information they provide will be safeguarded and remain confidential.  A decrease in

cooperation by foreign governments, in turn, would severely hamper the United States'

counterterrorism efforts.  *See* Buzby Decl., ¶ 20.

Indeed, under Executive Order 12958, "[t]he unauthorized disclosure of foreign

government information is presumed to cause damage to the national security."  E.O. 12958,

§ 1.1(c).  The foreign government information withheld by DoD therefore is properly classified

and falls within Exemption 1.  *See Krikorian v. Dep't of State*, 984 F.2d 461, 464-65 (D.D.C.

1993) (State Department properly withheld under Exemption 1 information communicated by

foreign governments "on a confidential basis," release of which "would, in the Department's

judgment, jeopardize 'reciprocal confidentiality' and damage national security"); *ACLU v. FBI*,

429 F. Supp. 2d 179, 188 (D.D.C. 2006) (upholding FBI's withholding of information "to

prevent the identification of . . . cooperating foreign governments"); *Judicial Watch v. U.S. Dep't

of Justice*, 306 F. Supp. 2d 58, 65-66 (D.D.C. 2004) (telegrams properly withheld under

Exemption 1 because disclosure "could adversely affect the persons involved, inhibit the

---

[7]  This category of withheld information is also protected from disclosure under
Exemption 3, which protects matters "specifically exempted from disclosure by statute . . ."  5
U.S.C. § 552(b)(3).  *See* Buzby Decl. ¶ 25.  The relevant statute is 10 U.S.C. § 130c, which
permits the Secretary of Defense to withhold from public disclosure otherwise required by law
any sensitive information provided to DoD by a foreign government in confidence.

willingness of corporate and foreign government officials to discuss frankly with the U.S.

government officials matters affecting our national interests, and damage relations with the

Dominican Republic"); *McErlean v. Dep't of Justice*, No. 97 Civ. 7831, 1999 WL 791680, at *5

(S.D.N.Y. Sept. 30, 1999) (FBI properly withheld under Exemption 1 documents that "identify

by name components of specific foreign governments and contain[] classified information

originated and provided to the FBI by these components").

### 8.    Information Related to Military Plans and Operations

Finally, DoD has also withheld under Exemption 1 information related to military plans

and operations against hostile forces and the operation of detention facilities by JTF-GTMO.

The information is classified at the SECRET level and properly withheld under Exemption 1

because  release of this information could permit hostile entities to determine the effectiveness

and vulnerabilities in the military operations in the United States and abroad, including

Guantanamo.  Buzby Decl., ¶ 18.

### B.    DoD Properly Withheld Information Under Exemption 2

DoD has withheld information also under Exemption 2, which information overlaps to a

significant extent with the classified information already withheld under Exemptions 1 and 7.

Exemption 2 covers matters "related solely to the internal personnel rules and practices of an

agency," if the "disclosure may risk circumvention of agency regulation[8] . . . ." 5 U.S.C.

---

[8]  The reference to circumvention of agency regulation in Exemption 2 has been
interpreted to cover circumvention of an agency's law enforcement function.  *See, e.g., Blanton
v. Dep't of Justice*, 63 F. Supp. 2d 35, 43 (D.D.C. 1999) (Exemption 2 properly invoked to
withhold information "the release of which might provide the public with insight into the internal
handling of investigations involving race crimes" (internal quotation marks omitted)); *see also
infra,* note 9.

§ 552(b)(2). *Sussman v. U.S. Marshals Service*, 494 F.3d 1106, 1112 (D.C. Cir. 2007) (quoting

*Schwaner v. Dep't of the Air Force,* 898 F.2d 793, 795 (D.C. Cir. 1990)); *see also Crooker v.*

*Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1074 (D.C. Cir. 1981) (en banc).  The

information must be predominantly internal.  *Sussman*, 494 F.3d at 1112.

     Here, DOD has withheld three categories of information under Exemption 2:  (1)

classified intelligence assessments, methods and codes; (2)  instructions for the handling of

sensitive information; and (3) details of disciplinary actions.  This Withheld Information reflects

guidelines and procedures internal to the government, which, if revealed, could allow persons

hostile to the United States to tailor their behavior to thwart the government's intelligence

gathering and circumvent the United States' counterterrorism efforts.  *See* Buzby Decl., ¶ 34.

