UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMEDOU OULD SLAHI,       )
                            )
            Plaintiff,       )
                            )
                            )       Civil Action No. 06-CV-0597 (JR)
      v.                     )
                            )       DECLARATION OF
                            )       REAR ADMIRAL
UNITED STATES DEPARTMENT OF  )       MARK H. BUZBY
DEFENSE,                     )
            Defendant.       )
                            )

Pursuant to 28 U.S.C. §1746, I, Rear Admiral Mark H. Buzby, declare as follows:

1.  I am a Rear Admiral in the United States Navy, with 28 years of active duty service.  I

currently serve as the Commander of Joint Task Force – Guantanamo (JTF-GTMO), at

Guantanamo Bay, Cuba (Guantanamo).  I have held this position since May 22, 2007.  As such, I

am directly responsible for the successful execution of the JTF-GTMO mission to conduct

detention and interrogation operations and exploit intelligence in support of the Global War on

Terrorism (GWOT), coordinate and implement detainee screening operations, and support law

enforcement and war crimes investigations.  Prior to assuming command of JTF-Guantanamo, I

served on the Staff of the Chief of Naval Operations as deputy director, Expeditionary Warfare.

2.  In my capacity as Commander, I oversee all personnel assigned to JTF-GTMO.  I am familiar

with the procedures followed by JTF-GTMO personnel in responding to requests for access to

JTF-GTMO's records and information pursuant to the Freedom of Information Act (FOIA) and

Executive Order (EO) 12958, as amended.  The statements contained in this declaration are

based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations made in accordance therewith.

3. My responsibilities as Commander of JTF-GTMO include the review of JTF-GTMO information for classification purposes as mandated by EO 12958, as amended, and the preparation of declarations in support of Exemption 1 withholdings under the FOIA. As the Commander, JTF-GTMO, I have been designated by the Under Secretary of the Defense for Intelligence as an Original Secret Classification Authority and a declassification authority pursuant to EO 12958, as amended, Sections 1.3 and 3.1.

### Purpose of this Declaration

4. The purpose of this declaration is to describe the search for documents responsive to the FOIA request filed by Sylvia Royce, the attorney for Mohammedou Ould Slahi ("plaintiff"), and to explain the bases for withholding information from responsive records pursuant to FOIA exemptions 1, 2, 3, 5, 6, and 7, 5 U.S.C. § 552(b)(1), (2), (3), (5), (6), and (7). A copy of the Vaughn Index is attached as Exhibit A. Information that reasonably can be segregated has been produced.

### Search for Responsive Documents

5. Plaintiff's counsel submitted a FOIA request on May 26, 2005, requesting records relating to plaintiff. The request seeks all "memoranda, inter-agency communications, case summaries, notes, indexes, jottings, message slips, letters, facsimile transmissions, diaries, e-mails and calendars." In June 2005, the Department of Defense Office of Freedom of Information and Security Review ("OFOI") tasked U.S. Southern Command with conducting a search and providing records responsive to this FOIA request. The request was thereafter transmitted to JTF-GTMO by U.S. Southern Command, our parent command, because it had determined that

responsive records, if they exist, would most likely be in the possession of JTF-GTMO. In January 2006, plaintiff's counsel informed U.S. Southern Command that she was particularly interested in receiving copies of plaintiff's medical records.

6. Upon review of plaintiff's FOIA request, Major General Jay W. Hood, then the Commander of JTF-GTMO, determined that records responsive to plaintiff's request, if they existed, would most likely be in the possession of the units discussed in the following four paragraphs. He directed personnel at those units to search for responsive documents, and those searches included manual and/or electronic searches of both classified and unclassified records. The searches were conducted in a fashion reasonably calculated to retrieve all records responsive to plaintiff's request. I am aware of no remaining places within JTF-GTMO reasonably likely to have records responsive to plaintiff's request.

7. In or about July 2005, in response to the request for plaintiff's medical records, personnel in JTF-GTMO's Joint Medical Group ("JMG") conducted a search of its records. After conducting manual and electronic searches of all the medical records maintained by the JMG, on February 23, 2006, personnel at the JMG identified approximately 200 pages of medical records pertaining to plaintiff. These documents were provided to OFOI for its further review in April 2006.

8. In or about July 2005, the Joint Detention Group (JDG) was tasked to conduct a search of its records. The JDG ensures that the detention mission is performed in a humane manner that protects the security of both the detainees and the safety of JDG personnel assigned to JTF-GTMO. After conducting manual and electronic searches of all the detention records maintained by the JDG, on or about September 30, 2005 personnel at the JDG found approximately 30 pages of material reflecting details about plaintiff's detention at Guantanamo Bay. This information was provided to OFOI for its further review in February 2006.

9. In or about July 2005, the Joint Intelligence Group ("JIG") at JTF-GTMO was tasked to search for responsive documents. The JIG conducts strategic counter-terrorism interrogation operations, detainee assessments, all-source analysis and productions, and detainee screening operations to collect and exploit intelligence in support of the Global War on Terror. Utilizing a search feature in JTF-GTMO's intelligence database, JIG personnel searched for documents referencing plaintiff, and found approximately 600 documents. These documents were forwarded to OFOI for its further review in February 2006.

