# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
MOHAMEDOU OULD SLAHI,     )
)
      Plaintiff,     )
)
   vs.     )     Civil Action No. 06-cv-0597 (JR)
)
U.S. DEPARTMENT OF DEFENSE     )
)
      Defendant.     )
_____ )

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Mohamedou Ould Slahi, through his undersigned counsel, respectfully

opposes in part the defendant U.S. Department of Defense's (DOD) Motion for Partial

Summary Judgment.  In particular, Mr. Slahi opposes summary judgment as to DOD's

claims that it conducted a reasonably adequate search of Southern Command and that it

properly withheld information regarding: (1) the illegal and brutal interrogation methods

that government agents used against Mr. Slahi at Guantanamo Bay Naval Station,

particularly during the summer and fall of 2003; (2) the dates documents were created

and, in some cases, the dates Mr. Slahi was interrogated; (3) the identity, including names

and ranks, of the government personnel who devised, approved, and implemented the

abuse and torture of Mr. Slahi during his detention at Guantanamo, particularly during

the summer and fall of 2003; and (4) the United States Government's role in Mr. Slahi's

arrest and transfer to Guantanamo, including the extraordinary rendition of Mr. Slahi from his home in Mauritania to Jordan for interrogation.

Mr. Slahi does not oppose entry of partial summary judgment as to the withholding of the following information DOD identifies as having been redacted from the documents produced: (a) current and properly classified intelligence gathering methods; (b) methods of coordinating intelligence gathering and analysis; (c) identities of any cooperating detainees; (d) internal codes indicating intelligence sources or other intelligence information; (e) photographs of men imprisoned at Guantanamo Bay, including Mr. Slahi; (f) the location of Mr. Slahi's cell; (g) information provided by a foreign government under a guarantee of confidentiality; (h) information related to military plans and operations, except those pertaining specifically to the abuse and torture of Mr. Slahi; and (i) instructions for handling and forwarding sensitive information.

In addition to asking the Court to deny DOD's motion with respect to the documents identified in the first paragraph, Mr. Slahi also respectfully asks the Court to order DOD to produce a supplemental *Vaughn* index that includes the dates of the documents---which largely were redacted from the index produced to the Court and Mr. Slahi.  Mr. Slahi also respectfully asks that the Court conduct an *in camera* review of unredacted versions of certain documents DOD produced to him to insure that information has not been withheld solely to prevent embarrassment to DOD.

## FACTUAL BACKGROUND

Because DOD challenges the public's interest in certain information it has chosen to withhold in this case, it is important to provide the Court with background information regarding Mr. Slahi and his request for the release of information pertaining to his ongoing detention by the United States Government.

**A.    The arrest and rendition of Mr. Slahi at the direction of the United States Government.**

Mohamedou Ould Slahi is a 37-year old citizen of Mauritania who has been imprisoned by or at the direction of the United States Government since November 2001. *See* Summary of Administrative Review Board Proceedings for ISN 760 (Summary of ARB Proceedings)[1] at 18, available at http://www.dod.mil/pubs/foi/detainees/csrt/ARB_Transcript_Set_8_20751-21016.pdf [attached as Exhibit A]. On September 29, 2001, Mr. Slahi turned himself into the Mauritanian police at their request. He was interrogated by at least two Americans, who Mr. Slahi believes were FBI agents. One of his interrogators struck him with a full bottle of water and threatened to torture him. *Id.* Mauritanian authorities subsequently released Mr. Slahi in October 2001. *Id.* at 19. However, he was rearrested on November 20, 2001, after again turning himself into Mauritanian authorities at their request. *Id.* at 20.

After his second arrest, the United States Government almost immediately rendered Mr. Slahi to Jordan, where he was imprisoned, interrogated, and abused for

---

[1] Mr. Slahi elected to make a statement under oath before the Administrative Review Board. Summary of ARB Proceedings, at 1. Thus, all statements referred to in this factual background were made under oath.

approximately eight months.[2]  *Id.* at 20-21 (Mr. Slahi describing repeatedly being struck in the face and threatened with torture, being shown a man who had been badly beaten and listening to the moans and cries of others being beaten).  On July 19, 2002, the United States Government rendered Mr. Slahi from Jordan to Bagram, Afghanistan, where he was interrogated by American soldiers.  *Id.* at 21-23.  Mr. Slahi reports that with the exception of one incident involving a soldier dragging him over concrete stairs, he was not tortured in Bagram, although he was made to sit on his knees for long periods of time which exacerbated his sciatica.  *Id.* at 23.   He was also threatened with torture.  *Id.*

**B.      The abuse and torture of Mr. Slahi at Guantanamo Bay Naval Station, Cuba.**

On August 4, 2002, the United States Government flew Mr. Slahi to Guantanamo Bay, Cuba, where he has been imprisoned ever since.  *Id.* at 23.  As with the vast majority of the prisoners held at Guantanamo Bay, Mr. Slahi has never been charged with a crime.

After his arrival at Guantanamo Bay, Mr. Slahi a special FBI team interrogated Mr. Slahi for several months.  *Id.* at 24-25; *see also* Erik Saar and Viveca Novak, INSIDE THE WIRE: A MILITARY INTELLIGENCE SOLDIER'S EYEWITNESS ACCOUNT OF LIFE AT

---

[2] At the time the United States Government sent Mr. Slahi to Jordan for interrogation, it was well aware of the fact that there were "significant problems in [Jordan's] human rights record[,]" including "extrajudicial killings by members of the security forces, police abuse and mistreatment of detainees; allegations of torture; arbitrary arrest and detention[.]"  *Jordan: Country Reports on Human Rights Practices – 2000*, released by the U.S. Department of State on Feb. 23, 2001, and available at http://www.state.gov/g/drl/rls/hrrpt/2000/nea/836.htm; *see also Jordan: Country Reports on Human Rights Practices – 2001*, released by the U.S. Department of State on Mar. 4, 2002, and available at http://www.state.gov/g/drl/rls/hrrpt/2001/nea/8266.htm ("Other human rights problems include police abuse and mistreatment of detainees [and] allegations of torture[.]").

GUANTANAMO 151-52 (Penguin Group 2005) (describing the FBI interrogation of Mr.

Slahi). On approximately May 22, 2003, the FBI agent who had been interrogating Mr.

Slahi informed him that was their last session together and Mr. Slahi "was not going to

enjoy the time to come." Summary of ARB Proceedings at 25. Mr. Slahi was then

handed over to new interrogators, at least some of whom were employees of the

Department of Defense. *Id.* (describing an interrogator as a "First Sgt."); *see also*

Memorandum for Record dated December 24, 2004, FOIA Disclosure 1439-1446

(redacted document showing that "[redacted] turned over hold status of the detainee to

DOD by stating that the detainee 'would not be invited to tea and snacks'") [attached as

Exhibit B].

