## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
MOHAMEDOU OULD SLAHI,                )
                                     )
        Plaintiff,                   )
                                     )
    vs.                              )        Civil Action No. 06-cv-0597 (JR)
                                     )
U.S. DEPARTMENT OF DEFENSE           )
                                     )
        Defendant.                   )
———————————————————— )

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## EXHIBIT E



**DEPARTMENT OF DEFENSE**
**JOINT TASK FORCE 170**
**GUANTANAMO BAY, CUBA**
**APO AE 09360**

REPLY TO
ATTENTION OF

JTG GTMO-SJA

MEMORANDUM FOR RECORD

SUBJECT: ICRC Meeting with MG Miller on 09 OCT 03

The following personnel were present: MG Miller, JTF-GTMO Commander, COL Lynch, JTF-GTMO Chief of Staff, CAPT Edmonson, Hospital Commander, LCDR LeBlanc, Staff Judge Advocate, SGT Rivera, OSJA / JDOG ICRC Liaison, Vincent Cassard, ICRC Team Leader, Christophe Girod, ICRC Head of North American Delegation, Thomas Heneke, ICRC Delegate. The meeting commenced at 1422 hours.

- Mr. Christophe Girod started the meeting by announcing that Vincent Cassard would do most of the talking, however, he wanted to reserve the last five minutes for himself to conclude the conversation.

- Mr. Vincent Cassard wanted to thank all the JTF and JDOG staff that assisted The ICRC during this long visit. The ICRC was able to conduct 302 private talks and over 500 interviews while on the cellblocks.

- Mr. Cassard emphasized that the purpose of this long visit was to follow up on the previous recommendations that were made by the ICRC president. The job of the delegates was to assess the progress made in four specific areas:

    i.   The implementation of a due process legal system for the detainees
    ii.  Decrease in the use of caged cells in Camp Delta
    iii. The excessive isolation of detainees
    iv.  Increase in the repatriation rate for the detainees

Mr. Cassard mentioned the ICRC delegates did see some improvements in the camps, however there was no improvement in any the four major areas of concern. Mr. Cassard then began to explain their process of evaluation.

- The ICRC was able to visit all parts of the camps. There were 13 cases where the ICRC was not able to see a detainee, but these issues were all resolved. MG Miller emphasized to Mr. Cassard that theses 13 cases were due to administrative circumstances in the camps and were not restrictions. Mr. Cassard agreed with this statement.

- Mr. Cassard stated that there were still four detainees that the ICRC had not been able to visit. ISN 056; ISN 558 who they had only been able to see and distribute messages to since February 2003; ISN 760; and ISN 990. MG Miller informed Mr. Cassard that ISN 760, 558 and 990 were off limits during this visit due to military necessity. The ICRC may be given access to these detainees during another visit.

- Mr. Cassard replied that the ICRC does not feel bound by the previous SOP that was created between JTF and a previous ICRC team. MG Miller asked Mr. Cassard to point out the part(s) of the SOP they disagreed with. Mr. Girod responded by stating that the ICRC has their own SOP that they follow world wide, which grants then unrestricted access to all areas and to all detainees. The ICRC acknowledged the JTF SOP, they will live with it but do not like it.

*[For the record, Mr. Girod handed MG Miller a sealed enveloped and stated that it was a letter discussing the items the briefly spoke about in private before the meeting began.]*

- Mr. Cassard began to layout how the delegates assessed each of their 4 major areas of concerns:

## Due Process:

- Mr. Cassard stated that they focused on all the detainees under interrogation and the methods that were used. The ICRC focused on the effects that the interrogations where having on the mental health of the detainees. The ICRC feels that interrogators have too much control over the basic needs of detainees. That the interrogators attempt to control the detainees through use of isolation. Mr. Cassard stated that the interrogators have total control of the level of isolation in which the detainees were kept; the level of comfort items detainees can receive; and also the access of basic needs to the detainees. According to Mr. Cassard, detainees are kept in uncertainty as to their future and are often given contradictory information about their repatriation.

- MG Miller stated that he had issues with the comments made by Mr. Cassard about the interrogation process at GTMO. MG Miller continued by stating that the detainees are enemy combatants picked up on the field of battle in Afghanistan. There is no issue with the interrogation methods. The focus of ICRC should be the level of humane detention being upheld not the interrogation methods. JTF GTMO treats all detainees humanely.

