# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MOHAMEDOU OULD SLAHI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 06-cv-0597 (JR) |
| | ) | |
| U.S. DEPARTMENT OF DEFENSE | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## EXHIBIT H

Testimony of LTG RANDALL M. SCHMIDT
Taken 24 August, 2005 at Davis Mountain Air Force Base, Arizona;
between the hours of 0910 and 1055 by [(b)(7)(C)]
And [(b)(7)(C)]
Department of the Army Inspector General, Investigations Division,
Presidential Towers, Crystal City, Virginia.

[(b)(7)(C)] The time is 0910. This tape-recorded interview is conducted on 24 August, 2005, at Davis Monthan Air Force Base, Arizona.

Persons present are the witness Lieutenant General Randall Marc Schmidt and the Investigating Officer [(b)(7)(C)]
[(b)(7)(C)]

This inquiry is directed by the Vice Chief of Staff of the Army concerning allegations made against a senior official assigned to the Department of the Army.

An Inspector General is an impartial fact-finder for the Directing Authority. Testimony taken by an IG and reports based upon that testimony may be used for official purposes. Access is normally restricted to persons who clearly need the information to perform their official duties. In some cases, disclosure to other persons may be required by law or regulation or may be directed by proper authority.

Sir, upon completion of this interview I will ask you whether you consent to the release of your testimony if requested by members of the public pursuant to the Freedom of Information Act or FOIA. Since I will ask you to provide your Social Security Number to help identify you as the person testifying, you've previously been provided with an explanation of the Privacy Act by [(b)(7)(C)] Sir, do you understand the Privacy Act?

LTG SCHMIDT: I do.

[(b)(7)(C)] You are not suspected of any criminal offense and are not the subject of any unfavorable information. Before we continue, I was to remind you of the importance of presenting truthful testimony. It is a violation of Federal Law to knowingly make a false statement under oath.

Do you have any questions before we begin?

LTG SCHMIDT: No.

[(b)(7)(C)] Please raise your right hand so I may administer the oath.

[Lieutenant General Randall Marc Schmidt, US Army Force, was sworn and testified under oath as follows:]

BY 

Q.    You may lower your hand, Sir.  Sir, please for the record can you state your full name?

A.    Okay.  Randall Marc Schmidt.

Q.    Your rank and component?

A.    Lieutenant General, United States Air Force.

Q.    Your current position and organization?

A.    Commander, 12th Air Force, US Southern Command Air Forces.

Q.    Your Social Security Account Number should you choose to disclose it, Sir?

A.    I'm going to withhold that, the Social Security Number.

Q.    Yes, Sir.  And a good address either home or office keeping in mind that the return address on any correspondence from out office will indicate it's from the Department of the Army Inspector General.

A.    Okay, ████████████████████████████████████

Q.    Thank you, Sir, and a phone number?

A.    Okay, it's ███████████ is the home phone.

███████████ Okay.  Thank you, Sir, ██████████ is going to lead off with the questions today.

BY ██████████

Q.    All right, thank you, Sir.  Sir, just to start out can you provide us a quick background on why the AR 15-6 Investigation that we now call the Schmidt Furlow Report was initiated?

A.    Well like everybody else I was reading the papers about the abuse allegations at Guantánamo and I passed the papers everyday thanking God that I was not involved in that.  I could envision myself with combat operations and training and things like that.  I got the phone call from my boss, General Craddock, now the Commander of US Southern Command and he said he had kind of run into a stop on an investigation that was currently undergoing.  That General Furlow had been tasked

to run it--he had essentially two months underway with a small team looking into these allegations. I was unaware of that. That investigation.

Q.    Okay.

A.    He said that he had been informed by the investigator General Furlow that, he was, in a position where he had to interview officers senior to him. Two, specifically and that unless he received some sort of extraordinary permissions or whatever that, that he'd need some help.

So General Craddock called me said that he needed me to take over the investigation and as he saw it, I didn't have to go back and reinvent the investigation. And-- I'll explain what the investigation was as I got into it, but he needed me to essentially to take over, take it to completion, get the football across the goal line essentially with these two other interviews.

The interviews as he understood it would probably be Major Generals. So he needed a Lieutenant General. Where he only has two assigned there, Lieutenant General Marty Bern, Marine Corps, he's about to retire and me. And I was about to go off to a major exercise. And would I help him. He actually asked and I said I'll find out if I can disengage myself from this exercise.

Q.    Okay.

A.    The largest one that the Air Force and the Army are doing this entire year in the Continental United States. And I was able to get two of my Deputies to take that on and get permission from everybody to do that. So I called him back very quickly and said I would do the investigation. So I was hooked on that. He gave me 30-days.

Q.    Okay.

A.    He said there'd be probably no extensions to that as he has already extended the initial one, and it looked at that time, that there would only be two additional senior officers investigated.

Q.    Okay.

A.    So I convened a small team here. Joined up with the Army team. General Furlow, and his three others, and we set to work on getting that last piece done. What we found was there was a whole lot of other work to be done. The genesis of the investigation was FBI allegations into detainee abuse there--it was pretty well defined and there were essentially a couple of others that were tacked on. Three I believe.

Q.    Okay.

A.    They were tacked by General Craddock to say this clean up. These are things that would beg questions later. So put those into your investigation. Then he also told me that if I saw anything else down there in the course of our investigation that those would also be under my purview to investigate. Any allegations or indications of abuse by any party not just the FBI. So we had those. The FBI allegations were of some number and those are all in my testimony.

Q.    Right.

A.    We boiled those down to events and not individual agents. Some agents had seen probably the same thing and it was the same kind of event so we looked to corroborate that. So this thing was actually pretty small. It looked like, let's go just knock these things out one after the other.

Q.    Okay.

A.    What happened was as we began to do these investigations, and I needed the background before I started to do the last interviews. And the last interviews were with, possibly Geoff Miller and JTF-160-170 Commanders that were being combined, Dunlavey.

Q.    Okay.

A.    Major General Dunlavey, a Reservist. So those were the two I think I was being postured to interview. As we got through this, I just needed to understand how the situation got to where it was and why these abuses presented themselves. What was perception or what was ground-truth and that sort of thing.

I went through all of the interviews that had been previously conducted. These were the FBI agents who had actually answered the e-mail queries from the FBI, Department of Justice, saying if you see anything, in the interrogation Protocols down at Guantánamo that conflicted with stand procedure, that--that the Agency would use then respond to this. And there were varied responses. I think it came down to about 26 which melted it down to about there were 11 of which we got down to about nine were actually events that needed to be investigated. And those were the subjects that went through the interviews with all these FBI agents.

Q.    Okay.

A.    There were-- four I believe, FBI agents who has responded out of those 26 that we were unable to contact. For a bunch of reasons. Some were still deployed into combat OPS and that sort of thing and the Agency wasn't about to disclose where they were and that sort of thing. There was another significant, agent that we were just not able to get hold of. And we repeatedly asked the FBI if we could get to them. The FBI was very cooperative. But they were much like an IG charter, they were not going



to say well you contact her at this address. And here's her home--you know they weren't ever going to do that.

Q.    Okay.

A.    As it turned out ████████████████████████████████████ She was very sick. They were--it was being sort of a protective sort of thing. And it was none of our business and it wasn't until after the Senate probed this on why--you know, Senator Warner, you know, didn't think very much of this. Why aren't you talking to her. And finally--and the FBI finally said hey she's just now ███████████████████ and we'll make her available now. Obviously things started breaking loose. But we knew what she had alleged.

Q.    Right.

A.    We saw her e-mails, we felt that we had got a complete idea of what she thought she saw and everything.

Q.    Okay.

A.    And so we went that way. So we understood the bubble. So now I'm in the investigation. I have no time. I have 30-days. I went back and relooked the testimony in the interviews. None was sworn. It was a hard to decipher kind of gobblygook. A lot of the testimony was very difficulty to understand.

Q.    This is the FBI testimony that they took?

A.    Our transcribing of the interviews that were done with these agents.

Q.    Oh, I see.

A.    From the time that I took over.

Q.    Okay.

A.    So we spent about a week. We came back to Tucson here with the Army team and the Air Force team, knowing that we got a mindset and started to rebuild and sorted this thing. So we used the interviewer now saying is this was what it meant. Did this person mean this and say this. What's fact. What's opinion and that sort thing. Just sorting that thing out. It took a little of our time. Then I got to the interviews. The interviews, I think actually interviewed seven General officers.

Q.    Okay.

A.    I wanted to cover the entire spectrum of when we stood on operations to include just operations for detention before we got to interrogations at Guantánamo. All the way through today and went down there to interview Jay Hood. Down there today and I had a chance to go down to GTMO again and look at all the things that are going on down there and dig into that.

We found some information that, was very enlightening, in terms of our investigation on that trip.

Q.    Okay.

A.    Those were the interrogation logs that nobody else had even seen for some reason. And they were right three in plain sight kind of thing. Went through it and that's where a lot of our information came from.

Q.    Okay.

A.    At that point, I had already interviewed General Miller.

Q.    Okay.

A.    Okay, and that's what I am trying to, the part that you're concerned about.

Q.    Right.

A.    I had already interviewed General Miller and he has already talked to me about you know what he knew and what he had seen and what was his policies. A lengthy interview. A couple of hours. When I came back, I did a cursory debrief to General Craddock and at that time I came back out and we had to interview General Miller again.

Q.    Okay.

A.    And this time it was point blank. I swore him. And by the way all the testimony after I joined was all sworn testimony.

Q.    And, Sir, just real quick. What made you decided that you needed to interview him again? What caused that?

A.    It was because—now I knew what his policies were.

Q.    Okay.

A.    I knew what he had issued as far as direction. I knew how things had developed as he evolved into what he thought were appropriate detention and interrogation policies and techniques. But I never really sat there on the data that I now



knew and said, did you know—is that part of your policy. Did you know and is this part of your policy? And then I had a chance to do that. So I had two interviews with General Miller.

Q.    Okay.

A.    One was face-to-face. The other one was sworn over the telephone.

Q.    Okay.

A.    And he was very familiar with both of them, and that's—some of the stuff is secret and we had kept that in the secret classification. So when I discuss what we talked about, that will be secret.

Q.    Okay, Sir.

A.    Okay, so at that point is when I started finding out what the disconnect was. So now I investigated all the background mechanics of how guidance as far as techniques for interrogations has come to play and I had to develop all that. And we didn't get that through the FBI interviews.

Q.    Right.

A.    Now I had to figure out how the FBI perceived things to be, abusive, degrading— one individual even used the word 'torturous' in his assessment of what was going on down there.

