IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMEDOU OULD SLAHI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. 06-cv-0597 (JR) |
| ) | |
| U.S. DEPARTMENT OF DEFENSE ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**EXHIBIT I**

 

FORMAT FOR PRINTING sponsored by TOSHIBA Leading Innovation >>

March 31, 2007

PAGE ONE

# The Conscience of the Colonel

Lt. Col. Stuart Couch volunteered to prosecute terrorists. Then he decided one had been tortured

By JESS BRAVIN
*March 31, 2007*

DOW JONES REPRINTS

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

Start a FREE trial of the Online Journal

Subscribe to The Print Journal

Free US Quotes:
⦿ Symbol
◯ Name

Get FREE E-Mail by topic

Check Out our Mobile & Wireless Services

DIGEST OF EARNINGS
Details of the latest corporate earnings reported for FREE.

*Washington*

When the Pentagon needed someone to prosecute a Guantanamo Bay prisoner linked to 9/11, it turned to Lt. Col. V. Stuart Couch. A Marine Corps pilot and veteran prosecutor, Col. Couch brought a personal connection to the job: His old Marine buddy, Michael "Rocks" Horrocks, was co-pilot on United 175, the second plane to strike the World Trade Center on Sept. 11, 2001.

The prisoner in question, Mohamedou Ould Slahi, had already been suspected of terrorist activity. After the attacks, he was fingered by a senior al Qaeda operative for helping assemble the so-called Hamburg cell, which included the hijacker who piloted United 175 into the South Tower. To Col. Couch, Mr. Slahi seemed a likely candidate for the death penalty.



Patrice Gilbert
Lt. Col. Stuart Couch

"Of the cases I had seen, he was the one with the most blood on his hands," Col. Couch says.

But, nine months later, in what he calls the toughest decision of his military career, Col. Couch refused to proceed with the Slahi prosecution. The reason: He concluded that Mr. Slahi's incriminating statements -- the core of the government's case -- had been taken through torture, rendering them inadmissible under U.S. and international law.

The Slahi case marks a rare instance of a military prosecutor refusing to bring charges because he thought evidence was tainted by torture. For Col. Couch, it also represented a wrenching personal challenge. Laid out starkly before him was a collision between the government's objectives and his moral compass.

These kinds of concerns will likely become more prevalent as other high-level al Qaeda detainees come before military commissions set up by the Bush administration. Guantanamo prosecutors

estimate that at least 90% of cases depend on statements taken from prisoners, making the credibility of such evidence critical to any convictions. In Mr. Slahi's case, Col. Couch would uncover evidence the prisoner had been beaten and exposed to psychological torture, including death threats and intimations that his mother would be raped in custody unless he cooperated.

**ON THE TRAIL OF SLAHI**

**Mohamedou Ould Slahi** attracted the attention of U.S. intelligence as early as 1998, years before he would be suspected of indirectly helping to round up future hijackers for the 9/11 attacks. Read more[1].

**KEY DOCUMENTS**

Read a transcript[2] of Mr. Slahi's hearing before a Combatant Status Review Tribunal at Guantanamo Bay, Cuba.

...

Read the unclassified summary[3] of the spring 2005 Schmidt-Furlow report presenting the results of a Pentagon investigation into detainee abuse at Guantanamo. The section detailing Mr. Slahi's treatment is headed "second special interrogation plan," on page 21.

...

Read a transcript[4] of Mr. Slahi's Administrative Review Board hearing at Guantanamo Bay in December 2005.

...

See the Defense Meritorious Service Medal[5] and citation awarded to Col. Couch by Defense Secretary Donald Rumsfeld in September 2006.

...

Read a letter[6] Mr. Slahi sent to his attorneys, Nancy Hollander and Sylvia Royce, from Guantanamo Bay on Nov. 9, 2006.

