## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MOHAMMEDOU OULD SLAHI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-CV-0597 (JR) |
| | ) | |
| U.S. DEPARTMENT OF DEFENSE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, defendant, the United States Department of Defense, respectfully moves for partial summary judgment on the claims of plaintiff Mohammedou Ould Slahi. In support thereof, the Court is respectfully referred to the accompanying Memorandum in Support of Defendant's Motion for Partial Summary Judgment, the Defendant's Statement of Material Facts, and the supporting declarations and exhibits.

Dated: July 31, 2008

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General, Civil Division

JEFFREY A. TAYLOR
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

JOHN R. TYLER
Senior Trial Counsel

_____/s/ Jean Lin_____
JEAN LIN
Trial Attorney
Federal Programs Branch, Civil Division
United States Department of Justice

20 Massachusetts Ave., N.W.
Washington, D.C. 20530

Counsel for Defendant

# INDEX OF EXHIBITS

## **DECLARATIONS**

Exhibit 1:      Declaration of Jefferson L. Kaster
                Criminal Investigation Task Force ("CITF"), DoD

Exhibit 2:      Declaration of Michael L. Bietsch
                Air Force Office of Special Investigations ("AFOSI"), DoD

Exhibit 3       Declaration of Jeffrey L. Canfield
                United States Strategic Command ("STRATCOM"), DoD

Exhibit 4       Declaration of Alesia Y. Williams
                Defense Intelligence Agency ("DIA"), DoD

Exhibit 5       Declaration of Margaret P. Grafeld
                Department of State

Exhibit 6       Declaration of Michael A. Noll
                United States Northern Command ("NORTHCOM"), DoD

Exhibit 7       Declaration of Robert J. Cotell
                Office of the Military Commissions - Prosecution ("OMC-P"), DoD

Exhibit 8       Declaration of Russell G. Leavitt
                Office of General Counsel ("OGC"), DoD

                        Exhibit A – plaintiff's FOIA request
                        Exhibit B – Detainee Search Chart
                        Exhibit C – *Vaughn* Index
                        Exhibit D – DIA *Vaughn* Index

Exhibit 9       Declaration of Sandra Hodgkinson
                Office of Detainee Affairs ("ODA"), DoD

Exhibit 10      Declaration of Steven A. Hummer
                United States Special Operations Command ("USSOCOM"), DoD

Exhibit 11      Declaration of David D. Campbell
                Office for the Administrative Review of the Detention of Enemy Combatants
                ("OARDEC"), DoD

Exhibit 12      Declaration of Lesley Lawrence Spanheimer

Joint Staff, DoD

Exhibit 13     Declaration of Susan J. Butterfield
               United States Army Intelligence and Security Command ("INSCOM"), DoD

Exhibit 14     Declaration of James L. Pickett
               United States European Command ("EUCOM"), DoD

Exhibit 15     Declaration of Jacqueline J. Scott
               United States Central Command ("USCENTOM"), DoD

Exhibit 16     Declaration of Joseph P. Ceglio
               Naval Criminal Investigative Service ("NCIS"), DoD

Exhibit 17     Declaration of Jolynn J. Bien
               United States Transportation Command ("TRANSCOM"), DoD

Exhibit 18     Declaration of Paul A. Walker
               Office of Naval Intelligence ("ONI"), DoD

Exhibit 19     Declaration of David M. Thomas
               Joint Task Force-Guantanamo ("JTF-GTMO"), DoD

Exhibit 20     Declaration of David M. Hardy
               Federal Bureau of Investigation ("FBI")

                          Exhibits A - L

Exhibit 21     Declaration of Jean Lin

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

MOHAMMEDOU OULD SLAHI,    )
    )
    Plaintiff,    )
    )
    v.    )    Civil Action No. 06-CV-0597 (JR)
    )
U.S. DEPARTMENT OF DEFENSE,    )
    )
    Defendant.    )
    )

---

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff Mohammedou Ould Slahi, an alien detained as an enemy combatant by defendant, the Department of Defense ("DoD"), at the Guantanamo Bay Naval Base in Cuba ("Guantanamo") filed this action against DoD alleging that DoD has improperly withheld agency records responsive to his Freedom of Information Act ("FOIA") request seeking all records relating to him. *See* 5 U.S.C. § 552. DoD now moves for partial summary judgment with respect to information withheld from responsive documents located in all DoD components, offices and organizations that have conducted a search, with the exception of United States Southern Command ("Southern Command").

As demonstrated by the accompanying declarations of eighteen (18) DoD components, as well as the declarations of the Department of State and the Federal Bureau of Investigation ("FBI"),[1] DoD has discharged its statutory obligations under FOIA by conducting reasonably

---

[1] An index of the twenty supporting declarations (Exhibits 1 through 20), including the DoD components or outside agencies that the declarants represent, is attached at the end of this brief. When referring to the declarations, this brief will cite only the declarant's last name, the exhibit number and the relevant paragraph number(s).

adequate searches and by withholding only information protected from disclosure by a FOIA exemption – namely, Exemptions 1, 2, 3, 5, 6 and 7, 5 U.S.C. §§ 552(b)(1), (2), (3), (5), (6) & (7). A significant portion of the withheld information involves classified intelligence methods, codes, sources, intelligence data relating to the plaintiff and other individuals of intelligence interest, and information relating to foreign relations and foreign activities of the United States, including confidential sources. Such information is properly withheld under Exemption 1 because, as DoD's and the FBI's declarations demonstrate, the disclosure of such information reasonably could be expected to result in damage to national security.

In addition, a substantial amount of the withheld information falls within Exemption 2, which protects internal agency guidelines and practices, the disclosure of which may risk circumvention of the law. Information withheld in this category, which overlaps significantly with information already protected from disclosure under Exemption 1, consists primarily of information that reflects internal guidelines and methods regarding investigative steps, interrogation techniques, assessment and analysis of intelligence data, threat level and intelligence value, and practices for gathering intelligence. DoD and the FBI have determined that if such information were to be disclosed, it would allow hostile individuals and entities to develop countermeasures or otherwise thwart the government's intelligence gathering efforts and compromise the United States' defense against transnational terrorism.

Moreover, pursuant to Exemptions 3, 6, and 7(C), DoD, the FBI and the State Department have withheld personally identifying information of law enforcement and other government personnel, third parties mentioned in the responsive documents, third parties interviewed by DoD or the FBI, and the subjects of the FBI or DoD law enforcement

2

components' investigations. While the disclosure of some of this information is exempt by a specific statute, the remainder is also protected from disclosure because the balancing of these individuals' privacy interests outweigh any public interest in the disclosure. Indeed, the nature of responsive information in this case relates to the government's investigation of suspected terrorists and their organizations. The individuals whose personally identifying information have been withheld here have a strong privacy interest in not being connected to such investigations. Disclosure of the information, moreover, would not serve any public interest because it would not shed light on how the government is performing its statutory duties.

DoD has also withheld privileged information under Exemption 5, which protects privileged information that would not be available to a party in civil litigation. The withheld information primarily includes: assessments of plaintiff's intelligence value and threat level; intra- and inter-agency assessments and recommendations concerning whether plaintiff should be designated an enemy combatant; and whether, as an enemy combatant, he should be released, transferred, or continued in detention by the United States. Disclosure of this category of information is likely to chill full, frank, and open discussions within the agency and impair the quality of decisionmaking regarding the designation, treatment, and disposition of detainees.

Finally, DoD and the FBI have invoked Exemption 7 to protect against the disclosure of their law enforcement files, which include information regarding techniques and procedures for law enforcement investigations or prosecutions. Indeed, the investigation of detainees for potential prosecution for violations of laws of war is ongoing, and trial by military commission remains a possibility for Guantanamo detainees. Thus, as demonstrated by the declarations of the FBI and DoD's law enforcement components, disclosure of this category of information

3

would reveal techniques, procedures and guidelines used during these investigations and prosecutions and pose significant harm to the interests of the United States in its ongoing terrorism-related investigations and future prosecutions.

## BACKGROUND

Plaintiff Slahi is an alien who is currently detained by DoD at Guantanamo as an enemy combatant, which is defined as an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. *See* CSRT Implementation Order (July 14, 2006), Encl. (1), sec. B. (available at http://www.defenselink.mil/news/Combatant_Tribunals.html); Leavitt Decl. (Ex. 8), ¶ 3. By letter dated May 26, 2005, plaintiff's counsel in his habeas corpus case submitted a FOIA request to DoD's FOIA office seeking "records relating to Mohamedou Ould Slahi aka Mohammedou Ould Salahi, born in Mauritania in approximately 1970." *See* Leavitt Decl. (Ex. 8) ¶ 4 & Ex. A.

On or about June 30, 2005, plaintiff's FOIA request was referred to Southern Command, the DoD component that encompasses Joint Task Force-Guantanamo. *Id.* ¶ 5. The search and withholding of responsive records by Southern Command was thereafter the subject of DoD's motion for partial summary judgment, which DoD withdrew on May 22, 2008 due to the public disclosure in a report by the Department of Justice, Office of Inspector General of certain information concerning the plaintiff that was previously classified and withheld by Southern Command. DoD has requested an extension of time to file a separate motion for partial summary judgment with respect to Southern Command. *See* Dkt. No. 23.

As for the search for responsive documents by other DoD components, plaintiff's counsel

was informed on July 28, 2006 that if she wanted DoD's search to extend to DoD organizations beyond Southern Command, she must make a commitment to pay additional fees for those searches and the reproduction costs of any responsive documents that are found, as authorized by regulation. *See* Leavitt Decl. (Ex. 8), ¶ 4. In May, 2007, DoD provided plaintiff's counsel with a Detainee Search Chart, which lists the DoD record systems most likely to have the largest number of responsive records concerning Guantanamo detainees. *See id.* ¶ 5; Detainee Search Chart (attached as Ex. B to Leavitt Decl.). Southern Command is one of those components, and has the primary records systems for documents regarding Guantanamo detainees. *See id.* ¶ 5; Ex. B to Leavitt Decl.

As explained in the declaration of DoD's Associate Deputy General Counsel Russell G. Leavitt, DoD does not maintain a central file management system. *Id.* ¶ 7. Instead, DoD's individual components maintain their own files and manage their own FOIA programs. *Id.* FOIA requests for records on behalf of current or former Guantanamo detainees are centrally managed by the DoD's Office of Freedom of Information ("OFOI"). *Id.*; Ex. B to Leavitt Decl. If responsive records are located by an individual DoD component, an appropriate official of the component recommends to OFOI whether to release or withhold the records in question. OFOI, in turn, further processes the records for final release or withholding. *Id.*

On June 29, 2007, plaintiff's counsel committed to paying for the search of all those DoD components listed in the Detainee Search Chart. *Id.* ¶ 4. In early July 2007, following that commitment, DoD tasked all those DoD components to search for responsive documents. *Id.* ¶ 8. Those components are: United States Central Command; United States Transportation Command; Defense Intelligence Agency; Criminal Investigation Task Force; United States

5

Special Operations Command; Office for the Administrative Review of Detained Enemy Combatants; DoD Office of General Counsel; Office of Detainee Affairs; and Joint Staff.[2]  *Id.*

In addition, in the course of conducting these searches, DoD found documents that referenced three additional DoD components not listed in the Detainee Search Chart:  United States Army Intelligence and Security Command; United States European Command; and Office of Military Commissions-Prosecution.  *Id.* ¶ 9.  After plaintiff's counsel committed to pay for the searches, DoD further tasked those three components to search for responsive documents.  *Id.*

While processing responsive records, many of the twelve components found documents that originated with, or contain information that originated with, other DoD components or outside agencies.  *Id.* ¶ 10.  Those documents were forwarded to OFOI to be referred to the originating DoD component or outside agency for review and release recommendation.  *Id.*  A total of six additional DoD components were referred responsive documents:   Air Force Office of Special Investigations; United States Strategic Command; United States Northern Command; United States Army Intelligence and Security Command; Naval Criminal Investigative Service; and Office of Naval Intelligence.  *Id.*  In addition, three outside agencies were referred responsive records that either originated with them or contained information that originated with them: the Central Intelligence Agency ("CIA"); the Department of State; and the FBI.  *Id.*

