**Exhibit 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMEDOU OULD SLAHI,<br><br>Plaintiff,<br><br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>DEFENSE,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 06-CV-0597 (JR)<br><br>DECLARATION OF<br>LtCol JEFFERSON L. KASTER<br>USMC |

Pursuant to 28 U.S.C. Sec. 1746, I, Jefferson L .Kaster, declare as follows:

1.  I am a Lieutenant Colonel in the United States Marines Corps, with more than 13 years of active duty service. I currently serve as the Deputy Staff Judge Advocate of the Department of Defense (DoD) Criminal Investigation Task Force (CITF), Fort Belvoir, Virginia. I have been in this position since July, 2006.

2. As the Deputy Staff Judge Advocate of CITF, I am largely responsible for the planning and execution of many of the legal aspects of CITF's mission, as well as counseling and advising the Commander and staff on that mission. Under the direction of the Secretary of the Army, CITF conducts worldwide criminal investigations to substantiate or refute alleged or suspected war crimes or acts of terrorism committed by certain individuals against U.S. persons, property or interests. CITF is a joint, operational, criminal investigative task force, comprised primarily of Special Agents from the U.S. Army Criminal Investigations Division, the U.S. Air Force Office

1

of Special Investigations, and the U.S. Navy Criminal Investigation Service. Special Agents

assigned to CITF conduct law enforcement interests of suspects and memorialize record of these

interviews on documents known as CITF Form 40s.

3. As Deputy Staff Judge Advocate, I am in a position to oversee many of the functions

and operations of the Task Force. Due to the nature of my position, I am familiar with the

procedures followed by CITF in responding to requests for information from its files pursuant to

the provisions of the Freedom of Information Act (FOIA), 5 U.S.C. Sec. 552. I am familiar with

the FOIA request filed by  counsel for plaintiff, Guantanamo detainee Mohammedou Ould Slahi,

seeking all documents relating to plaintiff.    The statements contained in this declaration are

based on my personal knowledge, upon information provided to me in my official capacity, and

upon conclusions and determinations reached and made in accordance therewith.

### Purpose of This Declaration

4. This declaration describes the record system at CITF, provides an accounting of CITF

documents determined to be responsive to Plaintiff's requests and justifications for withholding

responsive information from CITF records pursuant to FOIA exemptions (b)(1), (b)(2), (b)(5),

(b)(6), (b)(7)(A), (b)(7)(C), and (b)(7)(F). See Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).

The purpose of this declaration is to provide plaintiff and the Court with a description of the

documents numbered 1864 through 2038, and 2229 through 2231.

### Explanation of CITF'S Record System

5. Special Agents assigned to CITF conduct law enforcement interviews of persons

suspected of involvement in international terrorism at locations throughout the world and

memorialize records of these interviews on CITF Form 40s. Form 40s are scanned or transmitted electronically to a database accessible at several locations, including CITF Headquarters. In addition, other CITF documents, such as transfer recommendations and jurisdictional assessment are routinely created by CITF personnel and stored electronically in CITF computer databases.

CITF Records Responsive To
Plaintiff's FOIA Request

6. On July 3, 2007 CITF was tasked to conduct a search for documents responsive to plaintiff's FOIA request. Using electronic search programs known as I2G and Orion Magic, and a manual review of files, CITF employed an extensive list of search terms that identified documents that appeared to be responsive to Plaintiffs' request. The search encompassed all CITF records created since its inception in 2002 until a cutoff date of July 2007. Hard copy records were also manually reviewed by CITF personnel to identify other documents responsive to the request.

Explanation of Format Used For The
Justification of Redacted Material

7. All documents located as responsive were processed to achieve maximum disclosure consistent with provisions of the FOIA. Every effort was made to provide Plaintiff with all material in the public domain and with all reasonably segregable portions of releasable material. The FOIA exemptions asserted as grounds for nondisclosure of portions of the documents are FOIA Exemptions (b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C) and (b)(7)(F).

8. Copies of the documents released contain, on their face, coded categories of exemptions which detail the nature of information withheld pursuant to the provisions of the FOIA. To further describe the information withheld in more detail than that provided in this

3

declaration could identify the very material that is being protected. No reasonably segregable, non-exempt portions were withheld from Plaintiff. In other words, all material withheld is exempt from disclosure pursuant to a FOIA exemption, or is so intertwined with protected material that segregation was not possible without revealing the underling protected material.

9. The coded categories are provided to aid the court's and plaintiff's review of the explanation of FOIA exemptions used to withhold the protected material within the context of the documents themselves. Each instance of information withheld pursuant to the FOIA on the attached documents is accompanied by a coded designation that corresponds to the categories listed below. For example, if (b)(7)(C)-1 appears on a document, the (b)(7)(C) designation refers to Exemption (b)(7)(C) of the FOIA concerning "Law Enforcement Records – Unwarranted Invasion of Privacy." The numerical designation (-1) following the "(b)(7)(C)" narrows the main category to the more specific subcategory, "Names and Identifying Information of CITF Special Agents." Listed on the next page are the categories used to explain the FOIA exemptions asserted to withhold protected material:

## SUMMARY OF JUSTIFICATION CATEGORIES

| CODED CATEGORIES | INFORMATION WITHHELD |
|---|---|
| Exemption (b)(1) | Classified Information |
| Exemption (b)(2) | Internal Agency Personnel Rules and Practices |
| (b)(2)-1 | Document identification numbers |
| (b)(2)-2 | Agent identification numbers |
| (b)(2)-3 | Detainee identification numbers |
| Exemption (b)(5) | Inter/Intra-agency documents |
| (b)(5)-1 | Deliberative Process Privilege |
| (b)(5)-2 | Attorney Work-Product |
| (b)(5)-3 | Attorney-Client Privilege |
| Exemption (b)(6) | Third Party Privacy |
| Exemption (b)(7) | Law Enforcement Records |
| Exemption (b)(7)(A) | Pending Law Enforcement Investigation |
| Exemption (b)(7)(C) | Unwarranted Invasion of Personal Privacy – Law Enforcement Records (claimed in conjunction with (b)(6)) |

4

| (b)(7)(C)-1 | Names and identifying information of CITF Special Agents |
| (b)(7)(C)-2 | Names and identifying information of US government support personnel (non-agent) |
| (b)(7)(C)-3 | Names and identifying information of third parties mentioned |
| (b)(7)(C)-4 | Names and identifying information of third parties interviewed |
| (b)(7)(C)-5 | Names and identifying information of subjects of criminal investigations |
| (b)(7)(C)-6 | Names and identifying information of non-CITF law enforcement agents |
| Exemption (b)(7)(E) | Law Enforcement Technique |
| Exemption (b)(7)(F) | Information Which Could Endanger the Life or Safety of Third Parties |

EXEMPTIONS (b)(1) and (b)(2)
Classified Matters of National Defense or Foreign Policy and Internal Personnel Rules
and Practices

10. CITF is the declaring agency and needs to show with reasonable specificity, and in good faith, why certain documents fall within a particular exemption. Exemption 1 cases "inherently require a degree of generalization" to prevent compromise of national security interests, aff'd per curium, No. 96-5304, 1997 WL 411685 (D.C. Cir. June 19, 1997). CITF has the expertise necessary to quantify the effect dissemination and release of information will have on the national security while the standard of review for Courts is not to second-guess the Agency's characterization of classified documents. Courts must respect the experience of the agency and stay within the proper limits of the judicial role in FOIA review. Such deference is based upon the "magnitude of the national security interests and potential risks at stake." Ctr. For Nat'l Sec. Studies vs. U.S. Dep't of Justice, 331 F. 3d 918, 928 (D.C. Cir. 2003) (quoting CIA v. Sims, 471 U.S. 159, 179 (1985)).