### 1.    Intelligence Assessments, Methods and Codes

     The first category of Exemption 2 withholdings includes intelligence codes and methods,

and assessments regarding Slahi and other individuals' and organizations' intelligence value and

threat level, *see* Buzby Decl. ¶¶ 33- 34, 42, 46, all of which are classified as discussed, *supra*, in

Section III.A., subsections 2, 3 and 4.  As determined by Rear Admiral Buzby, disclosure of

assessments of individuals' and organizations' intelligence value and threat level would reflect

how the government analyzes intelligence in general, and in particular, the guidelines used by

JTF-GTMO and Southern Command to make intelligence assessments.  *Id.* ¶ 35.  Similarly, the

disclosure of intelligence methods – such as interrogation techniques and plans, methods for

analyzing intelligence data, and plans for further intelligence gathering – would reveal internal

guidelines and practices for gathering and analyzing intelligence.  *Id.* ¶¶ 37, 42.  As for the

classification codes, which is "purely for internal use," *id.* ¶ 46, they could reveal sources of

intelligence, intelligence activities, and the interplay between various government agencies in collecting intelligence, because the abbreviations contained in the codes sometimes resemble the information for which they are meant to stand. *Id.* ¶ 45.

Thus, for example, DoD has withheld the non-numeric portion of plaintiff's full internment serial number because it contains information specific to the detainee that is used to identify certain information pertinent to detainee operations and intelligence-gathering operations. *Id.* ¶ 49. Internment serial numbers, or "ISNs," are identifying numbers unique to a detainee, analogous to a social security number. *Id.* A full ISN is a 12-digit alpha numeric identifier that incorporates certain abbreviated information about the detainee. *Id.* DOD also uses shortened ISNs consisting of 3 or 4 digits to identify detainees. *Id.* Plaintiff's shortened ISN has been released his counsel. *Id.* ¶ 50. The remainder of the full ISN is withheld because ISNs are often used in intelligence message traffic and reports to identify a particular detainee as a source for information. *Id.* Disclosure of the full ISN to the public could allow knowledgeable persons to cross-reference these detainee numbers with other information in the public domain in order to identify (1) specific detainees, (2) DoD personnel associated with detainee operations and intelligence gathering activities, and (3) other individuals mentioned in other DoD documents, thereby potentially impeding JTF-GTMO detention and intelligence gathering operations. *Id.*

Accordingly, the information is properly withheld under Exemption 2. *See, e.g., Massey v. FBI*, 3 F.3d 620, 622 (2d Cir. 1993) (FBI properly withheld informant symbol numbers and other identifying source information under Exemption 2); *Blanton v. U.S. Dep't of Justice*, 63 F. Supp. 2d 35, 43 (D.D.C. 1999) (Exemption 2 properly invoked to withhold FBI source symbol

27

numbers and other identifiers and information about administrative practices and procedures "the release of which might provide the public with insight into the internal handling of investigations involving race crimes" (internal quotation marks omitted)).

### 2.   Instructions for Handling and Forwarding Sensitive Information

The second category of Exemption 2 information withheld by DoD is technical instructions relating to DoD's handling, sharing, and transmission of sensitive information contained in intelligence reports and messages. These instructions are purely internal to the U.S. government, as they provide agencies with guidance concerning dissemination of, and authorizations needed to disseminate, sensitive information. The release of this information would impede U.S. counterterrorism efforts because it would reveal which agencies have an interest in particular intelligence data; the agencies' relative competence and responsibilities; and their manner of interaction regarding intelligence data. *See* Buzby Decl., ¶ 47.