10. In or about July 2005, The Staff Judge Advocate's ("SJA") office at JTF-GTMO was tasked to search for responsive documents. The SJA office provides legal counsel in support the JTF-GTMO mission. This includes providing legal counsel to the commander of JTF-GTMO and the commander's subordinates. SJA personnel searched the electronic database for documents referencing plaintiff and, on or about October 28, 2005 found 8 responsive documents consisting of 10 pages.

11. On May 24, 2007, JTF-GTMO was tasked to conduct a supplemental search specifically for records of polygraph examinations and "interrogation logs." Specifically, the JIG was tasked to conduct the search. It was the unit most likely to have such records because it is has primary responsibility for conducting interrogations and assessing the results of interrogations. JTF-GTMO completed a manual and electronic search of its records and found no "interrogation logs." JTF-GTMO did find 4 polygraph documents.[1] Each of these polygraph documents either originate with or contain information derived from another agency. Subject to review and confirmation by the originator of these documents, as discussed *infra* these documents are exempt pursuant to FOIA exemption 7(A), 5 U.S.C. § 552(b)(7)(A).

---

[1] One of these documents has already been released to the requester, the rest are being referred to their originating agency.

12.  In July 2007, in the process of examining documents for production, JTF-GTMO located 13 "interrogation plans" relating to plaintiff which it did not locate during its prior search.  JTF-GTMO processed those documents and referred them to OFOI on September 24, 2007 for further review.  OFOI will process these documents and produce the releasable portions on October 1, 2007.

### Justification for Withholding Plaintiff's Photographs Under Exemption 1

13.  Several identification photographs of plaintiff, taken during his detention at JTF-GTMO, were withheld from the documents provided to plaintiff's counsel.  These photographs were taken by personnel at JTF-GTMO for administrative purposes while plaintiff has been detained at Guantanamo and do not depict anyone other than plaintiff.  Plaintiff is currently detained by the DoD at Guantanamo.  Photographs of current detainees are classified at the SECRET level, at my direction.

14.  Human intelligence is the most essential piece of the strategic intelligence being gathered in the Global War on Terror.  Due to the nature of terrorist organizations (including al Qaeda), these organizations' methods of operation, and the affiliations between terrorist organizations, human intelligence is the most effective source of actionable information for the anticipation and interdiction of terrorist activity.  Because of the value of human intelligence, detained enemy combatants, whether detained at JTF-GTMO or elsewhere, are a potential source of information needed to wage the Global War on Terrorism effectively.   The cooperation of sources in the gathering of actionable information is a critical requirement in the fight against terrorist activities.  Such sources will not provide information if they believe that doing so will jeopardize their safety and/or the safety of the families.  It is clear that people who cooperate with capturing authorities are subject to reprisals from those who believe the source provided information about

them. Concern about these reprisals and retaliation are particularly acute in the case of individuals linked to terrorist activity. Alleviating the perceived or genuine reprisal concerns of cooperating individuals is an essential part of developing human intelligence sources and gathering usable information. Cooperating detainees at JTF-GTMO have specifically voiced concerns for their families' safety, as well as their own.

15. In strategic interrogations such as those conducted at JTF-GTMO, the cooperation of human intelligence sources is crucial to the on-going human intelligence efforts. Detainees at JTF-GTMO continue to provide useful information about a variety of subjects, including how al Qaeda, the Taliban and other terrorist organizations are organized and funded, their leadership structures, how these organizations recruit, train and retain members and how they plan, command and control their operations. These detainees also continue to provide useful intelligence about the physical areas of operations in which the Global War on Terrorism is conducted, the locations of training facilities and safe houses, travel patterns and routes used for smuggling people and equipment, as well as the identities of newly-captured fighters. The Joint Intelligence Group gains useful information from detainees on nearly a daily basis. Some of this information contributes pieces to the mosaic of how terrorist organizations operate. Other information supports real-time, ongoing operations in the ongoing war. Given the nature of JTF-GTMO's intelligence operations, even individuals who have been detained for a period of years continue to possess and provide information that is useful to the U.S. government and its allies in the Global War on Terrorism.

16. FOIA Exemption (b)(1) allows for the withholding of information that (A) is specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) is in fact properly classified pursuant to such

Executive Order. The photographs of detainees at Guantanamo satisfy those requirements. In order to protect human intelligence sources and to preserve the human intelligence method of collecting information, photographs clearly identifying the face of a detainee are classified at the SECRET level. This information is specifically authorized to be kept secret in the interest of national defense under Executive Order 12958, as amended. In accordance with Section 1.1(a) of that Executive Order, (1) this information has been classified by a prior commander of JTF-GTMO, who exercised original classification authority, (2) the information is owned, produced by and for, and is under the control of the United States government, (3) the information concerns "intelligence activities (including special activities), intelligence sources or methods, or cryptology," under Section 1.4 of the Executive Order, and (4) I, as the current Commander, JTF-GTMO maintain that classification and determined, for the reasons stated herein, that the unauthorized disclosure of the information reasonably could be expected to result in serious damage to the national security, including our defense against transnational terrorism. The information therefore meets the requirements found in Executive Order 12958, Section 1.1(a)(4) for SECRET information.