　　　Around June 18, 2003, Mr. Slahi was put into total isolation. Summary of ARB

Proceedings at 25; *see also* Inspection Record of Prisoner in Segregation, FOIA

Disclosure 4-12 (June 16 – August 19, 2003) [attached as Exhibit C]; Memorandum for

Record at 1439 ("On 17 June 2003, two guards appeared at the detainee's cell and

informed him that he was moving."). From approximately mid-June through mid-August

2003, Mr. Slahi was subjected to daily interrogations, during which time his interrogators

(1) kept him in a cell Mr. Slahi described as the "freezer" because it was so cold; (2)

forced him to stand with his hands shackled to the floor or to stand all day during

interrogations, which exacerbated his sciatica; (3) sexually abused him by having a

female interrogator touch his crotch, rub her breasts on him, and make sexual comments;

(4) deprived him of sleep by pouring ice-cold water on him and banging on the walls of

his cell at night, such that he got at most one hour of sleep at a time; (5) forced him to

stand in a room with strobe lights and heavy-metal music playing on repeat, until he could no longer stand from the exhaustion; (6) deprived him of food; (7) threatened him with torture and threatened to harm his family; (8) head butted him; (9) forbade him from praying or mocked his prayers; and (10) showed him a forged letter from Washington stating that the United States Government was going to put his mother in jail. Memorandum for Record at 1439-44. This abuse lasted for approximately 70 days. *Id.*

On approximately August 23, 2003, the torture of Mr. Slahi escalated. *Id.* at 1444-45; *see also* Summary of ARB Proceedings at 27. Mr. Slahi was being interrogated when he heard several individuals running down the hall. Memorandum for Record at 1444. Three men burst into the room, two of whom were wearing masks and one of whom was holding a military working dog. The men began hitting Mr. Slahi all over his body, then blindfolded him and restrained his wrists and ankles so tightly they bled. *Id.* They then dragged him into a vehicle while continuing to hit him. He was placed in a boat, where he remained for approximately one to three hours and was forced to drink salt water. *Id.* Finally, he was taken off the boat and placed in a chair, where he was continually but randomly beaten for another four hours. *Id.* His captors put ice down his shirt and pants and, when the ice would melt, added more.

Eventually, he was placed in another cell and seen by an alleged doctor, who treated his injuries while cursing him. *Id.* Medical records released pursuant to FOIA indicate that Mr. Slahi suffered from rib contusions, an edema of the lip, and a small laceration on August 26, 2003. Medical Records for ISN 760 (Mr. Slahi) at 96, 98, disclosed May 31, 2006 [attached as Exhibit D]. Mr. Slahi was given medication that

caused him to drift in and out of consciousness for what he believes were two to three weeks. Memorandum for Record at 1444. He does not recall being interrogated during that time, although he was awakened every hour or two and forced to drink water. *Id.* at 1444-45. During this period, the International Committee of the Red Cross (ICRC) was prohibited from visiting Mr. Slahi. *See* Memorandum for Record, Subject: Meeting with MG Miller on 09 Oct 03, available at http://www.washingtonpost.com/wp-srv/nation/documents/GitmoMemo10-09-03.pdf [attached as Exhibit E] (Vincent Cassard of the ICRC notes that the ICRC had not yet been allowed to visit four detainees, including Mr. Slahi (ISN 760) and MG Miller informed the ICRC that Mr. Slahi and two other detainees were still off-limits due to "military necessity"); *see also* Minutes of ICRC Meeting at 2 (Feb. 2, 2004), available at http://www.washingtonpost.com/wp-srv/nation/documents/GitmoMemo02-02-04.pdf [attached as Exhibit F] (ICRC again refused permission to visit Mr. Slahi).

To end this horrific treatment, Mr. Slahi decided to admit to whatever the interrogators wanted to hear. *Id.* at 1445. Because he was afraid, however, Mr. Slahi did not report what had happened to him for well over a year. *See* Summary of ARB Proceedings at 28 (stating that he was afraid to disclose his torture at his Combatant Status Review Tribunal (CSRT) hearing on December 8, 2004); *see also* Summary of CSRT Hearing for ISN 760 at 7-8, available at http://www.dod.mil/pubs/foi/detainees/csrt/Set_41_2665-2727.pdf at 35-36 (refusing to discuss his mistreatment by American soldiers "if I don't have to").

**C.    Government corroboration of Mr. Slahi's allegations of abuse and torture at Guantanamo.**

Some of the specific details of Mr. Slahi's mistreatment have been confirmed by sources within the United States Government.  For example, on June 9, 2005, the Department of Defense released a report of an investigation into FBI allegations of the abuse and torture of men imprisoned at Guantanamo.  *See* John T. Furlow and Randall M. Schmidt, ARMY REGULATION 15-6 FINAL REPORT: INVESTIGATION INTO FBI ALLEGATIONS OF DETAINEE ABUSE AT GUANTANAMO BAY, CUBA DETENTION FACILITY (Schmidt-Furlow Report), available at http://www.defenselink.mil/news/Jul2005/d20050714report.pdf (as amended June 9, 2005) [attached as Exhibit G].

The Schmidt-Furlow Report confirmed generally the Department of Defense's use of many of the abusive techniques Mr. Slahi reported, including female interrogators acting in sexually inappropriate manners with detainees, *id.* at 7-8; interrogators placing prisoners in an interrogation booth and subjecting them to strobe lights and loud music, *id.* at 9; subjecting prisoners to extremes in temperature, *id.* at 9-10; and extreme sleep deprivation, termed the "frequent flyer program," during which prisoners are awakened every few hours, *id.* at 9-10; *see also id.* at 5-6 (recognizing that allowing a person to rest briefly and then repeatedly awakening him constitutes sleep deprivation).  The report also documented, although it did not confirm, FBI allegations regarding the shackling of detainees' hands to the floor and requiring them to stand or to lie down in a fetal position.

*Id.* at 12. The Report did note, however, that the practice was specifically prohibited in later Standard Operating Procedures. *Id.*

In addition to addressing generally abusive techniques used against the men imprisoned at Guantanamo, the Schmidt-Furlow Report also specifically investigated allegations of the abuse and torture of Mr. Slahi.[3] *Id.* at 21-26. The Report confirmed the use of certain interrogation techniques against Mr. Slahi, including the use of extreme heat and cold during interrogations, *id.* at 22, as well as threats to Mr. Slahi and his family, *id.* at 23-26. As for the other forms of abuse and torture Mr. Slahi suffered, the Report's authors did not confirm their use as they were not documented in the interrogation logs.[4] *Id.* at 23 ("The interrogation logs contain no reference to any physical violence against the subject of the Second Special Interrogation Plan."). Although DOD developed a special interrogation plan for Mr. Slahi, it was never implemented because Mr. Slahi had already decided to admit to whatever the interrogators wanted to hear in order to stop the earlier torture. *Id.*; *see also* Sworn

---

[3] Although Mr. Slahi is not named in the report, the details of the techniques used against the prisoner subjected to the Second Special Interrogation Plan coupled with the Report's description of the timing of that prisoner's disclosure of abuse and torture make it clear that the prisoner is Mr. Slahi. For example, the Report discusses two memos disclosing the torture of the subject of the Second Special Interrogation Plan, dated December 11 and 24, 2004. Schmidt-Furlow Report at 3. These are the dates of two Memoranda for Record disclosed in this FOIA litigation. *See* Memorandum for Record, FOIA Disclosure 1431-32 (Dec. 11, 2004); Memorandum for Record, FOIA Disclosure 1439-46 (Dec. 24, 2004). In addition, the Schmidt-Furlow Report discusses an interrogator impersonating a Navy Captain and presenting the prisoner with a letter purportedly from the White House threatening to interrogate the prisoner's mother and transport her to Guantanamo Bay for long-term detention. *Id.* at 24. This same incident is reported in the Memorandum for Record detailing Mr. Slahi's account of his abuse and torture. *See* Memorandum for Record, FOIA Disclosure 1443 (December 24, 2004).