- Mr. Cassard replied by stating that the ICRC focused on the psychological pressure and the coercion towards the detainees and the cumulative effect on their mental health. Mr. Cassard also stated the duration of the interrogations concerns the ICRC. He also stated that the ICRC does not question the interrogation methods but the cumulative result on the detainees. Mr. Girod stated the time

factor is the key. The ICRC will never question why or how integrations happen. Mr. Girod continued by stating that if there were a legal process in place there would be a set investigation period, and then a charge (or not) and the trial. There is no such legal process here at Guantanamo instead everything is open-ended. MG Miller stated that the legal process at Guantanamo is a policy issue, which should be addressed at Washington, D.C.

- Mr. Cassard did state that there has been an increase in positive cooperation with the mail. During this trip the ICRC distributed about 1,500 messages and received about 1,000 to take back. The ICRC thought there was some censorship in a few pieces of mail but admitted with the overall large number of letters, this was not a real issue.

Isolation:

- Mr. Cassard went on to state that the ICRC has issues with the cage type cells. According to Mr. Cassard, this is a big dilemma for ICRC. He stated that the recommendation was to change the cage like cells to a more enclosed structure and that ICRC is ill at ease because this has not been done. Mr. Cassard has stated that the changes that have been made in the camp only benefit those that cooperate with the interrogators.

- MG Miller stated that every detainee in Camp Delta has the basic elements required by the Geneva Convention. Also, over 85% of detainees in Camp Delta get privileges above and beyond basic requirements. MG Miller continued by stating additional privileges from the Geneva Convention basic requirements are given to detainees. Does the ICRC object to these additional privileges? Privileges are removed from detainees for disciplinary reasons; so if a detainee loses a privilege, it is as a result of his actions.

- Mr. Cassard gave an example using the Detainee Library. The ICR has donated books for the library and according to the detainees the interrogators are using the books as part of their interrogation. The interrogators sometimes give books to detainees as rewards, and then restrict books as a form of punishment. MG Miller replied by stating that interrogators cannot take away any privileges without his approval. Restrictions only occur as a result of detainee disciplinary infractions. Mr. Cassard stated that the ICRC has serious allegations from detainees that they believe this to be true. MG Miller stated he would listen to the allegations but he has given the ICRC the accurate facts.

- Mr. Cassard continued by stating that Camp 4 is a benchmark and fits the Geneva Convention. He also stated that there have been improvements in the rest of Camp Delta.

3

<u>Cage cells:</u>

- Mr. Cassard stated that they are very concerned with the caged cells in addition to the maximum-security regime. The ICRC concern is that the caged cells plus the maximum-security regime exerts too much pressure on detainees. ICRC would like JTF to better separate the detainees that are not high risk from these cells.

- Mr. Cassard stated that the ICRC has a serious concern with the treatment of the Koran in the camps, particularly in August. Specifically, an incident of mishandling of the Koran. The ICRC heard from detainees that the MPs are mishandling the Koran. MG Miller responded by informing the ICRC that he conducted a complete investigation into that incident and he found that it was an accidental incident. MG Miller explained that cell searches were being conducted and an MP, while lifting up a mattress during a cell search, accidentally bumped the surgical mask that was holding the Koran. The Koran fell to the floor of the cell as a result of this accident. MG Miller continued by stating that the detainees were trying to use this incident to create disturbances throughout the camp. This was during a time when new MPs had just arrived at GTMO. Over 1200 new MPs arrived to GTMO during this time period. MG Miller emphasized that this was an accident and that JTF has the utmost respect for religion and the Koran. Mr. Cassard stated that he was pleased that such a thorough investigation was conducted. However, the ICRC takes the allegation very seriously and 20 detainees have informed the ICRC that as punishment for the disturbances they have been shaved. MG Miller stated that detainees were shaved only for hygienic purposes by a qualified barber. The approval to shave a detainee comes from the JDOG commander and is never done as a punishment.