Q.    Okay.

A.    So this is what they had seen. Then I had to figure out what they had seen—or what was seen down there was it authorized. Was it torture. Did it mean to be abusive. Did it mean to be degrading. You know, what was the intent of all that and I had to marry that up. Now I'm into the judgment part of this thing.

Q.    Right.

A.    So I finally had the full bubble on that. And here's where it went. What they saw is what they saw. We didn't question the FBI's integrity on this. If they said they saw somebody short shackled to the floor, then somebody was short shackled to the floor. We didn't—that was a given. We didn't question it. There was—what was hard to nail down was when they couldn't tell plus or minus a week or plus or minus a month; or plus or minus two months or three months when they saw this.

Q.    Okay.

knew and said, did you know—is that part of your policy. Did you know and is this part of your policy? And then I had a chance to do that. So I had two interviews with General Miller.

Q.    Okay.

A.    One was face-to-face. The other one was sworn over the telephone.

Q.    Okay.

A.    And he was very familiar with both of them, and that's--some of the stuff is secret and we had kept that in the secret classification. So when I discuss what we talked about, that will be secret.

Q.    Okay, Sir.

A.    Okay, so at that point is when I started finding out what the disconnect was. So now I investigated all the background mechanics of how guidance as far as techniques for interrogations has come to play and I had to develop all that. And we didn't get that through the FBI interviews.

Q.    Right.

A.    Now I had to figure out how the FBI perceived things to be, abusive, degrading-- one individual even used the word 'torturous' in his assessment of what was going on down there.

Q.    Okay.

A.    So this is what they had seen. Then I had to figure out what they had seen--or what was seen down there was it authorized. Was it torture. Did it mean to be abusive. Did it mean to be degrading. You know, what was the intent of all that and I had to marry that up. Now I'm into the judgment part of this thing.

Q.    Right.

A.    So I finally had the full bubble on that. And here's where it went. What they saw is what they saw. We didn't question the FBI's integrity on this. If they said they saw somebody short shackled to the floor, then somebody was short shackled to the floor. We didn't---that was a given. We didn't question it. There was--what was hard to nail down was when they couldn't tell plus or minus a week or plus or minus a month; or plus or minus two months or three months when they saw this.

Q.    Okay.



A.    Which building they saw it in.  Who else was there.  When they couldn't put that to it, then it kind of went into the vague we're going to investigate it.  We're going to look into that.  But it was very hard to nail those down.  So we had sort of a spectrum of not credibility but of defining the event.

Q.    Okay.

A.    We were able to prove in fact short shackling did happen.  And that covered numerous of the FBI perceptions of what they had seen.

Q.    Okay.

A.    Was short shackling authorized.  It was never authorized in interrogation.  It was authorized as a security control measure for detention.

Q.    Okay.

A.    The handover from the detention to interrogation is a longer period than you might imagine.  They have very, very prescribed, meticulously programmed how to put the manacles on, the detainee turns around, and they do this.  It's a check list by the numbers kind of thing.  Which it has to be.  And they do that today and it's quite impressive.  It takes time.

When some of these detainees were brought into the interrogation area, some of the control measures that would be used in detention are still used to get them set-up for the interviews/interrogations.  And then, when the interrogation began then the interrogation protocols which did not allow for short-shacking detention, that's where the thing did not allow for some of the control measures.

Q.    Okay.

A.    The strip searches and things like that, where they're done for security control.  Were done in detention, for instance.  And those were inappropriate.  And those were things that we brought out in the investigation.  So I had to figure out where all that was.  The policy part of this plays heavily, but that was not part of our investigation.

Q.    Right.

A.    But I had to know what was it the policy said you could do in an interrogation.  And what the policy said was, Field Manual 34-52 is the overarching guidance for this.  The President's guidance for these particular detainees because they were not entitled to Enemy Prisoner of War protocols.

Q.    Okay.

A.    Which if you read the Geneva Conventions and also 34-52, it will tell you that, they're entitled to congregate. They're entitled to elect a leader. They're entitled to have, representation, visits--I mean all kinds of stuff. And the write up it's almost like they're entitled to have a band. You know, and present grievances. And it's pretty crazy. They weren't entitled to that. The President said that they're not entitled to that, but they will be treated humanely and they will be given shelter, security, food, water and medicinal attention. I mean it just laid it out there.

Q.    Okay.

A.    So that became kind of the baseline for what was considered humane treatment. And there is no definition of what is "humane treatment".

Q.    Right.

A.    And I have Senators sending me—you know, answer these questions. What's the difference between inhuman and inhumane. I mean I'm just a dumb fighter pilot that did this investigation. So I said, okay, here's the judgment. The President said this. If they're--and there are no other guidance, if they were Enemy Prisoners of War it would be this. Okay? So somewhere in between. So we have kind of a threshold which I would probably recognize as what's torture. And there is a Convention against torture. I know what that is. There is humane treatment and nobody knows what that is, but there is a general fuzzy line.

Q.    Okay.

A.    And then it's up to me to recognize what abusive or degrading kind of treatment is. That's the protocol we used. The Secretary of Defense, when we started this, took responsibility for providing guidance through US Southern Command down to the JTFs. The JTFs 160 and 170 were set up as independent--

Q.    Right.

A.    Parallel, almost non-cooperative sort of entities.

Q.    Okay.

A.    And the line between the two was really vague. The 160 JTF was detention operations, Military Police. They pretty much knew what they were doing. They were trying to figure out how to deal with the kinds of people they had. Violent. people that had written off their lives already. It was like having psychotic murderers row times six hundred. And it remains somewhat like that today, although they did kind of reach a plateau where there was a lot of spitting and things like that and cursing and throwing excrement and things like that are still kind of going on. But it wasn't the violent violence. They've been dummied down quite a bit.

Q.    Okay.

A.    On the interrogations side it was a little bit--and I don't want to say it is out of control, but it was California Avocado Freestyle kind of a thing. Let's figure out what to do and how to interrogate these individuals when they're not Enemy Prisoners of War. They don't have a--they don't have an organizational construct. They're free agents. Dedicated-- they've already signed off their live. There is nothing left to lose kinds of individuals. It's like you have mass murders and said, okay, you know, these are your rules. These are--and they're going we don't do rules. And we don't do your sort of thing.

And the more serious the more influential individuals in that crowd have been trained in what we call "The Manchester Document" the rules of how to resist. They had gone to school on our FM 34-52. They knew we weren't going to torture them. They knew that they had rights. They knew that eventually they'd have the habeas entry into the legal system. They knew all this sort of stuff. And I mean you can--I've read their manual a few times.

Q.    Okay.

A.    And they've been through resistance training and they had a lot of time to think about. And when they sign to go to these missions, they know that if they don't die then they will deal with this and they do pretty well.

The interrogators had to deal with that. Okay? And it was a little chaotic. How they were going to deal with that and how the more structured Military Police side of this, blended together is the subject of several reports.

Q.    Okay.

A.    Every one of these reports made this an issue. The Church Report is probably the best written. The Fay Report is also pretty good on this. It says we got to figure out where the two lines cross. Well, this was kind of chaotic. The lines did cross eventually when General Hill, the Commander of US Southern Command, said, we're going to make this thing JTF-Guantánamo, we're going to combine the two JTFs and have one person have oversight of both of these things and get this act together. That was Geoff Miller that was told to do that.

Q.    Okay.

A.    So he had a chocolate mess on his hands when he got down there as far as discipline and cooperation and our act as national entity, the JTF dealing with this detention problem. Which was starting to create some visibility in the press and other levels. In the Congress as a matter of fact.

Q.    Okay.

A.    So that was the situation.  The guidance part of this was the one that was hardest to deduce.  The Secretary of Defense got a request from General Dunlavey, saying we now have reached almost a dead-end on exploiting and getting relevant intelligence from people who we know, detainees, who we know in this population that we can get from them.  Standard FM 34-52 techniques are not going to work.  This was still very close to 2001 and this was approaching 2002 and we didn't know if we were going to get whacked again.  We knew at that time we had Mister Khatani.

Q.    Okay.

A.    We knew that he probably had relevant current intelligence about the hijacking operation and who his cohorts were and where the training came from, and the coordination and all that sort of thing.  We became aware of the other high value detainee later.  And he's obviously the big--he's a bigger fish.  A much bigger fish.  So this is--other high value detainee is classified, Khatani is not.

Q.    Okay, Sir.

A.    We've laid all that out for everybody.  The classified detainee piece is one that comes later because there were two special investigations that were set up. special interrogation plans set up.  The only one that was really executed was the one on Khatani started and that one is public knowledge now.

Q.    Right.

A.    After our testimony.

Q.    Right.

A.    The Secretary of Defense received a list of interrogation techniques from General Dunlavey.

Q.    Okay.

A.    Who was the JTF Commander at that time.  It was still not classified JTF-Guantánamo.  It wasn't until General Miller arrived.  So he had 170 but he was a domino player.  He was senior to 160 Commander.  And so--and there were some leadership issues with him.

Q.    Right.

A.    As our investigation reveals pretty chaotic.  Pretty dysfunctional as a matter of fact.  He looked like he was about ready to die a violent death by the time General Miller came in and took control.  And he established good order pretty quickly. He had a lot on his plate.



Q.    Was this General Dunlavey or General Baccus that was——

A.    General Baccus was the 160, he was the detention guy.

Q.    Right. In terms of the disorder and about to die a death?

A.    The disorder—he was more the victim I think of General Dunlavey. You're not helping. You're not helpful. You need to do this. You need to do that and he was sticking to his MP discipline in doing, trying to do. General Baccus was a Guardsman.

Q.    Right.

A.    General Dunlavey I believe is a Reservist.

Q.    USAR, yes.

A.    That's right. And there were disconnects there. It was just bad. Really bad. That's the same time that the Secretary received this request for expanded interrogation techniques——

BY 

Q.    Excuse me, Sir, but the time was about October of 2002, is that correct?

A.    Yes, that's correct. That's correct. So I think they already the decision to have a JTF-Guantánamo they just hadn't marshaled to people and done the organizational structures.

Q.    Manning document.

A.    Making manning documents and making it one, and get the CONOPS and that sort of stuff, set up the operations and all those kind of normal--

Q.    Sure.

A.    The Secretary of Defense takes this list, vets it out with his General Counsel. The General Counsel goes to the Service General Counsels and they all go through a planning kind of process and that's beyond the report.

BY

Q.    Right.

A.    The report comes back to them. Now, it's important in terms of my report that there were some people omitted from this vetting process. For instance the

Service JAGs. The Service JAGS and the Service General Counsels--whew, just kind of went like that.