Raised in Asheboro, N.C., Col. Couch, now 41 years old, was an Eagle Scout, a graduate of Duke and commander of his Naval ROTC battalion. An Anglican, Col. Couch says he counts among his heroes two men known for making a public commitment to their faith: C.S. Lewis, the academic and book author, and Dietrich Bonhoeffer, the Lutheran pastor hanged by the Nazis in 1945.

In 1987, Col. Couch joined the Marines to be a pilot before an assignment on the squadron's legal desk inspired him to enroll in law school. After graduating from Campbell University, Buies Creek, N.C., he was assigned to the team prosecuting a flight crew for a 1998 incident in Aviano, Italy, where a Marine Prowler clipped a ski gondola cable, killing 20. He still keeps in touch with relatives of the accident's victims.

Col. Couch left active duty but found private practice boring. After 9/11, he asked to return to the military. When President Bush issued his Nov. 13, 2001 order creating the first iteration of military commissions, he volunteered.

"I did that to get a crack at the guys who attacked the United States," he says. "I wanted to do what I could do with the skill set that I had."

Col. Couch began his assignment at the Office of Military Commissions in August 2003. Soon after arriving at the commissions' offices in Crystal City, Arlington, Va., he was handed files on several Guantanamo prisoners. The Slahi file stood out as the one directly connected to 9/11.

Mr. Slahi, now 37, is the eighth of 12 children born to a Mauritanian camel herder, according to his lawyers. He studied electrical engineering in Germany and later ran an Internet cafe. Before 9/11, U.S. authorities tried unsuccessfully to link him to the so-called Millennium Plot to blow up Los Angeles International Airport. Mauritanian authorities picked him up after Sept. 11, and shipped him to Jordan, according to testimony he gave to a Guantanamo detention board.

The U.S. got a break one year later, when Ramzi Binalshibh, a top al Qaeda operative, was captured in Pakistan. He told the CIA that in 1999, Mr. Slahi sent him and three future 9/11 hijackers -- Mohammed Atta, Ziad Jarrah and Marwan al-Shehhi -- from Germany to Pakistan, and then to al Qaeda headquarters in Afghanistan. There, according to the 9/11 Commission, Mr. bin Laden assigned them to the 9/11 operation.

But beyond Mr. Binalshibh's uncorroborated statements, Col. Couch had little additional evidence.

In Crystal City, morale was sinking. Several junior officers complained that, in its rush to win

convictions, the office was proceeding with shaky cases, overlooking allegations of abuse and failing to protect exculpatory evidence. Allegations of torture at places such as Abu Ghraib had not yet surfaced, but some officers were starting to express their unease in private. A handful of prosecutors would later quit rather than take part in trials they considered rigged.

Subsequent internal reviews found no criminal wrongdoing, but prompted a shake-up in which the then-chief military commissions prosecutor was ousted.

Col. Couch had his own misgivings. On his first visit to Guantanamo in October 2003, he recalls preparing to watch an interrogation of a detainee when he was distracted by heavy-metal music. Accompanied by an escort, he saw a prisoner shackled to a cell floor, rocking back and forth, mumbling as strobe lights flashed. Two men in civilian dress shut the cell door and told Col. Couch to move along.



Lt. Col. V. Stuart Couch stands before his KC-130 during a 1992 mission to Peru.

"Did you see that?" he asked his escort. The escort replied: "Yeah, it's approved," Col. Couch says. The treatment resembled the abuse he had been trained to resist if captured; he never expected Americans would be the ones employing it.

The incident "started keeping me up at night," he says. "I couldn't stop thinking about it."

Col. Couch contacted a senior Marine lawyer who had been an informal mentor. The officer said: "I know there's a lot of stuff going on, and that's why we need people like yourself in this situation," Col. Couch recalls. "You're shirking your responsibility if you've got issues and you're not willing to do something about it."

"He was looking for a sanity check, asking: 'Am I crazy or does this smell bad to you?' " the Marine lawyer, now a retired brigadier general recalls. "My response was, 'yeah, this is a problem and you need to work this problem.' "

Col Couch's wife, Kim, a nurse, says her husband began to rue each coming week. "I called it the Sunday Night Blues," she says. "It got worse and worse."