In all, DoD processed approximately more than 3,700 pages (not including those

---

[2]  Of those nine components, the Office of Detainee Affairs is listed on the Detainee Search Chart as within the same organization/command as the Joint Staff.   However, ODA conducted a separate search of its own files and processed the responsive records found in that search.  *See* Leavitt Decl. (Ex. 8), ¶ 8; Ex. 22.  In addition, although the Office of General Counsel is not specifically listed as under the Office of the Secretary of Defense, it too was tasked to conduct a search for responsive records.  *Id.*

originating at Joint Task Force-Guantanamo), and of those, approximately 1,487 pages have been withheld in full. *Id.* Approximately 1,305 pages of responsive documents were produced to plaintiff's counsel on December 12, 2007, and an additional 40 pages that had been referred to the State Department were produced on December 20, 2007. *Id.* In July 2008, the CIA also separately produced to plaintiff's counsel all nonexempt, responsive documents DoD referred to the CIA for direct response. *Id.* In addition, DoD will produce to plaintiff approximately 943 pages of responsive documents on or about July 31, 2008. *Id.*

All components have conducted a line-by-line and page-by-page review of the responsive documents to ensure maximum disclosure of reasonably segregatable portions. *See, e.g.,* Kaster Decl. (Ex. 1) ¶¶ 7-8; Bietsch (Ex. 2) ¶ 10; Leavitt Decl. (Ex. 8) ¶ 12; Campbell Decl. (Ex. 11) ¶ 16; Ceglio Decl. (Ex. 16) ¶ 8; Hardy Decl. (Ex. 20) ¶ 96. In addition, all withheld information has been reviewed in light of the public disclosure in a May 20, 2008 report by the Department of Justice, Office of Inspector General of certain previously classified information relating the plaintiff. *See* Leavitt Decl. (Ex. 8) ¶ 10.

## ARGUMENT

### DEFENDANT IS ENTITLED TO PARTIAL SUMMARY JUDGMENT BECAUSE ITS COMPONENTS HAVE CONDUCTED REASONABLE SEARCHES AND HAVE WITHHELD ONLY INFORMATION EXEMPT FROM DISCLOSURE UNDER FOIA

### I.    STANDARD OF REVIEW

FOIA generally mandates disclosure, upon request, of government records held by an agency of the federal government except to the extent such records are protected from disclosure by one of nine exemptions. "[P]ublic access to Government documents" is the "fundamental principle" that animates FOIA. *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989).

The Act is designed "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978). At the same time, Congress recognized "that legitimate governmental and private interests could be harmed by release of certain types of information and provided nine specific exemptions under which disclosure could be refused." *FBI v. Abramson*, 456 U.S. 615, 621 (1982); *see also* 5 U.S.C. § 552(b). While these exemptions are to be "narrowly construed," *Abramson*, 456 U.S. at 630, courts must not fail to give the exemptions "meaningful reach and application." *John Doe Agency*, 493 U.S. at 152. The FOIA thus "represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential." *Center for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003).

  Summary judgment is the procedure by which courts resolve nearly all FOIA actions. "In order to obtain summary judgment the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). "There is no requirement that an agency search every record system." *Id.* Failure to uncover a responsive document does not render the search inadequate; "the issue to be resolved is not whether there might exist any . . . documents possibly responsive to the request, but rather whether the search for those documents was adequate." *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (internal quotations omitted); *see also Meeropol v. Meese,* 790 F.2d 942, 952-53 (D.C. Cir. 1986) (search is not presumed unreasonable simply because it fails to

produce all relevant material); *Perry v. Block,* 684 F.2d 121, 128 (D.C. Cir. 1982) (agency need

not demonstrate that all responsive documents were found and that no other relevant documents

could possibly exist).

      In evaluating the adequacy of a search, courts accord agency affidavits "a presumption of

good faith which cannot be rebutted by purely speculative claims about the existence and

discoverability of other documents." *SafeCard Services, Inc. v. SEC,* 926 F.2d 1197, 1200 (D.C.

Cir. 1991) (internal quotation marks and citation omitted); *see also Ground Saucer Watch, Inc. v.

CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981) (same). Declarations should be "sufficiently detailed,"

but "[t]he standard . . . is not 'meticulous documentation [of] the details of an epic search.'"

*Texas Independent Producers Legal Action Ass'n v. IRS*, 605 F. Supp. 538, 547 (D.D.C. 1984)

(quoting *Perry*, 684 F.2d at 127). "[A]ffidavits that explain in reasonable detail the scope and

method of the search conducted by the agency will suffice to demonstrate compliance with the

obligations imposed by the FOIA." *Meeropol*, 790 F.2d at 952.

      As for sustaining its burden of justifying nondisclosure of information, *see* 5 U.S.C.

§ 552(a)(4)(B), the agency must provide declarations that identify the information at issue and

the bases for the exemption(s) claimed. *See Summers v. Dep't of Justice*, 140 F.3d 1077, 1080

(D.C. Cir. 1998). Courts review *de novo* the agency's use of a FOIA exemption to withhold

documents. *Wolf v. C.I.A*, 473 F.3d 370, 375 (D.C. Cir. 2007). "Yet in conducting *de novo*

review in the context of national security concerns, courts must accord *substantial weight* to an

agency's affidavit concerning the details of the classified status of the disputed record." *Id.*

(citations and internal quotation marks omitted) (emphasis in original); *see also Krikorian v.

Dep't of State,* 984 F.2d 461, 464 (D.C. Cir. 1993) (noting deference to expertise of agencies

9

engaged in national security and foreign policy). Indeed, "[s]ummary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail" and "are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Wolf*, 473 F.3d at 375 (citations and internal quotation marks omitted). Moreover, "a reviewing court 'must take into account . . . that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm.'" *Id.* (quoting *Halperin v. CIA,* 629 F.2d 144, 149 (D.C. Cir. 1980)). "Ultimately, an agency's justification for invoking an exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.*

In support of its motion for partial summary judgment, DoD has attached the declarations of eighteen (18) DoD components, the FBI, and the State Department. As discussed below, those declarations demonstrate that DoD has satisfied its burden under FOIA.

## II.    THE DOD COMPONENTS HAVE CONDUCTED REASONABLE SEARCHES

As noted above, DoD initially tasked all nine components (beside Southern Command) most likely have responsive records concerning Guantanamo detainees to search for records relating to plaintiff. These components are included in the Detainee Search Chart made available to the plaintiff because their missions or functions relate directly or indirectly to Guantanamo detainees. For example, the Office for the Administrative Review of the Detention of Enemy Combatants is responsible for conducting several processes involving Guantanamo detainees, including Combatant Status Review Tribunals ("CSRTs") and Administrative Review Boards ("ARBs"). *See* Campbell Decl. (Ex. 11) ¶ 1. The Office of Detainee Affairs is responsible for providing policy advice to the Under Secretary of Defense for Policy on matters

regarding detainees in DoD custody.  *See* Hodgkinson Decl. (Ex. 9) ¶ 1.  The  Defense

Intelligence Agency has its mission to collect, analyze and provide foreign intelligence, *see*

Williams Decl. (Ex. 4) ¶ 3, and the Criminal Investigation Task Force conducts worldwide

criminal investigations to substantiate or refute alleged or suspected war crimes or acts of

terrorism, *see* Kaster Decl. (Ex. 1) ¶ 2.  The Transportation Command is responsible for

providing transportation of certain detainees from a theater of operation to Guantanamo.  *See*

Bien Decl. (Ex. 17) ¶ 1; *see also* Ex. B to Leavitt Decl.  And, detainees may initially have been

captured or turned over to the Special Operations Command and Central Command.  *See* Ex. B

to Leavitt Decl.  The Joint Staff, on the other hand, assists the Chairman of the Joint Chiefs of

Staff in preparing strategy for and directing unified combatant forces, *see* Spanheimer Decl. (Ex.

12) ¶ 1, while the Office of General Counsel provides advice to the Secretary and Deputy

Secretary of Defense regarding all legal matters, *see* Leavitt Decl. (Ex. 8) ¶ 1.

       All nine DoD components that were initially tasked to process plaintiff's FOIA request

conducted searches that were reasonably calculated to locate all documents relating to plaintiff.

The search method generally involved using variants of plaintiff's name and his detainee

identification number ("ISN"), and all classified and unclassified records systems reasonably

likely to have responsive records were searched either manually, electronically, or both.  *See*

Campbell Decl. (Ex. 11) ¶ 12; Hodgkinson Decl. (Ex. 9) ¶ 5; Williams Decl. (Ex. 4) ¶¶ 6-11;

Kaster Decl. (Ex. 1) ¶ 6; Bien Decl. (Ex. 17) ¶¶ 3-4; Spanheimer Decl. (Ex. 12) ¶¶ 3-4; Leavitt

Decl. (Ex. 8) ¶ 11; Hummer Decl. (Ex. 10) ¶ 5; Scott Decl. (Ex. 15) ¶ 2.

       For example, using as the key words both variants of plaintiff's name and "ISN" within

three words of a number including 760 (which is plaintiff's ISN number), the Defense

Intelligence Agency ("DIA") searched both of the agency's primary databases. One of those databases contains more than 60 million electronic messages addressed to, or originated from, DIA. The other contains human intelligence material produced by the DIA and DoD, and has the largest single collection of intelligence documents from all members of the U.S. intelligence community, with nearly 2.8 million records dating back to 1965. *See* Williams Decl. (Ex. 4) ¶¶ 7-8. In conducting electronic searches of these databases, if the search registered a "hit," DIA also reviewed the corresponding hard copy to determine its responsiveness. *Id.* ¶ 9. In addition, the Directorate for Analysis within DIA separately conducted a search of its own databases. *Id.* ¶ 11.

Typically, however, the tasked DoD component conducted both electronic and manual searches of its records to identify responsive documents. The Office of Detainee Affairs and the Criminal Investigative Task Force did so with respect to all of its records, *see* Hodgkinson Decl. (Ex. 9) ¶ 5; Kaster Decl. (Ex. 1) ¶ 6, while the Transportation Command did so for all components within that command reasonably likely to have responsive records: the Command Surgeon; the Operations and Plans Directorate; the Air Mobility Command; and the Staff Judge Advocate. *See* Bien Decl. (Ex. 17) ¶¶ 3-4. Similarly, Central Command's Army Central, the component within that command having the primary administrative control over detainee operations, searched both detainee electronic databases and physical records in its custody. *See* Scott Decl. (Ex. 15) ¶ 2. The Office of the Administrative Review of the Detention of Enemy Combatants, in contrast, identified and copied the official CSRT and ARB records of proceedings pertaining to plaintiff because it had no other files reasonably likely to contain responsive information. *See* Campbell Decl. (Ex. 11) ¶ 12.

12

As noted before, three additional DoD components were tasked to conduct a search after the search by the first nine components revealed documents referencing them. *See* Leavitt Decl. (Ex. 8) ¶ 9. The Office of Military Commissions-Prosecution ("OMCP") searched its hardcopy files maintained for each OMCP prosecution, as well as its database containing all electronic records that have been received and retained by the OMCP, including scanned documents pertaining to detainees. *See* Cotell Decl. (Ex. 7) ¶¶ 5-6, 9. Similarly, the Joint Analysis Center of European Command, the only components in that command reasonably likely to have responsive records, conducted both manual and electronic searches of all files reasonably likely to contain responsive information. *See* Pickett Decl. (Ex. 14) ¶ 3. Finally, three components of the Army Intelligence and Security Command – Counterintelligence HUMINT Collection Management Office; Military Intelligence Group; and the Military Intelligence Brigade in Darmstadt, Germany – searched their files because they were the components reasonably likely to have responsive records. *See* Butterfield Decl. (Ex. 13) ¶ 4.