CITF is a Department of Defense Joint Task force specifically tasked with investigating international terrorism suspects. Its personnel are national security officials which are uniquely positioned to view "the whole picture" and "weigh the variety of subtle and complex factors" in order to determine "whether the disclosure of information would damage the national security."

5

Sims, 471 U.S. at 179-80; see also, e.g., Zadvydas v. Davis, 533 U.S. 678, 696 (2001) (commenting that "terrorism or other special circumstances" may warrant "heightened deference")(non-FOIA case).

FOIA Exemption 2 (high) exempts from disclosure the internal guidelines, rules, practices and procedures of an agency if the disclosure would risk circumvention of the law. The withheld information includes information about certain investigative tools and procedures used by CITF in investigating and assessing Mr. Slahi. Information contained in this category of withholdings includes: results of CITF's agency checks and intelligence community database checks; details regarding other investigative steps undertaken by CITF; statements regarding contemplated next steps in CITF's investigation; and procedures for coordinating CITF's investigation with other agencies.

11. Disclosure of the investigative procedures used and steps taken by CITF in Slahi's case would reveal the internal guidelines CITF follows in conducting law enforcement investigations of Guantanamo detainees and other persons of investigative interest in the GWOT. If this information were publicly released, persons hostile to the United States could discern the types of information the government looks for in conducting terrorism-related law enforcement investigations and take steps to counter or thwart the government's effort to obtain such information in the future. Revelation of the nature of CITF's coordination with other agencies concerning Slahi would reveal the agencies' areas of relative competence or responsibility, and the distinct investigative tools they employ, thereby permitting persons of interest to the United States to tailor their behavior and adopt means to thwart the agencies' efforts, and risking circumvention of the government's efforts to bring terrorists to justice.

12. Likewise, revelation of the results of CITF's use of certain intelligence community databases to investigate Slahi would identify the databases CITF uses to conduct its investigations of individuals of law enforcement or intelligence interest, as well as the specific information about Slahi contained in those various databases. In doing so, disclosure would permit persons hostile to the United States to glean information about how the government maintains and shares information by organizations known to be involved in the information gathering process, thereby risking circumvention of U.S. law enforcement and counter-terrorism efforts.

13. In the case of intelligence community databases identified in one of the CITF memoranda discussed above, the information is withheld under Exemption (1) as well. The chart listing the searches CITF performed of certain intelligence community databases is also withheld under Exemption 1. 5 U.S.C. Sec. (b)(1) exempts from disclosure information (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order. The names of the databases and results of CITF's search of them are withheld under Exemption (b)(1). The names of the databases were classified at the time of the Plaintiff's request at the SECRET/NOFORN level because of the sensitivity of the connection between the procedures used in investigating individuals, the names of the databases and sources. Similarly, results of the investigatory searches were classified at the time of Plaintiff's request because releasing the results of those database searches reasonably could be expected to cause serious damage to the national security. Documents falling within this category are: 1864 through 1866, 1868 through 1874, 1879 through 1885, 1894, 1905 through 1906, 1908, 1910, 1912 through

1914, 1985 through 2000, 2003 through 2038, and 2229 through 2230, 3746, 3747, 3748 through 3787, 3788, 3789 and 3802.

### EXEMPTION (b)(2)

14. Certain internal numbers, namely document identification numbers and full detainee identification numbers have been withheld under Exemption 2 (high), the disclosure of which information could impede the effectiveness of CITF's internal law enforcement investigative procedures. Documents falling within this category are: 380 through 381, 1864 through 1866, 1868 through 1869, 1870 through 1872, 1874 through 1876, 1878 through 1879, 1881, 1889, 1891 through 1895, 1898, 1905 through 1906, 1908 through 1912, 1915, 1997, 1999, 2000, and 2229 through 2231.

15. Exemption 2 has been asserted to protect the document form numbers. Each document is assigned a unique identification number. At times, these numbers are used in lieu of detainees' names and numbers in order to identify a specific interview of a particular detainee that occurred on a specific date. In addition, full Internment Serial Numbers are withheld under exemption 2 because the full ISN is used as an identification tool for each individual detainee as well as other information pertinent to detainee operations and intelligence-gathering operations.

16. If CITF disclosed these numbers, personnel hostile to the United States could use these numbers to access CITF or other Government database systems in an attempt to retrieve information about particular detainees. In addition, disclosure of these numbers may facilitate disclosure of the identity of a detainee and the detainee's relationship to sensitive on-going investigations involving suspected members of terrorist organizations. Cross referencing of documents could also allow knowledgeable persons to ascertain the identity of detainees and their relationships to certain intelligence. In sum, disclosure of these numbers would impede

CITF's effectiveness by allowing unauthorized individuals to access sensitive information within CITF or other agency's database system related to detainees or to identify detainees and specific information related to these detainees.    Therefore this information is withheld pursuant to exemption (b)(2).

## EXEMPTION (b)(5)

17. 5 U.S.C. Sec. 552 (b)(5) exempts from disclosure, "inter-agency or intra-agency memorandums of letters which would not be available by law to a party…in litigation with the agency." As such, it has been construed to exempt intra or inter-agency information between subordinates and superiors involving open and frank discussions of policy not intended for or expected to be released to the public, and which, if released would discourage further open and frank discussions of policy issues. In addition, the exemption protects intra or inter-agency information concerning proposed policies prior to the adopt of these policies, and information what would cause public confusion if disclosed because the reasons and rationales noted were in fact not ultimately the grounds for the agency action or decision. Finally, the exemption also protects attorney work product and material containing confidential legal advice not discoverable in litigation. Withheld documents falling within this category are: 1906, 1912 through 1915, 1997, 2003, and 2229 through 2231.

18. Specifically, CITF's recommendation memorandum to CSRT, ARBs regarding the disposition of plaintiffs and line through memorandums, are withheld under the deliberative process privilege because they are predecisional and deliberative, containing evaluations that if published would negatively impact future cases. Additionally, these types of documents have been withheld under the attorney work product privilege because they were prepared by attorneys in CITF in connection with future prosecution of detainees.

9

### EXEMPTION (b)(6)
#### Privacy Interest

19. Exemption 6 permits the Government to withhold information about individuals contained in personnel and medical files and similar files when the disclosure of such information "would constitute a clearly unwarranted invasion of privacy." Information withheld under this exemption includes telephone numbers and e-mail addresses of DoD personnel. Disclosure of the information would clearly intrude on these DoD personnel's privacy interest. There is no public interest in the disclosure because the information would not inform the general public about CITF's performance of its mission to investigate individuals suspected of committing offenses related to international terrorism in which charges may be brought before military commissions. Documents affected by this exemption are numbered: 1864 through 1866, 1868, 1870 through 1898, 1905 through 1915, 1997 through 2000, 2008, 2010, 2013 through 2017, 2021 through 2023, 2230 through 2231.