### 3.   Details of Disciplinary Actions

Under Exemption 2, DoD has further withheld details related to disciplinary actions taken against plaintiff as a result of his misbehavior in the detention facility, as well as plaintiff's overall discipline status. Buzby Decl., ¶ 50. Maintaining order and discipline among the detainee population is a critical law enforcement function of JTF-GTMO. DoD punishes violations of the detention rules and policies by various appropriate methods, including loss of comfort items, transfer to different parts of the camp, and restrictions on recreation opportunities. *Id.*¶¶ 50-51. These disciplinary procedures are the law enforcement mechanism used for governing and attempting to maintain discipline among alien enemy combatants. *Id.* ¶ 51. The

records documenting the detainees' misconduct are compiled and maintained in order to permit all guard personnel to be informed of detainees' past actions and to provide continuity in the disciplinary process. *Id.*

Rear Admiral Buzby has determined that disclosure of which types of discipline are taken in response to certain forms of detainee misbehavior would significantly risk enabling detainees or others to circumvent the discipline system at JTF-GTMO and impede the effectiveness of discipline enforcement activities. The matrix of disciplinary responses contained in the information withheld from plaintiff provides guidelines for responding to reported disciplinary infractions on a case-by-case basis, in order to assure an appropriate response consistent with maintaining safety and security for both detainees and guards. Because the specific discipline that is adjudged in a situation is dependent on a variety of factors, including the detainee's past disciplinary records and the specific facts of the situation, the action taken by military personnel in the case of one detainee may not be the same action taken in a similar case involving another detainee. However, releasing details about the specific application of these guidelines in specific disciplinary situations would enable detainees or others to use this information in an effort to force military personnel to alter the decisions made in other similar disciplinary situations. It also risks giving rise to disputes between and among detainees about punishments they have received relative to each other. This would significantly disrupt the good order and discipline that is necessary for the safe and secure operation of this wartime detention facility. *See* Buzby Decl., ¶ 52.

Accordingly, the details of the disciplinary actions taken against plaintiff are properly withheld under Exemption 2.

### C.    DoD Properly Withheld Information Under Exemptions 3 and 6

DoD has also withheld under Exemptions 3 and 6 information from the responsive records that identifies JTF-GTMO medical, detention and other personnel, including the names, military ranks, signatures and initials of these personnel. *See* Buzby Decl. ¶ 53.

Exemption 3 protects matters "specifically exempted from disclosure by statute . . . , provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). The exemption's "unmistakable thrust" is "to assure that basic policy decisions on governmental secrecy be made by the Legislative rather than the Executive branch." *Ass'n of Retired R.R. Workers, Inc. v. Railroad Retirement Bd.*, 830 F.2d 331, 333 (D.C. Cir. 1987). To determine whether a withholding of information is proper under Exemption 3, the court is first to determine whether the statute is one of exemption as contemplated by Exemption 3, and, if so, whether the information is covered by the statute. *CIA v. Sims*, 471 U.S. 159, 167 (1985); *Fitzgibbon v. CIA*, 911 F.2d 755, 761 (D.C. Cir. 1990). "[O]nce a court determines that the statute in question is an Exemption 3 statute, and that information requested at least arguably falls within the statute, FOIA *de novo* review normally ends." *Aronson v. I.R.S.*, 973 F.2d 962, 967 (1st Cir. 1992) (Breyer, C.J.).

Here, DoD has invoked 10 U.S.C. § 130b, which provides that the Secretary of Defense "may, notwithstanding section 552 of title 5, authorize to be withheld from disclosure to the public personally identifying information regarding . . . any member of the armed forces assigned to an overseas unit, a sensitive unit, or a routinely deployable unit." 10 U.S.C. § 130b(a)(1).

30

There is no question that this statute is an Exemption 3 statute because it specifically permits DoD to withhold the specified information notwithstanding the disclosure requirements of FOIA. Further, the withheld information, *i.e.,* the names, military ranks, signatures and initials of personnel at GTMO, is covered by the statute, which defines "personally identifying information" to include "the person's name, rank, duty address, and official title . . . ."  10 U.S.C. § 130b(c)(1).  Accordingly, DoD's withholding under Exemption 3 is proper.