17. Official public release of U.S. government photographs of detainees that depict their detention in U.S. custody is likely to substantially impede U.S. intelligence collection efforts. Disclosure is likely to deter current and future intelligence sources, including detainees currently held at Guantanamo Bay and those held outside Guantanamo Bay, from providing intelligence information to the United States. This is true even where photographs of detainees have already been publicly released through means other than official U.S. government release. If the United States government releases or is required to release photographs of Guantanamo Bay detainees, it will send a message that detainees who cooperate and provide information cannot be protected.

Release of these photographs would negatively impact our ability to provide assurances of confidentiality to future human intelligence sources.

**Justification for Withholding of Cell Location
Under Exemption 1**

18. The cell block and number where plaintiff resides is contained on several of the documents released to plaintiff's counsel. That information is withheld pursuant to FOIA Exemption 1. The precise location of where plaintiff has been housed within the detention facility at JTF-GTMO is classified because releasing such information creates an undue security risk. In short, detainees in Camp Delta are all enemy combatants associated with al-Qaida and the Taliban. These organizations remain engaged in hostilities against the United States,  Releasing the precise location of given detainees within Camp Delta, including cell numbers, reduces the difficulty that such groups would have in forcibly freeing such detainees, and thereby increases the risk that such an act could occur.   Accordingly, I have determined that this information is and remains properly classified at the SECRET level, and that its release reasonably could be expected to cause serious damage to national security.

**Justification for Withholding Information
Concerning Military Plans and Operations Under Exemption 1**

19. Information concerning military plans and operations may be classified under the authority of Section 1.4(a) of Executive Order 12958, as amended, if its release could cause damage to the national security of the United States.  Certain information withheld from plaintiff and contained in legal documents from the SJA's office is generally related to military operations against hostile forces and the operation of detention facilities by JTF-GTMO and at the time plaintiff made his FOIA request, was classified at the SECRET level through the action of the Commander of JTF-GTMO.  I have determined that this information continues to warrant

classification at the SECRET level, pursuant to EO 12958, as amended. Release of this information could cause serious damage to the national security as hostile entities would learn of the effectiveness and vulnerabilities in the military operations in the United States and abroad.

## Justification for Withholding Information Provided by a Foreign Government Under Exemption 1 and 3

20. Certain of the Withheld Information consists of information provided by a foreign government about plaintiff. At the time plaintiff made his FOIA request, the information in this category withheld under Exemption 1 was classified at the SECRET level through the action of the Commander of JTF-GTMO. I have determined that this information continues to warrant classification at the SECRET level, pursuant to EO 12958, as amended, as the release of this information reasonably could be expected to result in serious damage to national security.

21. As part of ongoing intelligence gathering operations, JTF-GTMO routinely solicits and receives information from foreign governments about detainees, including intelligence and law enforcement information. Such information is provided to JTF-GTMO in confidence and with the expectation that it will not be publicly released by DOD. Official public release of such information, in contravention of such expectations of confidentiality, would substantially impair DOD's ability to secure cooperation by foreign governments in providing information about detainees or otherwise. Foreign governments will be less likely to cooperate with U.S. intelligence collection and other counterterrorism efforts if they cannot be confident that the information they provide will be safeguarded and remain confidential. A decrease in cooperation by foreign governments, in turn, would severely hamper the United States' counterterrorism efforts. Accordingly, the public release of this information under FOIA reasonably could be expected to result in serious damage to national security.

22.  Furthermore, this withheld information is exempt under Exemption 3 and 10 USC 130c

which protects unclassified information provided to DoD by a foreign government or

international organization in confidence. As stated above, this information was provided to JTF-

GTMO in confidence and with the expectation that it will not be publicly released by DOD, and

thus it falls under the specific statutory provision of 10 USC 130c.

### Justification for Withholding Intelligence Data about Plaintiff and His Activities and Other Persons or Organizations Under Exemption 1

23.  Certain of the Withheld Information includes intelligence data compiled about plaintiff or

summaries of such data.  Intelligence data included in this category of withholdings typically

describes plaintiff's biographical information; the circumstances of his capture and what he had

in his possession when he was captured; the circumstances and date of his transfer to

Guantanamo; his travel; his affiliations with individuals and organizations of intelligence

interest; and his activities in support of those organizations.  The intelligence data in this

category also includes information about other persons and organizations.

24.  These categories of information about plaintiff have been withheld under FOIA Exemption

1, which exempts from release matters that are "specifically authorized under criteria established

by an Executive order to be kept secret in the interest of national defense or foreign policy and

… [that] are in fact properly classified pursuant to such Executive order."  Section 1.4(c) of EO

12958, as amended, permits the classification of "intelligence activities (including special

activities), intelligence sources or methods, or cryptology," recognizing that the disclosure of

intelligence activities and sources can cause harm to national security.