[4] In the course of his FOIA request, Mr. Slahi specifically requested that DOD release copies of these interrogation logs. *See* May 21, 2007 Letter from Sylvia Royce to Nicholas J. Patterson at 2, attached as Exhibit 6 to Declaration of Jean Lin, Dkt. 19-4 (October 1, 2007). DOD has not produced the logs, although the authors of the Schmidt-Furlow Report clearly had access to them. *See* Schmidt-Furlow Report at 21, 22, 23 (referring to "interrogation logs").

Testimony of LTG Randall Schmidt, Aug. 24, 2005 at 48-49, available at

http://images.salon.com/ent/col/fix/2006/04/14/fri/Schmidt.pdf [attached as Exhibit H]

(describing the "ruse" used on a "classified detainee" that included death threats and a

boat ride similar to the one described by Mr. Slahi and which led to the detainee

capitulating before DOD could implement its special interrogation plan for the detainee).

      Although the Schmidt-Furlow Report did not confirm the full spectrum of abuse

and torture perpetrated against Mr. Slahi, the military prosecutor assigned to his case

ultimately concluded that Mr. Slahi had been tortured.  On March 31, 2007, the Wall

Street Journal published an article reporting that the Department of Defense prosecutor

assigned to prosecute Mr. Slahi, Lieutenant Colonel V. Stuart Couch, refused to proceed

with the prosecution.   Jess Bravin, *The Conscience of the Colonel*, Wall Street Journal, at

A1 (March 31, 2007) (*Conscience of the Colonel*) [attached as Exhibit I].  According to

the article, Lt. Col. Couch "concluded that Mr. Slahi's incriminating statements---the

core of the government's case---had been taken through torture, rendering them

inadmissible under U.S. and international law."  *Id.*

      In fact, Col. Couch witnessed one of the many forms of torture Mr. Slahi endured

during the exact time period Mr. Slahi reported enduring it.  *Compare Conscience of the*

*Colonel* at 3 ("On his first visit to Guantanamo in October 2003, he recalls preparing to

watch an interrogation of a detainee when he was distracted by heavy-metal music.

Accompanied by an escort, he saw a prisoner shackled to a cell floor, rocking back and

forth, mumbling as strobe lights flashed.  Two men in civilian dress shut the cell door and

told Col. Couch to move along."), *with* Memorandum for Record, FOIA documents at

1441 ¶ 8 (Dec. 24, 2004) ("The detainee described the night shift as psychologically

terrorizing.  The interrogations were held in [redacted] and included strobe lights and

threatening music being played on repeat such as, 'Let the Bodies Hit the Floor.'[5]  The

guards tried to get the detainee to stand, but he kept falling down from exhaustion.").

On November 8, 2007, Lt. Col. Couch was scheduled to appear before Congress to

testify about his knowledge of interrogation practices at Guantanamo Bay, which would

presumably include his knowledge of the torture of Mr. Slahi.  However, the Department

of Defense forbade him to testify.  Jess Bravin, *Pentagon Forbids Marine to Testify*, Wall

Street Journal, at A1 (Nov. 8, 2007).

---

[5] The song is likely "Bodies" by the heavy-metal band Drowning Pool.  The song is reportedly popular
with the United States military personnel.  *See* Official Website for Drowning Pool, located at
http://www.drowningpool.com/news.html (discussing the band's relationship with the U.S. military).  The
song begins and ends with the screaming repetition of the phrase "Let the bodies hit the floor."  The lyrics
describe being beaten and "driven by hate consumed by fear." The chorus, which is repeated three times
during the song (in addition to the repetition of the phrase at the beginning and end of the song), reads:

> One - Nothing wrong with me
> Two - Nothing wrong with me
> Three - Nothing wrong with me
> Four - Nothing wrong with me
> One – Something's got to give
> Two – Something's got to give
> Three – Something's got to give
> Now!
> Let the bodies hit the floor
> Let the bodies hit the floor
> Let the bodies hit the floor
> Let the bodies hit the floor
> Let the bodies hit the floor
> Let the bodies hit the floor

**D.    The FOIA Litigation.**

Mr. Slahi does not contest DOD's description of the history of this FOIA litigation nor does he dispute the factual allegations in DOD's Statement of Material Facts as to Which There is No Genuine Issue in Support of Its Motion for Partial Summary Judgment Regarding Southern Command (Statement of Material Facts), Dkt. 19-3 (Oct. 1, 2007).[6]  However, Mr. Slahi draws the Court's attention to additional facts relevant to its determination of whether DOD has met its burden of proving both that it has conducted a reasonable search for responsive records with the Southern Command and that it is entitled to withhold information under the FOIA exemptions it cites.

On May 21, 2007, Mr. Slahi's counsel, Sylvia Royce, specifically asked that DOD produce copies of records of polygraph examinations and interrogation logs if those documents were not within the already-identified group of documents DOD stated it would produce.  *See* May 21, 2007 Letter from Sylvia Royce to Nicholas J. Patterson at 2, attached as Exhibit 6 to Declaration of Jean Lin, Dkt. 19-4 (Oct. 1, 2007).  According to DOD, only the Joint Intelligence Group was tasked to look for these documents.  *See* Statement of Material Facts at ¶ 20; *see also* Declaration of Rear Admiral Mark H. Buzby (Buzby Declaration) at 11, Dkt. 19-6 (Oct. 1, 2007).  Although the Joint Intelligence Group found four polygraph documents, it did not find any "interrogation logs." Statement of Material Facts at ¶ 20.  DOD has produced no evidence that it searched any other units of the Southern Command.

---

[6] With respect to DOD's statement that it has withheld documents under particular FOIA Exemptions, Mr. Slahi disputes that the Exemptions identified authorize DOD to withhold the information, as discussed in greater detail in this response.  Statement of Material Facts, at ¶ 24.

The interrogation logs for Mr. Slahi clearly were created by personnel at Southern Command as they are discussed throughout the Schmidt-Furlow Report. *See* Schmidt-Furlow Report at 21-23. In addition, the interrogation log of another detainee was made public in 2005 in a Time magazine article. *See* Extracts from an Interrogation Log, Time Magazine (June 12, 2005) (describing the interrogation of Guantanamo Detainee 063), available at http://www.time.com/time/magazine/article/0,9171,1071202,00.html.