- Mr. Cassard continued with his report by stating that the Maximum Security Unit (MSU) has not changed since their last visit. According to Mr. Cassard, detainees are in MSU for 30 days, released for a short period of time, and then put back into MSU for another 30 days. Mr. Cassard stated that this type of punishment is harsh and that some detainees are put in MSU at the request of interrogators. Mr. Cassard also stated that detainees were placed in MSU for intelligence reasons. MG Miller responded by stating that detainees are placed in MSU only for disciplinary problems. 30 days is the maximum punishment a detainee may be placed in MSU. MSU is an appropriate tool for discipline; for example, assault on an MP might result in 30 days in the MSU. MG Miller also stated that he is the only approving authority to place a detainee in an MSU for over 30 days. He also stated that currently there are no detainees in this situation but that it can occur. MG Miller stated that he is careful not to exceed 30 unless a detainee has committed a serious breach of the disciplinary rules.

- Mr. Cassard began to discuss the report made by the ICRC physician. According to the ICRC, things have not changed to improve the mental health of the detainees. MG Miller asked Mr. Cassard to explain his last statement. Mr. Cassard stated that medical files are being used by interrogators to gain

4

information in developing an interrogation plan. And there is a link between the interrogation team and the medical team.  This is a breach of confidentiality between a physician and a patient. Only medical personnel are supposed to have access to these files. MG Miller stated that interrogators do not have access to detainee medical files, only medical personnel may use the medical files of detainees. CAPT Edmonson replied that the ICRC doctor did not notify him during their conversation about such an allegation.  Also, MG Miller asked the ICRC to confirm their facts with regard to the medical records issue.

- Mr. Cassard raised a concern that MG Miller was not taking the discussion seriously. MG Miller explained that he was taking the discussion seriously, that he respected the work and opinions of the ICRC. He also asked the ICRC team to respect his opinions.

- Mr. Cassard stated that the ICRC was shocked to see that Camp Echo had expanded.  The ICRC believes that Camp Echo is extremely harsh and has very strict interrogations. MG Miller explained that Camp Echo was built to hold detainees that are awaiting the commissions process.  Camp Echo is an appropriate facility that allows detainees to have private conversations with their attorneys. Also that there are currently very few detainees in Camp Echo and they are there for serious assaults against MPs.

- MG Miller told the ICRC that the JTF continuously recommends release of certain detainees and that a Detainee Movement Operation (DMO) should occur by the end of October.  JTF will inform the ICRC in advance of a DMO to facilitate their travel to Cuba to meet with detainees that are identified for movement.

- Mr. Cassard stated that Camp Iguana is a very good facility.  However, the ICRC feels that there are several minors being held in Camp Delta. MG Miller stated that there are no detainees under the age of 16 that are being held at Camp Delta. With regard to the list of suspected minor detainees that the ICRC provided by letter, many of the ages were incorrect and he reviewed them:

| ISN | ICRC DOB | JTF DOB |
|-----|----------|---------|
| 660 | 11-29-86 | 11-29-68 |
| 664 | 1986 | 1-1-76 |
| 842 | 11-1-85 | 11-1-84 |
| 911 | 1987 | 1-1-82 |

- MG Miller stated that none of the above mentioned detainees are minors.  He also stated that the 3 minors in Camp Iguana would never be placed with the adults. MG Miller also noted that negotiations are under way to have the minors released to the UNICEF Child Soldier Program.

- Mr. Girod concluded by stating the detainees should be allowed to have visitation rights and that the open-ended detention is very hard on detainees. He stated that the president of the ICRC will travel to Washington, D.C. in November and will ask for changes to be made in Camp Delta. He also expressed concern that the ICRC could not visit the Brig in Charleston. And that there are several policy issues that need to be changed and that the ICRC understands that this must be done in Washington, D.C. Mr. Girod also stated that after 2 years it is time for ICRC and the U.S. to put everything out on the table and make some real policy changes.

- MG Miller concluded by saying that he values the opinions of the ICRC and appreciates the open dialogue, which is essential to have a good working relationship and that he truly respects and appreciates the input from the ICRC. In fact, the Pashtu Reading Initiative is an idea that came from a conversation between Mr. Cassard and MG Miller. MG Miller noted that changes are being made in Camp 1 to make it similar to Camp 4 due to the low security risk of the detainees in this camp.

- MG Miller asked that ICRC respect the fact that some detainees here are very high risk, very dangerous and must be treated as such. That the ICRC has access to detainees that is prudent for their safety.

- MG Miller stated that the ICRC's mention of the death penalty in their letter addressed to him is premature as no one has been charged and the commission process has not begun.

- Mr. Cassard stated that they will return for the DMO and they plan to return in December.

- The meeting closed at 1520 hours.