 Okay.

A.    And that comes to roost later. They came back--to the Secretary of Defense with a-- some recommendations on what could be authorized techniques. And they had done these under what's lawful and unlawful probably. Not what was appropriate or inappropriate which the JAGs kind of had an issue with that later.

He takes it and he chops it down. And he cuts it down to a significant number. Takes out a lot of the stuff that would have really watered your eyes kind of things.

BY 

Q.    Right.

A.    If just on the nomenclature of what it looked.

Q.    Okay.

A.    He takes it and chops it down and submits it and says this is approved to be used in special circumstances which I will approve and it's for Mister Khatani number one. So this becomes a special interrogation plan. It's issued now. It is promulgated through US Southern Command with almost no other guidance added to it. It goes to the JTF. The JTF now implements it regarding Mister Khatani.

BY 

Q.    Sir, when it came to the JTF, was--this was for General Miller to command, is that correct? When it got down on 2 December I believe? So this----

A.    What happened----

Q.    --was after.

A.    What happened was General Miller was coming in. He wasn't even there when the request went up.

 : Yes, Sir.

: Right.

A.    Just deliberated. When it comes down there is--and this is not hugely relevant but it was something that we had to piece together. When was permission

given to start this special interrogation plan? We're pretty sure it was started about two weeks early. And before the SECDEF actually signed off. And I had this discussion with the Secretary of Defense and he wasn't happy. Okay? And he could not remember--strike that about not being happy. He went around the table to all the people that he could recollect that were in the room for that period. And say did I approve that before I actually signed it? And they all went we don't remember. We just don't remember. The COCOM, General Hill, at that time, had been in D.C. Had been there, and General Hill had been up there. And they had all been together with the Secretary of Defense and they couldn't remember and Craddock as the secretary's Military Assistant was actually in the room and they all couldn't remember.

 Okay.

A.     So rather than to call an entire line of people liars, we said that probably happened. You just can't prove it. So it's unknowable.

BY 

Q.     I believe the Church Report found it happened as well.

A.     He deduced that it happened.

Q.     Right.

A.     Based on the same testimony that we got through-- people had no reason not to, you know, say it didn't happen.

Q.     Right.

A.     So we said okay it happened or it didn't happen. All the techniques that were applied in that plan were approved eventually so for us whether it happened two weeks earlier or not wasn't relevant because it was whether they were abusive or not.

Q.     Right.

A.     If they deemed to be abusive intentionally or whatever then they were approved. So it became a non-relevant thing. But it was a point that they dwelled on in the investigation.

 : Yes, Sir.

BY 

Q.     And you did talk to the SECDEF, Sir?

A.     Yes. Oh, yes.

Q.    Did you interview General Hill as well?

A.    No, he's the only one we did not interview and that's one where I'd had to bump the investigation again.

Q.    Right.

A.    And I felt like we knew everything that General Hill did.

Q.    Okay.

A.    General Hill, when he promulgated guidance he did it in a very visible transparent way.  When he pushed the request forward for instance, when he pushed the quest forward from the JTF to the Secretary of Defense, he was very clear.  He did a note on it that was--you know, very clear.  He said I find some of these very troubling. And particularly threatening families and--and death threats and things like that.  I mean which is something that popped out later.

Q.    Right.

A.    He said I'm not sure we're on solid ground with this.  And pushed it forward.

BY 

Q.    And we've seen that document?

A.    Yeah.  And, so all his correspondence and his chop on everything was clear.

Q.    Okay.

A.    So I didn't have to bump the report again and get another investigating officer--and I'm not sure how they would have done it.  But----

Q.    And then just again real quick, Sir, before we let you go on.  Did you also talk to Secretary Wolfowitz and/or Cambone?

A.    Did not talk to Wolfowitz or we did not interview Cambone.

Q.    Okay.

A.    Did not find that they were relevant to this.  I did not want to investigate the guidance process.



Q.   Right.

A.   That would have taken me beyond my little charter, for the AR 15-6 was to investigate FBI allegations into abuse of detainees.

Q.   Okay.

A.   And now I'm up doing a national level how's policy derived kind of thing. And I got into that about all I needed to.

Q.   Right.

A.   So what I deduced out of all this was when it was promulgated down was the Secretary of Defense, through a vetting of his General Counsels and Service General Counsels said that certain techniques could not be used for a special interrogation plan for a specific person. And it could be used for others if it was requested and laid out; and it wasn't until later when it was done for Classified ▮▮▮▮▮▮▮

So there I knew what the broad techniques were. If you go to the Field Manual what's a technique? What's an approach? You know, they're kind of vague. Ad the guidelines on how vague they should be are unwritten by logic and guidance that pertains to EPWs. Like what's lawful or unlawful. Such broad things as if—if you think that something you're doing to an EPW was done to one of your troops that was held—was detained, would we consider it torturous? Would we consider abusive or degrading.

Q.   Right.

A.   If it was then don't to it.

Q.   Right.

A.   And that's lawful or unlawful. You can't apply that logic to the status that was accorded to detainees at Guantánamo.

Q.   Okay.

A.   So I had to go back to the President's humane treatment line.

Q.   Okay.

A.   And the obviously the Convention against torture being clear. So this was promulgated down. This guidance was promulgated down from the Secretary of Defense, through SOUTHCOM to JTF-Guantánamo and now General Miller is there.

Q.   Okay.

A.    Okay, he is there.  He's new on the ground.  Boots on the ground for about two weeks.  Two week-ish we think.  But this special interrogation had started actually about two weeks earlier because of the verbal that was passed down.  Not relevant to our process.  General Miller was clear about it.  Now, he knew who he had.  He also knew in his testimony with me that he knew all aspects of what was going on with the special interrogation plan.  He had correspondence with General Hill where he reassured General Hill that he had full knowledge.  They were on this.  The JTF is on this.  We are watching this.  This is a very important thing.  This is his most important thing he's got going.

BY 

Q.    Sir, is that correspondence in your report?

A.    It is.  Yes, I think it is.  It's one of the annexes.

Q.    I'm aware of the 21 January memo that General Miller wrote back up to Hill.

A.    To General Hill.  He says we are--

Q.    Is that the one you're referring to?

A.    Yes.

Q.    Okay.

A.    The special interrogation plan is proceeding.  We are watching it meticulously.  We're on this.

Q.    Okay.

A.    You know it's under control.  We've got it kind of thing.  This is reassuring the COCOM that this is important.  This is his most important thing.  So he's aware of all that.

My first interview with General Miller, I said, were you aware?  Oh, yeah.  Were you aware of the interrogation plan for Mister Khatani?  Oh, yeah.  Did you--were you down there for the interrogations?  Well, no, not really.  Okay.  But you were absolutely aware of everything?  And he had told us in previous discussions he had "walked the gun line."  I think that was a quote.  He knew everything that was going on.

I asked him about some of the other things that were kind of spinning off on this.  The GTMO-izing thing.  I tried to say away from this migration theory.

Q.    Okay.

Q.    Should it have gone to General Miller, Sir, or was it okay not to because they weren't going what they perceived was beyond the guidance in the memorandum as promulgate to them?

A.    The problem was it was hard to go beyond the guidance because there was almost no guidance.

By  Okay.

A.    When the Secretary of Defense says, you go down for futility.  When it gets down to a creative application of something.  You've seen the menstrual blood thing.

 : Yes, Sir.

A.    You've seen the gender coercion stuff.

 : Okay.

A.    All that sort of stuff.  That never got up to him.  He was never--he was not approving that.  He never saw that.

BY 

Q.    "Him" being General Miller, Sir?

A.    General Miller.  He also, well, he told me he was on this.  He was watching this.  You know, and the time the example I used in our investigation was, "If you're juggling wooden balls and glass balls you really want to watch the glass balls."  You know.  You can live if you're dropping a wooden one once in a while or a rubber ball.  This is one of those ones you have to watch.  And he agrees.  He agrees.

BY 

Q.    Okay.

A.    When I went back through my second interview with him and I said, "Were you aware of this use of dogs?" No, I never would have used dogs.  Dogs were used in a special interrogation plan.  Okay.  It was in it.  It was used.  I mean here's this guy manacled, chained down, dogs brought in, put his face, told to growl, show teeth, and that kind of stuff.  And you can imagine the fear kind of thing.  You know at what point-- if that was done our folks then we would have gone--if you had a camera and snapped that picture, you'd been back to Abu Ghraib.

Q.    Right.



A.    You know, the dogs with the guy detained. Here's the dog and with the teeth. We could find that anybody was ever bitten. I don't think anybody was ever bitten.

Q.    Okay.

A.    But now we're also using the Military Police in the interrogation business. Which there was a brig log supposedly. General Miller said there was a brig log; they did facilitate interrogations. There was a detention---these troopers were told these are your wards. Their safety and security are yours. You don't like them. You hate these guys. They hate you. But their safety and security are your responsibility. Then you're in putting a dog in their face.

BY 

Q.    Sir, can you elaborate "in their face", that's something I hadn't see before.

A.    Brought into the detention room. Brought up close in the interrogation rooms. These are small rooms. Have you seen the rooms?

BY 

Q.    No, not yet, Sir.

A.    They're little bitty rooms.

Q.    But he was in an interrogation room, he wasn't in his cell?

A.    In the interrogation room. That's right. Not in his cell. The cells are the detention; the interrogation rooms are interrogations operations. Different people.

 Yes, Sir.

A.    Different people. And there's hand-off. There is a bring them, control them, get them down. The interrogators come in. They do their part. They hand them over to the detention folks and then they're returned under a very strict Military Police protocol back to detention operations where they're formally treated. I mean dispassionately these are hated folks, but they are--where safety and security is involved. So that's what I was talking about. When I--

BY 

Q.    So when a detainee is in an interrogation room and he's shackled in some fashion and the dogs---

A.    You know, the dogs with the guy detained.  Here's the dog and with the teeth.  We could find that anybody was ever bitten.  I don't think anybody was ever bitten.

Q.    Okay.

A.    But now we're also using the Military Police in the interrogation business. Which there was a brig log supposedly.  General Miller said there was a brig log; they did facilitate interrogations.  There was a detention---these troopers were told these are your wards.  Their safety and security are yours.  You don't like them.  You hate these guys.  They hate you.  But their safety and security are your responsibility.  Then you're in putting a dog in their face.

BY 

Q.    Sir, can you elaborate "in their face", that's something I hadn't see before.

A.    Brought into the detention room.  Brought up close in the interrogation rooms.  These are small rooms.  Have you seen the rooms?