Under the Pentagon structure, Col. Couch had no direct contact with his potential defendants, but received instead summaries of their statements. In late 2003, Mr. Slahi suddenly started corroborating the Binalshibh allegations.

"After a while, I just couldn't keep up with him because things were coming out every day," Col. Couch says. "He was giving like a "Who's Who" of al Qaeda in Germany and all of Europe."

The sanitized reports reaching Col. Couch made no mention of what spurred this cooperation. Intelligence agencies refused to share all the information they had on the prisoner.

A colleague let on that Mr. Slahi had begun the "varsity program" -- an informal name for the Special Interrogation Plan authorized by then-Defense Secretary Donald Rumsfeld for the most recalcitrant Guantanamo prisoners.

Col. Couch says he and his case investigator, an agent detailed from the Naval Criminal Investigative Service, began an "under the table" effort to find out what made Mr. Slahi break. Col. Couch says he was suspicious about the sudden change, and felt he needed to know all the circumstances before bringing the case to trial.



Col. Couch and his wife, Kim, after he is commissioned as a second lieutenant in 1987.

"It was like Hansel and Gretel, following bread crumbs," Col. Couch says. The agent spoke to intelligence officers and others with more direct knowledge, pursued documents with details of the interrogations, and passed his findings on to the prosecutor.

What emerged, Col. Couch believed, was torture.

Initially, Mr. Slahi said he was pleased to be taken to Guantanamo. "I thought, this is America, not Jordan, and they are not going to beat you," he told his detention hearing. But after Mr. Binalshibh named him as a top al Qaeda member, "my life...changed dramatically," Mr. Slahi said.

The account of Mr. Slahi's treatment has been pieced together from interviews with government officials, official reports and testimony, as well as Mr. Slahi's attorneys and Col. Couch. Col. Couch wouldn't discuss classified information, including aspects of the Slahi interrogation involving the CIA.

Initially, Mr. Slahi denied having al Qaeda connections, frustrating his interrogators. On May 22, 2003, a Federal Bureau of Investigation interrogator said, "this was our last session; he told me that I was not going to enjoy the time to come."

In the following weeks, Mr. Slahi said, he was placed in isolation, subjected to extreme temperatures, beaten and sexually humiliated. The detention-board transcript states that at this point, "the recording equipment began to malfunction." It summarizes Mr. Slahi's missing testimony as discussing "how he was tortured while here at GTMO by several individuals."

Mr. Slahi was put under more intense interrogation. On July 17, 2003, a masked interrogator told Mr. Slahi he had dreamed of watching detainees dig a grave, according to a 2005 Pentagon report into detainee abuse at Guantanamo, headed by Air Force Lt. Gen. Randall Schmidt and Army Brig. Gen. John Furlow. (Gen. Furlow later testified that Mr. Slahi was "the highest value detainee" at Guantanamo, "the key orchestrator of the al Qaeda cell in Europe.")

The interrogator said he saw "a plain, pine casket with [Mr. Slahi's] identification number painted in orange lowered into the ground." Three days later, the interrogator told Mr. Slahi "that his family was 'incarcerated,'" the report said.



On Aug. 2, an interrogation chief visited the prisoner posing as a White House representative named "Navy Capt. Collins," the report said. He gave the prisoner a forged memorandum indicating that Mr. Slahi's mother was being shipped to Guantanamo, and that officials had concerns about her safety as the only woman amid hundreds of male prisoners, according a person familiar with the matter.

"Capt. Collins" told Mr. Slahi "that if he wanted to help his family he should tell them everything they wanted to know," the report continued.

The same day, an interrogator made a "death threat" to Mr. Slahi, Gen. Schmidt said in testimony to the Senate Armed Services Committee. According to records cited by the report, the interrogator advised Mr. Slahi "to use his imagination to think of the worst possible scenario he could end up in."