As the above discussion makes clear, DoD's various components have conducted a reasonable search in response to plaintiff's FOIA request. In all, three DoD components – Central Command, Transportation Command, and Special Operations Command – did not locate any responsive records, *see* Scott Decl. (Ex. 15) ¶ 2; Bien Decl. (Ex. 17) ¶ 4; Hummer Decl. (Ex. 10) ¶ 5. The remaining DoD components located approximately 2,000 pages of responsive documents. *See* Leavitt Decl. (Ex. 8) ¶ 10.

## III.    DOD, THE STATE DEPARTMENT, AND THE FBI HAVE PROPERLY WITHHELD INFORMATION PURSUANT TO FOIA EXEMPTIONS

All nine DoD components whose searches yielded exempt responsive records have provided detailed declarations justifying the withholding of information under one or more of

FOIA's exemptions.  Moreover, because Central Command, Transportation Command, the FBI and the State Department, as well as six additional DoD components, were referred responsive information that had originated with them, each has submitted a declaration supporting its withholdings.  Finally, because some of the DoD components' claim of Exemption 1 concerns information originally classified through the action of the Commander of JTF-GTMO (*see, e.g.,* Noll Decl. (Ex. 6) ¶ 4; Hodgkinson Decl. (Ex. 9)  ¶ 10, 11; Leavitt Decl. (Ex. 8) ¶¶ 14, 17, 21, 23), the current Commander of Joint Task Force-GTMO, Rear Admiral David M. Thomas, Jr., has submitted a declaration to support the Exemption 1 claim of those components.  *See* Thomas Decl. (Ex. 19) ¶ 4.

### A.      DoD and the FBI Properly Withheld Information Under Exemption 1

The vast majority of the withheld information falls within Exemption 1, which protects records that are:  (A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy, and (B) in fact properly classified pursuant to an Executive Order.  5 U.S.C. § 552(b)(1).  The relevant Executive Order ("E.O.") is E.O. 12958, "Classified National Security Information," as amended.[3]  Information may be classified pursuant to E.O. 12958 if it meets the following four conditions:

(1)      an original classification authority is classifying the information;

(2)      the information is owned by, produced by or for, or is under the control of the United States Government;

(3)      the information falls within one or more of the categories of information listed in section 1.4 of th[e] order; and

---

[3]  Executive Order 12958 was amended by Executive Order 13292.  *See* E.O. 13292, 68 Fed. Reg. 15315 (Mar. 25, 2003).  All citations in this brief to Executive Order 12958 are to the Order as amended.

       (4)       the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

E.O. 12958, § 1.1(a).  Substantial weight is accorded to an agency's determination that potential harm merits classification of particular information, and a court should be reluctant to second-guess such agency determinations in a national security FOIA case.  *See, e.g., Students Against Genocide v. Dep't of State*, 257 F.3d 828, 837 (D.C. Cir. 2001); *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999); *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990); *Taylor v. Dep't of the Army*, 684 F.2d 99, 109 (D.C. Cir. 1982); *Military Audit Project v. Casey*, 656 F.2d 724, 745 (D.C. Cir. 1981); *Halperin*, 629 F.2d at 148.

       Moreover, the Court should be mindful that classification decisions are not made in a vacuum, but must be examined in the context in which the information is found.  While it is true that, whenever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter, the inherent risk of disclosure involved in trying to separate classified and unclassified information is significant.  As the D.C. Circuit explains: "[t]housands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate."  *Halkin v. Helms*, 598 F.2d 1, 8 (D.C. Cir. 1978); *cf. Center for Nat'l Sec. Studies*, 331 F.3d at 928-29 (in deferring to agency determination that withheld information would allow knowledgeable persons to piece together a "composite picture" of September 11 investigation and enable terrorists to evade investigation and devise countermeasures, the court stated that "[w]hile the name of any individual detainee may appear innocuous or trivial, it could be of great use to al Qaeda in

15

plotting future terrorist attacks or intimidating witnesses in the present investigation"). Thus, facts that are in isolation unclassified, may nonetheless be classified because, when aggregated and discussed in the context of the responsive records, they would reveal another underlying fact, association, or relationship that is classified. *Halperin*, 629 F.2d at 150 (observing that "[e]ach individual piece of intelligence information, much like a piece of a jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself"); *see also* E.O. 12958, § 1.7(e).

Under Exemption 1, DoD, the State Department and the FBI have withheld information that is classified pursuant to E.O. 12958, § 1.4(a) (military plans and operations); § 1.4(b) (foreign government information); § 1.4(c) (intelligence activities, intelligence sources or methods, and/or cryptology); or § 1.4(d) (foreign relations or foreign activities of the United States, including confidential sources). All information withheld under Exemption 1 was properly classified by an original classification authority at the time of plaintiff's FOIA request and remains properly classified. *See, e.g.,* Kaster Decl. (Ex. 1) ¶ 14; Canfield Decl. (Ex. 3) ¶¶ 6, 9, 10, 13; Williams Decl. (Ex. 4) ¶¶ 22-25; Grafeld Decl. (Ex. 5) ¶¶ 13-14; Noll Decl. (Ex. 6) ¶ 7; Cotell Decl. (Ex. 7) ¶¶ 22, 24-25, 28; Leavitt Decl. (Ex. 8) ¶¶ 17, 21, 23, 25, 28; Campbell Decl. (Ex. 11) ¶¶ 17; Butterfield Decl. (Ex. 13) ¶ 4; Pickett Decl. (Ex. 14) ¶¶ 4-5; Scott Decl. (Ex. 15) ¶ 6; Ceglio Decl. (Ex. 16) ¶¶ 9, 12; Hardy Decl. ¶ 38; *see also* Thomas Decl. (Ex. 19) ¶¶ 6-8, 17-18, 20-21, 23-24, 27. Each category of the classified information will be discussed below, except for those categories that are not being challenged by plaintiff, consisting of foreign government information provided in confidence (which falls within E.O. 12958, § 1.4(b)); the identities of any cooperating detainees (which falls within E.O. 12958, § 1.4(c)); and internal

codes indicating intelligence sources or other intelligence information (which also fall within
E.O. 12958, § 1.4(c)).  *See* Lin Decl. (Ex. 21) ¶ 2.

### 1.    Information Related to Military Plans and Operations

Three DoD components withheld under Exemption 1 information related to military
plans and operations against hostile forces.  Information concerning military plans and
operations may be classified under the authority of Section 1.4(a) of E.O. 12958, as amended, if
its release could cause damage to the national security of the United States.  *See* Thomas Decl.
(Ex. 19) ¶ 28.  As their declarations demonstrate, release of this information could permit hostile
entities to determine the effectiveness and vulnerabilities in the military operations in the United
States and abroad, including Guantanamo.  *See* Canfield Decl. (Ex. 3) ¶ 6; Leavitt Decl. (Ex. 8) ¶
14; Spanheimer Decl. (Ex. 12)  ¶ 12; *see also* Thomas Decl. (Ex. 19) ¶ 28.   Accordingly, the
information is properly withheld under Exemption 1.

### 2.    Intelligence Data About Slahi, His Activities and Other Individuals or Organizations and Intelligence Sources

Section 1.4(c) of E.O. 12958, as amended, permits the classification of "intelligence
activities (including special activities), intelligence sources or methods, or cryptology,"
recognizing that disclosure of such information could cause harm to national security.  Many
DoD components and the FBI withheld intelligence data about plaintiff and intelligence sources
that are classified pursuant to Section 1.4(c).  This category of information includes intelligence
information about plaintiff; his affiliations with individuals and organizations of intelligence
interest; how those affiliations came about; the actions he took while associated with those
individuals and organizations; his activities in support of those organizations; and information
about those individuals and organizations.  *See* Canfield Decl. (Ex. 3) ¶ 7; Williams Decl. (Ex.

17

4), ¶ 23; Noll Decl. (Ex. 6) ¶ 7; Cotell Decl. (Ex. 7) ¶ 11; Leavitt Decl. (Ex. 8) ¶ 15; Spanheimer

Decl. (Ex. 12) ¶ 5; Butterfield Decl. (Ex. 13)  ¶ 5; Ceglio Decl. (Ex. 16) ¶ 10; *see also* Thomas

Decl. (Ex. 19) ¶ 9; Hardy Decl. (Ex. 20) ¶¶ 45-51.

       As DoD's declarations demonstrate, disclosure of this intelligence data reasonably could

be expected to damage the national security because it would reveal details about the intelligence

the government has gleaned regarding individuals and organizations of intelligence interest, the

sources of that intelligence, and the specific information obtained from such sources.  Revealing

the extent of intelligence gathered concerning Slahi would show, among other things, what the

United States knows about certain individuals and organizations; what the government does not

know; and the leads it followed or did not follow based on the intelligence it obtained.  It would

also reveal intelligence concerning other individuals and organizations.  These critical facts

could then could be pieced together with other information that has entered the public domain to

reveal details about the government's intelligence.  *See, e.g.,* Canfield Decl. (Ex. 3) ¶ 9-10;

Leavitt Decl. (Ex. 8) ¶¶ 17-18; Butterfield Decl. (Ex. 13) ¶ 6; *see also* Thomas Decl. (Ex. 19)

¶ 10.

       Additionally, public release of such intelligence data would damage our ability to collect

intelligence on our targets or those associated with them who may not have realized they have

been linked, or identified as related, to the detainee, *see* Ceglio Decl. (Ex. 16) ¶ 10, and would

also have a chilling effect on human intelligence collection.  *See* Canfield Decl. (Ex. 3) ¶¶ 9-10;

Leavitt Decl. (Ex. 8) ¶ 19; Hardy Decl. (Ex. 20) ¶ 47 (averring that disclosure of the identities of

FBI intelligence sources, regardless of whether they are active or inactive, alive or deceased, can

reasonably be expected to cause current and potential intelligence sources to fear that their

18

identities will be publicly revealed at some point, in spite of the FBI's present expressed or implied assurance of confidentiality).

As explained in the declaration of Rear Admiral Thomas, due to the nature of terrorist organizations such as al Qaeda and these organizations' methods of operation, human intelligence is the most essential piece of the strategic intelligence being gathered in the global war on terror. *See* Thomas Decl. (Ex. 19) ¶¶13-14. It is also the most effective source of actionable information for the anticipation and interdiction of terrorist activity. *Id.* Releasing the withheld intelligence data would reveal who has cooperated with the United States and the information they provided, placing those sources (or individuals perceived by others as sources) at risk of retribution. *Id.* ¶ 13. It would also dissuade other sources from cooperating with ongoing intelligence collection efforts, thus impeding the United States' ability to gather actionable intelligence. *Id.*

The Defense Intelligence Agency's declaration has explained, for example, that DIA relies on a variety of intelligence sources to collect foreign intelligence critical to our national security. Those sources can include individuals, foreign or American, foreign entities, and the intelligence and security services of foreign governments. Intelligence sources can be expected to furnish information only when confident that they are protected from retribution by the secrecy surrounding their relationship to the United States government. Sources that are compromised become extremely vulnerable to retaliation from a variety of entities including their own governments or others having a stake in the confidentiality of the information provided by the source. In certain parts of the world, the consequences of public disclosure of the identity of an individual who has served as a U.S. source are often swift and far reaching, from

19

economic reprisals to possible harassment or threat to physical safety.  *See* Williams Decl. (Ex. 4) ¶ 23.

For all of these reasons, the information is properly withheld under Exemption 1.  Indeed, another court recently upheld DoD's Exemption 1 claim with respect the same type of intelligence information concerning another Guantanamo detainee.  *See Azmy v. Dep't of Defense*, -- F. Supp. 2d --, No. 06 Civ 15340, 2008 WL 2501053, *2-*4 (S.D.N.Y. June 22, 2008).  *See also Schrecker v. U.S. Dep't of Justice*, 254 F.3d 162, 166 (D.C. Cir. 2001) (upholding Exemption 1 withholding based on FBI determination that "release of the information in question would damage national security by dissuading current and future sources from cooperating"); *Hogan v. Huff*, No. 00 Civ. 6753, 2002 WL 1359722, at *8 (S.D.N.Y. June 21, 2002) (sustaining withholding of information "fall[ing] into the category of intelligence activities that were compiled through interviews with intelligence sources").