20. In addition, as discussed in detail later, this same information is exempt from disclosure under Exemptions (b)(7)(C).\).

### EXEMPTION (b)(7)
#### Investigatory Records Compiled For
#### Law Enforcement Purposes

21. 5 U.S.C. Sec. 552 (b)(7) exempts from disclosure certain "records compiled for law enforcement purposes." The CITF is a joint law enforcement task force whose sole, overarching mission is to conduct law enforcement investigations. All CITF documents identified as responsive to plaintiff's FOIA request are records compiled for law enforcement purposes.

22. Exemption (b)7(A) covers materials compiled for law enforcement purposes whose disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). The enforcement proceedings need not be currently ongoing; it suffices for them to be reasonably anticipated. Exemption (b)(7)(A) as been asserted for withholding factual information concerning individuals and organizations of on-going investigatory interest to CITF. This category of information is contained in documents 1868 through 1898, 1905 through 1978, 1981 through 2038 and 2231. This information is withheld pursuant to (b)(7)(A) because its release would disclose avenues being pursued by CITF in investigating organizations and individuals that are still the subject of investigatory interests. Due to the unique aspects of the current conflict, CITF's law enforcement efforts are multi-faceted, broad in scope, and ongoing. Our investigations often involve, among other things, interviewing of detainees at Guantanamo and in Afghanistan, interviewing witnesses in federal custody in other locations, seizing and analyzing evidence found in Afghanistan and Pakistan, integrating all forms of strategic and tactical intelligence, and collaborating with interagency counterparts. This can take years, even in the case of investigations focused on a particular individual or group. Additionally, even after the departure of a particular detainee, CITF continues to pursue leads it obtains from that detainee. In other words, as part of CITF's ongoing and wide range investigations into offenses subject to the jurisdiction of military commissions, agents pursue leads based on information obtained from current and former detainees, as well as other sources.

23. Disclosures of individuals and organizations identified in the withheld information can be expected to interfere with these investigative efforts. In addition, public disclosure of what the government has learned about these particular affiliated individuals and organizations could cause the identified individuals, and individuals affiliated with the identified organizations,

to conceal their activities. In this way, disclosure could reasonably be expected to interfere with CITF's efforts to bring to justice individuals who have committed acts subject to the jurisdiction of military commissions.

### EXEMPTION (b)(7)(C)
#### Personal Information In Law Enforcement Records

24. Exemption (b) 7(C) covers materials compiled for law enforcement purposes whose disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The categorical withholding of information that identifies third parties in law enforcement records will ordinarily be appropriate under this exemption, given the traditional recognition of the strong privacy interests inherent in law enforcement records.

25. The names and identifying information of the following categories of individuals have been withheld from the responsive law enforcement documents: CITF special agents and other law enforcement personnel; government support personnel; third parties mentioned or interviewed; and subjects of CITF's investigation. The documents that contain these withholding are: 1864 through 1866, 1868, 1870 through 1872, 1874 through 1876, 1878 through 1880, 1881, 1889, 1891, 1893 through 1895, 1898, 1905 through 1911, 1914 through 1915, 1997 through 2000.

### Names of CITF Special Agents

26. Disclosure of the identities of CITF Special Agents, other law enforcement agents and government support personnel involved in the investigation of suspected terrorists and their organizations would subject the Special Agents to harassment and annoyance in the conduct of their official duties and their private lives. Further, release of their names could jeopardize their

safety as well as the safety of their family members, and cause undue worry and stress regarding their personal security. There is no legitimate public interest in the identities of these agents and support personnel because of the disclosure would not inform the public about DoD's performance of its statutory duties. Due to the breadth of privacy protection under Exemption (b)(7)(C) and potential harm resulting from release, any release pertaining to these government personnel, would be unwarranted intrusion on these individuals' personal privacy.

Names of U.S. Government Support Personnel

27. Disclosure of the names of U.S. Government Support Personnel, would subject these persons to harassment and annoyance in the conduct of their official duties and their private lives. Further, release of their names could jeopardize their safety and the safety of their family members, and cause undue worry and stress regarding their personal security. Most of the personnel who fall under these categories are translators or non-law enforcement agents working at CITF. Nothing in these documents alleges any wrongdoing by an U.S. Government Support Personnel whose names have been withheld that would justify any public disclosure of their identities. There is no legitimate public interest in the identities of these agents. Therefore, any release of support personnel names would be an unwarranted intrusion of these persons' privacy.

Names of Third Parties Mentioned

28. Similarly, third parties mentioned in the law enforcement documents, including third parties interviewed by CITF and the subjects to CITF's criminal investigation, have a legitimate privacy interest in not being identified as associated with CITF's criminal investigation of suspected terrorist acts. Disclosure of their identities could subject them to harassment and annoyance and potentially, jeopardize their safety and the safety of their family members. Some of the third parties who fall under this category are potentially unaware of their names have been

13

mentioned in law enforcement files. There is no legitimate public interest in their identities. Due the breadth of privacy protection under exemption (b)(7)(c), and in light of the magnitude of harm that might befall these individuals if they are identified in these investigations of suspected terrorists and their organizations, protection of their identities is appropriate. Therefore, any release of third parties names would be unwarranted intrusion on these persons' privacy.

Names of Third Parties Interviewed

29. Disclosure of the names of third parties interviewed in the released law enforcement documents would subject these persons to harassment and annoyance. Further, release of their names could jeopardize their safety and the safety of their family members, and cause undue worry and stress regarding their personal security. The fact that they were interviewed could subject them to threats of physical harm. There is no legitimate public interest in the identities of these individuals. Due to the breadth of privacy protection under exemption (b)(7)(C), and in light of the magnitude of harm that might befall these individuals if they are identified in these investigation of suspected terrorists and their organizations, protection of their identities is appropriate. Therefore, any release of third party names would be an unwarranted intrusion on these persons' privacy.

Names of Subjects of Criminal Investigations

30. Disclosure of the names of subjects of law enforcement investigations into potential terrorists activities and terrorists organizations would subject these persons to harassment and annoyance. Further, release of their names could jeopardize their safety and the safety of their family members, and cause undue worry and stress regarding their personal security. Most of the documents released under this request contain names of the subjects as well as summaries of their comments to investigations. Release of the subjects' names would allow their names to be

14

matched with their comments. Others taking issue with the disclosures could retaliate against the subjects either directly or through threats and attacks against family members or property. There is no legitimate public interest in the identities of these subjects. Due to the breadth of privacy protection under exemption (b)(7)(C), and in light of the magnitude of harm that might befall these individuals if they are identified in these investigations of suspected terrorists and their organizations, protection of their identities is appropriate. Therefore, any release of subjects' names would be an unwarranted intrusion on these persons' privacy.

### Names of Non-CITF Law Enforcement Agents

31. Disclosure of the names of non-CITF law enforcement agents investigating suspected terrorists and their organizations would subject the agents to harassment and annoyance in the conduct of their official duties and their private lives. Further, release of their names could jeopardize their safety and the safety of their family members, and cause undue worry and stress regarding their personal security.. There is no legitimate public interest in the identities of these agents. Due to the breadth of privacy protection under Exemption (b)(7)(C) and potential harm resulting from release, any release of Agent names would be an unwarranted intrusion on these agents' personal privacy, even with respect to the discharge of their official duties.