Alternatively, the withheld personally identifying information at issue is protected from disclosure under Exemption 6, which allows the government to withhold information about individuals in "personnel and medical and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6). *See Department of State v. Washington Post Company*, 456 U.S. 595, 599-600 (1982) ("the primary concern of Congress in drafting Exemption 6 was to provide for the confidentiality of personal matters").  For this exemption to apply, the information at issue must be maintained in a government file and "appl[y] to a particular individual." *Id.* at 602.  Once this threshold requirement is met, Exemption 6 requires the agency to balance the individual's right to privacy against the public's interest in disclosure.  *See Department of the Air Force v. Rose*, 425 U.S. 352, 372 (1976); *see also Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991).

In this case, DoD has determined that the release of its personnel's personally identifying information would constitute an warranted invasion of the those individuals' privacy.   Buzby Decl., ¶ 54.  There is no legitimate public interest in the disclosure of such information because the information would not inform Slahi or the general public about how DoD performed its statutory duties.  *Id.*  The information is irrelevant to the work of the agency and cannot be said

to "reveal [anything] about an agency's own conduct." *See Department of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989). On the other hand, these DoD personnel have a legitimate privacy interest and personal safety interest (as they are involved in the detention of enemy combatants linked to al Qaeda or the Taliban during wartime) that would be threatened if the information identifying them is publicly disclosed. Accordingly, the information is properly withheld under Exemption 6.

### D.    DoD Properly Withheld Information from the Responsive Documents Pursuant to FOIA Exemption 5

DoD has invoked Exemption 5 in withholding certain responsive information. The Exemption protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). The Supreme Court has construed this language to "exempt those documents . . . normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). In this case, the Withheld Information implicates the deliberative process privilege.

The deliberative process privilege is predicated on the recognition "'that the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl.'" *Dow Jones & Co. v. U.S. Dep't of Justice*, 917 F.2d 571, 573 (D.C. Cir. 1990) (quoting *Wolfe v. HHS*, 839 F.2d 768, 773 (D.C. Cir. 1988) (*en banc*)). Thus, the agency need not disclose "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997).

Because the privilege protects the decision-making process, the document in question

must be pre-decisional, *i.e.*, it is "prepared in order to assist an agency decisionmaker in arriving

at his decision." *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 421 U.S. 168, 184

(1975); *see also NLRB*, 421 U.S. at 151 n.18; *Mapother v. Department of Justice*, 3 F.3d 1533,

1537 (D.C. Cir. 1993). Documents prepared by agency officials who "themselves lack any

authority to take final agency action . . . are necessarily predecisional." *Hopkins v. U.S. Dep't of*

*Housing and Urban Dev.*, 929 F.2d 81, 85 (2d Cir. 1991). The communication also must be "a

direct part of the deliberative process" in that it "makes recommendations or expresses opinions

on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975); *see also*

*Wolfe*, 839 F.2d at 773-74.

       In this case, DoD has withheld internal deliberations regarding policy or future actions

concerning treatment of detainees, including matters such as interrogation policies. Buzby Decl.,

¶ 56. It has also withheld assessments of plaintiff's intelligence value and threat level; and

recommendations concerning whether plaintiff should be designated an enemy combatant and

whether, as an enemy combatant, he should be released, transferred, or continued in detention.

*Id.* ¶ 57. These assessments and recommendations were reviewed by The Staff Judge Advocate's

Office for legal sufficiency. *Id.* The Staff Judge Advocate's Office in turn made its own

recommendations to the Commander of JTF-GTMO on the advice provided in these assessments

and recommendations. *Id.* All this information was then forwarded by JTF-GTMO to the (1) the

Administrative Review Boards, for their consideration in formulating their respective

recommendations to the deciding official – the Designated Civilian Official ("DCO") – regarding

whether to transfer, release, or continue to detain Slahi; and (2) the DCO, for his consideration in

making the ultimate determination as to the disposition of Slahi. *Id.* ¶¶ 57-58. This information

was also utilized by Combatant Status Review Board in its determination as to whether plaintiff should be designated as an enemy combatant.  *Id.*

The withheld information thus clearly falls within the deliberative process privilege because it is "prepared in order to assist an agency decisionmaker in arriving at his decision," *Renegotiation Bd.,* 421 U.S. at 184, and contains recommendations or opinions on legal or policy matters.  And as Rear Admiral Buzby has determined, disclosure of this withheld information would severely hinder JTF-GTMO's and Southern Command's ability to provide their candid, open, and frank opinions to the decisionmakers, and compromise the quality of decision concerning the designation and disposition of particular detainees.  Buzby Decl., ¶ 58.  Accordingly, the information is properly withheld under Exemption 5.