25.  I have determined that the intelligence data about plaintiff and other individuals and

organizations described the foregoing paragraphs reveals details about intelligence we have

gleaned regarding individuals and organizations of intelligence interest and also that this

information reveals the sources of our intelligence. At the time of plaintiff's FOIA request, this intelligence data was classified at the SECRET level through the action of the Commander of JTF-GTMO. I have determined that this information remains properly classified, and that its release reasonably could be expected to cause serious damage to the national security because it would reveal information concerning intelligence sources, the specific information obtained from such sources, or both. Accordingly, this information was and is properly classified at the SECRET level, pursuant to Section 1.4(c) of EO 12958, as amended.

26. If this intelligence data were released publicly, it would reveal the content of our intelligence concerning Plaintiff and other persons and organizations.

a. If the United States publicly released classified information about our intelligence concerning plaintiff, including his affiliations with certain individuals and organizations, how those affiliations came about, and the actions he took while associated with those individuals and organizations, this would reveal information about the United States' intelligence sources and activities. The potential damage caused by such revelations would be exacerbated, given that the intelligence could be pieced together with other information that has entered the public domain to reveal a considerable amount of detail about our intelligence concerning certain individuals and organizations.

b. Revealing the extent of intelligence gathered concerning plaintiff would show, among other things, what the United States knows about certain individuals and organizations; what the government does not know; and the leads it followed or did not follow based on the intelligence it obtained. Those critical facts would also be revealed through disclosure of withheld intelligence data concerning other individuals and organizations.

c. In addition, release of information about the circumstances of plaintiff's capture and
the date of his transfer to Guantanamo, particularly if pieced together with other, similar
information about other detainees, would reveal details about how detainees come into
U.S. custody, which detainees were transferred to Guantanamo on which dates and
through what means, and the routing of planes and movement of detainees on the ground
in the theater of operations.

d. Ultimately, release of the information described above would aid persons hostile to the
United States in hiding their activities and finding other means to thwart our intelligence-
gathering efforts, evade capture by U.S. authorities, and otherwise thwart U.S.
counterterrorism efforts.

27.  Additionally, public release of such intelligence data, given that it would result in revealing
sources of our intelligence about plaintiff and other persons and organizations, would have a
chilling effect on human intelligence collection and would substantially impede DOD's ability to
gather actionable intelligence from other sources, including current Guantanamo detainees.
Releasing this type of information would reveal publicly who has cooperated with interrogators
at Guantanamo and elsewhere and the information they provided.  Such public identification of
intelligence sources would place those sources, or individuals who are perceived by others as
sources, at risk of retribution and deter other sources from cooperating with ongoing intelligence
collection efforts.

28.  As mentioned above, human intelligence is the most essential piece of the strategic
intelligence being gathered in the GWOT.   Because of the nature of terrorist organizations, such
as al Qaeda, the terrorist organizations' methods of operation, and the affiliations between

terrorist organizations, human intelligence is the most effective source of actionable information for the anticipation and interdiction of terrorist activity.

29.  The cooperation of human intelligence sources in gathering actionable information is an indispensable requirement in the fight against terrorist activity.  The process of gaining actionable intelligence from a human intelligence source is built around trust and confidentiality. Cooperating subjects will not provide information if they believe that, in so doing, they will jeopardize their own safety, or the safety of their families and loved ones.  A key part of their comfort in providing information is a sense of anonymity.  The release of information that a given source provided to the U.S. government would eliminate any anonymity the source expected or had when he decided to provide information.

30.  In some cases, disclosure of intelligence data in this category would reveal that the intelligence source is or was a Guantanamo detainee.  Some detainees have specifically voiced concerns for their families' safety, as well as their own, as a result of their cooperation or perceived cooperation with the U.S. government.  In fact, some of the detainees have used multiple names and aliases in the past to conceal their real identities.  Detainees who have provided information to the U.S. government have an implicit, and in many cases explicit, expectation that their identities and statements will not be revealed to the general public. Detainees who provide information to U.S. government personnel often request that they not be associated with the information they are providing or identified as the source of this information, based on a fear of retaliation, embarrassment, and harm to themselves and members of their family.

31.  While such concerns arise in a variety of settings in which the government relies on cooperating witnesses, they are particularly acute in the context of sources linked to terrorist

activity. Intelligence sources can be expected to furnish information only when confident that they are protected from retribution by the secrecy surrounding their relationship to the U.S. government. Alleviating cooperating individuals' perceived or genuine concerns about reprisal is an essential part of developing human intelligence sources and gathering useable information. Releasing information provided by these sources would dissuade them, and future sources, from cooperating.

32. Even where certain information provided to intelligence officials is publicly available in another form, the fact of a source's cooperation with intelligence officials and the specific information provided to such officials remains sensitive, because of its potential to dissuade the source and other sources from cooperating in the future. Further, when factual information is contained within a document setting forth intelligence assessments, conclusions or recommendations, the selection of and emphasis on particular facts reveals information about the analyst's thought processes, the guidelines being applied to analyze the intelligence data, and the limits of or gaps in available intelligence. Accordingly, such factual information remains sensitive, even if the same or similar information has been publicly revealed in a different context.