In addition to the missing interrogation logs, it appears that DOD has either failed to produce documents containing information previously released or it has chosen to withhold information it previously released from those documents it has produced. Specifically, the Schmidt-Furlow Report quotes from Memoranda for Records (MFRs) dated August 2, 2003 and September 8, 2003. Schmidt-Furlow Report at 25. The quoted material appears nowhere in the MFRs DOD produced. *See* Declaration of Theresa M. Duncan (Duncan Declaration) at ¶¶ 3-5 [attached as Exhibit J]. As the dates of the MFRs produced in this case have all been redacted, it impossible to tell whether DOD failed to produce these MFRs in their entirety or has simply chosen to withhold those paragraphs previously released.

Finally, despite the evidence that Mr. Slahi was abused and tortured while at Guantanamo and that this mistreatment was investigated, the only documents Southern Command appears to have produced related to the investigation of that mistreatment are two memoranda summarizing Mr. Slahi's allegations and the results of a records search conducted December 15, 2004. *See* Duncan Declaration at ¶ 6.

## ARGUMENT

**A.    Introduction**

The purpose of the Freedom of Information Act (FOIA) is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). FOIA "seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *E.P.A v. Mink*, 410 U.S. 73, 80 (1973). Thus, FOIA is "often explained as a means for citizens to know what their Government is up to." *National Archives & Records Admin. v. Favish*, 541 U.S. 157, 171 (2004), reh'g denied, 541 U.S. 1047 (2004) (internal quotation and citation omitted).

FOIA "adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies." *Halpern v. Federal Bureau of Investigation*, 181 F.3d 279, 286 (2d Cir. 1999). While there are nine exemptions pursuant to which an agency may withhold information, *see* 5 U.S.C. § 552 (b)(1)-(9), the Court of Appeals for the District of Columbia has "repeatedly stated that these exemptions must be construed narrowly, in such a way as to provide the maximum access consonant with the overall purpose of the Act." *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973); *see also Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7-8 (2001) ("These limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act; consistent with the Act's

14

goal of broad disclosure, these exemptions have been consistently given a narrow compass.") (internal quotations and citations omitted).  For this reason, any reasonably segregable portion of any record must be released.  *See* 5 U.S.C. § 552(b).

"By like token and specific provision of the Act, when the Government declines to disclose a document the burden is upon the agency to prove *de novo* in trial court that the information sought fits under one of the exemptions to the FOIA."  *Vaughn*, 484 F.2d at 823; *see also United States Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 755 (1989) ("Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter *de novo*.'"), *quoting* 5 U.S.C.§ 552(a)(4)(B).  To meet its burden of showing that it has properly withheld documents or information, the government is required to produce "a relatively detailed analysis in manageable segments" of the material withheld without resort to "conclusory and generalized allegations of exemptions."  *Vaughn*, 484 F.2d at 826-27; *see also Halpern*, 181 F.3d at 291.  This analysis most frequently takes the form of a declaration and index setting forth the bases for the government's claimed exemptions under FOIA.  The declaration must "describe with reasonable specificity the nature of the documents at issue and the justification for nondisclosure; the description provided in the affidavits must show that the information logically falls within the claimed exemption."  *Lesar v. United States Dep't of Justice*, 636 F.2d 472, 481 (D.C. Cir. 1980).  In addition, the index should divide the documents under consideration "into manageable parts cross-referenced to the

relevant portions of the Government's justification" for withholding information.
*Vaughn*, 484 F.2d at 827.

FOIA requires that the trial court review *de novo* the government's decision to withhold information from the public, and specifically authorizes the court to examine documents *in camera* where necessary to perform this review.  5 U.S.C. § 552(a)(4)(B). Courts enjoy broad discretion to conduct *in camera* review of withheld documents, particularly where the government relies on vague or generalized assertions to justify the withholding.  *See Allen v. CIA*, 636 F.2d 1287, 1298-99 (D.C. Cir. 1980), *overruled on other grounds by Founding Church of Scientology v. Smith*, 721 F.2d 828 (D.C. Cir. 1983) (finding, *inter alia*, conclusory nature of agency affidavits, bad faith on the part of the agency, disputes over the contents of a document, and strong public interest in disclosure militate in favor of *in camera* review of withheld documents); *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978) ("*In camera* inspection does not depend on a finding or even tentative finding of bad faith. A judge has discretion to order *in camera* inspection on the basis of an uneasiness, on a doubt he wants satisfied before he takes responsibility for a *de novo* determination. Government officials who would not stoop to misrepresentation may reflect an inherent tendency to resist disclosure, and judges may take this natural inclination into account.").

*In camera* review is particularly appropriate in cases such this in which evidence exists "of bad faith or illegality with regard to the underlying activities which generated the documents at issue."  *Jones v. Federal Bureau of Investigation*, 41 F.3d 238, 242 (6th Cir. 1994); *see also Paterson by Patterson v. Federal Bureau of Investigation*, 893 F.2d

595, 599 (3d Cir. 1990) (district court concluded *sua sponte* "that *in camera* inspection of certain withheld documents is required in order for this Court to assure itself that the FBI has acted in good faith with regard to its investigation of Todd Patterson, that the FBI complied with all relevant government regulations, and that the FBI engaged in no illegal conduct"). Although an agency's processing of a FOIA request ordinarily enjoys a presumption of good faith, "where it becomes apparent that the subject matter of a request involves activities which, if disclosed, would publicly embarrass the agency or that a so-called 'cover up' is presented, government affidavits lose credibility." *Jones*, 41 F.3d at 243, *quoting Ingle v. Dep't of Justice*, 698 F.2d 259, 267 (6th Cir.1983), *overruled on other grounds by United States Dep't of Justice v. Landano*, 508 U.S. 165 (1993). Where evidence of such illegality is strong, the Sixth Circuit has concluded "it would be an abdication of the court's responsibility to treat the case in the standard way and grant summary judgment on the basis of *Vaughn* affidavits alone." *Jones*, 41 F.3d at 243.

Mr. Slahi does not object to DOD's decision to withhold much of the information identified in the Declaration of Rear Admiral Mark H. Buzby. However, Mr. Slahi strongly objects to its decision to withhold the following information: (1) the illegal interrogation methods that government agents used against Mr. Slahi at Guantanamo Bay Naval Station, particularly during the summer and fall of 2003; (2) the dates documents were created and, in some cases, the dates Mr. Slahi was interrogated; (3) the identity, including names and ranks, of the government personnel who devised, approved, and implemented the abuse and torture of Mr. Slahi during his detention at Guantanamo, particularly during the summer and fall of 2003; and (4) the United States Government's

role in Mr. Slahi's arrest and transfer to Guantanamo, including the extraordinary

rendition of Mr. Slahi from his home in Mauritania to Jordan for interrogation.

In addition, Mr. Slahi objects to DOD's *Vaughn* index insofar as it fails to include

the date on which documents were created and fails to provide sufficient information

regarding the contents of certain documents. Finally, Mr. Slahi opposes the entry of

summary judgment on DOD's claim that it has conducted a reasonably adequate search

for responsive documents, particularly with respect to the logs used to document his

interrogations and the investigation of his allegations of torture.

**B.     DOD has failed to meet its burden of proving that it may withhold information regarding government agents' past use of illegal interrogation methods against Mr. Slahi at Guantanamo Bay Naval Station.**

DOD claims that it is entitled to withhold information regarding interrogation

methods it has employed against Mr. Slahi pursuant to FOIA Exemptions 1, 2, and 7(E).