BY

Q.    No, not yet, Sir.

A.    They're little bitty rooms.

Q.    But he was in an interrogation room, he wasn't in his cell?

A.    In the interrogation room.  That's right.  Not in his cell.  The cells are the detention; the interrogation rooms are interrogations operations.  Different people.

Yes, Sir.

A.    Different people.  And there's hand-off.  There is a bring them, control them, get them down.  The interrogators come in.  They do their part.  They hand them over to the detention folks and then they're returned under a very strict Military Police protocol back to detention operations where they're formally treated.  I mean dispassionately these are hated folks, but they are—where safety and security is involved.  So that's what I was talking about.  When I--

BY

Q.    So when a detainee is in an interrogation room and he's shackled in some fashion and the dogs---



A.    And the dogs are out the door and they're brought into interrogation room and they're given--and that's all in my report. And they're brought in and they've told to growl and show teeth, at the detainee. And this guy is restrained. That's sort of a fear factor thing. Anyway, so I asked these about the use. No, I disagree with the use of that. And, and I can get a quote in here but "I would never approve that."

BY 

Q.    Okay.

A.    Were you aware of this, this, and this--and I have a whole laundry list here I went through.

Q.    Okay.

A.    And with the exception of only one or two, he said I was not aware. On a couple of them I said "I never would approve that." And now I'm thinking at what point is someone who was 'on this' reassuring the COCOM that he's got eyes on this interrogation thing, this is important, this is the most important thing he's got going on down there. At what point is he checking on this? That's why in my report I didn't say because the dog went in it's his fault. It wasn't because of the-- all, you know, the homosexual stuff going on, the degradation stuff, that he's a fault. It was the cumulative effect of all of that on this particular person that I found him lacking the proper supervision and monitoring of this.

When he told me in the first interview how he was aware of everything and he was responsible. And he was. And I've been a JTF Commander a couple of times and over here where he's not aware of any of this. And then I go down and look through, thumb the interrogation logs and it's all right there. And if you've read the interrogation logs--and I don't know if you've been through those.

Q.    We've read them. They're included in your report.

A.    That's correct.

BY

Q.    Sir, was there evidence that he had reviewed interrogation logs on a regular basis or any time, or----

A.    I told him----

Q.    Or receiving SIDPERs or was----

A.    I asked him, did you look at the interrogation logs that were--not only daily, they're hourly. They're by shift. This individual was being interrogated 20 hours a day.

Okay? And then given four hours off. In that four hours, he was taken to a white room. Okay? With all the lights and stuff going on and everything and he was--could set your clock by it, it was meticulously logged. You know this was a crucible that was being used.

Now this was a bad guy. This was a guy who had information that we needed. Okay? Information that we needed and if he had coerce them in some way that dropped down to the line just above, well above torture, but above humane treatment, where was that line?

He was the guy that I felt should have been at the throttle on this thing. And as it was, he was unaware of all what was surfacing the line. What was going on here. That was entrusted to what I considered some minor level folks. Okay? Important people but minor level.

So for 20 hours a day for at least 54 days, this guy was getting 20 hours a day interrogation in the white cell. In the white room for four hours and then back out. All the stuff that was going on with him--and I won't even go through all the list. You have all that.

BY 

Q.    Okay.

A.    And I laid it out for the Senate as well. If you read the interrogation logs, I mean you kind of get a little weird feeling. You go, "Man, we're doing that." He--and I asked him point blank. Have you read any of the interrogation logs? No. Where were you getting your feedback to reassure the COCOM that this was all going well? He said we had a meeting at least once a week where we would get the general idea of what was going on and what we were getting from him. And at a point Khatani would in fact break, give us a bunch of stuff, and then kind of come back together again.

The stuff that he gave us, I don't know that all of it was very factual. And I didn't get into the intelligence part of a lot of this. Although I am aware of it.

Q.    Okay.

A.    This guy is a hard-nut and he is a bad guy. Okay? And I went down and looked at him and he looks like hell. He was just coming out of this thing.

Q.    Really.

A.    He has got black coals for eyes. Now I understand in the last four or five months, he has kind of ballooned up because all of the stuff is off of him. His stress factor has gone way done and he's pounding MREs and he's a 195 pounds.



A.     Because they weren't interviewing witnesses or under these programs, particularly Khatani. Now they had him over in the brig for a long time. And, one-on-one they had total control. Now the other was we also got the brig logs. Nobody else, any previously investigation, had even looked at the brig logs. So we got the ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ or whatever they call them, who had eyes on these guys during all this. And we found that they were not abused. We found that the amount of interrogation interviews were not very much. And this guy was essentially left alone over in the brig.

So the FBI in their rapport building approach, were unable to establish rapport with Khatani. And they eventually they just left him there and essentially the brig called over and we've got this detainee over here. You know he's sort of a found-on-base item.

Q.     Okay.

A.     And the JTF went over and collected him up. The FBI's approach didn't work. Their rapport building, even this 34-52-ish sort of approach wasn't working on him. And that's when the JTF began and they found out that 34-52 techniques weren't going to work and they requested up.

So, the FBI's approach wasn't working. It was completely dead and I think they recognized it. Then when they saw that the DoD DIA piece of this going on, they went you know that's extreme. And in fact by their standards for evidence it is extreme. By techniques to get intelligence, they were border-line. Okay. They were down there on that--that's why I used the words "abusive and degrading." I didn't use "inhumane" and I absolutely ruled out torture. Okay? I felt that the JTF Commander was the only who had the authority; had the opportunity, and had the responsibility to be at this level. It wasn't above that level. That went on for about 45 days when the JAGs began to up at the higher level, policy level, began to question this. Particularly the ▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ said you're way out there and we're finding this thing to be way beyond what we should be doing. And that's when the SECDEF rescinded the guidance that was in the special interrogation plan for Mister Khatani and he went back to the normal 34-52 kind of plan. And he has been a clam ever since.

BY ▓▓▓▓▓

Q.     So we kind of milked all that we could have gotten out of him during that—

A.     But I don't know. We don't because----

▓▓▓▓▓▓▓     The guidance changed----

A.     It came down, the guidance changed. And then April, eventually a final, set of guidance on interrogation techniques for the detainees at Guantánamo came

down and that's where we are today. And it has some additional guidance by General Hill that said, okay, this is the guidance, and I as the COCOM now am going to lay some things on there like what is--what's sleep deprivation.

Q.    Right.

A.    You know it's 16 hours. Blab-blab-blab. No more moving these guys around and doing all this sort of things. I forget what that's called. But moving them around.

Q.    The Frequent Flier Program?

A.    The Frequent Flier Program, moving them around from cell to cell. We found that only happened to a few folks, but it was going on. We don't know it was ever sustained on any individual. A lot of it had to do with moving them around because they were--we know they had developed tap-codes and done all the stuff like we had in Hanoi and those sort of things. So we knew that was all going on. And we couldn't find, even though we knew it happened and was discussed, there was no documentation on it. So we knew it had happened. There were enough witnesses to say, oh, yeah, detainee ▓▓▓▓▓ think was one. ▓▓▓▓▓▓ was one of the guys who was a frequent flier.

So anyway when it came in April, April 16th, General Hill said also bang, bang, bang, laid a bunch of extra guidance rules on it. And I think it was becoming obvious what was going on down there was going to get looked at pretty hard. So oversight started picked up the pace. Particularly with, after all the discussions at the policy level.

Q.    Right.

A.    The JAGs, the General Counsels, that had all kind of convened and the Secretary of Defense. I thought the Secretary of Defense in good faith was approving techniques. In good faith absolutely after talking to him twice. I know that--and these weren't interrogations or interviews of him. This was our hour and forty-five minute and then another hour and fifteen kind of thing were we sat in there and had these discussions with him. Somewhere there had to be a throttle on this. He was going, my God, you know, did I authorized putting a bra and underwear on this guy's head? You know and make with a male interrogator and tell him all his buddies knew he was a homosexual. Then later he alleged threats of homosexual rape. Well, he could deduce that. You know, I mean's kind of the way we set it up. Collective "we". The Secretary said, yeah, I didn't say that. You know? Well the guy's ego is coming down pretty fast. But I did say put a bra and panties on this guy's head and make him dance with another man? No, you didn't say, Sir, but just under that broad technique that was application. Well where in there was the throttle? It's hard for me to say it was that E5.

Q.    Okay.

A.    The E5 would vet that at the next level up which is ICE, interrogation Control Element. The Interrogation Control Element was good to sign off the interrogation plan. And this stuff was in the plan and then they did it and then they documented what they did in it. And that was a matter of record. And they did it minimum three times a day. There were medical folks watching them the whole time.

This particular individual had a low heart beat condition. There was some concern that, under the temperature control, they'd run the temperature down in the room and everything--he got cold, make him uncomfortable as what maximum it would have been. That this guy was getting hypothermia. He had a low body temperature. His core temperature was pretty low and they kept checking on him. I mean all this stuff is pretty invasive. Somewhere somebody had to be watching that. Who is it? Is a person doing it or is there a perch somewhere. The perch had to be the JTF.

Q.    Okay.

A.    Now I am very aware that NAVBASE issues, the political issues that were going on, and discussions, and all that sort of thing, the organizational issues, the blending of the Military Police detention OPS and the interrogation OPS was still being worked hard. There was a huge facility upgrade. They're building a prison down there essentially.

Q.    Okay.

A.    Getting these folks out of camps. There was a rotational guard force issue they had to keep working. Who knew who was coming in. There were training issues that required a JTF Commander's attention as well. But this was a glass ball right here. This was one that had to be watched. In my opinion the JTF Commander was the only one that had the suitable knowledge of what the SECDEF meant because he talked to the Secretary of Defense. He's the only one that really knew the intent of what a technique was and probably where the line was, and crossing it, and should have watching that. It was not an E5.

Q.    Okay.

A.    And had I not been a JTF Commander like I said a couple of times, I probably have said, no, he's just too busy. There's just not a too busy alibi there for that. And again this was a hard one, because I know Geoff Miller. Geoff Miller's heart absolutely is in the right place. He's a great Soldier and he's a super General Officer. I just found that he should have known about some of this stuff in his opportunity over an extended period of time to the cumulative effect aspect of this on this particular prisoner deserved a little more attention. At least cursory attention and it was not given.

Q.    Okay.

A.    So that's why I found it. And I would have left that alone. That's where a fact-finding AR 15-6 and that's where an investigator stops. Here's the facts. I was directed to not only say it not only the JTF Commander, but it was General Miller, okay, because that's where I left it in my report; and then I was directed to say what to do about, and I said because it was not a criminal a failure to monitor appropriately, the cumulative effects, that's not a criminal act.