In his detention-board testimony, Mr. Slahi provided further details, as did other people familiar with the matter. Two men took a shackled, blindfolded Mr. Slahi to a boat for a journey into the waters of Guantanamo Bay. The hour-long trip apparently led Mr. Slahi to think he was to be killed and, in fear, he urinated in his pants.

After making land, "two Arab guys" took him away, beat him and turned him over to a "doctor who was not a regular doctor [but] part of the team," Mr. Slahi said. The doctor "was cursing me and telling me very bad things. He gave me a lot of medication to make me sleep," Mr. Slahi said. After two or three weeks, Mr. Slahi said, he broke, "because they said to me, either I am going to talk or they will continue to do this."

On Sept. 8, 2003, according to the Pentagon report, Mr. Slahi asked to see "Capt. Collins." Mr. Slahi corroborated the account of Mr. Binalshibh and provided an extensive list of other al Qaeda names.

In later testimony to the Army Inspector General, Gen. Schmidt said he concluded that the interrogation chief "was a rogue guy," a "zealot" who "essentially was having a ball." A Pentagon spokesman says the interrogation chief, who invoked his right against self-incrimination and didn't testify, was not court-martialed. The spokesman declines to say what discipline he received.

Military and law-enforcement officials started warning the Bush administration in 2002 that its unorthodox interrogation practices, which the president has called "tough" and "necessary," were hurting the ability of prosecutors to bring cases to court. Officials expect the concern to arise in particular with 14 "high-value" al Qaeda suspects transferred to Guantanamo in September after years of secret CIA interrogation. They include Khalid Sheikh Mohammed, the man who claimed responsibility for planning 9/11. Some detainees, including Mr. Mohammed, have alleged they were tortured. Pentagon reviews documented cruel and degrading treatment, while declining to classify such abuse as torture.

"There's a serious question of whether they will ever be able to legitimately prosecute those individuals," if necessary evidence was produced through torture, says retired Maj. Gen. Thomas Romig, who served as the Army's top uniformed lawyer, the judge advocate general, from 2001 to 2005.

Gen. Romig, recently appointed dean at Washburn University law school, Topeka, Kan., says within the government "there was a view that we have got to get intelligence out of these guys, and we don't care we if we prosecute them or not."

The military commissions trying the cases of foreign terrorists don't hew to the rules that govern civilian courts or courts-martial. The 2006 Military Commissions Act permits use of evidence obtained before Dec. 30, 2005, through "cruel, inhuman or degrading" methods, although it bars any obtained by torture.

Top U.S. government officials won't specify which practices cross the line beyond stating that prisoners should be treated "humanely." Such ambiguity has forced decision-making down the chain of command. Even Guantanamo's chief prosecutor, Air Force Col. Moe Davis, says he's still not sure how the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment applies to military commissions.

A report into abuses at Guantanamo concluded that the "threats" made to Mr. Slahi "do not rise to the level of torture as defined under U.S. law" but did violate the Uniform Code of Military Justice, which governs the conduct of the armed forces. The Pentagon won't say how the report reached that conclusion.

By May 2004, Col. Couch had most of the picture relating to Mr. Slahi's treatment, and faced a painful dilemma: Could he seek a conviction based on statements he thought were taken through torture, as permitted by President Bush's November 2001 military commission order citing a "state of emergency?" Or was he nonetheless bound by the Torture Convention, which bars using statements taken "as a result of torture...as evidence in any proceedings."

The convention says "no exceptional circumstances whatsoever" can be cited to justify torture, which it defines broadly. The 1994 federal statute implementing the treaty contains additional definitions, including the "threat of imminent death" or "severe physical pain or suffering," as well as the actual or threatened use of "mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality."

Col. Couch was uneasy over interfering with plans to try Mr. Slahi, given the detainee's history. He turned to others with his dilemma, including Marine lawyers he knew and his wife's two brothers -- one a Protestant theologian, the other a retired Marine infantry officer. Because of the classified nature of the information, Col. Couch didn't give them specifics about the case, and spoke only in generalities. Their advice conflicted.