### 3.    Intelligence Assessments and Conclusions

Both the Office of Detainee Affairs and Strategic Command withheld under Exemption 1 intelligence assessments and conclusions pertaining to Slahi and other individuals and organizations of intelligence interest, which are classified pursuant to Section 1.4(c) of E.O. 12958, as amended.  *See* Canfield Decl. (Ex. 3) ¶ 10; Hodgkinson Decl. (Ex. 9) ¶ 8.  As explained by Captain Jeffrey L. Canfield of Strategic Command, the intelligence assessments and conclusions of Slahi and other individuals and organizations of intelligence interest are vital to DoD's assessment of plaintiff's activities, and remain vital to its ongoing efforts to obtain intelligence on other individuals and organizations.  Disclosure of these assessments and conclusions (such as threat level and intelligence value), especially in conjunction with

20

disclosure of the specific intelligence data that is necessarily intertwined with them, would reveal how analysts evaluate intelligence information and the conclusions they reach. Specifically, when factual information is contained within a document setting forth intelligence assessments, conclusions or recommendations, the selection of, and emphasis on, particular facts reveal information about the analyst's thought processes, the methods being applied to analyze the intelligence data, and the limits of, or gaps in, available intelligence.  Such revelations could aid persons hostile to the United States in hiding their activities and thwarting the government's intelligence gathering efforts.  *See* Canfield Decl. (Ex. 3) ¶ 10; *see also* Thomas Decl. (Ex. 19) ¶¶ 18-19.

Accordingly, the withheld intelligence assessments and conclusions are properly classified and exempt from disclosure under Exemption 1.  *See Azmy*, No. 06 Civ 15340, 2008 WL 2501053 at *2-*4 (upholding under Exemption 1 DoD's withholding of intelligence assessment and conclusions regarding a Guantanamo detainee).

### 4.    Information Concerning Intelligence Methods

Five DoD components and the FBI withheld under Exemption 1 information reflecting intelligence methods in gathering, analyzing, and coordinating intelligence data, which is classified pursuant to E.O. 12958, as amended, § 1.4(c).  Included in this category of withholdings are interrogation techniques and plans; tools and methods for analyzing intelligence data; tools and requirements for coordinating intelligence gathering and analysis among DoD components and other agencies; criteria used and priorities assigned to current intelligence or counterintelligence investigations; plans for further intelligence gathering based on specific intelligence data obtained from intelligence sources; association/connection of a

specific detainee with intelligence interrogations; and internal reports generated based on those interrogations. *See* Canfield Decl. (Ex. 3) ¶ 12; Leavitt Decl. (Ex. 8) ¶ 21; Williams Decl. (Ex. 4) ¶ 24; Cotell Decl. (Ex. 7) ¶¶ 23-27; Scott Decl. (Ex. 15) ¶ 6; Hardy Decl. (20) ¶¶ 49-51.

Intelligence methods are the means by which DoD and other intelligence agencies collect intelligence data to support military operations, assist in national policymaking, assess military threats, conduct counterterrorism activities, or otherwise accomplish their missions. These methods and practices must be protected because knowledge of such information would allow hostile entities to develop countermeasures and be of material assistance to those who seek to penetrate, detect, prevent, avoid or otherwise damage the intelligence operations of the United States. Of particular concern is an individual's ability to anticipate particular investigative or interrogation techniques. Indeed, public disclosure of specific methods used with sources of human intelligence, whose identities are themselves classified as described above, would allow individuals of intelligence interest to anticipate and immunize themselves from those methods. *See* Canfield Decl. (Ex. 3) ¶ 12; Williams Decl. (Ex. 4) ¶ 24; Leavitt Decl. (Ex. 8) ¶¶ 21-22; Thomas Decl. (Ex. 19) ¶ 25; Hardy Decl. (20) ¶ 50.

Thus, for example, both the Office of Naval Intelligence and European Command withheld documents referred to as "source directed requirements" and "intelligence information reports." These documents discuss the intelligence community's proposed questions to be asked of the detainees, as well as inquiries from one part of the intelligence community to another. These questioning plans were formulated based upon other intelligence reports and information received from other intelligence sources, in addition to the detainee's own answers during prior interrogations. The documents also contain discussions about why the proposed

22

questions are important to our intelligence gathering effort, as well as the possible uses of the information in further inquiries. *See* Pickett Decl. (Ex. 14) ¶ 5; Walker Decl. (Ex. 18) ¶ 5. In addition, they reveal relationships and associations and identify targets or additional groups and organizations under investigation, who may not have realized they have been identified or linked to any particular detainee. *See* Pickett Decl. (Ex. 14) ¶ 6. Accordingly, DoD has properly determined that disclosure of such information could hamper the United States' intelligence gathering efforts, thereby causing damage to national security. *See* Pickett Decl. (Ex. 14) ¶ 6; Walker Decl. (Ex. 18) ¶¶ 6-7.

Similarly, the government's methods of coordinating intelligence gathering and analysis among agencies and components are central to its efforts to counter acts of terrorism and support military operations. Effective military and counterterrorism strategy depends on the coordination of intelligence gathering among agencies and components responsible for gathering and analyzing intelligence data. Revealing the nature of that coordination and how agencies and components work together could reveal their areas of relative competence or the distinct intelligence tools they employ, thereby permitting persons hostile to the United States to tailor their behaviors and adopt means to thwart the government's intelligence gathering efforts. *See* Leavitt Decl. (Ex. 8) ¶ 23; Thomas Decl. (Ex. 19) ¶ 26.

Thus, the Criminal Investigative Task Force ("CITF") withheld the names of certain intelligence community databases, as well as the results of CITF's search of those databases, the disclosure of which would permit persons hostile to the United States to glean information about how the government maintains and shares information among intelligence organizations involved in the information gathering process. *See* Kaster Decl. (Ex. 1) ¶¶ 12-13. As CITF's

23

declaration demonstrates, revealing such information would also identify the connection between the procedures used in investigating individuals of law enforcement or intelligence interest, as well as the specific information about the plaintiff and sources contained in those various databases used by CITF to conduct the investigation. *See* Kaster Decl. (Ex. 1) ¶¶ 12-13.

For all of these reasons, the withheld intelligence methods are properly exempt from disclosure under Exemption 1. *See, e.g., Hogan*, 2002 WL 1359722, at *8 (upholding Exemption 1 withholding of information that "would potentially harm the agency by exposing its methods"); *see Wolf*, 473 F.3d at 376-77 (upholding CIA's refusal to confirm or deny Agency interest in foreign national because doing so "could damage sources and methods by revealing CIA priorities, thereby providing foreign intelligence sources with a starting point for applying countermeasures against the CIA and thus wasting Agency resources").

### 5. Foreign Relations or Foreign Activities of the United States, Including Confidential Sources

Section 1.4(d) of E.O. 12958, as amended, recognizes that the release of certain information would impair U.S. government relations with foreign governments, and thus permits the classification of certain information relating to "foreign relations or foreign activities of the United States, including confidential sources." Three DoD components, the State Department, and the FBI have withheld responsive information that is classified under Section 1.4(d). *See* Williams Decl. (Ex. 4) ¶ 26; Grafeld Decl. (Ex. 5) ¶ 14; Hardy Decl. (Ex. 20) ¶¶ 52-55; Hodgkinson Decl. (Ex. 9) ¶ 11 (discussing 1.4(d) information originally classified through the action of the Commander of JTF-GTMO); Cotell Decl. (Ex. 7) ¶ 10.

As explained by the Commander of JTF-GTMO, as part of the ongoing global war on terror, the United States routinely conducts counterterrorism activities with foreign governments

involving individuals detained at JTF-GTMO. Such activities are conducted with the expectation that they will not be publicly released by the United States Government. Official release of information related to such activities, in contravention of such expectations of confidentiality, would substantially impair the United States' ability to secure cooperation by foreign governments in the future and could damage our relations with a government that might be reluctant to be seen as cooperating with the United States. Foreign governments will be less likely to cooperate with U.S. counterterrorism efforts if they cannot be confident that information regarding their participation will remain confidential. A decrease in cooperation by foreign governments, in turn, would severely hamper the United States' counterterrorism efforts. *See* Thomas Decl. (Ex. 19) ¶ 26; Decl. of Grafeld (Ex. 5) ¶ 14.

As the Defense Intelligence Agency ("DIA") explains, good relations with other nations facilitate intelligence sharing with the United States, and maintaining good relations with foreign governments is imperative to the successful accomplishment of DIA's mission to collect, analyze and provide foreign intelligence. *See* Williams Decl. (Ex. 4) ¶ 26. The DIA thus has withheld responsive records classified under Section 1.4(d) of E.O. 12958, as amended, that consists of information the intelligence community obtained from foreign governments or the types of information the intelligence community is interested in collecting on foreign countries, because release of such information would damage the relations we have with those nations. *See* Williams Decl. (Ex. 4) ¶ 26.

Similarly, the FBI withheld information regarding the cooperative endeavors between the FBI and certain foreign government components because the retention of the secret nature of such law enforcement intelligence cooperation is essential to ensuring continued liaison with

25

cooperating foreign governments. Hardy Decl. (Ex. 20) ¶¶ 52-55.  The State Department

withheld information that contains confidential sources and sensitive aspects of United States

foreign relations, including, in particular, information relating to identifying threats to the United

States.  *See* Decl. of Grafeld (Ex. 5) ¶ 14.  As the State Department explains, to obtain this

sensitive information requires the cooperation of many countries, including countries in which

public opinion might not currently favor close cooperation with the United States.  *Id.*

Moreover, information that affects the foreign relations of the United States does not lose its

sensitivity with the passage of time.  *See* Hardy Decl. (Ex. 20) ¶ 53.

As for the withholding of foreign confidential sources, as discussed above regarding

classified intelligence sources, the attached declarations demonstrate that U.S. officials must

often depend on information provided by individuals on the express or implied condition that the

identity of the source will be protected from disclosure.  Protection of the identity of a

confidential source becomes a matter of trust between the source and the U.S. official.  Breach of

the trust would result in the unwillingness or inability of the source to provide further

information.  Exposure of a confidential human source could in many circumstances lead to

serious, possibly fatal adverse consequences for the source.  Moreover, failure to protect a

source, even if the consequences are not severe for that individual, could damage the climate of

confidence essential for obtaining the information needed to conduct U.S. foreign and security

policy.  *See* Grafeld Decl. (Ex. 5) ¶ 14.

For example, the State Department withheld portions of a telegram given to the U.S.

Embassy in Germany that contains translations of an informal paper given to the Embassy in

confidence by a German counterterrorism official.  The paper contains information about

26

plaintiff that was provided by several sources.  Those sources and the German official constitute

foreign confidential sources, and disclosure of their identities could damage relations with that

government and inhibit the ability of the United States to obtain such information in the future.

*Id.* at 13-14 (Doc. No. D4).

Similarly, the State Department also redacted from another embassy telegram, which

responded to a State Department instruction concerning the plaintiff, the identity of a sensitive

source and a paragraph which explained certain sensitive aspects of the Mauritanian domestic

political scene and suggested a variation on the procedures proposed by the State Department for

obtaining the requested information.  Disclosure of this information would adversely impact

bilateral relations with the host country and is, therefore, properly classified. *See id.* at 17 (Doc.

No. D8).