### EXEMPTION (b)(7)(F)
#### Records or Information the Disclosure of Which
#### Would Risk the Physical Safety of a Wide Range of Individuals

32. Given that all investigations conducted by CITF involve suspected terrorism and threats to homeland security from groups that have declared war against the United States and carried out attacks on Americans within the U.S. and abroad, disclosure of the identity of any of individuals associated with these investigations would jeopardize their personal physical safety,

lives and well-being and that of their family members. Therefore, all exemptions asserted under (b)(7)(C) are also asserted and incorporated by reference under (b)(7)(F).

Pursuant to 28 U.S.C. Sec. 1746, under the penalty of perjury, I declare the foregoing to be true and correct.

Executed this 28th day of July, 2008.

JEFFERSON L. KASTER
LtCol, USMC
Deputy Staff Judge Advocate

**Exhibit 2**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MOHAMMEDOU OULD SLAHI,<br>    **Plaintiff** | ) | |
| | ) | |
| | ) | |
|     v. | ) | **Civil Action No. 06-CV-0597 (JR)** |
| | ) | |
| **UNITED STATES DEPARTMENT** | ) | |
| **OF DEFENSE,** | ) | |
|     **Defendants** | ) | |
| | ) | |

## DECLARATION OF MICHAEL L. BIETSCH

Pursuant to 28 U.S.C. 1746, I, MICHAEL L. BIETSCH hereby declare under penalty of perjury that the following is true and correct.

1. I am the Deputy Director of Operations (XO) for Headquarters, Air Force Office of Special Investigations (HQ AFOSI). My responsibilities include program management of all AFOSI investigative programs and I have held this position since July 9, 2007.

2. AFOSI is the United States Air Force's major criminal investigative service. The organization provides investigative services to commanders of all Air Force activities and reports to the Inspector General, Office of the Secretary of the Air Force. AFOSI's primary responsibilities are criminal investigations and counterintelligence services.

3. My responsibilities also include reviewing classified information to determine whether it can be released. Because of my official duties, I am familiar with Air Force and Department of Defense (DoD) requirements for processing requests made pursuant to the FOIA, 5 U.S.C. 552, and with local procedures for tracking the processing of requests received by HQ AFOSI. The Air Force FOIA regulation has been published at 32 C.F.R., Part 806. It supplements the DoD FOIA regulation, which has been published at 32 C.F.R., Part 286.

4. On 25 March 2008, HQ AFOSI received a referral from the Department of Defense Freedom of Information Act Litigation Office, concerning a classified document originating with this agency regarding Mr. Mohammedou Ould Slahi. The document is identified as Document number one.

5.  HQ AFOSI/XO was asked to review this information and return a copy of the Disclosure Letter to the Department of Defense Freedom of Information Act Litigation Office, making any redactions necessary and citing the exemptions used.

6.  Upon review, HQ AFOSI has determined the referred document is exempt from disclosure pursuant to FOIA Exemption 1, 5 U.S.C. 552 (b) (1), which exempt from disclosure those records that are "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy; and (B) are in fact properly classified pursuant to such Executive Order…."

7.  The document was classified by The Deputy Under Secretary of Defense (Counterintelligence and Security) pursuant to Executive Order 12958, as amended, section 1.1 (a), which provides that:

    (1) an original classification authority is classifying the information;
    (2) the information is owned by, produced by or for, or is under the control of the United States Government;
    (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

8.  Executive Order 12958 sections 1.4 (b), (c), (d) and 3.3 (b) (6) as amended pertain to this decision. Specifically; section 1.4 of E.O. 12958, as amended, states: "Information shall not be considered for classification unless it concerns:

    (1) (b) foreign government information;
    (2) (c) intelligence activities (to include special activities), intelligence sources or methods, or cryptology;
    (3) (d) foreign relations or foreign activities of the United States, including confidential sources

9.  The withheld foreign government information relates to tactics, techniques, and procedures that would severely harm our relationship with foreign governments for cooperation involved with intelligence gathering and operations. Its disclosure could seriously impair ongoing diplomatic activities of the United States because of the sensitive relationships established following the attack on the World Trade Centers, and thus cause damage to national security. Accordingly, the information is properly classified at the "Secret" level, pursuant to E.O. 12958, as amended, 1.6 (a) (1) – (5).

10.  Through my review, I have determined there are no segregable portions of this document that can be released.  Release of this information accordingly should be denied pursuant to 5 U.S.C. 552 (b) (1).

Michael L. Bietsch, YN-03, DAFC
Director, Counterintelligence

Date:    30 Jul 08

**Exhibit 3**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMMEDOU OULD SLAHI,           )
                                )
                 Plaintiff,     )
                                )
                                )      Civil Action No. 06-CV-0597 (JR)
         v.                     )
                                )      DECLARATION OF CAPTAIN
                                )      JEFFREY L. CANFIELD
                                )
                                )
UNITED STATES DEPARTMENT OF     )
DEFENSE,                        )
                                )
                 Defendant.     )

I, Jeffrey L. Canfield, make the following declaration pursuant to 28 U. S. C. 1746:

1.  I am a Captain in the United States Navy and currently assigned as the Director of

Intelligence (J2) United States Strategic Command (USSTRATCOM) located at Offutt Air Force

Base, Nebraska.  I serve as the senior intelligence officer and principal intelligence advisor to the

Commander of USSTRATCOM.  I am also responsible for planning, integrating and

coordinating intelligence, surveillance, and reconnaissance (ISR) assets in support of strategic

and global operations.  I assumed these duties on 31 July 2007.

2. My responsibilities as Director of J2 include the review of intelligence information for

classification purposes as mandated by EO 12958, as amended, and the preparation of

declarations in support of Exemption 1 withholdings under the FOIA.  As the Director of J2, I

have been designated by the Deputy Commander of the United States Strategic Command as an

Original Classification Authority, at the secret level, and a declassification authority pursuant to EO 12958, as amended, Sections 1.3 and 3.1.

3.  In my capacity as Director, I oversee all personnel assigned to J2. I am familiar with the procedures followed by J2 personnel in responding to requests for access to J2 records and information pursuant to the Freedom of Information Act (FOIA) and Executive Order (EO) 12958, as amended. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations made in accordance therewith.

## Processing of Responsive Documents

4.  On 29 October 2007, the Command FOIA Manager, USSTRATCOM/J006, received a FOIA referral from the Department of Defense Office of Freedom of Information (DoD/OFOI). This referral contained two classified electronic messages produced by USSTRATCOM/J212 and USSTRATCOM/J2SSI. These messages are (a) SECRET//NOFORN electronic message from USSTRATCOM INTEL DIRECTORATE OFFUTT AFB NE//J212//DTG 250005ZJAN07 Subject: Consumer IIR Evaluation/USSTRATCOM (U) (Bates number 2669-2670) and (b) SECRET//NOFORN electronic message from USSTRATCOM OFFUTT AFB NE//J2SSI//DTG070806ZAUG02 Subject: (S//NF) USSTRATCOM COUNTERINTELLIGENCE HIGHLIGHTS 07 AUG 02 (U) (Bates number 2671-2675). I have determined that message (a) and the first paragraph of message (b) are responsive to the FOIA request filed by plaintiff's counsel on May 26, 2005, which seeks information relating to plaintiff.