> **E.    DoD Properly Withheld Information from the Responsive Documents Pursuant to FOIA Exemption 7**

Finally, DoD has withheld information under Exemption 7(A) and (E), which information also overlaps to a significant extent with information already withheld under other exemptions, including Exemptions 1 and 2.  Buzby Decl., ¶ 61.

> **1.    Law Enforcement Information Withheld Under Exemption 7(A)**

Exemption 7(A) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  In enacting this exemption, "Congress recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations."  *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 232 (1978).

However, as the D.C. Circuit has made clear, "Exemption 7(A) does not require a presently pending 'enforcement proceeding'"; rather, "it is sufficient that the government's ongoing September 11 terrorism investigation is likely to lead to such proceedings." *Center for Nat'l Sec. Studies*, 331 F.3d at 926.

The threshold question for a Exemption 7(A) withholding is whether the withheld record was compiled for law enforcement purposes, which the agency can establish by showing "(1) a rational nexus between the investigation and one of the agency's law enforcement duties; and (2) a connection between an individual or incident and a possible security risk or violation of federal law." *Id.* at 926 (internal quotation marks omitted). This threshold requirement has been expressly recognized to "include[] national security related government activities." *Morley v. CIA*, No. 03-2545, 2006 WL 2806561, at *14 (D.D.C. Sept. 29, 2006); *see, e.g., Center for Nat'l Sec. Studies*, 331 F.3d at 926.

Here, the information withheld under Exemption 7(A) was compiled for law enforcement purposes because it was gathered during ongoing investigations for suspected violations of the laws of war and other prosecutable acts of terrorism related to the attack of September 11. *See* Buzby Decl, ¶ 61. Trial by military commission remains a possibility for Guantanamo detainees. *Id.* In addition, information produced by the ongoing investigations at Guantanamo is used by Administrative Review Boards to determine whether certain detainees should be released from detention by the United States. *Id.* ARBs are law enforcement proceedings because they determine whether enemy combatants should be transferred, released, or continued in detention by the United States. *See* Implementation of Administrative Review Board Procedures (July 14, 2006) (available at http://www.defenselink.mil/news/Combatant_Tribunals.html).

35

As explained in Rear Admiral Buzby's declaration, the release of this information would potentially compromise the interests of the United States in the September 11th and other ongoing terrorism-related investigations and trials.  It would give interested parties improper insight into the techniques and guidelines used during investigations and prosecutions, allowing them to manipulate the outcomes of these investigations or proceedings.  It may also allow people to deduce that a particular detainee is still under investigation or is being considered for trial by military commission.  *See* Buzby Decl., ¶ 62.

Notably, as is the case with Exemption 1, Rear Admiral Buzby's judgment regarding the harm to national security is entitled to substantial deference.  *See Center for Nat. Sec. Studies*, 331 F.3d at 926 (in Exemption 7(A) case, deferring to predictive judgments of counterterrorism officials' determination that release of information concerning detainees in September 11 terrorist investigation would compromise national security).  Indeed, as the D.C. Circuit has said, "in the FOIA context, [the D.C. Circuit] ha[s] consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review."  *Id.; see also id.* 927 (court cannot "conceive of any reason to limit deference to the executive in its area of expertise to certain FOIA exemptions so long as the government's declarations raise legitimate concerns that disclosure would impair national security").

According, DoD's withholdings under Exemption 7(A) is proper.