### Justification for Withholding Intelligence Assessments and Conclusions Under Exemptions 1 and 2

33. Intelligence assessments and conclusions reached by analysts and other personnel at JTF-GTMO and SOUTHCOM about plaintiff are withheld under FOIA Exemptions 1 and 2. At the time of plaintiff's FOIA request, this analytic material was classified at the SECRET level through the action of the Commander of JTF-GTMO. The intelligence assessments and conclusions withheld under Exemption 1 are vital to DOD's assessment of plaintiff's activities, and remain vital to its ongoing efforts to obtain intelligence on other individuals and

organizations. The intelligence data, assessments, and conclusions that appear in the documents pertain to individuals and organizations of intelligence interest, and the relationships among individuals and organizations of intelligence interest. Disclosure of these assessments and conclusions, especially in conjunction with disclosure of the specific intelligence data that is necessarily intertwined with them, would reveal how analysts evaluate intelligence information and the conclusions they reach. Such revelations would aid persons hostile to the United States in hiding their activities and thwarting the government's intelligence gathering, and severely harm the United States' ongoing efforts to gather intelligence critical to fighting the GWOT. I have therefore determined, pursuant to Section 1.4(c) of EO 12958, as amended, that this information remains properly classified at the SECRET level and that its release reasonably could be expected to cause serious damage to national security.

34. I have further determined that JTF-GTMO's and SOUTHCOM's intelligence assessments and conclusions should be withheld under FOIA Exemption (b)(2) (high) because disclosure would reveal the internal guidelines followed by JTF-GTMO and SOUTHCOM in evaluating the intelligence value and threat level of individuals and organizations of intelligence interest, and thus risk circumventing U.S. counterterrorism efforts.

35. An analyst's selection of or emphasis on particular intelligence data in his assessment would reveal what intelligence was important to the United States in assessing plaintiff, and by extension other individuals, as well as how the government analyzes intelligence in general. Individuals of intelligence interest could thereby discern the guidelines used by JTF-GTMO and SOUTHCOM to make intelligence value and threat level assessments concerning Guantanamo detainees and others. Revelation of those internal guidelines would in turn reveal a critical aspect of DOD's intelligence activities and methods, which would aid persons hostile to the

United States in hiding their activities and tailoring their behavior to thwart the government's intelligence gathering, and thus risk circumventing U.S. counterterrorism efforts.

36. Included in this category of withholdings are assessments of intelligence data obtained from particular intelligence sources and the data analysts relied on in making those assessments.[2]

### Justification for Withholding Intelligence Methods Under Exemptions 1 and 2

37. DOD has withheld, under FOIA Exemptions 1 and 2, information reflecting intelligence methods used by JTF-GTMO personnel in gathering, analyzing, and coordinating intelligence data. Included in this category of withholdings are: interrogation techniques and plans; tools and methods for analyzing intelligence data; tools and requirements for coordinating intelligence gathering and analysis among DOD components and other agencies of the government; and plans for further intelligence gathering based on specific data obtained from intelligence sources.[3]

38. At the time of plaintiff's FOIA request, the Withheld Information reflecting intelligence methods described in the preceding paragraph was classified at the SECRET level through the action of the Commander of JTF-GTMO.

39. I have determined that release of the information pertaining to intelligence methods remains properly classified and that its release reasonably could be expected to cause serious damage to national security.

   a. Intelligence methods are the means by which the Joint Intelligence Group (JIG) at

   JTF-GTMO and other intelligence agencies collect intelligence data to support military

---

[2] The rationale for withholding this intelligence information under Exemptions 1 and 2 also applies when the information is incorporated into documents that originate with other agencies or components, such as CITF, OARDEC or ODA, and when JTF-GTMO evaluates information collected by other agencies or components (e.g., the FBI or CITF) and draws conclusions about that information.

[3] The rationale for withholding information reflecting intelligence methods under Exemptions 1 and 2 also applies when the information is incorporated into documents that originate with other agencies, such as CITF, OARDEC or ODA.

operations and to assess, and counter, terrorist and military threats. These methods and practices must be protected because their public release would be of material assistance to those who would seek to penetrate, detect, prevent, avoid or otherwise damage the intelligence operations of the United States. The actual loss to the United States if such methods are revealed is not only the cost of developing the initial methods, but also the loss of intelligence while new methods are developed to replace those lost.

b. In particular, public disclosure of specific methods used with sources of human intelligence, whose identities are themselves classified as described above, would allow individuals of intelligence interest to anticipate and immunize themselves from those methods. Of particular concern is an individual's ability to anticipate particular interrogation techniques. The Withheld Information includes interrogation techniques used in connection with sources of human intelligence.