DOD Motion for Partial Summary Judgment at 19-21, 26-27, 37; Buzby Declaration at ¶¶

37-42, 65-67. Mr. Slahi does not contest DOD's decision to withhold information

regarding properly classified, lawful interrogation techniques currently employed.

However, Mr. Slahi strongly opposes the withholding of information regarding the

unlawful and brutal interrogation techniques used against him in the past, particularly in

the summer and fall of 2003. DOD's grounds for redacting this information are

insufficient to justify that withholding.

       **1.**    *DOD has failed to meet its burden of proving that information regarding the past use of cruel and frequently unlawful interrogation methods against Mr. Slahi may be withheld pursuant to Exemption 1.*

Exemption 1 exempts from disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). The Executive Order DOD invokes, Executive Order 12958, allows classification where disclosure "could reasonably be expected to cause damage to the national security," but makes clear that classification may not be used to "conceal violations of law" or "to prevent embarrassment." Executive Order 12958, at § 1.8(a). The Executive Order authorizes classification of information only if all of four prerequisites are met: (1) an "original classification authority" must classify the information; (2) the information must be "owned by, produced by or for, or … under the control of the United States Government"; (3) the information must fall within one of the authorized categories of information described in section 1.5 of the Order; and (4) the original classification authority must determine "that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and must be "able to identify or describe the damage." *Id.* at § 1.2(a). With respect to the third prerequisite, DOD asserts in this case that the interrogation methods used against Mr. Slahi qualify as "intelligence activities (including special activities), intelligence sources or methods, or cryptology." *Id.* at § 1.5(c). With respect to the fourth prerequisite, "damage to the national security" is defined as "harm to the national

defense or foreign relations of the United States from the unauthorized disclosure of information, to the sensitivity, value, and utility of that information." *Id.* at 1.1(l).

DOD claims that it is entitled to withhold information regarding interrogation methods used against Mr. Slahi because release of that information would allow "individuals of intelligence interest to anticipate and immunize themselves from those methods" and "to tailor their behavior and adopt means to thwart the agencies' efforts." Buzby Declaration at ¶¶ 39a-42; DOD Motion for Partial Summary Judgment at 20. DOD also claims that it will suffer "not only the cost of developing the initial methods [of interrogation], but also the loss of intelligence while new methods are being developed." DOD Motion for Partial Summary Judgment at 20; *see also* Buzby Declaration at ¶ 39a. DOD's *Vaughn* index does not distinguish between past and present interrogation methods, but simply states in a conclusory manner that release of information regarding interrogation methods and activities "would be of material assistance to those who would seek to penetrate, detect, prevent, avoid or otherwise damage the intelligence operations of the United States." Buzby Declaration at ¶ 39a. While the government's allegations may be sufficient to justify withholding information regarding <u>current</u>, lawful and properly classified interrogation methods, those allegations are patently insufficient to justify the redaction of information regarding the <u>past</u> use of unlawful or outdated interrogation methods against Mr. Slahi.

As such, Mr. Slahi does not challenge the withholding of information regarding current, lawful and properly classified interrogation methods. However, the release of information regarding the past abuse and torture of Mr. Slahi will not compromise the

future national security of the United States as many of the methods used against him were unlawful at the time they were used and others have since been prohibited. *See* Schmidt-Furlow Report at 12 (short-shackling previously used at Guantanamo now prohibited under Standard Operating Procedures). As of December 30, 2005, the effective date of the Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680, §§ 1001-1006, the treatment of all individuals in DOD custody has been governed by the publicly available United States Army Field Manual. *See id.* at § 1002(a) ("No person in the custody or under the effective control of the Department of Defense or under detention in a Department of Defense facility shall be subject to any treatment or technique of interrogation not authorized by and listed in the United States Army Field Manual on Intelligence Interrogation."). Although the United States Army Field Manual was recently updated, it has been and remains a publicly available document.[7]

Accordingly, knowledge of interrogation techniques applied on Mr. Slahi in the past---particularly those techniques that deviate from the Army Field Manual---will not allow "individuals of intelligence interest to anticipate and immunize themselves from those methods." There can be no harm in persons anticipating methods that should never have been used in the first place or which are specifically prohibited from being used in the future. As for these past methods, the government has failed to prove that information regarding them is properly classified under Executive Order 12958, rather than improperly withheld in order to conceal violations of law or to hide embarrassing

---

[7] *See* FM 2-22.3 (FM 34-52), Human Intelligence Collector Operations (2006), available at http://www.fas.org/irp/doddir/army/fm2-22-3.pdf; Dep't of Army, Field Manual 34-52: Intelligence Interrogation (1992), available at http://www.fas.org/irp/doddir/army/fm34-52.pdf.

information.  *See American Civil Liberties Union v. Department of Defense*, 339 F. Supp. 2d 501, 504-05 (S.D.N.Y. 2004) ("If the documents are more of an embarrassment than a secret, the public should know of our government's treatment of individuals captured and held abroad.").

Because DOD chose to redact the dates of almost all the documents it produced in this case and redacted those dates from its *Vaughn* index, it is impossible to draw to the Court's attention specific documents referring to past as opposed to present interrogation methods.  However, it is very likely that some of the produced documents do contain information regarding past interrogation methods, including information that the government previously made public.  For example, the Schmidt-Furlow Report quotes from two Memoranda for Record (MFRs), dated August 2, 2003, and September 8, 2003, which detail some of the illegal methods described above.  *See* Schmidt-Furlow Report at 25 (quoting MFRs describing death threats made against Mr. Slahi as well as documenting the use of the forged letter stating Mr. Slahi's mother would be arrested and brought to Guantanamo).  While DOD's *Vaughn* index refers to numerous MFRs,[8] DOD has redacted the documents essentially in their entirety.

Although FOIA authorizes *in camera* review of documents and information withheld under any of the Act's nine exemptions, *see* 5 U.S.C. § 552(a)(4)(B), Congress expressly intended the provision for *in camera* review to encompass Exemption 1 withholdings, in particular.  *Halpern*, 181 F.3d at 291 (discussing 1974 Amendment to

---

[8] The MFRs may be found at bates numbers 582-619, 625-646, 649-50, 656-70, 674-97, 704-20, 723-39, and 742-53.  In addition, MFRs mislabeled in the Vaughn index as "Summary Interrogation Reports" may be found at bates numbers 754-63, 777-98, 804-28, 831-53, 859-60, 871-73, 878-84, 900-01, and 905-08.

FOIA, which "clarified that *de novo* review should apply in all cases, and specifically extended the language of FOIA's provision for *in camera* inspection to encompass Exemption 1"). Given DOD's decision to withhold not only information regarding current interrogation methods but also information regarding past methods that were illegal when perpetrated or have since been banned, *in camera* review is appropriate to ensure that the information withheld properly falls within the scope of Exemption 1 and is not being withheld simply to conceal violations of law or to hide embarrassing information. *See Jones*, 41 F.3d at 243 (where evidence of illegal conduct is strong, "it would be an abdication of the court's responsibility to treat the case in the standard way and grant summary judgment on the basis of *Vaughn* affidavits alone"). Thus, Mr. Slahi respectfully asks that this Court order DOD to produce unredacted documents for this Court's *in camera* review.