Q.    Okay.

A.    It doesn't violate policy. Okay? What's the policy? Is there a policy that says what a Commander's responsibilities are? Well there kind of is. You're supposed to—you know you're responsible is what it says.

Q.    Okay.

A.    But what are you responsible for? Everything? You know how much toilet paper is in the 15th stall. You know? I mean there is a common sense line there.

Q.    Right.

A.    So as a guy told to be the investigator and told also to be the evaluator. In the Air Force what we do up to that point if an investigator brings that to me, he's finished. At that point as the Commander it's not only my prerogative it's my responsibility to decide, okay, I now hold this person responsible and this is what I am going to do about it.

I was directed to do those two things and I did. I submitted my report and General Craddock took it. We had been working with his legal folks. So there were some legal things--and they were good. Good inputs. ████████████ to make sure the report read right. And we'd done a huge amount of work getting the testimony from the FBI agents all right. So we thought it was a good report.

He had a couple of other issues, he held the report because the DOJ was going to do their own report. Now we had collaborating with the DOJ because the genesis of our report was FBI agent's allegations.

Q.    Okay.

A.    So we shared everything we were getting with them. We reconvened back here downstairs in my JAG Office area where we did the bulk of the report in getting it all so it made sense. They were down there with us. So there was daylight between that. If we needed something from DOJ in terms of the FBI they gave it to us.

Q.    Okay.

A.    The two lead investigators. They were directed by Mister Gonzalez, the Attorney General, to do an investigation. So when they went off, we were to stay with them. General Craddock held my report for almost three months while we followed up with them. General Furlow went down to Guantánamo with them and through all the stuff they did, the only thing that was different was they found another piece of paper that had to do with a classified piece, which is the DESKREC by Navy——

Q.    Lieutenant Commander——

A.    Lieutenant Commander, Reservist. We actually found a piece of paper that was the piece of paper used.

Q.    Okay.

A.    That somebody had rat-holed somewhere and didn't produce for us. All that did was corroborate what we already had deduced through all the testimony and actually that the letter itself wasn't nearly as damming as all the testimony of what this guy was told was in the letter.

Q.    Okay.

A.    So that was it. There were no other findings. So again the report was— not it's resubmitted. The legal review is all done. Again, and we knew that was all going to be easy because we has stayed in step with legal review.

We went to— now we're now back to getting ready to go to the Secretary of Defense for the last time, and the day of— it was a Monday, we were going to brief the Secretary of Defense. We went in and General Craddock, we sat down an hour and half before reporting to the SECDEF. And he told me that he disagreed with my recommendations and finding on General Miller. And he said we agree to disagree.

Q.    Okay.

A.    And I just politely said well we haven't really disagreed because I didn't know you were disagreeing with it. You know kind of thing.

Q.    Right.

A.    And we tried to be collegial about. He disagreed for the reason I told you. The same reasons that I had an issue with, that it wasn't criminal because he didn't violate a policy. It wasn't a criminal thing. Particularly on his part. I found him to be responsible and accountable not culpable, but accountable for knowing what was going on in his organization at this level and this important of a project.

Q.    Okay.

A.    He was the only one between the Secretary of Defense and the interrogator that could do it.  That actually had the knowledge and the wherewithal to put a throttle on this.

Q.    Okay.

A.    Or look at it and--and it looked like there was almost no attempt.  And that's all a matter of record.  You read my interviews with him.

Q.    Right.

A.    Okay.

Q.    We've got what is included in the report.  Now we don't have——

A.    And that's in the classified report.  Did you read the classified report or the unclassified report?

Q.    It's classified, yes, Sir.

A.    It's the unclassified testimony of myself with General Miller the 1st one and the 2nd one.

Q.    Great.  Is this a verbatim?

A.    It's the second one is closer to verbatim but it says I asked this question and he answered this.

Q.    Right.  Okay, Sir.

A.    That kind of thing and I signed both--I think--yeah, I signed both of those.

Q.    Okay, Sir, and we can take these with us?

A.    Yes and he was sworn both times.

███████  All right.  Thank you, Sir.

BY ███████

Q.    Sir, can I ask you a couple of questions quickly before we go on.

A.    Okay.

Q.    Just administratively you mentioned the name ███████  Can you spell that for us?





A.    ▮▮▮▮▮

▮▮▮▮▮ Oh, ▮▮▮▮▮

A.    She goes by ▮▮▮▮▮

▮▮▮▮▮ Okay, Sir, got it.

▮▮▮▮▮: I think we'll talk to her.

LTG SCHMIDT: She was the previous ▮▮▮▮▮

BY ▮▮▮▮▮

Q.    Yes, was there any evidence that with respect to the interrogation laws that there techniques being used or events occurring or that occurred that didn't make it into the logs?

A.    I got to tell you when you're writing down the level of detail that they did there, they were—they were writing down everything. I can't imagine that they would-- that they missed anything. And we wouldn't just presume that they were putting things in there unless we could corroborate a FBI allegation, a date, a time, and a place that was in one of these interrogations and some of those we did. It was so complete that it was an assist to the investigation. It was also so detailed and so well written that I just can't imagine that these weren't being reviewed or read by the JTF.

Q.    Yes, Sir.

A.    And they weren't. And that's why the logs--and no one had looked at the logs before for some reason. No one had ever even look at the brig logs where Mister Khatani was held for an extended period with the FBI, and then us in the JTF for a while and then he was transferred out.

Q.    Were there any written policies, directives or Standing Operating Procedures that were either in place when General Miller took over and that he retained or that he, established and signed and put in place while he was there that you're aware of that would be evidence of supervisory control?

A.    He instituted and as they do, all the JTF Commanders, have done the SOPs and those were formative. He had to stand those up himself. The SOPS for the two JTFs were rank gradient. The seams were too wide between the two. And it was the same detainees. The impact on them was the same.

So he had to invent all that stuff. He did a pretty good job of doing that. And again that's part of the caseload he had in addition to this particular individual. And



I was cognizant of that and I tried to put that in the right perspective. And again what he said and what he did were two different things. He said he was all over this. He was watching it. He was aware of everything. As a matter of fact I think it's a quote, "I'm always aware of everything that happened to 063." From the first interview.

The second interview as I went through all the events--[Pounding the desk] that were just booming out of the logs he was essentially not aware of most any of them.

Q.     Okay.

A.     So, he--

BY 

Q.     So was----

A.     But he did establish policy and he continue to review policy. A lot of it had to do with safety, security, and organizational sort of things. There was some Be Nos in there that he put in there, you know, to-- and there was some that he didn't----

Q.     "Be no's", Sir?

A.     Yeah, there will "be no" this or "be no" that.

 Oh, okay.

 Oh, okay.

A.     I'm sorry. There were some--he told us that--as far as short shackling. Now he directed there'd be no-- short shackling was inappropriate. Would not be doing that. As a matter of fact they even modified the eye-bolts on the floor so that you couldn't--you couldn't actually put the hand of the--the ones in-- your feet manacles you take a chain, stick in there and do that. But you couldn't do the cuffs the way they were with the locks and everything. You just couldn't get your hands----

 Yeah. Okay.

A.     --anymore kind of thing.

Q.     Okay.

A.     So he had said he did a verbal. That was not in the SOPs. We looked that even up to today. I say today, when we--the time of the report. There was no SOP saying no short shackling. It didn't say that. But there was a verbal and every person

we talked to said, no, that you know, that the JTF Commander said none of that. So-- some of it wasn't codified. Some of it was.

: All right, Sir.

A.    All right.

BY 

Q.    Sir, regarding your finding that you made with respect to General Miller, I just want to make sure we understand it exactly. If you had found that General Miller had been aware of all of those techniques that you went through with him line by line, was aware of them; admitted to it, would you have then come to the same conclusion? Was--was your concern with him more the fact that he didn't know everything that was going or what he should have know that was going on, or was the problem more just abusive and degrading treatment? In other words, if you had---

A.    Yeah, oh, I understand totally.

Q.    Okay.

A.    What I would have said was General Miller was responsible.

Q.    Right.

A.    That would have been a finding. He was responsible for the conduct of interrogations that I found to be abusive and degrading. The intent of those of those might have been to be abusive and degrading to get the information they needed and it might have hovered above the level of inhumane. Above the level which means it didn't--it was not inhumane. And it was certainly not torture.

Q.    It didn't violate anything.

A.    It didn't violate the torture statute.

Q.    Okay.

A.    The Convention against torture. It didn't violate the general premises of humane treatment. Was it abusive and degrading? Find me somebody that will argue that it wasn't.

Q.    Okay.

A.    Was it intentional and did the means justify the ends? That's fine. So he responsible because he was witting and he was responsible.



Q.     Okay.

A.     Recommendation might have been, that's it. You know. The fact that he didn't know what was going on; the fact that it was judged to be abusive and degrading; but that was wasn't the intent or was it the intent? I mean it was just a free for all. That was my finding and my recommendation to hold him to the level of admonishment. Which is about the lowest level that you can get. Was because he didn't know what was going on. And I felt like the JTF Commander or some Commander, him, because he's the one that could be the translator between the SECDEF's guidance because he communicated with the Secretary of Defense; the COCOM; and daily with his--with his interrogator/detention folks.

He was at the appropriate level in my judgment. And asking my opinion and I was told--my opinion and write it down. So I did. I would have, had he been witting of all that, I would have said, still said he's responsible. Because now he is responsible and he always was in my opinion.

Q.     Okay.

A.     But a judgment or an admonishment? No, he was executing what he thought was the Secretary's intent and only he would have been the right guy at that level to know into the action--the application of the technique, and only he would have been the one who should known how it was being applied. He was----

BY 

Q.     Well, Sir, even if he had been aware then he would have also been the same position that you were then to make a judgment that the effect of the 54-days, day after day after day, and that the cumulative effect was approaching or perhaps exceeding some line somewhere. Then he would have been in the same position as you then to make judgment. So--

A.     Absolutely. Absolutely. I would have had the same finding. The recommendation would have been different. That's I think what you're asking. The recommendation would have been--now, General Craddock said, you make the recommendation to me. He said to me you make the recommendation and I told him it was inappropriate for me as the investigator to make that--it was a Commander's prerogative. He goes no. You make the recommendation. And I'm being very clear about this. And I don't want to--I'm not going to tube my boss here. I'm just telling you that's why I made a recommendation.

BY 

Q.     Right.

A.      And so I said alright. I'm going to tell you that I would admonish your General Officer JTF Commander. He goes fine that's what I wanted to hear. I want to hear what you recommend. And I would have done that. Had General Miller been witting of all this, okay, that means it was deliberately done. It was done with the knowledge of what the technique approved meant in the application process. Instead of going the way it went. I didn't find the threshold of humane crossed.