"He wanted to be a good solider and yet on the other hand felt his duty to his God to be the greatest duty that he had," recalls Bill Wilder, director of educational ministries at the Center for Christian Study, Charlottesville, Va. "He said more than once to me that human beings are created in the image of God and as a result we owe them a certain amount of dignity."

Mr. Wilder says he agreed with Col. Couch's concerns. "Stuart, you need to pray about this," Mr. Wilder says he advised.

Briant Wilder, the other brother and a former Marine lieutenant, urged Col. Couch to instead consider the context of the war on terrorism, where obtaining intelligence could be crucial to protecting innocent lives.

"I have to also say that I don't agree with everybody's definition of torture," Mr. Wilder says. "If some of the things that people say are torture were torture, then I was tortured at Officer Candidate School at Quantico. And so was he."

In May 2004, attending a baptism at Virginia's Falls Church, Col. Couch joined the congregation in reciting the liturgy. The reading concluded, as is typical, with the priest asking if congregants will "respect the dignity of every human being."

"When I heard that, I knew I gotta get off the fence," Col. Couch says. "Here was somebody I felt

was connected to 9/11, but in our zeal to get information, we had compromised our ability to prosecute him." He says, in retrospect, the tipping point came with the forged letter about Mr. Slahi's mother. "For me, that was just, enough is enough. I had seen enough, I had heard enough, I had read enough. I said: 'That's it.' "

In May 2004, at a meeting with the then-chief prosecutor, Army Col. Bob Swann, Col. Couch dropped his bombshell. He told Col. Swann that in addition to legal reasons, he was "morally opposed" to the interrogation techniques "and for that reason alone refused to participate in [the Slahi] prosecution in any manner."

Col. Swann was indignant, Col. Couch says, replying: "What makes you think you're so much better than the rest of us around here?"

Col. Couch says he slammed his hand on Col. Swann's desk and replied: "That's not the issue at all, that's not the point!"

An impassioned debate followed, the prosecutor recalls. Col. Swann said the Torture Convention didn't apply to military commissions. Col. Couch asked his superior to cite legal precedent that would allow the president to disregard a treaty. The meeting ended when Col. Swann asked the prosecutor to turn over the Slahi files so the case could be reassigned, Col. Couch recalls.

Through a spokesman, Col. Swann declined to comment for this article. Col. Swann retired from the Army in 2005. He continues, as a civilian employee, to serve as deputy chief prosecutor, playing a major role in commission operations.

Other trial prosecutors in the office say they respected Col. Couch's decision. "I thought his conduct was perfectly appropriate and I agreed with his approach," says retired Navy Cmdr. Scott Lang, now a state prosecutor in Virginia.

A week later, Col. Couch put his position in writing and asked that his concerns be raised with the Pentagon's general counsel, William J. Haynes II. The legal adviser to the military commissions office, Air Force Brig. Gen. Thomas Hemingway, says: "Mr. Haynes was not informed of the issues raised by Lt. Col. Couch nor did he expect to be told about all internal operations within the Office of Military Commissions."

Gen. Hemingway says Col. Swann "was aware the interrogation techniques used were under investigation at the time Lt. Col. Couch expressed misgivings about the information he had received. Col. Swann removed Lt. Col. Couch from the case to assuage his concerns."

In a written statement, the Defense Department says it "cannot comment on Mohamedou Ould Slahi because he is under investigation. It would be inappropriate for us to discuss ongoing cases that are pending prosecution."

In March 2005, Col. Couch considered quitting, frustrated by how the office was run. Lt. Col. Daniel Daugherty, one of Col. Couch's best friends, urged him in an email to reconsider. "Personally I would rather be fired than quit," Col. Daugherty wrote. "Being fired for your ethics is (in my view) better than walking away."