Accordingly, the government has properly withheld information relating to foreign

relations or foreign activities of the United States, including confidential sources, under

Exemption 1.  *See ACLU v. FBI*, 429 F. Supp. 2d 179, 188 (D.D.C. 2006) (upholding FBI's

withholding of information "to prevent the identification of . . . cooperating foreign

governments"); *Judicial Watch v. U.S. Dep't of Justice*, 306 F. Supp. 2d 58, 65-66 (D.D.C. 2004)

(telegrams properly withheld under Exemption 1 because disclosure "could adversely affect the

persons involved, inhibit the willingness of cooperating foreign government officials to discuss

frankly with U.S. government officials matters affecting our national interests, and damage

relations with the Dominican Republic"); *McErlean v. Dep't of Justice*, No. 97 Civ. 7831, 1999

WL 791680, at *5 (S.D.N.Y. Sept. 30, 1999) (FBI properly withheld under Exemption 1

documents that "identify by name components of specific foreign governments and contain[]

27

classified information originated and provided to the FBI by these components").

### B.    DoD, the FBI and the State Department Properly Withheld Information Under Exemption 2

DoD, the FBI and the State Department have also withheld information under Exemption 2, which overlaps to a significant extent with the classified information already withheld under Exemptions 1 and/or 7.  Exemption 2 covers internal matters "related solely to the internal personnel rules and practices of an agency" if the material relates to trivial administrative matters of no genuine public interest [known as low 2]; or if the disclosure may risk circumvention of agency regulation [known as high 2].[4]  *See* 5 U.S.C. § 552(b)(2); *Sussman v. U.S. Marshals Service*, 494 F.3d 1106, 1112 (D.C. Cir. 2007); *see also Schiller v. NLRB*, 964 F.2d 1205, 1207 (D.C. Cir. 1992); *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1074 (D.C. Cir. 1981) (en banc).

Three DoD components, the FBI and the State Department withheld internal information under the former category, low 2.  The Defense Intelligence Agency withheld internal matters under the latter category, which include administrative handling codes, Intelligence Information Report numbers, the web addresses of DIA offices' websites on a classified network, internal office symbols, internal phone numbers and other similar points of contact information, and message routing data.  *See* Williams Decl. (Ex. 4) ¶ 28.  The Office of Administrative Review of the Detention of Enemy Combatants, the Office of Military Commissions-Prosecution, and the

---

[4]  The reference to circumvention of agency regulation in Exemption 2 has been interpreted to cover circumvention of an agency's law enforcement function.  *See, e.g., Blanton v. Dep't of Justice*, 63 F. Supp. 2d 35, 43 (D.D.C. 1999) (Exemption 2 properly invoked to withhold information "the release of which might provide the public with insight into the internal handling of investigations involving race crimes" (internal quotation marks omitted)); *see also infra,* note 9.

FBI all redacted certain internal telephone numbers.  *See* Campbell Decl. (Ex. 11) ¶ 18; Hardy

Decl. (Ex. 20) ¶¶ 61-62; Cotell Decl. (Ex. 7) ¶ 31.  Similarly, the State Department withheld an

internal FBI case number.  *See* Grafeld Decl. (Ex. 5) at 15 (Doc. No. D5).  Such information has

no substantive value or legitimate public interest, and is properly withheld under Exemption 2

(low).  *Id.*; Campbell Decl. (Ex. 11) ¶ 18; Hardy Decl. (Ex. 20) ¶¶ 61-62.

Twelve DoD components and the FBI withheld information under Exemption 2(high)

reflecting guidelines and procedures internal to the government, which, if revealed, could allow

persons hostile to the United States to tailor their behavior to thwart the government's

intelligence gathering and circumvent the United States' counterterrorism.  *See* Kaster Decl. (Ex.

1) ¶¶ 11-13, 14; Canfield Decl. (Ex. 3) ¶¶ 11-12, 16 ; Williams Decl. (Ex. 4) ¶¶ 28-29; Grafeld

Decl. (Ex. 5) ¶ 15; Cotell Decl. (Ex. 7) ¶¶ 23, 29-30; Leavitt Decl. (Ex. 8) ¶¶ 24-27; Hodgkinson

Decl. (Ex. 9) ¶¶ 15-18; Butterfield Decl. (Ex. 13) ¶ 7 ; Pickett Decl. (Ex. 14) ¶¶ 5-6; Scott Decl.

(Ex. 15) ¶¶ 6-7; Ceglio Decl. (Ex. 16) ¶ 13; Bien Decl. (Ex. 17) ¶ 8; Walker Decl. (Ex. 18) ¶ 8;

Hardy Decl. (Ex. 20) ¶ 63.  The majority of the information withheld by these DoD components

relate to intelligence assessments and methods that are classified and withheld under Exemption

1.[5]  *See*, *supra*, Section III.A., subsections 3 and 4.  The specific withheld information is

discussed below, with the exceptions of two categories that are not being challenged by plaintiff

– namely, intelligence codes indicating intelligence sources or other intelligence information

(which also fall within Exemption 1) and instructions for the handling of sensitive information.

*See* Lin Decl. (Ex. 21) ¶ 2.

---

[5]  Indeed, with respect to any record subject to such overlapping claims of exemption, this Court need only find any one exemption applicable in order to grant summary judgment to DoD.  *Fund for Constitutional Gov't v. Nat'l Archives and Records Serv.*, 656 F.2d 856, 864 n.19 (D.C. Cir. 1981).

One DoD component, Transportation Command ("TRANSCOM"), withheld certain unclassified website information, consisting of the Uniform Resource Locator (URL) addresses of sites on the Secure Internet Protocol Router Network.  *See* Bien Decl. (Ex. 17) ¶ 8.  As explained in TRANSCOM's declaration, revealing these internal URLs would disclose information about the structure of a classified internal computer network system and/or codes, potentially allowing persons hostile to the United States to compromise the structure.  *Id.*

The Office of Detainee Affairs and Strategic Command withheld intelligence assessments regarding Slahi and other individuals' and organizations' intelligence value and threat level (which, as discussed before, are classified) because the disclosure would reveal the internal guidelines followed the DoD component in evaluating the intelligence value and threat level of individuals and organizations of intelligence interest, and thus risk circumventing U.S. counterterrorism efforts.  *See, e.g.,* Canfield Decl. (Ex. 3) ¶ 11; Hodgkinson Decl. (Ex. 9) ¶¶ 15-16.  As explained by these components, an analyst's selection of or emphasis on particular intelligence data in his assessment would reveal what intelligence was important to the United States in assessing plaintiff, and by extension other individuals, as well as how the government analyzes intelligence in general.  *See id.*  Individuals of intelligence interest could thereby discern the guidelines used by the United States to assess intelligence value and threat level.  *See* Canfield Decl. (Ex. 3) ¶ 11.

Six DoD components withheld intelligence methods – such as interrogation techniques and plans, tools and methods for analyzing intelligence data, tools and requirements for coordinating intelligence gathering and analysis among DoD components and other government agencies, and plans for further intelligence gathering – because their disclosure would reveal

internal guidelines and practices for gathering and analyzing intelligence. *See* Canfield Decl. (Ex. 3) ¶ 16; Grafeld Decl. (Ex. 5) ¶ 15 (withholding information relating the system by which the FBI organizes investigative files); Kaster Decl. (Ex. 1) ¶ 10; Cotell Decl. (Ex. 7) ¶ 23; Pickett Decl. (Ex. 14) ¶¶ 5-6; Scott Decl. (Ex. 15) ¶¶ 6-7.

The Criminal Investigative Task Force, for example, withheld details regarding investigative steps undertaken by CITF; statements regarding contemplated next steps in CITF's investigation; and procedures for coordinating CITF's investigation with other agencies. *See* Kaster Decl. (Ex. 1) ¶ 10. Disclosure of the investigative procedures used and steps taken by CITF in Slahi's case would reveal the internal guidelines CITF follows in conducting law enforcement investigations of Guantanamo detainees and other persons of investigative interest in the global war on terror. *Id.* ¶ 12. Persons hostile to the United States could then discern the types of information the government looks for in conducting terrorism-related law enforcement investigations and take steps to counter or thwart the government's efforts to obtain such information in the future. *Id.*

Similarly, the Defense Intelligence Agency withheld information that explains the types of intelligence information DIA is interested in collecting, because disclosure of that information may hinder the intelligence community's ability to collect similar information in the future and impede the effectiveness of DIA's collection capability for this type of information. *See* Williams Decl. (Ex. 4) ¶ 29. DIA also withheld information that identifies DIA locations and its ongoing intelligence operations because the disclosure would risk circumvention of DIA's intelligence gathering and counterterrorism efforts.[6] *See id.* ¶ 28.

---

[6] By statute, 10 U.S.C. § 424, DIA is exempted from disclosing certain information concerning the DIA, including its locations, functions, and information about its personnel.

Another court has recently upheld DoD's withholding under Exemption 2 (high) DoD's

withholding of similar information relating to another Guantanamo detainee – including law

enforcement and threat level assessment of the detainee; interrogation methods; and investigative

procedures used in investigating and assessing the detainee – because the disclosure would risk

circumvention of U.S. law enforcement efforts in the Global War on Terror. *See Azmy*, No. 06

Civ 15340, 2008 WL 2501053 at *5-*6. For this same reason, this Court should uphold DoD's

and the FBI's withholdings under Exemption 2.

### C.    DoD Properly Withheld Personally Identifying Information of Individuals Under Exemptions 3 and/or 6

#### 1.    Withholdings Under Exemption 3

Five DoD components and the FBI withheld from the responsive records the personally

identifying information of government personnel and certain other individuals under Exemption

3. Exemption 3 protects matters "specifically exempted from disclosure by statute . . . , provided

that such statute (A) requires that the matters be withheld from the public in such a manner as to

leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to

particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). The exemption's

"unmistakable thrust" is "to assure that basic policy decisions on governmental secrecy be made

by the Legislative rather than the Executive branch." *Ass'n of Retired R.R. Workers, Inc. v.

Railroad Retirement Bd.*, 830 F.2d 331, 333 (D.C. Cir. 1987). To determine whether a

withholding of information is proper under Exemption 3, the court is first to determine whether

the statute is one of exemption as contemplated by Exemption 3, and, if so, whether the

---

Accordingly, the information is also exempt from disclosure under FOIA Exemption 3, which, as
will be discussed in the next section, protects matters specifically exempted from disclosure by
statute.

information is covered by the statute.  *CIA v. Sims*, 471 U.S. 159, 167 (1985); *Fitzgibbon*, 911

F.2d at 761.  "[O]nce a court determines that the statute in question is an Exemption 3 statute,

and that information requested at least arguably falls within the statute, FOIA *de novo* review

normally ends."  *Aronson v. I.R.S.*, 973 F.2d 962, 967 (1st Cir. 1992) (Breyer, J.); *see also*

*Fitzgibbon*, 911 F.2d at 761-62.

Here, the Defense Intelligence Agency withheld the names, office affiliations, contact

information, and titles of DIA personnel based on 10 U.S.C. § 424.  *See* Williams Decl. (Ex. 4)

¶¶ 30-31.  Section 424(a) of that statute provides that, except as required by the President or as

provided in subsection (c), no provision of law shall be construed to require the disclosure of (1)

the organization or any function of an organization of the Department of Defense named in

subsection (b); or (2) the number of persons employed by or assigned or detailed to any such

organization or the name, official title, occupational series, grade, or salary of any such person.

DIA is a covered organization under this provision.  *See* 10 U.S.C. § 424(b).  The Army

Intelligence and Security Command, on the other hand, withheld the identities of United States

undercover intelligence officers, agents, informants and sources under 50 U.S.C. § 421, which

makes disclosure of such information a crime.  *See* Butterfield Decl. (Ex. 13) ¶ 10.

The FBI invoked Rule 6(e) of the Federal Rules of Criminal Procedure to withhold

certain federal grand jury information –namely, the personally identifying information of

individuals (as well as information identifying specific records) subpoenaed by the federal grand

jury.  *See* Hardy Decl. (Ex. 20) ¶ 66.  Although rules of procedure promulgated by the Supreme

Court generally do not qualify as a "statute" for purposes of FOIA, the D.C. Circuit has held that

Rule 6(e) is an Exemption 3 statute.  *Fund for Constitutional Gov't*, 656 F.2d 856, 868 (D.C. Cir.