## **Purpose of this Declaration**

5. The purpose of this declaration is to explain the bases for withholding information from both the above-mentioned electronic messages pursuant to FOIA exemptions 1, 2, and 6, 5 U.S.C. § 552(b)(1), (2), and (6). Information that reasonably could be segregated has been produced.

### Justification for Withholding Information
### Concerning Military Plans and Operations Under Exemption 1

6. The documents identified above contain information classified as SECRET//NOFORN and remain properly classified pursuant to Executive Order 12958, as amended. Information concerning military plans and operations may be classified under the authority of Section 1.4(a) of Executive Order 12958, as amended, if its release could cause damage to the national security of the United States. Certain information withheld from plaintiff is generally related to military operations against hostile forces and was classified at the SECRET//NOFORN level. I have determined that this information continues to warrant classification at the SECRET//NOFORN level, pursuant to EO 12958, as amended and the October 2004 Defense HUMINT Security Classification Guide. Release of this information could cause serious damage to the national security as hostile entities would learn of the effectiveness and vulnerabilities in the military operations in the United States and abroad.

### Justification for Withholding Intelligence Data about Plaintiff and His Activities
### and Other Persons or Organizations Under Exemption 1

7. Certain portions of the withheld information in both messages include intelligence data compiled about plaintiff or summaries of such data. The withheld information also includes intelligence data about other persons and organizations.

8. This category of information has been withheld under FOIA Exemption 1, which exempts from release matters that are "specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and ... [that] are in

fact properly classified pursuant to such Executive order." Section 1.4(c) of EO 12958, as amended, permits the classification of "intelligence activities (including special activities), intelligence sources or methods, or cryptology," recognizing that the disclosure of intelligence activities and sources can cause harm to national security.

9. I have determined that the intelligence data about plaintiff and other individuals and organizations described in the foregoing paragraphs reveals details about intelligence we have gleaned regarding individuals and organizations of intelligence interest and also that this information reveals our intelligence sources and our intelligence activities. At the time of plaintiff's FOIA request, this intelligence data was classified at the SECRET//NOFORN level through the actions of Ms. Alice Swinden, USSTRATCOM HQ/J2 HUMINT Collection Manager and pursuant to the October 2004 Defense HUMINT Security Classification Guide. I have determined that this information remains properly classified, and that its release reasonably could be expected to cause serious damage to the national security. Also, the potential damage could be exacerbated if the intelligence could be pieced together with other information that has entered the public domain to reveal a considerable amount of detail about our intelligence. Furthermore, the identification of intelligence sources could have a chilling effect on human intelligence collection. Accordingly, this information was and is properly classified at the SECRET level, pursuant to Section 1.4(c) of EO 12958, as amended.

### Justification for Withholding Intelligence Assessments and Conclusions Under Exemptions 1 and 2

10. Intelligence assessments and conclusions reached by analysts and other personnel at J2 about plaintiff are withheld under FOIA Exemptions 1 and 2. At the time of plaintiff's FOIA request, this analytic material was classified at the SECRET//NOFORN level through the action

of the USSTRATCOM/J2 HUMINT Collection Manager in accordance with the October 2004 Defense HUMINT Security Classification Guide. The intelligence assessments and conclusions withheld under Exemption 1 are vital to DOD's assessment of plaintiff's activities, and remain vital to its ongoing efforts to obtain intelligence on other individuals and organizations. The intelligence data, assessments, and conclusions that appear in the documents pertain to individuals and organizations of intelligence interest, and the relationships among individuals and organizations of intelligence interest. Disclosure of these assessments and conclusions, especially in conjunction with disclosure of the specific intelligence data that is necessarily intertwined with them, would reveal how analysts evaluate intelligence information and the conclusions they reach. Specifically, when factual information is contained within a document setting forth intelligence assessments, conclusions or recommendations, the selection of and emphasis on particular facts reveals information about the analyst's thought processes, the methods being applied to analyze the intelligence data, and the limits of or gaps in available intelligence. Such revelations would aid persons hostile to the United States in hiding their activities and thwarting the government's intelligence gathering. I have therefore determined, pursuant to Section 1.4(c) of EO 12958, as amended, that this information remains properly classified at the SECRET//NOFORN level and that its release reasonably could be expected to cause serious damage to national security.

11.  I have further determined that J2's intelligence assessments and conclusions should be withheld under FOIA Exemption (b)(2) (high) because disclosure would reveal the internal guidelines followed by J2 in evaluating the intelligence value and threat level of individuals and organizations of intelligence interest, and thus risk circumventing U.S. counterterrorism efforts. An analyst's selection of or emphasis on particular intelligence data in his assessment would

reveal what intelligence was important to the United States in assessing plaintiff, and by

extension other individuals, as well as how the government analyzes intelligence in general.

Individuals of intelligence interest could thereby discern the guidelines used by J2 to make

intelligence value and threat level assessments. Revelation of those internal guidelines would in

turn reveal a critical aspect of DOD's intelligence activities and methods, which would aid

persons hostile to the United States in hiding their activities and tailoring their behavior to thwart

the government's intelligence gathering, and thus risk circumventing U.S. counterterrorism

efforts. .

### Justification for Withholding Intelligence Methods Under Exemptions 1 and 2

12. Also withheld under FOIA Exemptions 1 and 2 is information reflecting intelligence

methods used by J2 personnel in gathering, analyzing, and coordinating intelligence data.

13. At the time of plaintiff's FOIA request, the Withheld Information reflecting intelligence

methods described in the preceding paragraph was classified at the SECRET//NOFORN level

through the action of the Commander of JTF-GTMO. I have determined that release of the

information pertaining to intelligence methods remains properly classified and that its release

reasonably could be expected to cause serious damage to national security. Intelligence methods

are the means by which the J2 and other intelligence agencies collect intelligence data to support

military operations and to assess, and counter, terrorist and military threats. These methods and

practices must be protected because their public release would be of material assistance to those

who would seek to penetrate, detect, prevent, avoid or otherwise damage the intelligence

operations of the United States. .

14. J2's method of coordinating intelligence gathering and analysis among agencies and

components is also central to their effort to counter acts of terrorism and support military

6

operations. Effective military and counterterrorism strategy depends on the coordination of intelligence gathering among agencies and components responsible for gathering and analyzing intelligence data. Revealing the nature of that coordination and how agencies and components work together could reveal their areas of relative competence, or the distinct intelligence tools they employ, thereby permitting persons of interest to the United States to tailor their behavior and adopt means to thwart the agencies' efforts.

15. Section 1.4(c) of EO 12958 recognizes that the disclosure of intelligence methods can cause harm to national security. I have determined that release of the withheld information pertaining to intelligence methods described in the preceding paragraphs remains properly classified at the SECRET NOFORN level and that its release could reasonably be expected to cause serious damage to the national security.

16. The information reflecting intelligence methods is also withheld under FOIA Exemption (b)(2) because disclosure would reveal internal guidelines and practices for gathering and analyzing intelligence, which would in turn risk circumvention of U.S. counterterrorism efforts by permitting persons hostile to the United States to tailor their behavior to resist or thwart the government's intelligence methods.

### Justification for Withholding Identifying Information About DoD Personnel Under Exemption 6

17. Certain identifying information, namely individuals' names, ranks, their telephone numbers and e-mail addresses have been withheld throughout both messages. This information was withheld pursuant to FOIA Exemption (b)(6). Exemption 6 permits the government to withhold information about individuals when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy."