### 2.    Law Enforcement Techniques, Procedures and Guidelines Withheld Under Exemption 7(E)

Exemption 7(E) authorizes the withholding of law enforcement information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would

disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).[9]  Like Exemption 7(A), Exemption 7(E) has been interpreted to cover a broad range of law enforcement information related to national security.  *See, e.g.; Center for Nat'l Sec. Studies v. INS*, No. 87-2068, 1990 WL 236133, at *5 (D.D.C. Dec. 19, 1990) (upholding under Exemption 7(E) agency's withholding of contingency plan in event of attack on United States because it and similar withheld documents "relate directly to . . . agency's law enforcement duties").

The intelligence techniques, guidelines, methods, and procedures used by DoD in its counterterrorism efforts, which is already discussed above under Exemptions 1 and 2, likewise falls under Exemption 7(E).  For example, disclosure of the particular interrogations or interrogation techniques used on certain detainees provide a far more detailed picture of DoD's interrogation process than the general information on interrogation techniques previously released by DoD.[10]  Buzby Decl, ¶ 65.  Such disclosure would provide knowledgeable persons with information concerning the circumstances in which certain interrogation techniques are used, permitting them to discern patterns of interrogation, draw conclusions regarding which

---

[9]  The anti-circumvention requirement in the second clause regarding disclosure of law enforcement guidelines is similar to the anti-circumvention requirement of Exemption (b)(2). *See, e.g., Coastal Delivery Corp,* 272 F. Supp. 2d at 965 (agency's withholding under Exemption 2 proper for same reason withholding proper under Exemption 7(E)); *Schwartz v. Dep't of Treasury*, 131 F. Supp. 2d 142, 150 (D.D.C. 2000) (Secret Service information evaluating threat potential of individuals was "clearly exempt" under both Exemptions 2 and 7(E)).

[10]  DOD has publicly released general information on interrogations in such documents as the reports of  Vice Admiral Albert Church and former Defense Secretary James Schlesinger. Unlike those general disclosures, disclosure of the particular techniques used with particular detainees such as plaintiff would result in significant harm to the United States' counterterrorism and law enforcement efforts.  Buzby Decl., ¶ 66.

37

techniques are or are not effective, and even create profiles of interrogation methods used on detainees possessing certain characteristics. *Id.* This would in turn permit persons hostile to the United States to improve their ability to counter DoD's interrogation methods and devise countermeasures to circumvent particular techniques. *Id.*

As Rear Admiral Buzby explains, this concern is not a theoretical one. Buzby Decl., ¶ 66. DOD has determined, based on its experience with detainee interrogations and intelligence assessments, that members of Al Qaeda in particular likely have been schooled in resistance to interrogation. *Id.* Indeed, an al Qaeda training manual recovered from the apartment of a known al Qaeda operative in Manchester, England (commonly referred to as the "Manchester Document"), contains a lengthy section on counterinterrogation techniques. *Id.* As DoD officials have also noted publicly, the behavior of detainees at Guantanamo shows that they are well-versed in the contents of the Manchester Document and have adopted its techniques to resist interrogation. *Id.*

In sum, public disclosure of the interrogation techniques used with Slahi would reduce or even nullify the effectiveness of those techniques in the government's ongoing investigations. *See* Buzby Decl., ¶¶ 65, 67. Accordingly, the information is properly withheld under Exemption 7(E). *See, e.g., Blanton v. Dep't of Justice*, 63 F. Supp. 2d 35, 49-50 (D.D.C. 1999) (certain polygraph information, such as the "sequence of questions," properly withheld because disclosure would allow individuals to employ countermeasures).

**CONCLUSION**

For all the foregoing reasons, this Court should grant DoD's motion for partial summary

judgment.

Dated: October 1, 2007                              Respectfully submitted,

                                                    PETER D. KEISLER
                                                    Assistant Attorney General

                                                    JEFFREY A. TAYLOR
                                                    United States Attorney

                                                    TERRY HENRY
                                                    Senior Trial Counsel

                                                    _____/s/ Jean Lin_____
                                                    JEAN LIN  (NY#4074530)
                                                    Federal Programs Branch, Civil Division
                                                    United States Department of Justice
                                                    20 Massachusetts Ave., N.W.
                                                    Washington, D.C.  20530
                                                    Tel: (202) 514-3716
                                                    Attorneys for Defendant