40. JTF-GTMO's and SOUTHCOM's methods of coordinating intelligence gathering and analysis among agencies and components is also central to their effort to counter acts of terrorism and support military operations. Effective military and counterterrorism strategy depends on the coordination of intelligence gathering among agencies and components responsible for gathering and analyzing intelligence data. Revealing the nature of that coordination and how agencies and components work together could reveal their areas of relative competence, or the distinct intelligence tools they employ, thereby permitting persons of interest to the United States to tailor their behavior and adopt means to thwart the agencies' efforts.

41. Section 1.4(c) of EO 12958 recognizes that the disclosure of intelligence methods can cause harm to national security. I have determined that release of the Withheld Information pertaining to intelligence methods described in the preceding paragraphs remains properly classified at the

SECRET level and that its release could reasonably be expected to cause serious damage to the national security.

42. The information reflecting intelligence methods is also withheld under FOIA Exemption (b)(2) because disclosure would reveal internal guidelines and practices for gathering and analyzing intelligence, which would in turn risk circumvention of U.S. counterterrorism efforts by permitting persons hostile to the United States to tailor their behavior to resist or thwart the government's intelligence methods.

### Justification for Withholding Intelligence Codes Under Exemptions 1 and 2, and Instructions Concerning the Handling of Sensitive Information Under Exemption 2

43. Internal codes that indicate intelligence sources, methods, or information, were withheld, under FOIA Exemptions 1 and 2. Included in this category of withholdings are: classification codes, which generally appear near the bottom of a page; codes indicating intelligence sources or information; encoded titles of exhibits used in plaintiff's CSRT and ARB proceedings; and codes describing a type of communication.

44. The codes in this category withheld under Exemption 1 were classified at the SECRET level through the action of the Commander of JTF-GTMO at the time plaintiff made his FOIA request.

45. The actual codes withheld under Exemption 1, while for internal use only, reflect sources of intelligence, intelligence activities, and the interplay between various U.S. government agencies in collecting intelligence. If these codes were to be made public, abbreviations contained in the codes, which in some cases resemble the information they are meant to stand in for, could reveal the sources of intelligence. Those abbreviations could also be pieced together with other public information to identify the significance of the codes to DOD's intelligence activities.

Accordingly, I have determined, pursuant to Section 1.4(c) of EO 12958, as amended, that this

information remains properly classified at the SECRET level and that its release reasonably could be expected to cause serious damage to national security.

46.    The internal codes described in the preceding paragraphs are also withheld under Exemption 2. These codes are purely for internal use. At the same time, because the codes contain or refer to information about intelligence sources or activities, their disclosure could enable persons hostile to the United States to piece together the government's methods for analyzing and handling intelligence data, as well as potentially intelligence data itself, thereby risking circumvention of U.S. counterterrorism efforts.

47.    Finally, DOD also withheld under Exemption 2 technical information relating to the handling and forwarding of sensitive information contained in the intelligence reports and messages that have been withheld. Releasing information about how intelligence reports are forwarded among agencies and within DOD would reveal internal guidelines for the sharing and transmission of such intelligence documents. This information is purely internal to the U.S. government, as it provides agencies with guidance concerning dissemination of and authorizations needed to share sensitive information. Release of these handling instructions would reveal which agencies have an interest in particular intelligence data, thereby revealing the agencies' relative competence and responsibilities and their manner of interaction regarding intelligence data, and risking circumvention of U.S. counterterrorism efforts.

### Justification for Withholding of Full Internment Serial Numbers Under Exemption 2

48. Internment serial numbers, or "ISNs," are identifying numbers unique to a detainee, analogous to a social security number. A full ISN is a 12-digit alpha numeric identifier that incorporates certain abbreviated information about the detainee. DOD also uses shortened ISNs

consisting of 3 or 4 digits to identify detainees.  The shortened ISNs are still unique to the detainee.

49.  The full ISN of plaintiff is found on several documents produced to plaintiff's counsel.  Only the shortened ISN was provided to plaintiff's counsel and the other digits and numbers comprising the full ISN were withheld under FOIA Exemption 2.   I have determined that the full ISN should be withheld under Exemption (b)(2)(high) as the non-numeric portion of this number contains information specific to the detainee that is used to identify certain information pertinent to detainee operations and intelligence-gathering operations.  Furthermore, the full ISN is often used in intelligence message traffic and reports to identify a particular detainee as a source for information.  Disclosure of the full ISN to the public could allow persons to potentially access information concerning detainees from DoD databases and other sources and then cross-reference these detainee numbers with other information in the public domain to identify specific detainees, DoD personnel associated with detainee operations and intelligence gathering activities, and other individuals mentioned in other DoD documents.  Access to this information, much of it classified, would have the effect of impeding JTF-GTMO detention and intelligence gathering operations.

## Justification for Withholding Details of Disciplinary Actions Under FOIA Exemption 2

50.  On several documents, JTF-GTMO withheld the details of disciplinary actions taken against plaintiff as a result of his misbehavior in the detention facility, as well as the overall discipline level of plaintiff.  The withheld information lists changes in plaintiff's discipline level (up or

down), changes to his recreation schedule and loss of certain "comfort items[4]," all taken in response to his misbehavior in detention.