> **2.    DOD has failed to meet its burden of proving that information regarding the past use of cruel and frequently unlawful interrogation methods against Mr. Slahi may be withheld pursuant to Exemption 2.**

Exemption 2 permits the withholding of documents "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). "The general thrust of the exemption is to relieve agencies of the burden of assembling and maintaining for public inspection matters in which the public could not reasonably be expected to have an interest." *Dep't of Air Force v. Rose*, 425 U.S. 352, 269-70 (1976). Thus, the Exemption relates to information concerning "those rules and practices that affect the internal workings of an agency, and, therefore, would be of no genuine public interest." *Massey v. Federal Bureau of Investigation*, 3 F.3d 620, 622 (2d Cir. 1993) (citation omitted). Such

internal agency information may be withheld if it is of "no genuine public interest" or, if the material is of public interest, "the government demonstrated that disclosure of the material would risk circumvention of lawful agency regulations." *Id.* The former type is often referred to as "Low 2" information, and the latter as "High 2" information. *Schiller v. Nat'l Labor Relations Board*, 964 F.2d 1205, 1207 (D.C. Cir. 1992).

Information regarding the past abuse and torture of a man imprisoned at Guantanamo Bay Naval Station by agents of our government is clearly of significant public interest. The government may only withhold records of significant public interest (or "High 2" information), if it can establish that: (1) the records fit the language of the statute, namely they relate to the "personnel rules and practices of the agency," and are "predominantly internal;" and (2) their disclosure must "significantly risk circumvention of agency regulations or statutes." *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1074 (D.C. Cir. 1981). DOD has not satisfied these criteria with respect to illegal or obsolete interrogation methods.

Assuming *arguendo* that information regarding the application of specific interrogation methods against a particular detainee relate to the "personnel rules and practices of the agency," and are "predominantly internal," DOD has failed to show--- indeed it cannot show---that disclosure of past application of illegal or now-discontinued interrogation methods "significantly risks circumvention of agency regulations or statutes." Rather than allowing persons of current or future intelligence interest to circumvent the "law," disclosure of the use of these methods against Mr. Slahi would

shed light on the use of unlawful and cruel techniques the government had no authority to use in the first place.

> ### 3. DOD has failed to meet its burden of proving that information regarding the past use of cruel and frequently unlawful interrogation methods against Mr. Slahi may be withheld pursuant to Exemption 7(E).

Exemption 7(E) provides for the withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information … (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).  An agency withholding records under this exemption must first establish that the records it seeks to withhold were "compiled for law enforcement purposes."  To demonstrate a "risk of circumvention of the law," the agency must demonstrate that the rules or procedures it seeks to withhold are not well known to the public.  *See Nat'l Sec. Archive v. Federal Bureau of Investigation*, 759 F. Supp. 872, 885 (D.D.C. 1991).

Importantly, "while documents which would reveal investigative techniques and procedures are exempted, FOIA does not shield materials relating to unauthorized or illegal investigative tactics."  *Kanter v. Internal Revenue Service*, 433 F. Supp. 812, 822 (N.D. Ill. 1977).  As one court stated:

> Because the policy behind this exemption is to shield effective and little-known law enforcement techniques from potential violators so that they may not be circumvented, Exemption 7(E) may not be used to withhold information regarding investigative techniques that are illegal or of questionable legality. The agency can have no valid interest in preventing

the public from discovering such techniques-indeed, there is a strong
countervailing public interest in exposing such methods to public scrutiny,
and in ensuring that agencies do not abuse their police power. Therefore,
Exemption 7(E) does not permit redactions of improper law enforcement
techniques.

*Wilkinson v. Federal Bureau of Investigation*, 633 F. Supp. 336, 349-50 (C.D. Cal. 1986).

Under these authorities and for the reasons stated above, Exemption 7(E) cannot

shield from public view information regarding the illegal interrogation methods used

against Mr. Slahi in the past. Because the government has failed to meet its burden of

showing that it properly withheld information regarding the use of illegal or now-

discontinued interrogation methods against Mr. Slahi, this Court must deny DOD

summary judgment as to this information.

**C.    DOD has failed to meet its burden of proving that it may withhold the dates
of documents it has produced.**

Although it does not say so in its memorandum in support or in its declarations,

DOD has redacted the dates of the vast majority of the documents it has produced. The

redacted dates are marked most frequently with FOIA exemption (b)(2). A representative

sampling of these redacted documents is attached as Exhibit K. In the case of the

Summary Interrogation Reports, DOD has redacted the dates from most, but not all of the

Reports. *See* Exhibit K at 224, 1029 (samples of Summary Interrogation Reports with

date redacted and not redacted). In the case of the Memoranda for Record, the

government has not only redacted the dates on which the documents were produced, but

also the dates on which the interrogations recorded in the memorandum were conducted.

*See id.* at 610. The dates of the memoranda are typically marked "(b)(2)", and the dates

of the interrogations are marked "(b)(1), (b)(2)." *Id.* Because DOD has failed to meet its burden of showing that these dates were properly withheld, it is not entitled to summary judgment as to the redaction of this information.

   1.   ***DOD has failed to meet its burden of proving that the dates documents are produced and the dates Mr. Slahi was interrogated may be withheld pursuant to FOIA Exemption 2.***

FOIA Exemption 2 permits the withholding of documents "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). As noted above, FOIA Exemption 2 may apply to two classes of information: "Low 2" information, which is of "no genuine public interest" or, "High 2" information which is of public interest, but for which the government has demonstrated "that disclosure of the material would risk circumvention of lawful agency regulations." *Id.*

Given DOD's failure to identify any basis for redacting the dates of the responsive documents, Mr. Slahi can only assume that it seeks to withhold this information under the theory that it is "Low 2" or of no public interest. However, given the evidence of the gross mistreatment of Mr. Slahi in 2003, the dates upon which he was interrogated as well as the dates of various documents related to those interrogations clearly are of public interest. Thus, DOD has failed to prove that it was entitled to withhold the dates under Exemption 2.

      2.       ***DOD has failed to meet its burden of proving that the dates Mr. Slahi was interrogated may be withheld pursuant to FOIA Exemption 1.***

The government has marked the redaction of the dates of interrogations as both (b)(1) and (b)(2) exemptions.  *See* Exhibit K at 610.  As noted above, Exemption 1 exempts from disclosure matters that are properly classified pursuant to an Executive order.  5 U.S.C. § 552(b)(1).  The Executive Order DOD has invoked with respect to other withheld information, Executive Order 12958, allows classification where disclosure "could reasonably be expected to cause damage to the national security."

Given that it is public knowledge that Mr. Slahi has been imprisoned at Guantanamo Bay Naval Station since 2002 and continues to be imprisoned there, it is difficult to fathom DOD's basis for concluding that release of the dates on which he was interrogated "could reasonably be expected to cause damage to the national security."  To the extent that the date of a particular interrogation is in close proximity to properly classified information, DOD is under an obligation to release "any reasonably segregable portion of a record … after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  Because DOD has failed to meet its burden of proving that it may withhold the dates of interrogations under Exemption 1, it is not entitled to summary judgment as to this information.