Q.      Okay.

A.      And torturous--now in the analogy I gave to SASC, you know, there's a level. Is listening to country music, does that bother you? Okay? Now some people say yeah it bothers me. Is that inhumane? Is it torture? No. But if you listen to it for 8-hours, it might go--it's really annoying. But say you listen to it for 24-hours, the same level. Now if it's not so loud he can't stand it, but it's the dominant atmospheric. What if he listened to it for a week? No one ever changed the channel. And you're just hearing. Not there is some of your body that's going to start tuning it out. It becomes background or whatever, but there is a reason, because you're starting to psychologically get whacked with it. Let's say we played that for a month. And that's--you know we just kept playing it. And I mean we did this with Mister Noriega down in Panama. Blasted him with rock and roll. Hard metal and stuff like that.

: Okay.

LTG SCHMIDT: It would drive him nuts and he couldn't think after a while. At what point do you say it's mildly annoying to where it's abusive and what point do you actually say it's torture? Is there a line in there somewhere? Who makes that call? Is it the E-5 who does an 8-hour shift? You know, does three days on; three days off; three days on; three days off? Who makes that call? You know is it--where is the throttle on this stuff?

But you multiply that times all the creative techniques that were done at the lowest level. Supposedly with oversight and it wasn't just applying futility. It wasn't just applying ego down. It--it--you know it was all of them at once. Continuously by different interrogation teams for extended periods of time. There were no limits. There was no limits put on this and there no boundaries. How loud was the music? You know how long did you play it? You know, did you play it just to where it was decibels ear-breaking and you back it off a notch, and then leave it on forever. No end.

When was this special interrogation plan going to end? It was never going to end. Okay? It ended because the SECDEF rescinded his guidance from the policy level and then it shot right down to the JTF, the interrogation level. There was no boundary and there was no limit on all these little creative--and that's what I said in my report. See this was one of those ones, that, I wanted to be right. I was not witch-hunting anybody. I felt no compulsion to go bring a scalp.



I know Geoff Miller and that's when it hit pretty hard. I find him to be a pretty solid guy. But I feel pretty confident that the way I've judged this is the way it should have been handled or--now, again I've got all the details.

BY 

Q.    Right.

A.    And that's I felt I should have handled it-- should have been handled.

Q.    Yes, Sir. Sir, would you have made the same recommendation regarding General Miller if you had found that there was no cumulative effect of abusive and degrading treatment regarding ISN 63 but you have found the same lack of involvement in knowledge by General Miller of the interrogations?

A.    I got to tell you if that was the case, there would have been no investigation.

Q.    Right.

A.    And that is---that's so subjective that I can't answer that kind of question.

Q.    I understand.

A.    If nothing had ever been alleged and there had been no abuse, would I have guilty of something?

Q.    Okay.

A.    I can't answer that.

Q.    Okay, but in this case it was more the fact that this was such an important interrogation that it did involve special authority that did push the boundaries perhaps of proper treatment; that that mere fact should have resulted in closer involvement in supervision by General Miller. Is that fair would you say?

A.    Yes, it is.

Q.    Okay, Sir.

A.    This is one that--this wasn't just daily business.

Q.    Okay.

A.    When the Secretary of Defense is personally involved in the interrogation of one person, and the entire General Counsel system of all the Departments of the



Military and the Office of General Counsel and Secretary of Defense; and the Secretary of Defense is personally being briefed on this-- and you mentioned a few names. I know Steve Cambone as well. And he was in there throwing rocks at us. In my staff's testimony. He's real concerned.

Q.    Okay.

A.    I don't know what element he played because I didn't investigate that.

Q.    Right.

A.    [REDACTED] is in there.

Q.    Okay.

A.    I know what level he played at, but I didn't investigate his logic processes.

Q.    Right.

A.    There were a lot of people that were involved. That was not my job.

Q.    Right.

A.    And all I wanted to do was find out what was approved and kind of the genesis of how it all kind of came out. How was it promulgated and who was responsible for the promulgation, guidance, and oversight of this.

And I just find it hard to believe, as does anybody, that when the Secretary of Defense has that kind of interest to where he's talking weekly with the JTF Commander and the COCOM, but the JTF Commander too, personally. And General Dunlavey said he didn't even go to the SOUTHCOM, he went directly to the Office of Defense. He dealt with him. He was the Secretary of Defense's person personally on this JTF; and he almost did nothing with JIG-- with SOUTHCOM. He almost ignored them.

When General Miller came in, he understood the chain of command and he went through SOUTHCOM to the Secretary of Defense but there was still a direct connection. And believe me the Secretary of Defense knows who Geoff Miller is.

Q.    Yes, Sir.

A.    When it's that important and you're asked how is it going and you say we're all over it. We know everything. You know we got this thing tight. Don't worry about it. You know we're-- our oversight is meticulous. I think the word meticulous is in there. He doesn't know anything that's going--and he doesn't even know what they're doing with this guy?

Q.    Okay.

A.    I found that to be lack of sufficient monitoring of this. I mean I'm sorry, I don't know how else to call it. And someone can go argue it. That's fine. But I was directed --

Q.    Right, Sir.

A.    --my finding and then the recommendation. Now, in the end, General Craddock, my boss, decided no, he didn't violate a policy. It wasn't criminal. And that's what I said all along. And then he disagreed with it. And then we went and tried to put the face on it. He had, the COCOM, as the Convening Commander, he has the responsibility for making the call. The fact that he asked me and directed me to a make a call is, unfortunately it's a matter of record.

Q.    Right.

A.    Which every Senator--I mean I--you could have seen this one coming. Every Senator and Congressman latched on to it.

Q.    Yes, Sir. Right.

A.    It never should have been in there.

Q.    Yes, Sir.

A.    But it's his responsibility and his prerogative to say in the end I'm the one. His should have been the only judgment on this.

Q.    Yes, Sir.

A.    Otherwise we wouldn't even be having this conversation.

▮▮▮▮ Sir, I'll tell you what. It is twenty-five after ten I'm going to need to switch over this tape.

LTG SCHMIDT: Okay.

▮▮▮▮ So let's turn off the tapes for just a second long enough for us to switch this stuff over. So we don't miss a sentence. We don't want to do that.

[Went off tape.]

[Back on tape.]

LTG SCHMIDT: I would also mention that General Furlow was--I don't think I did hardly anything without him.

BY 

Q.    Yes, Sir.

A.    Latching on.  Even though I took over this investigation, the bulk of the interviews were done by him and his team.  Then we cleaned up, and edited, and got things so they were actually readable and the intent came out of it.  I put a bigger staff on it.  He--he was and his team did almost all of the interviews before the General Officer level.

Q.    Okay.

A.    And I got involved in a few more as things started popping up.  I was there for about four or five-- that we just had-- there were some key people that I just wanted to hear it from.

Q.    Yes, Sir.

A.    And then the seven Generals, and actually had to make a call to Kuwait and hook up with one of the--he was the Deputy Commander of Southern Command that was sitting in the saddle before General Hill came on board.

Q.    Okay.

A.    So I covered it.  I think I hermetically sealed who had knowledge at that level.

Q.    Sir, can you run through real quickly which General officers you did speak to?

A.    Phew!

Q.    The best that you can remember.  It was certainly Miller, General Dunlavey, and General Baccus--

: We may have to ask you questions about----

A.    Start off with the first JTF 160--oh, gosh! He was Chief of Staff at Southern Command.  General-- a Marine Two Star.

BY 

Q.    Pace.



A.     No, no, he was the 

BY 

Q.     Lehnert?

A.     Lehnert.

BY ████

Q.     Lehnert.  That's right.

A.     We'll start with General Lehnert.  Okay? And because he was the guy on the ground that was detention operations.  This is before they even started anything to do with interrogations.  And we got some good insight on what his marching order was.  When he got down there, very quickly it was like how soon can you start interrogations.  And that's when they slammed together a JTF 170 team and that's when General Baccus I think was then--and so I interviewed Lehnert and Baccus.

Q.     Okay.

A.     And we started building this bridge.

Q.     Okay.

A.     Dunlavey was then assigned to go down there and be the JTF 170 Commander for interrogations.  He and General Baccus were at odds.

Q.     Okay.

A.     Now General Lehnert was the guy that actually build the first facility and got it going and essentially resurrected the--the, Echo, Camp X-Ray, and all that stuff, to go down there for--essentially the migrant camps into detention operations and got those things kind of going So three were--I just wanted to build the bridge as I got there just to kind of figure this thing out.

The next person in was obviously General Miller.  And General Miller came in and consolidated into JTF Guantánamo.  The oversight for that--and there a lapse because General Pace had left US Southern Command and there was a lapse and General Gary Speer who was the Deputy Commander Two Star-Army, was the interim kind of acting Commander.  I also interviewed the J-2, who is not the J-2.

Q.     General Burgess.

A.     Burgess.  General Burgess.

A.    And everything else.  And oh by the way, the Koran abuse thing blew up in the three month interim--

Q.    Right.

A.    Between my submitting my report to the time I did my final testimony to the SASC.  We had seen some things on Koran.  You know, handling.  And I'm down there and I was dumbstruck.  I am really a Middle East guy.

Q.    Okay.

A.    Five years living in the Middle East.

Q.    Okay.

A.    Since '83.  And I was dumbstruck on the deference given to these detainees' religious sensitivities.  Way beyond what I would ever do.  And I've lived--like I said I've lived with the Arabs.  I was just dumbstruck by it.  And then when I heard all the--you know, I watched the Korans all held up on a little doilies kind of thing and they have the prayer rugs and all this sort of thing.  I was just blown away by it.

Q.    Okay.

A.    Because having living in the Middle East that's not how the standard Muslim follows Islam.  You know it's their life.  Not part of their life.  It's their life and then everything else then comes from it.

Q.    Okay.

A.    But not like that.

Q.    Right.

A.    And we're giving them a shelter.  We gave them a mental and emotional shelter.

Q.    Okay.

A.    And I was phew!  Wow!  And then I leave and then I hear all this Koran abuse stuff.  I couldn't believe it.

Q.    Right.

A.    I also had a chance to look at the toilets in those 5 by 8 cells.  And I just didn't have the visual of putting one of those in the toilet.  Being an engineer it just didn't fit.  You know?

Q.    It didn't seem to fit.

A.    Yeah.

Q.    Okay.

A.    Okay. So anyway, those were the General officers and I also--let's see who else did I interview Officer wise? I mean was that five? I think I did seven total.