With the Slahi prosecution on ice, Col. Couch continued work on other cases -- including another "varsity program" prisoner, Mohammmed al-Qahtani, who, according to army report overseen by

Gens. Schmidt and Furlow, had been made to wear women's underwear, leashed, forced to perform dog tricks and berated as a homosexual. Col. Couch refused to use statements obtained during these interrogations. But he determined the prosecution could continue based on a separate source of evidence compiled by the FBI before Mr. Qahtani's Guantanamo interrogation.

He was also one of the prosecutors who worked on the case of Salim Hamdan, Mr. bin Laden's former driver. Mr. Hamdan's case would eventually go to the Supreme Court, which used the case to strike down the administration's first attempt to create a military commissions system.

Col. Davis, the Guantanamo chief prosecutor, says Mr. Slahi remains among the 75 or so prisoners potentially eligible for trial. He says no one is assigned to the case and that it's unclear when Mr. Slahi will be charged, due to Col. Couch's concerns and a staff shortage.

Today, Mr. Slahi is detained in private quarters at Guantanamo Bay, with a television, a computer and a tomato patch to tend, according to people familiar with the matter. "Since 2004, I really have no complaints," Mr. Slahi told a military detention board.

He has asked to be resettled in the U.S., an option Pentagon officials have not ruled out. Col. Davis declines to comment on plea negotiations. A lawyer representing Mr. Slahi, Nancy Hollander, says that if charged with a crime, Mr. Slahi would plead not guilty.

In a September 2006 letter to his attorneys, Mr. Slahi joked about their request that he detail his discussions with interrogators.

"Are you out of your mind! How can I render uninterrupted interrogation that has been lasting the last 7 years. That's like asking Charlie Sheen how many women he dated," Mr. Slahi writes. He divided his time into pre- and post-torture eras. In the latter, he wrote, "I yessed every accusation my interrogators made."

Col. Couch had been assigned to the prosecutor's office for a three year stint. When it came to an end, Col. Couch decided not to renew his assignment. He says there was no attempt to remove him from office.

After he left, Defense Secretary Rumsfeld awarded Col. Couch the Defense Meritorious Service Medal for his work on Guantanamo prosecutions as is typical when officers move on to new assignments. The citation describes him as "steady in faith, possessed by moral courage and relentless in the pursuit of excellence."

In August 2006, he took on a new assignment as a judge on the Navy-Marine Corps Court of Criminal Appeals.

Col. Couch says he's still frustrated that the actions of the U.S. government helped ruin the case against Mr. Slahi. "I'm hoping there's some non-tainted evidence out there that can put the guy in the hole," he says.

**Write to** Jess Bravin at jess.bravin@wsj.com[7]

URL for this article:
http://online.wsj.com/article/SB117529704337355155.html

Hyperlinks in this Article:
(1) http://online.wsj.com/article/SB117530458721355439.html
(2) http://online.wsj.com/public/resources/documents/couch-slahihearing-03312007.pdf

(3) http://www.defenselink.mil/news/Jul2005/d20050714report.pdf
(4) http://online.wsj.com/public/resources/documents/couch-slahiARB-03312007.pdf
(5) http://online.wsj.com/public/resources/documents/couch-DMSMaward-03312007.pdf
(6) http://online.wsj.com/public/resources/documents/couch-slahiletter-03312007.pdf
(7) mailto:jess.bravin@wsj.com

Copyright 2007 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

**RELATED ARTICLES AND BLOGS**
Related Content may require a subscription | **Subscribe Now -- Get 2 Weeks FREE**

**Related Articles from the Online Journal**
- FCC Told Not to Rush On Ownership Rules
- Senate Criticizes Mukasey On Waterboarding Stance
- Mukasey Riles Backers On Waterboarding Issue
- Cable Outfits Vow to Fight More Controls

**Blog Posts About This Topic**
- NYT: Decks Are Stacked in War Crimes Cases, Lawyers Say  plagueonthenation.blogspot.com
- waterboardingphp.jpg  attendingtheworld.wordpress.com

**More related content**          *Powered by Sphere*