1981).  Also, the scope of Rule 6(e) is necessarily broad.  It covers not only actual transcripts of proceedings, but also information which would reveal the identities of witnesses and jurors, the substance of testimony, the strategy of direction of the investigation, the deliberations or questions of the jurors, and the like.  *Id.*  Accordingly, the rule plainly covers the grand jury information withheld by the FBI.

A total of five DoD components invoked 10 U.S.C. § 130b, which provides that the Secretary of Defense "may, notwithstanding section 552 of title 5, authorize to be withheld from disclosure to the public personally identifying information regarding . . . any member of the armed forces assigned to an overseas unit, a sensitive unit, or a routinely deployable unit."  10 U.S.C. § 130b(a)(1).  The statue defines "personally identifying information" to include "the person's name, rank, duty address, and official title . . . ."  10 U.S.C. § 130b(c)(1).  There is no question that this statute is an Exemption 3 statute because it specifically permits DoD to withhold the specified information notwithstanding the disclosure requirements of FOIA.

The DoD personnel whose personally identifying information has been withheld here belonged to either an overseas unit or a routinely deployable unit.  *See* Pickett Decl. (Ex. 14) ¶ 7; Butterfield Decl. (Ex. 13) ¶¶ 9-10; Campbell Decl. (Ex. 11) ¶ 19; Liott Decl. (Ex. 9) ¶ 21; Leavitt Decl. (Ex. 8) ¶ 33.  For example, the Office for the Administrative Review of the Detention of Enemy Combatants withheld the names of those DoD personnel deployed to Guantanamo Bay, Cuba, *see* Campbell Decl. (Ex. 11) ¶ 19, while European Command withheld from disclosure the names and locations of its personnel in foreign territories.[7]  *See* Pickett Decl.

---

[7]  Although no balancing of interests is required under Exemption 3, the disclosure of such personnel potentially would make them more vulnerable to attacks by terrorists, particularly given that persons hostile to the United States might have more freedom of action in a foreign country than if they were within the United States.  *See* Pickett Decl. (Ex. 14) ¶ 7.

(Ex. 14) ¶ 7.  The Army Intelligence and Security Command – whose mission is to synchronize the Army's world-wide intelligence operations and to produce intelligence in support of the Army, combatant commands, and the national intelligence community – withheld its personnel's identifying information because all components of that command are considered routinely deployable as they may be positioned to provide operational support to commanders in a theater of operation.  *See* Butterfield Decl. (Ex. 13) ¶ ¶ 1, 9.

### 2.    Withholdings Under Exemption 6

Eleven DoD components, including the above five, as well as the FBI and the State Department have also withheld personally identifying information of both the DoD personnel and other individuals from the responsive records under Exemption 6, which allows the government to withhold information about individuals in "personnel and medical and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  *See Department of State v. Washington Post Co.*, 456 U.S. 595, 599-600 (1982) ("the primary concern of Congress in drafting Exemption 6 was to provide for the confidentiality of personal matters").  For this exemption to apply, the information at issue must be maintained in a government file and "appl[y] to a particular individual."  *Id.* at 602.  Once this threshold requirement is met, Exemption 6 requires the agency to balance the individual's right to privacy against the public's interest in disclosure.  *See Department of the Air Force v. Rose*, 425 U.S. 352, 372 (1976); *see also Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991).

In this case, the DoD components, the FBI and the State Department have determined that releasing the personally identifying information of its personnel and other individuals in

35

certain responsive records would constitute a clearly unwarranted invasion of the those

individuals' privacy.  *See* Pickett Decl. (Ex. 14) ¶ 7; Butterfield Decl. (Ex. 13) ¶ 11; Spanheimer

Decl. (Ex. 12) ¶ 5; Campbell Decl. (Ex. 11) ¶ 20; Walker Decl. (Ex. 18) ¶¶ 9-10; Bien Decl. (Ex.

17), ¶ 9; Liott Decl. (Ex. 9) ¶ 23; Leavitt Decl. (Ex. 8) ¶ 33; Cotell Decl. (Ex. 7) ¶ 34; Grafeld

Decl. (Ex. 5)  ¶ 19; Williams Decl. (Ex. 4) ¶¶ 32-33; Canfield Decl. (Ex. 3) ¶ 18; Kaster Decl.

(Ex. 1) ¶ 19; Hardy Decl. (Ex. 20)  ¶¶ 70-76.

There is no legitimate public interest in the disclosure of such information because the

information would not inform the plaintiff or the general public about how DoD performed its

statutory duties.  *See, e.g.,* Kaster Decl. (Ex. 1) ¶ 19 (averring that disclosure of personally

identifying information of CITF personnel would not inform the general public about CITF's

performance of its mission to investigate individuals suspected of committing offenses related to

international terrorism).  In fact, the information is irrelevant to the work of the agency and

cannot be said to "reveal [anything] about an agency's own conduct."  *See Department of Justice

v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (information that does

not directly reveal the operations of activities of the federal government "falls outside the ambit

of the public interest that the FOIA was enacted to serve"); *see also Long v. OPM*, No. 05-CV-

1522, 2007 U.S. DIST. LEXIS 72887 at *5-*6 (N.D.N.Y. Sept. 30, 2007) (withholding of DoD

employee names and duty station under Exemption 6 proper because such information "does not

relate to the employee's performance of public duties"); *Voinche v. FBI*, 940 F. Supp. 323, 330

(D.D.C. 1996) ("There is no reason to believe that the public will obtain a better understanding

of the workings of various agencies by learning the identities of [various federal

employees] . . .").

On the other side of the scale, the government personnel and other third parties whose personally identifying information has been withheld have a legitimate privacy interest and personal safety interest not to have their information disclosed, particularly given that the responsive files concern the United States' counterterrorism efforts against terrorist groups such as al Qaeda. Thus, for example, the Office of Naval Intelligence withheld the personally identifying information of its personnel involved in the human intelligence collection and evaluation efforts to protect their safety and privacy. *See* Walker Decl. (Ex. 18) ¶¶ 9-10. The Office for the Administrative Review of the Detention of Enemy Combatants withheld the names of the DoD personnel to protect their privacy and personal safety interests because those individuals were involved in the detention of enemy combatants linked to al Qaeda, the Taliban, or their associated forces. *See* Campbell Decl. (Ex. 11) ¶ 20. *See also Long*, No. 05-CV-1522, 2007 U.S. DIST. LEXIS 72887 at *47-48 (upholding the withholding of DoD employee names and duty stations under Exemption 6 because disclosure could allow enemies of the United States to target DoD employees performing specific missions for harassment or attack).

The strong privacy interests of these individuals clearly outweigh any public interest in the disclosure of their personally identifying information. Accordingly, the information is properly withheld under Exemption 6.

### D.    DoD Properly Withheld Information Under Exemption 5

Many DoD components have invoked Exemption 5 in withholding certain responsive information. That Exemption protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). The Supreme Court has construed this language to "exempt those documents . . .

normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). In this case, the withheld information implicates the deliberative process privilege, attorney work product privilege, and the attorney client privilege.

### 1.    Deliberative Process Privilege

The deliberative process privilege is predicated on the recognition "'that the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl.'" *Dow Jones & Co., Inc. v. U.S. Dep't of Justice*, 917 F.2d 571, 573 (D.C. Cir. 1990) (quoting *Wolfe v. HHS*, 839 F.2d 768, 773 (D.C. Cir. 1988) (*en banc*)). Thus, the agency need not disclose "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). Because the privilege protects the decision-making process, the document in question must be pre-decisional, *i.e.*, it is "prepared in order to assist an agency decisionmaker in arriving at his decision." *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 421 U.S. 168, 184 (1975); *see also NLRB*, 421 U.S. at 151 n.18; *Mapother v. Department of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993). Documents prepared by agency officials who "themselves lack any authority to take final agency action . . . are necessarily predecisional." *Hopkins v. U.S. Dep't of Housing and Urban Dev.*, 929 F.2d 81, 85 (2d Cir. 1991). The communication also must be "a direct part of the deliberative process" in that it "makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975); *see also Wolfe*, 839 F.2d at 773-74.

In this case, six DoD components withheld predecisional deliberations under the deliberative process privilege: Office of General Counsel; Criminal Investigative Task Force;

Office for the Administrative Review of the Detention of Enemy Combatants; Office of Detainee

Affairs; Office of the Military Commissions-Prosecution; and Army Intelligence and Security

Command.  *See* Leavitt Decl. (Ex. 8) ¶ 34; Campbell Decl. (Ex. 11) ¶¶ 22-23; Kaster Decl. (Ex.

1) ¶¶ 17-18; Cotell Decl. (Ex. 7) ¶ 32; Butterfield Decl. (Ex. 13) ¶ 11; Hodgkinson Decl. (Ex. 9)

¶ 14.  The majority of that information relates to assessments of plaintiff's intelligence value and

threat level, and recommendations concerning whether he should be released, transferred, or

continued in detention.

Specifically, the Office for the Administrative Review of the Detention of Enemy

Combatants withheld assessments, recommendations, and opinions regarding the plaintiff

provided by DoD components and other agencies to the Administrative Review Boards

("ARBs").  *See* Campbell Decl. (Ex. 11) ¶ 22.  The ARB is an administrative body comprised of

DoD personnel that assesses whether a detainee, such as the plaintiff, continues to present a

threat and to what degree.  Unlike the Combatant Status Review Tribunals ("CSRT"), which

determines whether individuals detained at Guantanamo are properly classified as enemy

combatants based on law enforcement and intelligence information, and other data and

assessments in the possession of the government, *id.* at ¶¶ 4-5, the ARB panel makes only non-

final, non-binding recommendations to a Designated Civilian Official ("DCO"), here the Deputy

Secretary of Defense, regarding whether DoD custody of a enemy combatant should be

continued, and, if not, whether a detainee should be transferred to the custody of another

country, or released.  *Id.* ¶ 6.  To assist the ARB in making its recommendation to the DCO, each

agency and DoD component involved in the process makes its own assessments of, and

recommendations concerning, particular detainees.  *Id.* ¶ 7.  These agencies and DoD

39

components often include the Department of State, the FBI, the CIA, the Criminal Investigation

Task Force ("CITF"), the Office of Detainee Affairs ("ODA"), and Joint Task Force-

Guantanamo. *Id.*

In addition to OARDEC, which maintains official CSRT and ARB records, the Office of

Detainee Affairs and the Criminal Investigative Task Force similarly withheld predecisional

assessments of plaintiff's intelligence value and threat level that were submitted to the CSRT

and/or the ARB, or were originated with the ARB.  *See* Hodgkinson Decl. (Ex. 9) ¶ 14; Kaster

Decl. (Ex. 1) ¶ 18.  The intra- and inter-agency assessments and recommendations were provided

to the CSRT and/or the ARB and the DCO for their consideration in making recommendations

(in the case of the ARBs) or final decisions (in the case of the DCO) regarding the disposition of

particular detainees.  *See* Campbell Decl. (Ex. 11) ¶ 23.

The withheld information clearly falls within the deliberative process privilege because it

is "prepared in order to assist an agency decisionmaker in arriving at his decision."

*Renegotiation Bd.,* 421 U.S. at 184.  The withheld assessments and recommendations were

quintessentially predecisional and integral to DoD's decision-making process regarding whether

to release, transfer or continue to detain the plaintiff through the ARB process.  The DoD

components and other U.S. government agencies that participate in the ARB process must be

able to engage in open and frank discussions with regard to detainee matters, both internally and

with each other.  The disclosure of this withheld information would have a chilling effect on

such candid, open, and frank discussions, and compromise the quality of decision concerning the

designation and disposition of particular detainees.  *See* Campbell Decl. (Ex. 11) ¶ 23; Kaster

Decl. (Ex. 1) ¶ 18.  Accordingly, the information is properly withheld under Exemption 5.  *See*

40

*Long*, No. 05-CV-1522, 2007 U.S. DIST. LEXIS 72887 at *7 (upholding under exemption 5 DoD's withholding of assessment and recommendations regarding a Guantanamo detainee prepared by DoD components and other agencies and submitted to CSRT, ARBs and DCO).