18. I have determined that this information should be withheld under Exemption (b)(6) as its release would constitute a clearly unwarranted invasion of the personal privacy of these individuals. These individuals whose personal information is at stake have a legitimate privacy interest and personal safety interest that would be threatened if this information was publicly disclosed and there is no public interest in having this information disclosed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 29TH day of July , 2008, at Offutt Air Force Base, Nebraska.

J. L. CANFIELD
Captain, U.S. Navy
Director of Intelligence

**Exhibit 4**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MOHAMMEDOU OULD SLAHI,            )
                                 )
            Plaintiff,            )
                                 )
      v.                         )      Civil Action No. 06-CV-0597 (JR)
                                 )
U.S. DEPARTMENT OF DEFENSE,      )
                                 )
            Defendant.           )
_____ )

### DECLARATION OF ALESIA Y. WILLIAMS

Pursuant to 28 U.S.C. § 1746, I, Alesia Williams, Chief of the Freedom of Information

Act Staff, Defense Intelligence Analysis Center, Boiling Air Force Base, Washington, D.C.

20340, hereby declare the following to be true and correct:

1.      I am the Chief of the Freedom of Information Act Staff for the Defense

Intelligence Agency ("DIA" or "Agency"), Department of Defense ("DOD"). I have held this

position since January 2008. Prior to that, I was an administrative officer processing Freedom of

Information Act (FOIA) requests at DIA from November 2006 to December 2007, and a

contractor assigned to DIA as a FOIA Senior Document Reviewer from January to November

2006. Prior to coming to DIA, one of my duties in the United States Air Force (USAF) was to

work with FOIA requests. I also spent over 5 years supervising two USAF FOIA offices.

2.      I supervise DIA's Public Access Branch (DAN-1A) that receives, processes, and

responds to requests for DIA records under the FOIA and the Privacy Act. I am the initial denial

authority for this Agency. At my direction, DIA personnel search Agency records systems under

their control to identify documents and other information which may be responsive to individual

requests. They forward any potentially responsive records located to my office, which in turn
determines whether responsive records should be withheld under any applicable statutory FOIA
or Privacy Act exemptions. The activities of my Branch are governed by the Department of
Defense, "DOD Freedom of Information Act Program Regulation," found at 32 C.F.R Part 286,
as supplemented by the "Defense Intelligence Agency (DIA) Freedom of Information Act"
regulation found at 32 C.F.R. Part 292. In the course of my official duties at DIA, I have become
personally familiar with the FOIA request by Sylvia Royce, counsel for plaintiff Mohammedou
Ould Slahi. The statements made herein are based upon my personal knowledge, upon
information made available to me in my official capacity, and upon determinations made by me
in accordance therewith.

3.      The Defense Intelligence Agency is a component of DOD. Its mission is to
collect, analyze, and provide intelligence on the military capabilities of foreign military forces to
the Secretary of Defense, the Joint Chiefs of Staff, and other DOD components. The Defense
Intelligence Agency also manages the Defense Attaché System for the Department of Defense.
The DIA organization and mission is more fully set out at 32 C.F.R. Part 385, "Defense
Intelligence Agency." Because of its mission to collect, analyze and provide foreign intelligence,
the vast majority of Agency records are classified in the interests of national security in
accordance with Executive Order 12958, as amended, "Classified National Security
Information."

SEARCH AND PROCESSING OF PLAINTIFF'S FOIA REQUEST

4.      In May 2006, plaintiff's counsel Sylvia Royce filed a FOIA request with DOD
seeking records relating to plaintiff Mohamedou Ould Slahi, a.k.a. Mohammedou Ould Salahi,
who is presently detained at the Guantanamo Bay Naval Base in Cuba.

5.       On 3 July 2007, DOD's FOIA office referred the request from the Plaintiff to DIA, directing that DIA initially conduct three hours of search time to locate documents in DIA's systems of records concerning Mohamedou Ould Slahi.

6.       The Directorate for Human Intelligence (DH), the Agency's research and reference resource library, and the Directorate for Analysis (DI), were directed to conduct a search on 17 July 2007. These are the only three DIA components reasonably likely to have responsive documents.

7.       DH conducted searches and found no documents responsive to the request. The Agency's research and reference resource library and DIA's FOIA office searched the Agency's two primary databases, Web Intelligence Search Engine (WISE) and InfoSphere Management (ISM). WISE is the proprietary DIA repository for electronic message traffic, currently holding in excess of 60 million such messages addressed to or originated by DIA, going back to 1 January 1987. ISM contains both Human Intelligence (HUMINT) products, such as Intelligence Information Reports (IIRs) as well as Finished Intelligence (FINTEL) documents. HUMINT products include material produced by DIA and DOD and are dated from 1965 to the present. The FINTEL collection includes documents from all members of the U.S. Intelligence Community and, while it is not 100% comprehensive, it is the largest single collection of intelligence documents, comprised of nearly 2.8 million records dating back to 1965.

8.       The key words utilized in the search were: Mohamedou Ould Slahi; Mohammedou Ould Salahi; 'ISN' within 3 words of a number including '760'.

9.       The method used to search for documents varied by databases. Boolean and key words were used to conduct the searches. The databases that generated indexed listings for each holding were electronically searched using key terms noted in paragraph 8 above. When the

search registered a "hit," the corresponding hardcopy document was examined to determine its responsiveness to the plaintiff's FOIA request.

10.      Employing the above described search methods and key words, 661 responsive documents were located from searching the WISE and ISM databases. Of these, 489 were determined to have originated with other government agencies and were referred directly to those agencies for review and return to DOD. The remaining 172 documents were reviewed by DIA. These documents are accounted for in the Vaughn Index (Attachment A). DIA started the review process of the documents identified in the Vaughn Index on 20 July 2007, the day DIA's FOIA office received the search results from the Agency's research and reference resource library. DIA returned the documents and provided its recommendations to DOD on 18 September 2007 for DOD's response to the requester.

11. As for the search conducted by the Directorate for Analysis (DI), DI initially determined that searching its databases would take more than 20 man hours. DI did not proceed with the search because that would exceed the three hours of search time DOD's FOIA's office initially directed. After further communications with DOD's FOIA office, however, on 20 March 2008, DIA's FOIA office directed DI to search its databases. DI completed its search on 31 March 2008 and provided DIA's FOIA office with 1800 hits. The FOIA office reviewed these hits for relevancy and duplicates. After eliminating the documents that were not responsive to the request and duplicates, the FOIA office determined that DI's search resulted in 172 responsive documents. Of these, 166 documents originated with other agencies, and were therefore referred to their originators for review and direct response to DOD. The remaining six DIA documents are accounted for in the Vaughn Index.

12.      Additionally, DIA received three referrals from DOD on 20 March 2008, 25

March 2008, and 15 April 2008, which were referred to DOD from the Office of Military Commission (OMC). DIA also received a referral from the Army on 21 March 2008. DIA has processed these referrals. All of the DIA originated documents from these referrals are noted in our Vaughn. Document with Bates number 3430, from the 25 March 2008 DoD-OMC referral, was originated with CENTCOM; however, DIA withheld internal office symbols in the message header and the name of a DIA employee under FOIA exemptions (b)(2) and (b)(3), Title 10 Section 424. Release of this information would reveal DIA's organizational structure. (Please note this document is not in DIA's Vaughn.)