51.  Detainees are advised of the rules and regulations regarding their behavior in detention. When DoD personnel observe or become aware of misbehavior by a detainee, the actions of the detainee are recorded and can serve was the basis for a potential punishment.  Violations of the rules and policies are punished by various methods, including loss of comfort items, transfer to different parts of the camp and restrictions on recreation opportunities.  These disciplinary procedures are the law enforcement mechanism used for governing the behavior of alien enemy combatants.  Maintaining order and discipline among the detainee population, and punishing their misconduct, is a critical law enforcement function of DoD personnel at Guantanamo.  The records documenting the detainee's misconduct are compiled and maintained in order to permit all guard personnel to be informed of detainees' past actions.  This provides continuity in the law enforcement process and also permits the guards to maintain a history of violations made by particular detainees.

52.  FOIA Exemption 2 (high) exempts from disclosure records that are "related solely to the internal personnel rules and practices of an agency," regarding "substantial internal matters, the disclosure of which would risk circumvention of a legal requirement."  I have determined that if DoD releases details about which types of discipline are taken in response to certain forms of detainee misbehavior, that release would significantly risk enabling detainees or others to circumvent the discipline system at JTF-GTMO or would impede the effectiveness of our discipline enforcement activities.  The matrix of disciplinary responses provide guidelines for

---

[4]  All detainees are issued certain basic items, including a Koran, a "finger toothbrush," toothpaste, soap, shampoo, plastic flip flops, and cotton underwear, shorts, pants and a shirt. Comfort items are additional items that are provided to detainees who act in compliance with facility rules and can include items such as a prayer rug, perfume oil, and prayer beads.

responding to reported disciplinary infractions on a case by case basis, in order to assure an

appropriate response consistent with maintaining safety and security for both detainees and

guards. Because the specific discipline that is adjudged in a situation is dependent on a variety

of factors, including the detainee's past disciplinary records and the specific facts of the

situation, the action taken by military personnel in the case of one detainee may not be the same

action taken in a similar case involving another detainee. However, releasing details about the

specific application of these guidelines in specific disciplinary situations would enable detainees

or others to use this information in an effort to force military personnel to alter the decisions

made in other similar disciplinary situations. It also risks giving rise to disputes between and

among detainees about punishments they have received relative to each other. This would

significantly disrupt the good order and discipline that is necessary for the safe and secure

operation of this wartime detention facility.

## Justification for Withholding Identifying Information About DoD Personnel Under Exemptions 3 and 6

53. Certain information is withheld throughout plaintiff's medical and detention records, namely

information that identifies JTF-GTMO medical personnel who were involved in treating plaintiff

and detention personnel who were involved in plaintiff's detention. This includes the names,

military ranks, signatures and initials of these personnel. DoD has also withheld the names and

other personally identifying information of its employees from the responsive records. This

information was withheld pursuant to FOIA Exemptions (b)(3) and/or (b)(6). 54. Exemption 3

permits the government to withhold information that is "specifically exempted from disclosure

by statute." 10 U.S.C. § 130b authorizes the withholding of "personally identifying information

regarding ... any member of the armed forces assigned to an overseas unit ... or a routinely

deployable unit." Exemption 6 permits the government to withhold information about

individuals when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy."

54.  I have determined that the names and other identifying information of DoD medical and detention personnel meet the criteria to be withheld pursuant to 10 U.S.C. § 130b and Exemption (b)(3).  I have further determined that this information, as well as other DoD employees' personally identifying information in the responsive documents, should be withheld under Exemption (b)(6) as its release would constitute a clearly unwarranted invasion of the personal privacy of these individuals. These individuals have a legitimate privacy interest and personal safety interest that would be threatened if this information was publicly disclosed and there is no public interest in having this information disclosed.  The public release of the names and other identifying information would not shed any light on how DoD performed its statutory duties relative to plaintiff.

### Justification for Withholding JTF-GTMO's and SOUTHCOM'S Assessments of Plaintiff and Disposition Recommendations Under Exemption 5

55. FOIA Exemption 5 permits the withholding of records that are inter-agency or intra-agency memoranda or letters which would not be available by law to a party other than an agency in litigation with the agency 5 U.S.C. § 552 (b) (5).  Exemption 5 has been construed to exempt those documents or information normally privileged in the civil discovery context and includes the predecisional deliberative process and attorney-client privilege.

56. The Deliberative Process Privilege protects the internal deliberations of the government by exempting from release recommendations, analysis, opinions, speculation and other non-factual information prepared in anticipation of decision-making.  Privileged information withheld from the responsive records includes internal or interagency deliberations regarding policy or future actions concerning treatment of detainees, including matters such as interrogation policies.

Disclosure of any of this deliberative information is likely to chill full, frank, and open internal discussions.