**D.**   **DOD has failed to meet its burden of proving that it may withhold the identity, including names and ranks, of the government personnel who devised, approved, and implemented the abuse and torture of Mr. Slahi during his detention at Guantanamo, particularly during the summer and fall of 2003.**

The government asserts that it is entitled to withhold the names and ranks of military personnel (and perhaps civilian contractors) under FOIA Exemptions 3 and 6, as well as 10 U.S.C. § 130b.  DOD's Motion for Partial Summary Judgment at 30-32; Buzby Declaration at ¶¶ 53-54.   Mr. Slahi does not challenge the withholding of this information as a general matter, but strongly opposes the withholding of the identities of those persons involved in his torture.  Because DOD has failed to prove that the personnel involved in that torture fall within the scope of 10 U.S.C. § 130b or that disclosure of their identity would clearly constitute an unwarranted invasion of personal privacy, this Court must deny the DOD's motion for partial summary judgment as it relates to this information.

   **1.**   **DOD has failed to meet its burden of proving that the identity of the government personnel who devised, approved, and implemented the abuse and torture of Mr. Slahi falls with FOIA Exemption 3.**

Exemption 3 provides that an agency need not disclose matters that are "specifically exempted from disclosure by statute … provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552.  The government has invoked 10 U.S.C. § 130b, which provides that the Secretary of Defense "may, notwithstanding section 552 of title 5, authorize to be withheld from disclosure to the public personally

identifying information regarding (1) any member of the armed forces assigned to an

overseas unit, a sensitive unit, or a routinely deployable unit." 10 U.S.C. § 130b(a)(1).

DOD's Motion for Partial Summary Judgment at 30.

Mr. Slahi does not dispute that 10 U.S.C. § 130b is an Exemption 3 statute.

However, DOD has wholly failed to meet its burden of proving that the information it

seeks to withhold is included within the statute's protection. *See Central Intelligence

Agency v. Sims*, 471 U.S. 159, 167 (1985) (government bears burden of showing that

information it seeks to withhold falls within scope of the statute). In its *Vaughn* index

and its motion, DOD baldly asserts that the "names and other identifying information of

DoD medical and detention personnel meet the criteria to be withheld pursuant to 10

U.S.C. § 130b and Exemption (b)(3)." Buzby Declaration at ¶ 54; DOD's Motion for

Partial Summary Judgment at 31. However, 10 U.S.C. § 130b(a)(1) authorizes the

Secretary of Defense to withhold identifying information regarding only three classes of

military personnel, namely "members of overseas unit, a sensitive unit, or a routinely

deployable unit." DOD does not identify which of these three units each person whose

information it seeks to withhold is currently a member. In fact, with respect to the

persons involved in the mistreatment of Mr. Slahi, LTG Schmidt testified that at least two

of them are no longer in the military. *See* Sworn Testimony of LTG Randall Schmidt, at

45. Thus, DOD has failed to meet its burden. *See O'Keefe v. Department of Defense*,

463 F. Supp. 2d 317, 325 (E.D. N.Y. 2006) (concluding that government failed to meet

its burden under Exemption 3 where it failed to make any showing that military personnel

were stationed with a unit within the ambit of 10 U.S.C. § 130b).

**2.    DOD has failed to meet its burden of proving that the identity of the government personnel who devised, approved, and implemented the abuse and torture of Mr. Slahi falls with Exemption 6.**

DOD also seeks to withhold identifying information of its personnel under FOIA

Exemption 6.  Exemption 6 permits the government to withhold information contained in

"personnel and medical files and similar files" when the disclosure of such information

"would clearly constitute an unwarranted invasion of personal privacy."  5 U.S.C. §

552(b)(6).  In determining whether disclosure would clearly constitute an unwarranted

invasion of personal privacy, this Court must balance the individual's right to privacy

"against the basic purpose of the Freedom of Information Act 'to open agency action to

the light of public scrutiny.'"  *Rose*, 425 U.S. at 372.

DOD asserts that there is no legitimate public interest in the identities of any of its

personnel.  *See* DOD's Motion for Partial Summary Judgment at 31.  While this may be

true for the vast majority of the persons named in the documents produced, it is simply

not true for those people who devised, approved, and implemented the abuse and torture

of Mr. Slahi.  The public clearly has a substantial interest in knowing the identities of the

government employees and officials responsible for the unconscionable treatment of Mr.

Slahi.  *See Stern v. Federal Bureau of Investigation*, 737 F.2d 84, 92 (D.C. Cir. 1984)

(recognizing the public interest "in knowing who the public servants are that were

involved in the governmental wrongdoing, in order to hold the governors accountable to

the governed").  Thus, Mr. Slahi objects to the withholding of the identities of those

persons.  He does not object to the redaction of information identifying government

personnel who were not involved in his mistreatment.

Where a privacy interest is protected by Exemption 6 and "the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in performance of their duties," the person requesting the information "must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2003). Mr. Slahi easily meets this requirement. As discussed *supra* at 8-11, members of the United States military have confirmed much of Mr. Slahi's account of government agents' use of abusive interrogation methods and torture against him in the summer and fall of 2003. The prosecutor assigned to his case refused to proceed because, after reviewing evidence within the government's possession, he concluded that much of the evidence against Mr. Slahi was tainted by that torture. Jess Bravin, *The Conscience of the Colonel,* Wall St. J., March 31, 2007. Thus, the public is entitled to information regarding the identity of the persons who devised, approved and implemented the abuse and torture of Mr. Slahi.

**E.    DOD has failed to meet its burden of proving that it may withhold under FOIA Exemption 1 information regarding its role in Mr. Slahi's arrest and transfer to Guantanamo, including the extraordinary rendition of Mr. Slahi from his home in Mauritania to Jordan for interrogation.**

DOD claims it is entitled to withhold information regarding its role in Mr. Slahi's arrest and transfer to Guantanamo under FOIA Exemption 1. DOD's Motion for Partial Summary Judgment at 15-16; Buzby Declaration at ¶¶ 23, 26c. It asserts that "release of information about the circumstances of Slahi's capture and the date of his transfer to Guantanamo, if pieced together with other, similar information about other detainees,

would provide a composite picture of how detainees come into U.S. custody, which detainees were transferred to Guantanamo on which dates and through what means, and the routing of planes and movement of detainees on the ground in the theater of operations."  DOD's Motion for Partial Summary Judgment at 16; Buzby Declaration at ¶ 26c.  It then claims that release of information regarding the United States Government's role in Mr. Slahi's arrest in Mauritania in November 2001, his rendition to Jordan for eight months of interrogation, his subsequent rendition to Bagram, Afghanistan in July 2002, and finally his rendition to Guantanamo in August 2002 "would aid persons hostile to the United States in …. evading capture by U.S. authorities, and otherwise frustrating U.S. counterterrorism efforts."  *Id.*; Buzby Declaration at § 26d.