BY 

Q.    I got General Miller, General Hood, General Dunlavey, General Baccus, General Lehnert, General Speer and General Burgess.

A.    That's it. Good to go.

BY 

Q.    Okay. Thanks, Sir. Sir, you've actually done a great job of addressing most of our questions that we had for you. I'm just going to go through our list real quick and just pick out a couple that we didn't address directly just to make sure that we cover it.

Sir, what concerns, if any, were raised to General Miller by either GTMO personnel or FBI personnel regarding the interrogation and treatment of Khatani?

A.    Yes.

Q.    In other words, was he ever made directly aware that hey there's some abusive treatment going on? That's what we're trying to pinpoint.

A.    There were I think in our report there were like two occasions where CITF personnel--

Q.    C-I-T-F?

A.    C-I-T-F personnel had meetings with General Miller to say, essentially it was to reiterate the argument about the techniques being used won't help in the prosecution. Evidentiary process of gathering evidence.

Q.    Right.

A.    You know that concern. That's on that was always in their face down there. And it was one that was never going to be understood by the FBI or by the Criminal Intelligence folks or by anybody else. The requirement to get actual



intelligence to stop an attack on the United States or us or wherever else and the information held in the heads of these individuals that we knew about down there, could be the thing that did that. There was just a disconnect. You know everybody has their job. And their job was to get evidence. The FBI and the CIA played another little role down there. That's their thing.

Q.    Okay.

A.    They also had custody by the way and we tried to rule out if something was observed like detainees abuse, it did not automatically say it was while they were in the hands of DoD being DIA or the detention OPS or interrogators, the US Military interrogators, because other people had hands on. Now the FBI probably wouldn't have observed someone in the hands of the FBI being treated that way but we didn't rule it out. You know? You'll get a rogue FBI agent, you know, having enough. And the CIA also had, unfettered access to people that they wanted to have and they had their own area. They didn't use our interrogation facilities because they used their own trailer operation.

Q.    Okay.

A.    But if you know what they were doing over there, it was unlikely that they'd be using anybody but--we didn't assume away anybody having a rogue person. Like we didn't assume away having a rogue, military or DIA person.

Q.    Okay.

A.    So we looked at everything we could.

Q.    Okay.

A.    The question again back to--

Q.    Oh, I was trying to ascertain if allegations of whether we call abuse or whether it was mistreatment were ever raised to General Miller regarding---

A.    We do know because of the evidentiary thing. And again I said I put my hands on and had these detainees for a while. It was raised to him.

Q.    Okay.

A.    And he acknowledges that. There was also--uh--

BY 

Q.    Observed by the FBI?



A.    I think it was the FBI agent down there. The senior—the senior agent.

BY 

Q.    Do you recall who that was, Sir?

A.    He is called the SAIC. No, I don't.

Q.    You don't know who the guy was. Okay.

A.    No, I don't know. But it wasn't--it wasn't a big slugfest.

Q.    Okay.

A.    Miller said I understand your concerns. And it's exactly what I would have done.

Q.    Right.

A.    There was also one of the other agents down there that had raised this and this wasn't like they said hey they're tearing so and so's hair out. They came to him and said we disagree with your techniques that have been approved. We disagree with your approach that you're taking towards these detention detainees. And that was really the genesis of it and General Miller got that.

           Sir----

           Okay.

BY

Q.    Sir, we understand it was because of the differences between getting actual intelligence and evidence to be used for prosecution, but that it also included concerns regarding what they considered to be abusive or even aggressive----

A.    Overly aggressive was the term.

           Right, overly aggressive.

A.    We're concerned about your overly aggressive techniques. In those complaints it wasn't that detainee XXX is being abused or tortured or whatever.

           Yes, Sir.

A.    It was we're concerned about your methodology here. So he was aware of that. He was very much aware of that





BY (b)(7)(C)

Q.    Sir, in your opinion, should that perhaps have raised a red flag to General Miller?

A.    It would—it would have just got him—well I don't think it would have been a red flag. But it would have said pay attention.

Q.    Right. That's what I'm asking.

A.    Yeah. It means they know that you're the throttle here.

Q.    Okay.

A.    The other agencies because that's where the level of guidance and command came from. He's the authority. I mean he was the authority.

Q.    Right, Sir.

A.    That—you know, yes, he was very much aware of their concerns.

Q.    Okay, well——

(b)(7)(C)    Do you know if he took any action regarding it, in response to this meeting?

A.    No, I don't. I know that whenever he had the occasion—and this came out in several interviews. He was very clear that these, that the detainees, would be treated humanely. Now, that's the same broad guidance but there was no definition of humanely that the President promulgated. The President's promulgation was the baseline they used. Which again you know stay secure——

BY (b)(7)(C)

Q.    Which is at level one?

A.    Man, it was mass level one right there. And it was medical care, food, water. And in fact food and water it didn't say soda-pop. It didn't say burgers and fries which they're munching on now. I went and watched they're eating fries. It's part of the rapport building now. In those days there was going to be no rapport building. Because fresh from the fight these guys had been swept up off the battlefield. They were going to die. And I mean if it was them and us being the detainees I mean they would have been killing us like that. [Snapped his fingers] You know there is no doubt about it. And they expected the same treatment that they would have given us. It never materialized. The folks that were studied in on the resistance techniques, knew

that we weren't going to do anything to them and they were the ones that were going to continue to fight.

BY ▨▨▨▨ :

Q.    Okay, Sir. Just a couple of more things, Sir. Let's just talk and we'll attempt to do this in an unclassified sense or at least up to the secret level. Regarding the classified detainee and the interrogation of him, the interrogation plan, and the report provides a pretty good description of the death threat that was made towards that detainee during the course of an interrogation. But the report also indicated that General Miller was not aware of that death threat. Yet the report did not make a finding regarding General Miller and his supervision of that interrogation as it did with respect to the other interrogations. Just curious why you chose to not do that?

A.    The reason—

Q.    Okay.

A.    First of all the Lieutenant Commander in question here, very clear when we interviewed him that this was his idea and he was the approval authority. He never attempted to vet it up. He did say that he tried to vet it laterally with, another individual a Colonel. A JAG. Both of those are now retired or out and they—we—again, no power of subpoena. We couldn't get corroboration. Both of them pled lawyers.

Q.    Okay.

A.    They "lawyered up" on us.

Q.    Okay.

A.    And the testimony that we had from the Lieutenant Commander, was enough to tell us that this guy was doing it on his own. He was going to—you know the level that he was going to work this. When I interviewed General Miller he said, he was unaware of it and he never would have approved it. He knew it was not only-- not appropriate, it was illegal. He knew that. And that's in my--in the question answer part of the classified piece.

Q.    Okay.

A.    So what we found there was there was a culpable person at a lower level who was--and I would tell you that Lieutenant Commander was a rogue guy.

Q.    Okay.

A.    He was sent over there in a capacity that had nothing to do with interrogation really. It had to do with more the process business. He became a zealot

and he jumped in there and got himself extended. Chopped from his sending organization to the JTF and essentially was having a ball.

Q.    Okay.

A.    I mean he was yakking away when the interview was done by General Furlow. General Furlow came out of there, and his eyes were just watered I guess. This guy was just saying the stuff he was doing. You know? Yeah, we decided to do this, and this, and this. And it was all corroborated by other people.

Q.    Okay.

A.    And he did it alone. General Miller was not accountable for this rogue guy at this point. He would not have approved and done that.

Q.    Okay.

A.    And it was so much that was hidden down there with him. So that's why we recommend a criminal investigation. When we submitted our report that's what it said. We were talked out of that by the legal folks saying well what you really need to do is hand it over to his current Commander in the Reserves for his action. So we kind of liked that. And my JAG who was in this said okay we'll bend to that. Because we don't know that it's criminal, but it needs a further look.

Q.    Right.

A.    The Commander would do that. And we'll put it over to a Commander that has authority over this individual right now. So that's what we did. That was the second point that General Craddock disagreed with me on.

Q.    He liked your first idea?

A.    See he came right back to me, and said no, it needs to be a criminal investigation. You know, so I poked myself in the eye and said you know here we go.

Q.    [Laughter]

A.    So, that's why. So, our recommendation that was negotiated away by the legal team from SOUTHCOM we--he came right back to it. So I'm fine with that.

Q.    Okay.

A.    Either way I would have been fine with it. I prefer the way that he recommended it in the end, General Craddock did.



Q.    Did you did not have similar concerns about General Miller's level of participation?

A.    I did not. I did not. I felt like the situation with Khatani was entirely different.

Q.    Okay.

A.    That was one where it was the business execution. Everybody was working in good faith that they were in control at whatever level and whatever they wanted to do. However creative they were going to be. They felt like well we got a green light to do this to whatever level we want to as long as we don't torture this individual.

Q.    Okay.

A.    Essentially was that and that we maintain the level of humane treatment. I think they kind were there. That's why I said I didn't have a finding there. There was question and again I was supposed to look into allegations of abuse.

Q.    Okay.

A.    I think I really want to stop saying "abuse." Was that abusive? Was it degrading? Yes, it was and that's where I labeled it.

Q.    Okay.

A.    I figured that was an echelon above inhumane.

Q.    Okay.

A.    Now, was that the intent? If it was and they didn't violated the level of inhumane or torture. Let's get on with it. Okay? That was our intent.

Q.    Okay.

A.    No one ever said that was our intent.

Q.    Okay.

A.    No one ever put some guidance in there. There was no control.

Q.    Okay.

A.    In spite of the fact that people were saying we got this. We know all that. We're in control. There was no control. It would have been easy for what happened with the Lieutenant Commander with the classified detainee to have happened easily.

Q.    Okay.

A.    It is just luck that it didn't.

Q.    Okay.

A.    And again I go back to the--you know, they said well a couple of Senators, you know, why did you find this to be "bad", you know?

Q.    Okay.

A.    Well just for the lack of a camera it would sure look like Abu Ghraib. And I didn't want to draw too much attention there because I had no proof.

Q.    Okay.

A.    I didn't want to get into this 'migration theory' thing which I'm not going to.

Q.    Right.

A.    So I didn't chase that one. Could have but that wasn't my charter.

Q.    And was the classified detainee interrogated using a special IP?

A.    There was a special IP approved for him.

Q.    Okay.

A.    They never really got into it. They got--they started it, but they didn't get into it because they had this ruse.

Q.    Okay.

A.    And I don't know that you read that the ruse--the ruse was they were going to put a confederate in with him and they were plant this idea that, well I've had this dream. These guys are very emotional guys. Had this dream that you're going to be buried.