In addition, both the Office of Military Commissions-Prosecution and the Office of General Counsel withheld internal discussions relating to (1) the classification of information pertaining to plaintiff, (2) requests for testimony by a foreign government, and (3) the interrogation of the plaintiff, all of which assisted the individuals involved to make assessments and come to certain conclusions.  *See* Leavitt Decl. (Ex. 8) ¶ 34; Cotell Decl. (Ex. 7) ¶ 32.  The Army Intelligence and Security Command ("INSCOM"), on the other hand, withheld pre-decisional, subjective opinions of individual employees regarding credibility of information, reliability of sources, potential motivation of individuals or organizations, potential adversarial capabilities, and possible future conduct.  *See* Butterfield Decl. (Ex. 13) ¶ 11.  As explained in INSCOM's declaration, protection of this information, none of which constituted the rationale for any agency decision previously released to the public, is critical to promote open, frank and candid analytical assessments of raw information and to ensure the unrestricted flow or undefined intelligence products between analysts and decisionmakers.  *See id.*  Accordingly, the withholding of this information under Exemption 5 claim is proper.

## 2.    Attorney Work Product Privilege

Three DoD components withheld information under the attorney work product privilege: Office of General Counsel; Criminal Investigative Task Force; and Office of the Military Commissions-Prosecution.  *See* Leavitt Decl. (Ex. 8) ¶¶ 35-36; Kaster Decl. (Ex. 1) ¶¶ 17-18; Cotell Decl. (Ex. 7) ¶ 33.  The attorney work product privilege is incorporated in FOIA

Exemption 5 and shields materials "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative." *Judicial Watch*, 432 F.3d at 369. "A]s the Supreme Court has made clear, the doctrine should be interpreted broadly and held largely inviolate." *Id.* (citing *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)). Notably, in contrast to the deliberative process privilege, "'[t]he work-product doctrine simply does not distinguish between factual and deliberative material.'" *Id.* (quoting *Martin v. Office of Special counsel*, 819 F.2d 1181, 1187 (D.C. Cir. 1987). "'Any part of [a document] prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under exemption 5.'" *Id.* (quoting *Tax Analysts v. I.R.S.*, 117 F.3d 607, 620 (D.C. Cir. 1997)). In other words, factual material is itself privileged when it appears within documents that are attorney work product. *Id.*

Here, the Office of Military Commission-Prosecution ("OMCP") and the Criminal Investigation Task Force (CITF) withheld under the attorney work product privilege assessments that were prepared by attorneys in CITF or OMCP in connection with potential prosecution of the plaintiff. *See* Kaster Decl. (Ex. 1) ¶ 18; Cotell Decl. (Ex. 7) ¶ 33. The withholding is proper because, as noted before, CITF conducts worldwide criminal investigations to substantiate or refute alleged or suspected war crimes or acts of terrorism, whereas OMCP's function is to conduct trials before the military commissions. Indeed, the plaintiff is potentially subject to being charged with offenses that would be triable by a military commission. *See* Cotell Decl. (Ex. 7) ¶ 33. The work product of CITF and OMCP's attorneys relating to the potential criminal prosecution of plaintiff is therefore properly protected under the attorney work protect privilege.

### 3.     Attorney Client Privilege

Two DoD components withheld information under the attorney client privilege, which protects confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services. *See In re Sealed Case*, 737 F.2d at 98-99. A government agency "needs the . . . assurance of confidentiality so it will not be deterred from full and frank communications with its counselors." *In re Lindsey*, 148 F.3d 1100, 1105 (D.C. Cir. 1998). Military attorneys have a number of identifiable clients depending on the area of law and the type of legal advice provided. They provide legal advice to Commanders as representatives of the military and to employees of an office or agency acting in their official capacities.

The Office of General Counsel ("OGC") withheld under the attorney-client privilege information (already protected by the deliberative process privilege discussed above) consisting of confidential communications between and among OGC attorneys and other employees of DoD who are their clients. *See* Leavitt Decl. (Ex. 8) ¶ 36. The information related to the classification of information pertaining to requests for testimony by a foreign government; and the interrogation of the plaintiff. OGC also withheld information prepared for matters where litigation is contemplated (in this case, both civil and criminal litigation is anticipated). *Id.*

Similarly, OARDEC withheld certain documents in the ARB records (already protected by the deliberative process privilege) under the attorney client privilege because they contain confidential communications between the ARBs, the DCO, and their attorneys regarding the legal sufficiency of the ARB proceedings. *See* Campbell Decl. (Ex. 11) ¶ 25. These documents include memoranda addressed to the DCO and prepared by the military attorneys assigned to

43

serve as the Legal Advisors to OARDEC. *Id.* This type of communication must be able to occur without threat that the confidential analyses and options provided by the military attorneys to their clients will be exposed to public scrutiny. Accordingly, the information is properly withheld under Exemption 5.

### E.    DoD Properly Withheld Information Under FOIA Exemption 7

Finally, five DoD components and the FBI have withheld information under Exemptions 7(A), (C), (D), or (E),[8] which also overlaps to a significant extent with information already withheld under other exemptions, including Exemptions 1 and 2.

### 1.    Law Enforcement Information Withheld Under Exemption 7(A)

Exemption 7(A) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). In enacting this exemption, "Congress recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations." *Robbins Tire & Rubber Co.,* 437 U.S. at 232. However, as the D.C. Circuit has made clear, "Exemption 7(A) does not require a presently pending 'enforcement proceeding'"; rather, "it is sufficient that the government's ongoing September 11 terrorism investigation is likely to lead to such proceedings." *Center for Nat'l Sec. Studies*, 331 F.3d at 926.

The threshold question for an Exemption 7(A) withholding is whether the withheld

---

[8] The Criminal Investigation Task Force has also asserted Exemption 7(F). *See, infra,* note 9.

record was compiled for law enforcement purposes, which the agency can establish by showing:

"(1) a rational nexus between the investigation and one of the agency's law enforcement duties;

and (2) a connection between an individual or incident and a possible security risk or violation of

federal law." *Id.* at 926 (internal quotation marks omitted).  This threshold requirement has been

expressly recognized to "include[] national security related government activities." *Morley v.*

*CIA*, No. 03-2545, 2006 WL 2806561, at *14 (D.D.C. Sept. 29, 2006); *see, e.g., Center for Nat'l*

*Sec. Studies*, 331 F.3d at 926.

Moreover, it is well-established that the applicability of Exemption 7(A) may be

demonstrated generically, based on the category of records involved, rather than on a document-

by-document basis.  *See Robbins Tire & Rubber Co.,* 437 U.S. at 236.  Thus, courts have

routinely accepted affidavits in Exemption 7(A) cases that specify the distinct, generic categories

of documents at issue and the harm that could result from their release, rather than requiring

extensive, detailed itemizations of each document.  *See, e.g., Spannaus v. DOJ*, 813 F.2d 1285,

1288 (4th Cir. 1987) ("The Supreme Court has rejected the argument that [Exemption 7(A)]

requires particularized showings of interference, holding instead that the Government may

justify nondisclosure in a generic fashion.").

Here, the FBI, three DoD components with law enforcement/counterterrorism functions

(*i.e.*, Criminal Investigative Task Force, Office of Military Commissions-Prosecution, Defense

Intelligence Agency) as well as DoD's Office of General Counsel have invoked Exemption 7(A)

to withhold responsive information gathered during ongoing investigations for suspected war

crimes or other prosecutable acts of terrorism related to the September 11th attack.  *See* Leavitt

Decl. (Ex. 8) ¶ 35; Kaster Decl. (Ex. 1) ¶ 22; Cotell Decl. (Ex. 7) ¶¶ 36-37; Williams Decl. (Ex.

4) ¶ 35.  Indeed, as noted before, trial by military commission remains a possibility for the plaintiff.  Release of this information could reasonably be expected to compromise the interests of the United States in the September 11th and other ongoing terrorism-related investigations and trials, and give interested parties improper insight into the techniques and guidelines used during investigations and prosecutions.  *See* Cotell Decl. (Ex. 7) ¶¶ 36-37; Leavitt Decl. (Ex. 8) *¶¶* 38-39.

For example, the FBI has asserted Exemption 7(A) for all of the responsive information located by DoD but that originated with the FBI because such information pertains to the FBI's criminal counterterrorism investigations conducted pursuant to 18 U.S.C. § 2332(b).  *See* Hardy Decl. ¶ 16.  Specifically, in support of the FBI's overriding mission of identifying those responsible for the September 11, 2001 attacks and preventing future acts of terrorism, the FBI deployed Special Agents and support personnel to interview terrorist suspects detained in Guantanamo, Afghanistan, Iraq and other locations for the purposes of collection and analysis of investigative and intelligence information.  *Id.* ¶ 5.  The FBI records at issue here were compiled during the course of the FBI's interviews and investigations of Guantanamo detainees.  *Id.* ¶ 20.  The vast majority of the withheld FBI records are either interview forms of detainees at Guantanamo or documents which contain the incorporated contents of these interviews.  *Id.* *¶* 25.  Other records include situation reports, photographs, intelligence information reports, interrogation plans, and a polygraph report of examination.  *Id.* ¶ 26.  Because DoD's investigation concerning the plaintiff is on-going, and the information gathered during the FBI's investigation of the plaintiff may be used in future military commission proceedings against the plaintiff, *id.,* disclosure of the information could reasonably be expected to interfere with the on-

46

going investigation and any potential military commission trial of plaintiff.  *See* Hardy Decl.

(Ex. 20) ¶¶ 5-6, 27-29; Williams Decl. (Ex. 4) ¶ 35.

The potential harms from the release of information contained in the FBI's investigative

files include:  the identification of individuals, sources, and potential witnesses and possible

harm to, or intimidation of these individuals; the use of information released to counteract

evidence developed by investigators, alter or destroy potential evidence or create false evidence;

the identification of third parties who are also under investigation; the identification of the

subject matter concerning classified information; and the locations in the United States, and

foreign countries where the FBI and DoD are focusing their investigative efforts and their

collection of investigative and source material.  Furthermore, the release of this information to

third parties not directly involved in this matter could allow these third parties to interfere with

the pending proceedings by harassment, intimidations, and creation of false evidence dispensing

facts discussed during the FBI's investigation.  *See* Hardy Decl. (Ex. 20) ¶¶ 29-30.

Similarly, the Criminal Investigative Task Force, a joint law enforcement task force

whose sole, overarching mission is to conduct law enforcement investigations, withheld all

responsive documents under Exemption 7(A) because release of the information would disclose

avenues being pursued by CITF in investigating target organizations and individuals.  As

explained in CITF's declaration, as part of its ongoing and wide-ranging investigations into

offenses subject to the jurisdiction of military commissions, CITF often interviews detainees at

Guantanamo and in Afghanistan, and witnesses in federal custody in various locations.  CITF

also seizes and analyzes evidence found in Afghanistan and Pakistan, integrates all forms of

strategic and tactical intelligence, and collaborates with interagency counterparts.  The

investigation can span several years, even in the case of investigations focused on a particular individual or group. Even after the departure of a particular detainee, CITF continues to pursue leads it obtains from that detainee. *See* Kaster Decl. (Ex. 1) ¶¶ 22-23.

Disclosures of these investigative files, including individuals and organizations identified in these files, can be expected to interfere with CITF's investigative efforts. In addition, public disclosure of what the government has learned about these particular affiliated individuals and organizations could cause the identified individuals, and individuals affiliated with the identified organizations, to conceal their activities. In other words, disclosure could reasonably be expected to interfere with CITF's efforts to bring to justice individuals who have committed acts subject to the jurisdiction of military commissions. *See* Kaster Decl. (Ex. 1) ¶¶ 22-23.