13.    Certain segments of the above-described documents have been redacted by employees of DIA in the Public Access Branch, Freedom of Information Act Staff, as reflected in the accompanying Vaughn Index. Additionally, DIA consulted with the Federal Bureau of Investigation (FBI) regarding documents with DIA Vaughn Numbers 173 and 182. FBI provided their recommendations regarding these two documents, and DIA incorporated their recommendations into the final release decision. DIA also consulted with the Immigration and Customs Enforcement Office (ICE) regarding the document with DIA Vaughn number 173. After consulting with FBI and ICE, it was determined that DIA Vaughn number 173 should be withheld in full for the reasons outlined in the Vaughn Index. DIA, FBI, and ICE asserted FOIA exemptions, which are referenced in the attached Vaughn Index, and are explained in detail below.

## FOIA EXEMPTIONS CLAIMED

### Portions of Documents Withheld Under 5 U.S.C. 552(b)(1)

14.    The current basis for classification of national security information is found in Executive Order (E.O.) 12958, as amended by E.O. 13292. Section 1.1 of E.O.

12958, as amended, authorizes an Original Classification Authority (OCA) to classify information owned, produced or controlled by the United States government if it falls within one of the following eight classification categories specified in Section 1.4 of E.O. 12958:

(a) military plans, weapons systems, or operations;

(b) foreign government information;

(c) intelligence activities (including special activities), intelligence sources or methods, or cryptology;

(d) foreign relations or foreign activities of the United States, including confidential sources;

(e) scientific, technological, or economic matters relating to the national security;

(f) United States government programs for safeguarding nuclear materials or facilities;

(g) vulnerabilities or capabilities of systems, installations, projects or plans relating to the national security; or

(h) weapons of mass destruction.

15.     Section 1.2 of E.O. 12958, as amended, provides that information covered by one or more of these classification categories may be classified at one of three classification levels - Top Secret (TS), Secret (S) or Confidential (C) - depending on the degree of harm that would result from the unauthorized disclosure of such information. Information is classified at the Confidential level if unauthorized disclosure would reasonably be expected to cause damage to national security. Information is classified at the Secret level if its release would cause serious damage to the national security. Classification at the Top Secret level is maintained if its release would cause grave damage to national security.

16.    Portions of the documents were withheld from release because they contain

information concerning foreign government information, intelligence sources and methods, and

information that, if released, would hinder foreign relations if released. This information is

classified at the SECRET or CONFIDENTIAL level.

### 1.4 (b) -- Foreign Government Information

17.    Section 1.4 of E.O. 12958, as amended, provides, in pertinent part, that:

Information may be considered for classification if it concerns:

(b) foreign government information.

Section 6.1(r) of E.O. 12958 defines "Foreign Government information" as:

(1) information provided to the United States Government by a foreign government or

governments, an international organization of governments, or any element thereof, with the

expectation that the information, the source of the information, or both, are to be held in

confidence;

(2) information produced by the United States Government pursuant to or as a result of a

joint arrangement with a foreign government or governments or an international organization of

governments, or any element thereof, requiring that the information, the arrangement, or both, are

to be held in confidence; or

(3) information received and treated as "foreign government information" under the terms

of a predecessor order.

18.    Under 1.1(c) of E.O. 12958, as amended, the unauthorized disclosure of foreign

government information is presumed to cause damage to the national security. During the

conduct of diplomacy in general, the U.S. government acquires information in confidence from

other governments which is essential to the formulation of U.S. positions and more generally to

the formulation of U.S. foreign policy, the conduct of U.S. foreign relations, and the execution of other governmental functions. As a general rule, information obtained by the United States from a foreign government through diplomatic channels is expected to be kept confidential. In addition, information is sometimes obtained from a foreign government only after the United States accedes to an express request to keep such information confidential. To violate this expectation of confidentiality that customarily attaches to diplomatic exchanges would inhibit the free exchange of information between officials of governments. Failure of the U.S. government to honor this expectation of confidentiality would adversely affect our ability to obtain from foreign governments information that is essential to the effective conduct of U.S. foreign policy. Disclosure of foreign government information provided in confidence would cause foreign officials, not only of the government providing the information, but of other governments as well, to conclude that U.S. officials are unable and/or unwilling to preserve the confidentiality expected in such exchanges. Foreign governments and their representatives thus would be less willing in the future to furnish information important to the conduct of U.S. foreign relations and other governmental functions, and in general less disposed to cooperate in foreign relations matters of common interest.

      19.    Moreover, inappropriate disclosure of foreign government information could damage the careers of foreign officials who had confided in U.S. representatives, causing them to discontinue cooperation with the U.S. Ambassador and Embassy officials. Even several years later, some of the officials may continue to occupy positions within some of these governments. In this way, the effectiveness of U.S. representation in their countries would be reduced, both with respect to influencing the foreign government's policy decisions and with respect to accurately and timely reporting of the foreign government's intentions.

20.    In order to maintain international credibility, generally, the United States must live up to the terms of its commitments, whether implied or expressed. Failure to respect the confidentiality premise with respect to diplomatic discussions could cause other governments to question our reliability, discretion, and good faith, and place at risk opportunities for further progress. In addition, any unilateral disclosure could anger the other foreign government and erode any atmosphere of cooperation. The foreign government could retaliate by, e.g., disclosing other information protected by mutual assurances of confidentiality.

21.    The principle of diplomatic confidentiality is especially important among the governments of our allies. A failure to preserve diplomatic confidentiality in one part of the world will be noted widely and unfavorably wherever the United States maintains diplomatic dialogue. Any tampering with the principle of diplomatic confidentiality will thus adversely affect the nature of future diplomatic exchanges to the detriment of our national security interests.

22.    Documents identified in the Vaughn Index as falling within category 1.4(b) have been determined on review to contain foreign government information as defined by E.O. 12958, disclosure of which reasonably could be expected to cause damage to U.S. foreign relations, and thereby to the national security, as described above. Each such document is currently and properly classified under E.O. 12958, as amended, and accordingly has been withheld as exempt from disclosure under 5 U.S.C. § 552 (b)(1).

### 1.4(c) -- Intelligence Sources and Methods

23.    Also withheld under Exemption (b)(1) is information relating to intelligence sources and methods. Section 1.4(c) of E.O. 12958, as amended, recognizes that the disclosure of intelligence sources can cause damage to the national security. DIA relies on a variety of

intelligence sources to collect foreign intelligence critical to our national security. Intelligence sources can include individuals, foreign or American, foreign entities, and the intelligence and security services of foreign governments. Intelligence sources can be expected to furnish information only when confident that they are protected from retribution by the absolute secrecy surrounding their relationship to the United States government. Sources that are compromised become extremely vulnerable to retaliation from a variety of entities including their own governments or others having a stake in the confidentiality of the information provided by the source. In certain parts of the world, the consequences of public disclosure of the identity of an individual that has served as a U.S. source are often swift and far reaching, from economic reprisals to possible harassment, imprisonment, or even death.