57.  Some of the withheld information constitutes assessments of the intelligence value of particular detainees and recommendations made by JTF-GTMO personnel to the JTF-GTMO commander on whether certain detainees should be retained in DoD custody, transferred to the custody of another country, or released.  These assessments and recommendations are predecisional in nature.  In addition, these assessments and recommendations are reviewed by personnel in the JTF-GTMO SJA's office for legal sufficiency.  The SJA's office then makes its own recommendations to the JTF-GTMO commander on the advice provided in these assessments and recommendations.  These assessments and recommendations along with the associated legal reviews are protected by the deliberative process privilege.  These assessments and recommendations were forwarded by JTF-GTMO and SOUTHCOM to the CSRT and to the ARBs as well as the Designated Civilian Official (DCO) during the ARB process.

58.  I have determined that these recommendations and assessments should be withheld under FOIA Exemption 5 because their release would severely hinder JTF-GTMO's and SOUTHCOM's ability to provide their candid assessments and recommendations regarding detainees such as Plaintiff to the CSRTs, ARBs, and DCO. The ARBs make their recommendations to the DCO in part on the basis of the assessments and recommendations they receive from various organizations, including JTF-GTMO and SOUTHCOM.  In addition, JTF-GTMO's and SOUTHCOM's recommendations and assessments are provided directly to the DCO for his consideration in deciding whether particular detainees should be transferred, released, or continued in detention, and are provided to the CSRTs in deciding whether particular

detainees are properly designated enemy combatants. If those recommendations and assessments are publicly disclosed under FOIA, the personnel involved in formulating such recommendations and assessments in the future would be dissuaded from providing complete, candid opinions and judgments. The quality of decisions concerning the designation and disposition of particular detainees would unavoidably deteriorate as a result.

## Justification for Withholding Records or Information Compiled for Law Enforcement Purposes Under Exemptions 7(A) and (E)

59. FOIA Exemption 7(A) permits withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information...could reasonably be expected to interfere with enforcement proceedings." Information withheld under this exemption relates to an on-going law enforcement proceeding or open investigation.

60. FOIA Exemption 7(E) exempts from mandatory disclosure "records or information compiled for law enforcement purposes" the disclosure of which "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."

61. DoD has withheld information that falls within those two subsections of Exemption 7. This category of information, much of which is already exempt under Exemptions 1 and 2, was compiled for law enforcement purposes because it was gathered during investigations for GTMO detainees for suspected war crimes or other prosecutable acts of terrorism. Trial by military commission remains a possibility for GTMO detainees. In addition, information produced by the ongoing investigations at GTMO is used by Administrative Review Boards, convened by the

Department of Defense, to determine whether certain detainees should be released from detention by the United States.

62. Release of this information would potentially compromise the interests of the United States, including interests related to investigation of the terrorist attack of September 11th as well as other ongoing terrorism-related investigations and trials. It would give interested parties improper insight into the techniques and guidelines used during investigations and prosecutions, allowing them to manipulate the outcomes of these investigations or in proceedings before the Administrative Review Boards or possibly the military commission. It may also reveal information from which it could be deduced that a particular detainee is still under investigation or being considered for trial by military commission.

63. Included in this category of records and information compiled for law enforcement purposes are the 4 polygraph documents found by JTF-GTMO.

64. DOD has publicly released general information on interrogations in such documents as the reports of Air Force General Counsel Mary Walker, Vice Admiral Albert Church, and former Defense Secretary James Schlesinger. Unlike those general disclosures, disclosure of the particular techniques used with particular detainees such as plaintiff would result in significant harm to the United States' counterterrorism and law enforcement efforts.

65. The Withheld Information also includes information related to interrogations and interrogation techniques. Disclosure of the particular interrogations techniques used on certain detainees such as plaintiff provide a far more detailed picture of DOD's interrogation process than the general information on interrogation techniques previously released by DOD. Such disclosure would provide persons hostile to the United States with information concerning the circumstances in which certain interrogation techniques are used, permitting them to discern

patterns of interrogation, draw conclusions regarding which techniques are or are not effective, and even create profiles of interrogation methods used on detainees possessing certain characteristics. Such disclosures, by providing information on which techniques were used with which detainees and their apparent effectiveness, would permit persons hostile to the United States to improve their ability to counter DOD's interrogation methods and devise countermeasures to circumvent particular techniques.

66. This concern is not a theoretical one. As noted in the Church Report, for example, DOD has determined, based on its experience with detainee interrogations and intelligence assessments, that members of Al Qaeda in particular likely have been schooled in resistance to interrogation. An Al Qaeda training manual recovered from the apartment of a known Al Qaeda operative in Manchester, England on May 10, 2000 (commonly referred to as the "Manchester Document"), also contains a lengthy section on counterinterrogation techniques. As DOD officials have publicly stated, the behavior of detainees at Guantanamo shows that they are well-versed in the contents of the Manchester Document and have adopted its techniques to resist interrogation.

67. I have determined that this information should be withheld under FOIA Exemption 7(A) and (E) because its release would severely hinder the ability of the United States in its investigation and prosecution of individuals, possibly including the plaintiff, as it continues to fight the Global War on Terror.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 1 OCT 2007

MARK H. BUZBY
Rear Admiral, United States Navy
Commander, Joint Task Force – Guantanamo