   DOD's conclusory statements utterly fail to establish that information regarding Mr. Slahi's arrest and rendition falls within the scope of Exemption 1.  To the contrary, given that extraordinary rendition violates both American policy and international law, the redaction of this information seems calculated to conceal those violations.  *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G, § 2242, 112 Stat. 2681-822 ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."); United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, opened for signature Dec. 10, 1984, art. III, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85, 114 ("No State Party shall expel,

return ('refouler') or extradite a person to another State where there are substantial

grounds for believing that he would be in danger of being subjected to torture."); *see also*

*Jordan: Country Reports on Human Rights Practices – 2000* (noting that there were

"significant problems in [Jordan's] human rights record[,]" including "extrajudicial

killings by members of the security forces, police abuse and mistreatment of detainees;

allegations of torture; arbitrary arrest and detention").

**F.    DOD's *Vaughn* index is inadequate given the redaction of dates and the
failure to describe at all some of the documents withheld.**

In its *Vaughn* index, DOD has redacted the majority of the dates of documents it

seeks to withhold in part or in entirety.  *See* Declaration of Rear Admiral Mark H. Buzby,

Exhibit A (Vaughn Index), Dkt. 19-7 (Oct. 1, 2007).  DOD offers no justification for its

decision to redact this information.  Given the evidence that Mr. Slahi was tortured

during the summer and fall of 2003, the date that a document was created is critical to

assessing whether the document may contain information related to that torture as well to

determining whether the information in the document provided by Mr. Slahi may have

been procured by or as a result of that torture.

In addition, the Vaughn index offers no description whatsoever of the documents

found at Bates Numbers 861-866, 867-870, 958 and 1447-54, other than to say that the

subject and description are "classified" or "redacted."  With the exception of Bates

Number 958, the documents referred to are completely redacted.  *See* Exhibit L (Bates

Numbers 861-866, 867-870, 958 and 1447-54).  Document 958 is almost entirely

redacted and appears to be circa September 2003.  *See* Exhibit L at 958.  Interestingly,

Document 1447-1454 immediately follows the Memorandum of Record documenting Mr. Slahi's allegations of torture.

Mr. Slahi respectfully asks that the Court order DOD to produce a copy of the *Vaughn* index without the dates redacted. With respect to those documents for which DOD has offered no description whatsoever, Mr. Slahi asks that the Court order it to provide a reasonable description of them so that he may meaningfully respond. In the alternative, Mr. Slahi asks that the Court order DOD to produce these documents to the Court for *in camera* inspection.

**G.    DOD has failed to meet its burden of showing that it conducted a reasonably adequate search for responsive documents, particularly with respect to the logs used to document his interrogations.**

"At the summary judgment stage, where the agency has the burden to show that it acted in accordance with the statute, the court may rely on 'a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials ... were searched.'" *Valencia-Lucena v. United States Coast Guard*, 180 F.3d 321 (D.C. Cir. 1999), *quoting Oglesby v. United States Dep't of the Army*, 920 F.2d 57, 68 (D.C.Cir.1990)). However, if review of the record raises substantial doubt as to the adequacy of the search, "particularly in view of 'well defined requests and positive indications of overlooked materials,' summary judgment is inappropriate." *Valencia-Lucena*, 180 F.3d at 326, *quoting Founding Church of Scientology v. National Sec. Agency,* 610 F.2d 824, 837 (D.C.Cir.1979).

Mr. Slahi's counsel specifically asked for interrogation logs related to him and it is clear that those logs were in fact created by personnel at Southern Command.[9]  *See* Letter from Sylvia Royce to Nicholas J. Patterson dated May 21, 2007 at 2, attached as Exhibit 6 to Declaration of Jean Lin, Dkt. 19-4 (Oct. 1, 2007); Schmidt-Furlow Report at 21-23 (discussing interrogation logs for subject of Second Special Interrogation Plan).  DOD tasked only one unit within Southern Command to look for these documents.  *See* DOD's Statement of Material Facts at ¶ 20; *see also* Buzby Declaration at 11.  DOD has produced no evidence that it searched any other units of the Southern Command.  Thus, it has failed to meet its burden of proving that it conducted a reasonably adequate search for those logs.  *See Oglesby*, 920 F.2d at 68 (an agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested").

In addition, review of the record raises a substantial doubt as to the adequacy of the overall search for responsive documents given that, other than two reports of Mr. Slahi's account of his torture and a memorandum summarizing a document search four days after that initial disclosure, no documents related to the investigation of that torture are included in materials identified in the *Vaughn* index.  That Southern Command has not identified any other documents belonging to such a critical category of information suggests a significant defect in its search process or an attempt to withhold information that would uncover violations of the law or that would prove embarrassing to the

---

[9] It is important to note that the interrogation logs fall within the scope of Mr. Slahi's original FOIA request for all records pertaining to him.  *See* Letter from Sylvia Royce to James Hogan, dated May 26, 2005, attached as Exhibit A to Declaration of William T. Kammer, Dkt. No. 19-5 (Oct. 1, 2007).

government.  Thus, DOD is not entitled to summary judgment as to the adequacy of its

search for responsive records.

<u>**CONCLUSION**</u>

For all the foregoing reasons, Plaintiff Mohamedou Ould Slahi respectfully asks

the Court to deny DOD's motion for partial summary judgment on the grounds that it

failed to prove that it conducted a reasonably adequate search of Southern Command and

failed to prove that it has properly withheld information regarding: (1) the illegal

interrogation methods that government agents used against Mr. Slahi at Guantanamo Bay

Naval Station, particularly during the period of June through October 2003; (2) the dates

documents were created and, in some cases, the dates Mr. Slahi was interrogated;  (3) the

identity, including names and ranks, of the government personnel who devised, approved,

and implemented the abuse and torture of Mr. Slahi during his detention at Guantanamo,

particularly from June through October 2003; and (4) the United States Government's

role in Mr. Slahi's arrest and transfer to Guantanamo, including the extraordinary

rendition of Mr. Slahi from his home in Mauritania to Jordan for interrogation.  Mr. Slahi

also respectfully asks this Court to order DOD to produce a supplemental *Vaughn* index

without the dates of documents redacted and to conduct an *in camera* review of

unredacted versions of certain documents DOD produced to Mr. Slahi to ensure that

information has not been withheld solely to prevent embarrassment to the Department of

Defense.

Dated:  November 19, 2007

Respectfully submitted,


Sylvia Royce, *pro bono*
DC Bar Number 924035
Law Office of Sylvia Royce
5505 Connecticut Avenue NW #340
Washington, DC 20015
Tel: (202) 362-3445
Fax: (202) 686-4271
sylvia_royce@hotmail.com


/s/ Theresa M. Duncan              .

FREEDMAN BOYD HOLLANDER
GOLDBERG & IVES P.A.
Nancy Hollander, *pro bono*
Theresa M. Duncan, *pro bono*
20 First Plaza, Suite 700
Albuquerque, NM 87102
(505) 842-9960
(505) 842-0761 (facsimile)
nh@fbdlaw.com
tmd@fbdlaw.com

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2007, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to all counsel of record.

 /s/ Theresa M. Duncan
THERESA M. DUNCAN