Q.    Right.

A.    And they had the messengers come to tell him certain things. And then they had the Navy Captain from the White House show up under ruse.



Q.    Right.

A.    And he had the letter. And we finally got the letter. And the letter wasn't--the letter was more that we were going to arrest your mother, bring to Guantánamo, and--and that kind of thing.

Q.    Okay.

A.    And the message that was--the verbal part was that you know, we're going to--you're going to die. You're going away. We are going to erase you and no one is going to miss you.

Q.    Right. Okay.

A.    And then the last part of the ruse was where he got the boat ride where he thought this is where he goes away. And within a very short time is when he had this epiphany and he joined the global war on terror.

Q.    Okay.

A.    Which is where he is today.

Q.    Right. Hurray for him.

A.    Yeah.

Q.    Okay, Sir. Thanks. I'm just not going to go into all this other stuff. The report, your report, indicated that there were some personnel that you wanted to interview but were unavailable to you. And you kind of addressed that, earlier, at the beginning of our interview here. Out of that group of folks that, for whatever reasons, you were not able to talk to you--that you were not able to talk to, would you recommend we try to speak to any of them? Do you think they would provide anything that would be useful for our assessment?

A.    We've gone back now and we have interviewed all of them as I understand.

Q.    Okay.

A.    Everything that they say corroborates what they said in their e-mail traffic and no other illuminating sort of stuff.

Q.    Okay.

A.    The one person was obviou▓▓▓▓▓▓▓▓▓▓▓

Q.    Right.

A.    She's the one that we finally found out that the reason they wouldn't give us access to her was because of her medical condition.

Q.    Okay.

A.    And supposedly—and there was another one that had—she jumped out of a truck in Afghanistan and broke both of her ankles or something and was getting, you know, some medical kind of treatment, and they wouldn't give us access. They don't tell you why. They just said no you can't have access to them right now. And some of them are involved in very sensitive operations, globally and they weren't going to pull them out.

But after Senator Warner, like I said, you know, got pretty excited about it, we finally got to everybody. Those interviews have now been done. There is nothing in, as I understand from General Furlow, nothing in any of those interviews that changes anything other than adding more discussion to the points we already investigated. The short shackle stuff. The—modifying the temperatures of the rooms. And we found that. Okay? And we addressed. Whether it was policy or not, or used or approved or not. We did all that. So just you know I'm saying it again. When it got to it, it's pretty much airtight.

BY 

Q.    Just in case—I'm sorry, but just in case, where are the transcripts for those interviews?

 Who has the interviews? SOUTHCOM?

A.    General Furlow has got it. Took it. It's now an addendum to the report. It's added addendum testimony.

BY 

Q.    Okay. We could probably get that from the SJA at SOUTHCOM?

A.    Sure. Yeah, and that's not going to get to the General Miller stuff.

Q.    No.

A.    It just gets to the details of the FBI allegations corroborated or not. So.

Q.    We just want to be able to say we've read everything.



A.    Oh, okay.  Yeah, and I would hit those.

Q.    Yes, Sir.

A.    The only one and this is not about General Miller, the only one we just can't get to is this one where ▓▓▓▓▓ and she has a couple of e-mails and you've probably read them.  Where she actually contradicts herself a little bit and she never saw anything that was really upsetting.  And she goes into this thing about this guy was short shackled to the floor.  He has pulled his out hair and he was lying in his own excrement and had been denied food or water for several days.  When we asked her about it, she goes well, he just looked like he was kind of a thin guy.  She translated that into being denied food or water for several days.  We could find nothing that said-- and this is on the detention side.  Those guards if prisoner so and so wasn't given food and water it was a big deal.

Q.    Okay.

A.    It was documented.  We got all the medical records.  So we pretty much knew all that.  We couldn't find anyone.  There was one detainee and he was called "Crazy Bob" and this is a guy who, certifiably crazy.  I mean he ate his own excrement.

Q.    Hmm.

A.    I mean this guy did all that kind of stuff.  Now ▓▓▓▓▓▓▓ couldn't tell us plus or minus of when she saw this and where she saw it.  But she did allude to interrogation.  I don't think we had Crazy Bob in the interrogation room.  Just a few times because he's so crazy.  And we didn't--certifiably crazy and it wasn't an act, but at some point she might have seen Crazy Bob.  You know?  This guy is a mess.  And yeah, to keep him throwing all the excrement on all the guards and doing stuff, he was probably short shackled as a control measure in detention probably.  And we just had a real hard time with one.  That's the one that the SASC latched on to.  That's the one that both the Republican and the Democratic side felt like, there you have it.  That's torture.  This guy has been shackled to the floor for days deprived of food and water and he is now living in his excrement and, and he has pulled his hair out because he is slowly going crazy.  Well, yeah, this guy is crazy.  He has been crazy for a while.  And detention hasn't helped him.

Q.    Okay, Sir.

A.    Okay, so that's the one left hanging.

Q.    Right.

A.    I don't know that we're ever going to get to it.  There are some things that are not known and probably not knowable.

Q.    Right. Okay, Sir.

A.    Okay. Sorry, I dragged that one out. That--

Q.    No. No. That's good.

A.    I just wanted to make it clear to you.

 Yes, Sir. Do you have any other questions?

 No, Ma'am.

BY 

Q.    Sir, is there anything else that you would like to add, perhaps, you know, clarify anything that you may have said previously or would like to add to what you've already said before we begin the read-out and let you go on your way?

A.    No. Yes, there is. One last thing and I did this with the Senate. I said, again, I know Geoff Miller. I'm not finding him and I didn't find him criminally libel for anything.

Q.    Okay.

A.    I didn't find him to be a bad officer, a bad Commander, I think he did some heroic stuff down there. He was given a big job jar. But in the context of this subject and this investigation for--and I'm not walking a mile in his shoes. But having, like I said, having done that, I got to tell you that was probably the most important thing he had for that period of time. And to be unwitting of not small details, but almost everything that was going on with that particular detainee when the Secretary of Defense had eyes on him, and had the entire General Counsels of all the Services ground up into this guy's plan, the not knowing of that and then have all of this creative application of these techniques going on that raised all this concern in my finding of it really being abusive and degrading--which it was. That could have been the intent.

Q.    Okay.

A.    That aside, that's where I found him to come up short. It was his failure to monitor the cumulative effects of this particular detainee. And that's how I listed it. And that's a finding. And someone else can refute that or whatever. I think they would be hard-pressed to do it.

Was that relevant to any kind of behavior or culpability? I would say he was culpable. I said he's the accountable person and because he failed to monitor this and because there was no goal to abuse or goal to degrade, there was probably a goal to not torture and there was a goal to maintain humane treatment. But the rest of it was

all left to the creative minds and applications processes of some very low level personnel. That's where I made the recommendation when I was directed to do that. So, that's what I'll say. He's not a criminal.

Q.    Okay.

A.    I mean this guy was given a big task and if you put yourself back in the context of the time. And this is where the Republican side was just coming down hard on me. In the context of the times, did we need the information from that person? Yes, no. If within the limits and boundaries that were not defined for the application, but within the limits and boundaries strategically of this detainee, what did the Secretary of Defense mean? Would we degrade this guy? By saying "ego down" my definition we were going to degrade him in some way. What limit? The lowest limit. But General Miller didn't know and didn't set the limits. He didn't set the boundaries. He didn't say how long it was going to go on. In the context of the times knew the country needed that intelligence. Actionable intelligence and I think that's where this thing gets really mushy.

Q.    Okay.

A.    But absolutely I don't think he watched--he didn't watch this glass ball. By

Q.    Sir, given that, in your opinion was General Miller derelict in the performance of his duty with respect to the supervision of the interrogation of that detainee?

A.    I got tell you the word, "derelict" stinks----

Q.    It's a tough word.

A.    Yeah, it comes to the wrong level. I'd said, "Failure to monitor".

Q.    Okay.

A.    Appropriately, this particular most important interrogation plan.

Q.    Okay.

A.    --is where I found him accountable. Not culpable and I'm not going to use the word "derelict".

Q.    Okay.

A.    I think that's the wrong level. That's just how I feel about it.



Q.    Gotcha, Sir. All right. Sir, who else do you think we should talk to without-

A.    Senator McCain, Senator Warner, Senator Levin--.

Q.    That might happen.

A.    Yeah, go crazy. everybody has got an interest in this.

Q.    Okay.

A.    Oh, yeah! So my last final word is I felt no pressure to bring back a scalp.

Q.    Okay.

A.    I felt no pressure from General Craddock. I felt no pressure from all the press out there saying hold somebody besides the lower level enlisted person. This is the Abu Ghraib mystique.

Q.    Right.

A.    You know, none of that. None of that. I did not have an agenda. I was told to go do this. And when General Craddock tells me to do the certain task and then he disagreed, I felt no compulsion to change. You know?

Q.    Okay.

A.    He said we've agreed to disagree. And I found out about that at the 11th hour. I was never pressured and I felt like given this investigation and the level that it took, and again it became additive to the 15-6 I felt personally.

Q.    Okay.

A.    I think it's the call that I was directed to make. So I did.

█████ Okay, Sir. All right. Well, thank you, Sir. Do you have anything else. Bob?

█████ No, I don't.

█████ All right then, we'll go ahead and begin the read-out, Sir, and finish up here.

LTGEN SCHMIDT: Okay.

█████ Sir, we are required to protect the confidentiality of IG Investigations and the rights, privacy, and reputations of all people involved in them.

We ask people not to discuss or reveal matters under investigation. Accordingly, we ask that you not discuss this matter with anyone, except your attorney if you choose to consult one, without permission of the Investigating officers.

Your testimony is part of an official Inspector General Record. Earlier I advised you that while access is normally restricted to persons who clearly need the information to perform their official duties, your testimony may be released outside official channels. Individual members of the public who do not have an official need to know, may request a copy of this record to include your testimony under the Freedom of Information Act. Is there is such a request, do you consent to the release of your testimony outside official channels?

LTG SCHMIDT: Since everything we've discussed here is--was an open forum in the SASC, I would say if there is a FOIA request for it by those kinds of people, then, it could be released.

[REDACTED] Right.

[REDACTED] So that's a yes?

LTG SCHMIDT: Yes.

[REDACTED] Do you have any questions?

LTG SCHMIDT: No.

[REDACTED] The time is 1055 and the tape-recorded portion of this interview is concluded. Thank you, Sir.

[Testimony of LIEUTENANT GENERAL RANDALL M. SCHMIDT Was transcribed and certified by [REDACTED] Certified Court-Reporter, Department of the Army Inspector General Agency, Crystal City, Virginia.]