For these reasons, DoD's and the FBI's withholding of its law enforcement files under Exemption 7(A) are proper. *See Azmy*, No. 06 Civ 15340, 2008 WL 2501053 at *10 (in FOIA case by Guantanamo detainee, CITF's withholding of names of individuals and organizations of ongoing law enforcement interest under Exemption 7(A) was proper because disclosure of the information could reasonably be expected to interfere with CITF's on-going terrorism and war crimes investigations); *see also Center for Nat. Sec. Studies*, 331 F.3d at 926 (in Exemption 7(A) case, deferring to predictive judgments of counterterrorism officials' determination that release of information concerning detainees in September 11 terrorist investigation would compromise national security).

>        2.    **Personally Identifying Information Withheld Under
>              Exemption 7(C)**

In addition to invoking Exemption 6 regarding the personally identifying information of individuals in their law enforcement records, three DoD law enforcement components and the

FBI also invoked Exemption 7(C) to protect that information. That exemption covers materials compiled for law enforcement purposes whose disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). To determine whether Exemption 7(C) applies, courts "balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." *Davis v. Dep't of Justice,* 968 F.2d 1276, 1281 (D.C. Cir. 1992). Where a legitimate privacy interest is implicated, the requester must (1) show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake; and (2) show the information is likely to advance that interest. *See Sussman,* 494 F.3d at 1115. As the D.C. Circuit has explained, on one side of the scale, the exemption protects the privacy interests of all persons mentioned in law enforcement records, whether they be investigators, suspects, witnesses, or informants. *Id; Schrecker,* 349 F.3d at 661 (citing cases). On the other side, "the only public interest relevant for purposes of Exemption 7(C) is one that focuses on the citizens' right to be informed about what their government is up to." *Davis,* 968 F.2d at 1282 (internal quotation marks omitted) (quoting *Reporters Comm. for Freedom of the Press,* 489 U.S. at 773). In other words, the only recognized public interest is that which sheds light on the operations and activities of the United States.

Importantly, the Supreme Court has furthermore observed that the statutory privacy right protected by Exemption 7(C) is broader than the protection accorded under other provisions. *See Reporters Comm. for Freedom of Press,* 489 U.S. at 762. The Court has made clear that because "[l]aw enforcement documents ... often contain information about persons ... whose link to the official inquiry may be the result of mere happenstance," "[t]here is special reason ... to give

49

protection to [ ] intimate personal data, to which the public does not have a general right of access in the ordinary course." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 166 (2004) (citing *Reporters Comm. for Freedom of Press,* 489 U.S. at 780; *see also Martin v. Department of Justice,* 488 F.3d 446, 456-457 (D.C. Cir. 2007)).  The categorical withholding of information that identifies third parties in law enforcement records will ordinarily be appropriate under this exemption, given the traditional recognition of the strong privacy interests inherent in law enforcement records.  *See Dunkelberger v. Dep't of Justice*, 906 F.2d 779, 781 (D.C. Cir. 1990) ("Exemption 7(C) takes particular note of the 'strong interest' of individuals, whether they be suspects, witnesses, or investigators, 'in not being associated unwarrantedly with alleged criminal activity.'") (quoting *Stern v. FBI*, 737 F.2d 84, 91-92 (D.C. Cir. 1984)).

    Here, the Defense Intelligence Agency, the Criminal Investigative Task Force, the Naval Criminal Investigative Service, and the FBI all withheld personally identifying information of individuals contained in their law enforcement records responsive to plaintiff's FOIA request. These individuals include special agents and other law enforcement personnel; government support personnel (such as translators); third parties mentioned in the files or interviewed by the law enforcement agency; and subjects of the law enforcement agency's investigation.  *See* Kaster Decl. (Ex. 1) ¶¶ 25-31; Hardy Decl. (Ex. 20)  ¶ 80-86; Williams Decl. (Ex. 4) ¶ 36; Ceglio Decl. (Ex. 16) ¶ 14.

    As these law enforcement agencies' declarations demonstrate, disclosure of the identities of law enforcement agents and government support personnel involved in the investigation of suspected terrorists and their organizations would not only subject these agents and government personnel to harassment and annoyance in the conduct of their official duties and their private

lives, but also jeopardize their safety as well as the safety of their family members.  *See* Kaster

Decl. (Ex. 1) ¶¶ 26-27; Hardy Decl. (Ex. 20) ¶¶ 80-82; Williams Decl. (Ex. 4) ¶ 36.  On the other

hand, there is no legitimate public interest in the identities of these law enforcement and other

government personnel because the disclosure would not inform the public about DoD's and the

FBI's performance of their statutory duties.  *See* Kaster Decl. (Ex. 1) ¶¶ 26-27; Hardy Decl. (Ex.

20) ¶¶ 80-82.  Similarly, the disclosure of the identities of third parties connected with the

government's counterterrorism law enforcement activities (whether because they were simply

mentioned in the law enforcement records, interviewed or were the subjects of the government's

investigation) could significantly intrude on these individuals' personal privacy and expose them

to potential harassment, retaliation or stigma.  *See* Kaster Decl. (Ex. 1) ¶¶ 28-30; Hardy Decl.

(Ex. 20) ¶¶ 83-86.  Again, there is no public interest in the disclosure to outweigh this potential

harm.  *Id.*

Accordingly, due to the breadth of privacy protection under Exemption 7(C), the

potential harm that could result from release, and the lack of public interest in the disclosure,

DoD's and the FBI's withholdings of the names and other identifying information of their

personnel and the third parties mentioned in their files are proper under Exemption 7(C).[9]  *James*

*v. Secret Service*, 06-CV-1951, 2007 WL 2111034, 6 (D.D.C. July 23, 2007) ("The deletion of

the names and identifying information of law enforcement personnel has been routinely

---

[9]  Indeed, because all investigations conducted by CITF involve suspected terrorism and threats to homeland security from groups that are hostile to the United States and have carried out attacks on Americans within the United States and abroad, disclosure of the identity of any of individuals associated with these investigations could jeopardize their personal physical safety as well as that of their family members.  *See* Kaster Decl. (Ex. 1) ¶ 32.  Thus, all exemptions CITF asserted under 7(C) are also asserted and incorporated by reference under Exemption 7(F), which covers documents whose release "could reasonably be expected to endanger the life or physical safety of any individual."  5 U.S.C. § 552(b)7(F).

upheld.") (citing *Lesar v. Dep't of Justice,* 636 F.2d 472, 487 (D.C. Cir. 1980)).

### 3.    Confidential Sources Information Withheld Under Exemption 7(D)

Both the Defense Intelligence Agency and the FBI have withheld FBI information under

Exemption 7(D), which permits the withholding of law enforcement records, the release of

which "could reasonably be expected to disclose the identity of a confidential source . . . and, in

the case of a record or information compiled by a criminal law enforcement authority in the

course of a criminal investigation . . . information furnished by a confidential source."  5 U.S.C.

§ 552(b)(7)(D).  Unlike Exemption 7(C), Exemption 7(D) requires no balancing of public and

private interests.  *See Dow Jones & Co.*, 917 F.2d at 575-76.  The exemption applies if the

agency establishes that a source has provided information under either an express or implied

promise of confidentiality.  *See Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993); *Williams

v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir. 1995).

The FBI withheld the names and identifying information of individuals who were

interviewed by the FBI in the course of its criminal, counterterrorism, and national security

investigations.  As discussed in detail in the declaration of David M. Hardy of the FBI, these

individuals provided information about the background and activities of suspected terrorists, and

in light of the terrorist organizations' well-documented history of violence, the individuals who

provided intelligence information to the FBI reasonably could be inferred to expect that their

identities, and any information that they provided (which, by its nature and content could

reasonably be expected to identify them) would not be released to the general public.  *See* Hardy

Decl. (Ex. 20) ¶¶ 91-93.  For the same reason, the Defense Intelligence Agency withheld under

Exemption 7(D) two confidential sources of the FBI and the identity of a foreign law

enforcement agency that provided information to the FBI on a confidential basis, as well the information provided by those sources. *See* Williams Decl. (Ex. 4) ¶ 37.

Because the FBI has demonstrated that the nature of its investigations leads to a reasonable inference that the individuals provided information to the FBI under an implied or express promise of confidentiality, the FBI's withholdings of these confidential sources, as well under the information provided by those sources, are proper under Exemption 7(D).

### 4.    Law Enforcement Techniques, Procedures and Guidelines Withheld Under Exemption 7(E)

Exemption 7(E) authorizes the withholding of law enforcement information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)7(E).[10] Like Exemption 7(A), Exemption 7(E) has been interpreted to cover a broad range of law enforcement information related to national security. *See, e.g., Center for Nat'l Sec. Studies v. INS*, No. 87-2068, 1990 WL 236133, at *5 (D.D.C. Dec. 19, 1990) (upholding under Exemption 7(E) agency's withholding of contingency plan in event of attack on United States).

Here, the FBI has asserted Exemption 7(E) (in conjunction with Exemption 2 (high)) to protect certain sensitive information in certain situation reports, an interrogation plan, and a

---

[10] The anti-circumvention requirement in the second clause regarding disclosure of law enforcement guidelines is similar to the anti-circumvention requirement of Exemption (b)(2). *See, e.g., Coastal Delivery Corp. v. Customs Services,* 272 F. Supp. 2d 958, 965 (C.D. Cal. 2003) (agency's withholding under Exemption 2 is proper for same reason withholding is proper under Exemption 7(E)); *Schwarz v. Dep't of Treasury*, 131 F. Supp. 2d 142, 150 (D.D.C. 2000) (Secret Service information evaluating threat potential of individuals was "clearly exempt" under both Exemptions 2 and 7(E)).

polygraph report.  As the FBI's declaration indicates, this information, if it were to be released, could risk circumvention of sensitive law enforcement techniques.  *See* Hardy Decl. (Ex. 20) ¶ 95.  Release of this type of information would reveal many of the specific inner workings of law enforcement interrogation plans and polygraph techniques which FBI special agents have been using effectively to obtain valuable information from numerous Guantanamo detainees. Release of this type of information would reveal not only the specific details of how the FBI conducts its interrogations and polygraph interviews, but would also result in the release of sensitive intelligence-gathering and reporting of those law enforcement and intelligence efforts in its situation reports.  Such a release of information would expose the FBI to the possibility that hostile individuals could reasonably impede the effectiveness of the FBI's interrogation plans and polygraph testing, and allow terrorists to adopt countermeasures to the FBI's various sensitive interrogation and polygraph techniques.  This in turn could likely jeopardize future FBI participation and effectiveness in the interrogation of – and gathering of intelligence from – individuals suspected of terrorists acts.

Accordingly, because disclosure of this type of information could reasonably be expected to risk circumvention of law, the FBI has properly withheld this information pursuant to Exemption 7(E).  *See, e.g., Blanton*, 63 F. Supp. 2d at 49-50 (certain polygraph information, such as the "sequence of questions," properly withheld because disclosure would allow individuals to employ countermeasures).

## CONCLUSION

For all the foregoing reasons, this Court should grant DoD's motion for partial summary judgment.

54

Dated: July 31, 2008                              Respectfully submitted,

                                                  GREGORY G. KATSAS
                                                  Assistant Attorney General

                                                  JEFFREY A. TAYLOR
                                                  United States Attorney

                                                  JOHN R. TYLER
                                                  Senior Trial Counsel

                                                  _____ /s/ Jean Lin _____
                                                  JEAN LIN
                                                  Federal Programs Branch, Civil Division
                                                  United States Department of Justice
                                                  20 Massachusetts Ave., N.W.
                                                  Washington, D.C.  20530
                                                  Tel: (202) 514-3716
                                                  Attorneys for Defendant