24.     Section 1.4(c) of E.O. 12958, as amended, also recognizes that the release of intelligence methods can cause damage to national security. Intelligence methods are the means by which (or the manner in which) an intelligence agency collects information to support military operations, assist in national policymaking, assess military threats, or otherwise accomplish its mission. Detailed knowledge of the methods and practices of an intelligence agency must be protected from disclosure because such knowledge would be of material assistance to those who would seek to penetrate, detect, prevent, avoid, or damage the intelligence operations of the United States.

25.     Disclosure of information the U.S. government obtains through intelligence sources or methods could reasonably be expected to enable persons and groups hostile to the United States to identify U.S. intelligence activities, methods or sources, and to design countermeasures to them, which would damage the ability of the U.S. government to acquire information that is often critical to the formulation of U.S. foreign policy and the conduct of

foreign relations. Based on the information provided to me in the course of my official duties,

the documents identified in the Vaughn Index as being withheld in part or in full under Section

1.4(c) of E.O. 12958, as amended, contain information concerning intelligence sources and

methods. Release of this information would reveal intelligence sources and methods and impair

the intelligence collection mission of the intelligence community. Release of this information

could negatively impact the government's ability to defend the nation against terrorism. This

information remains currently and properly classified under E.O. 12958, as amended, and it is

appropriately withheld under FOIA exemption (b)(1).

1.4(d) -- Foreign Relations

26.    Section 1.4(d) of E.O. 12958, as amended, also recognizes that the release of

certain information would impair U.S. government relations with foreign governments. Good

relations with other nations facilitate intelligence sharing with the U.S. Maintaining good

relations with foreign governments is imperative to the successful accomplishment of DIA's

mission. Through good foreign relations, DIA acquires intelligence it may not otherwise be able

to obtain. Based on the information provided to me in the course of my official duties, release of

the information identified in the Vaughn as being withheld under Section 1.4(d) of E.O. 12958,

as amended, would damage foreign relations. Information withheld under Section 1.4(d) of E.O.

12958, as amended, consists of information the intelligence community obtained from foreign

governments or the types of information the intelligence community is interested in collecting on

foreign countries. Release of information that was obtained from foreign governments would

damage U.S. relations with those nations in the future. Release of the fact that we are interested

in collecting specific information from certain nations would damage the relations we have with

those nations. This information remains currently and properly classified under Section 1.4(d) of

E.O. 12958, as amended, and it is appropriately withheld under FOIA exemption (b)(1).

## Portions of the Documents Withheld Under 5 U.S.C. § 552(b)(2)

27.    Portions of the documents are withheld pursuant to 5 U.S.C. § 552(b)(2) because they pertain to internal matters of a relatively trivial nature or to more substantial internal matters, the disclosure of which would risk circumvention of the law.  Such information includes government office names, symbols and codes, telephone identifiers, and internal procedures.

28.    Administrative handling codes, Intelligence Information Report numbers, the web addresses of DIA offices' websites on a classified network, internal office symbols, internal phone numbers and other similar point of contact information, and message routing data were withheld under exemption (b)2 (low) because they are internal and trivial in nature and are of no public interest. The name of an ongoing intelligence operation, locations of current DIA operations, and the administrative numbers assigned to the preparers of the Intelligence Information Reports were withheld under exemption (b)2 (high) because they are substantial internal matters, the disclosure of which would risk circumvention of the law.  Release of this information would identify DIA locations and ongoing intelligence operations and may reveal the identity of the preparers of these intelligence reports.

29.    Additionally, DIA withheld material within the document with DIA Vaughn number 182 under exemption (b)2 (high) to protect sensitive unclassified information dealing with transnational terrorism. This information explains the types of intelligence information DIA is interested in collecting.  Release of this information may hinder the intelligence community's ability to collect similar information pertaining to the war on terrorism in the future and would impede the effectiveness of DIA's collection capability for this type of information.

Portions of the Documents Withheld Under 5 U.S.C. § 552(b)(3)

30.    Subsection (b)(3) of the FOIA permits the withholding of documents that are
"specifically exempted from disclosure by statute provided that such statute. . . requires that the
matters be withheld from the public in such a manner as to leave no discretion on the issue . . ."
10 U.S.C. § 424 provides as follows: (a) Exemption from disclosure--Except as required by the
President or as provided in subsection (c), no provision of law shall be construed to require the
disclosure of--(1) the organization or any function of an organization of the Department of
Defense named in subsection (b); or (2) the number of persons employed by or assigned or
detailed to any such organization or the name, official title, occupational series, grade, or salary
of any such person. DIA is a covered organization under section 424(b).

31.    Portions of documents have been withheld under exemption (b)(3) because they
specifically identify the names, office affiliations, contact information, and titles of DIA
personnel. Portions of the documents were also withheld because they name a DIA unit and its
location, which, if released, would reveal DIA's organizational structure and affect the agency's
mission.

Portions of the Documents Withheld Under § 5 U.S.C. 552(b)(6)

32.    Subsection (b)(6) of the FOIA permits the withholding of "personnel and medical
files and similar files the disclosure of which would constitute a clearly unwarranted invasion of
personal privacy." Portions of the documents have been withheld under exemption (b)(6)
because they contain personally identifiable information of non-DIA government personnel and
foreign nationals. I have determined that release of these names would constitute a clearly
unwarranted invasion of those personnel's privacy. The disclosure would serve no public
interest because it would not inform the public how DIA performs its statutory functions relative

to plaintiff. These personnel's personally identifying information has therefore been withheld under exemption (b)(6).

33.    Certain personally identifying information of a FBI Special Agent, two persons of investigative interest to the FBI, and two persons who provided information to the FBI on a confidential basis were withheld from DIA Vaughn numbers 173 and 182 under exemption (b)(6) after consultation with the FBI. The disclosure would constitute a clearly unwarranted invasion of personal privacy because the disclosure would not shed light on how the government performed its statutory duties relative to plaintiff.

### Portions of the Documents Withheld Under § 5 U.S.C. 552(b)(7)

34.    After consulting with the FBI, certain information in documents with DIA Vaughn numbers 173 and 182 was withheld under exemption (b)(7).

35.    Based on consultation with the FBI, exemption (b)(7) was asserted to protect FBI investigative information in these records that were compiled for law enforcement purposes, specifically its overriding mission of identifying and investigating individuals responsible for terrorist attacks and of preventing future acts of terrorism. Specifically, exemption (b)(7)(A) was asserted to protect investigative information which, if released, could reasonably be expected to interfere with ongoing FBI law enforcement investigations and any potential Military Commission trial of plaintiff.

36.    After consulting with the FBI, exemption (b)(7)(C) was also asserted to protect information which, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy of certain individuals inasmuch as it would reveal the identity of a FBI Special Agent, the identities of two persons of investigative interest to the FBI and the identities of two persons who provided information to the FBI on a confidential basis. The

categorical withholding of information that identifies third parties, government investigators and confidential sources in law enforcement records is appropriate under this exemption, given the recognition of the strong privacy interests inherent in law enforcement records.

37.    In addition, the same two confidential sources of the FBI withheld under exemption (b)(7)(C) and the identity of a foreign law enforcement agency that provided information to the FBI on a confidential basis is withheld under exemption (b)(7)(D). Finally, exemption (b)(7)(D) was asserted to protect all confidential information provided to the FBI by these two human confidential sources and the foreign law enforcement agency.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 29th day of July, 2008.

Alesia Y. Williams

Chief, Freedom of Information Act Staff