**Exhibit 5**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Mahammedou Ould Slahi,<br><br>      Plaintiff,<br><br>      v.<br><br>Department of Defense,<br><br>      Defendant. | Civil Action No.<br>   1:06-0597 (JR) |

DECLARATION OF MARGARET P. GRAFELD

Pursuant to 28 U.S.C. § 1746, I, Margaret P. Grafeld, declare and state as follows:

1.  I am the U.S Department of State's Information and Privacy Coordinator and the Director of the Department's Office of Information Programs and Services (IPS).  In these capacities, I am the Department official immediately responsible for responding to requests for Department records under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, the Privacy Act, 5 U.S.C. § 552a, and other applicable records access provisions.  I have been in the employ of the Department of State since 1974, and have served with the

Department's Information Access Program for most of my tenure with the Department. I am authorized to classify and declassify national security information pursuant to Executive Order (E.O) 12958, as amended, and Department of State regulations set forth in 22 C.F.R. §§ 9.7, 9.14. I make the following statements based upon my personal knowledge, which in turn is based on a personal review of the records in the case file established for responding to this litigation, and upon information furnished to me in the course of my official duties. I have read the complaint filed by the plaintiff in the above-captioned matter, and I am familiar with plaintiff's FOIA request filed with the Department of Defense ("DoD") seeking DoD's records relating to him, a Guantanamo detainee.

2. The core responsibilities of IPS include: records access requests made by the public (under the FOIA, the Privacy Act, and the Mandatory Declassification Review requirements of E.O. 12958, as amended, or the Ethics in Government Act), members of Congress, and other government agencies, and those that have been made pursuant to judicial processes, such as subpoenas, court orders, and discovery requests; records management; privacy protection; national security classification management and declassification review; corporate records archives management; research;

operation and management of the Department's Library; and the application of technology that supports these activities.

3.    The purpose of this declaration is to explain the disposition of sixteen documents referred to the Department from the Department of Defense, including one of its components, the Defense Intelligence Agency.  A detailed description of the information withheld in the referrals as well as the applicable exemptions applied follows.

## I. ADMINISTRATIVE PROCESSING OF REFERRAL FROM DOD

4.    The Defense Intelligence Agency (DIA) referred thirteen Department of State documents to the Department for review.  The Department assigned case control number 200704136 to this referral.

5.    Of the thirteen documents in the DIA referral, the Department determined that three documents were releasable in full, eight documents must be withheld in part and that two documents must be denied in full.  The withholdings from these documents are described below.

6.    The Department of State received two separate referrals from the Department of Defense (totaling three documents).  The Department assigned case control numbers 200801670 and 200801794 to these referrals.

7.  Of the three documents in these two referrals, the
Department determined that one document must be withheld in
part, and that the other two documents did not contain
information that originated with the Department and thus were
returned to the Department of Defense for its own
determination or for consultation with government entities
other than the Department of State.  The document withheld in
part is described in more detail below.  It should be noted
that some of the withheld information discussed below does not
directly relate to Mr. Slahi and thus is not responsive.  But
because it appears in the same documents as responsive
information, explanations of its withholding are provided
below.

## II. EXEMPTIONS CLAIMED

### FOIA Exemption (b)(1) – Classified Information

8.  Title 5 U.S.C. Section 552 (b)(1) states that the
FOIA does not apply to matters that are:

   (A) specifically authorized under criteria established
   by an Executive order to be kept secret in the interest
   of national defense or foreign policy and (B) are in
   fact properly classified pursuant to such Executive
   order.

9.  State Department information in ten documents to
which the (b)(1) exemption has been applied continues to meet
the classification criteria of Executive Order 12958, as

amended.  (Except where otherwise specified, all references

herein to E.O. 12958 are to the order as amended by E.O. 13292

of March 25, 2003.)  Information in the ten documents in this

case withheld under exemption (b)(1) is classified

Confidential or Secret.

Section 1.2(a)(2) of E.O. 12958 states that:

"Secret" shall be applied to information, the
unauthorized disclosure of which reasonably
could be expected to cause serious damage to
the national security that the original
classification authority is able to identify or
describe.

Section 1.2(a)(3) of E.O. 12958 states that:

"Confidential" shall be applied to information,
the unauthorized disclosure of which reasonably
could be expected to cause damage to the
national security that the original
classification authority is able to identify or
describe.

Section 6.1(j) of E.O. 12958 states that:

Damage to the national security means harm to
the national defense or foreign relations of
the United States from the unauthorized
disclosure of information, taking into
consideration such aspects of the information
as the sensitivity, value, utility and
provenance of that information.

10. Section 1.4 of E.O. 12958 states in pertinent part

that:  "Information may not be considered for classification

unless it concerns:... (b) foreign government information; …

[or] (d) foreign relations or foreign activities of the United

States, including confidential sources;..."

<u>Section 1.4(b) - Foreign Government Information</u>

11. Section 6.1(r) of E.O. 12958 states in pertinent part that:

> "Foreign government information" means:
> (1) information provided to the United States Government by a foreign government or governments, an international organization of governments, or any element thereof, with the expectation that the information, the source of the information, or both, are to be held in confidence;

12. An essential understanding that governs all diplomatic intercourse, and that constitutes an essential element in all successful diplomatic exchanges, is that confidentiality will be observed. Mutual trust in this realm is vital for the development of cordial and productive diplomatic relations. Unwillingness or inability to maintain confidentiality in diplomatic exchanges would inevitably chill our relations with other countries and lead to diminished access to sources of information important to the successful formulation and implementation of U.S. foreign policy, and thereby would damage the national security.

13. Information that the U.S. Government obtained in confidence from foreign governments or international organization officials is withheld from five documents described in this declaration. The ability to obtain

information from foreign governments is essential to the
formulation and successful implementation of U.S. foreign
policy.  Disclosure of foreign government information provided
in confidence, either voluntarily by the Department or by
order of a court, would cause foreign officials to believe
that U.S. officials are not able or willing to observe the
confidentiality expected in such exchanges.  Governments would
become less willing in the future to furnish information
important to the conduct of U.S. foreign relations, and in
general less disposed to cooperate with the United States in
the achievement of foreign policy objectives of common
interest.  In the current case the specific information
concerns cooperation in anti-terrorist activities.  Disclosure
of this information "reasonably could be expected to result in
damage to the national security" (Section 1.1(a)(4), E.O.
12958).  The withheld State Department information in five
documents is currently and properly classified pursuant to
Section 1.4(b) of E.O. 12958 and is, therefore, exempt from
disclosure under FOIA exemption (b)(1).  Much of the same
information is also classified pursuant to Section 1.4(d) of
E.O. 12958 for the reasons outlined in the following
paragraphs.

<u>Section 1.4(d) – Foreign Relations or</u>
<u>Foreign Activities of the U.S.</u>

14. Information withheld from ten documents described in this declaration is classified under Section 1.4(d) of E.O. 12958. As described in each document, they include either or both confidential sources and sensitive aspects of U.S. foreign relations, including, in particular, issues relating to identifying potential threats to U.S. security. This sensitive issue requires the cooperation of many countries, including some in which public opinion might not currently favor close cooperation with the United States on security issues. Release of this information has the potential to damage our relations with a government that might be reluctant to be seen as cooperating with the U.S. on this issue. This information is currently and properly classified pursuant to Section 1.4(d) of E.O. 12958 and is, therefore, exempt from disclosure under FOIA exemption (b)(1).

With respect to confidential sources, U.S. officials must often depend on information provided by individuals on the express or implied condition that the identity of the source will be protected from disclosure. Protection of the identity of a confidential source, whether a private individual, or a foreign official, becomes a matter of trust between the source and the U.S. official. Sources often only

provide information because they are confident that their identities, and information that would point to their identities, will be protected.  Breach of the trust would result in the unwillingness or inability of the source to provide further information.  Exposure of a confidential human source could in many circumstances lead to serious, possibly fatal adverse consequences for the source.  Moreover, failure to protect a source, even if the consequences are not severe for that individual, would lead to damage to the climate of confidence essential for obtaining the information needed to conduct U.S. foreign and security policy.  The same protection must be accorded to sources identified in information provided by foreign governments for these and the additional reasons outlined in the explanation of Section 1.4(b) above. Disclosure of this information could result in harm to the national security and foreign affairs of the U.S., and is therefore properly classified pursuant to Section 1.4(d) of E.O. 12958.

<u>FOIA Exemption (b)(2) – Administrative Information</u>

15.  Title 5 U.S.C. Section 552 (b)(2) states that the FOIA does not apply to matters that are "related solely to the internal personnel rules and practices of an agency ...." Information withheld in one document in this case to which the (b)(2) exemption has been applied is an internal FBI

9

administrative matter (a case number) of no substantive value or legitimate public interest. It is accordingly exempt from disclosure under FOIA exemption (b)(2).

### FOIA Exemption (b)(6) - Personal Privacy

16. Title 5 U.S.C. Section 552 (b)(6) states that the FOIA does not apply to: "...personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy...." The courts have interpreted the language of exemption (b)(6) broadly to encompass all information that applies to an individual without regard to whether it was located in a particular type of file. Four documents in this case contain information that has been withheld under this privacy exemption by excising names and other personally identifying information.

17. Inasmuch as the information withheld is personal to an individual, there is clearly a privacy interest involved. I am required, therefore, to determine whether there exists any public interest in disclosure and to weigh any such interest against the extent of the invasion of privacy.

18.   In <u>United States Department of Justice v. Reporters Committee for Freedom of the Press</u>, 489 U.S. 749 (1989), the Supreme Court laid down two rules for determining public interest in disclosure of information involving a privacy interest:  (1) the agency must examine whether disclosure would serve the "core purpose" for which Congress enacted the FOIA, i.e., to show "what the government is up to," and (2) public interest means the interest of the public in general, not particular interest of the person or group seeking the information.  Accordingly, the identity of the requester as well as the purpose for which the information is sought is generally irrelevant in making the disclosure determination.

19.   I have concluded that (1) disclosure of the information withheld here -- names and other personally identifying information -- would result in a clearly unwarranted invasion of personal privacy; and (2) disclosure of this information would furthermore not serve the "core purpose" of the FOIA, i.e., it would not inform the public as to the Department of State's performance of its statutory duties.  Accordingly, the privacy interest clearly outweighs any public interest in disclosure of such personal information.

### III. DOCUMENT DESCRIPTIONS

Case Number 200704136

Documents D1, D2 and D3

Document No. D1 is Department of State telegram No.
145243 dated September 1, 2006 to a number of U.S. embassies,
including that at Nouakchott, Mauritania. Seventeen pages.
Classified CONFIDENTIAL under E.O. 12958, Section 1.4(d).
Denied in part. Exemptions (b)(1) and (b)(6).

Document No. D2 is Department of State telegram No.
015128 dated January 30, 2006 to a number of U.S. embassies.
Eight pages. Classified CONFIDENTIAL under E.O. 12958,
Section 1.4(d). Denied in part. Exemptions (b)(1) and
(b)(6).

Document No. D3 is Department of State telegram No.
164694 dated September 7, 2005 to a number of U.S. embassies,
including that in Nouakchott, Mauritania. Seven pages.
Classified CONFIDENTIAL under E.O. 12958, Section 1.4(d).
Denied in part.  Exemptions (b)(1) and (b)(6).

Plaintiff's FOIA request seeks information relating to
him.  As explained in the text from these telegrams that has
been released to the requester, certain actions were to be

taken by embassies in countries whose nationals were being
held as detainees at Guantanamo Bay and whose cases were to be
reviewed by an Administrative Review Board.  In these three
documents, we released all the information that related to
Mr. Slahi and all the paragraphs that related to the legal
proceedings that affected Mr. Slahi.  We withheld only
information, including some of the addressees and header
information of the telegrams, that revealed the countries of
origin and the names and personal information of other
detainees.  Such withheld information is not responsive.
Moreover, release of the names and personal information would
be a clearly unwarranted invasion of the personal privacy of
those individuals and the information is therefore exempt from
release under FOIA exemption (b)(6).  Release of the
information about the other individuals and the other
countries who were being contacted concerning their nationals
could reasonably be expected to damage U.S. relations with
those countries, and such information therefore continues to
merit classification at the CONFIDENTIAL level under Section
1.4(d) of E.O. 12958.  Thus, it is exempt from release under
FOIA exemption (b)(1).  There is no additional information
that may be declassified, segregated and released in these
telegrams.

Document No. D4 is Embassy Berlin telegram No. 01238
dated June 21, 2007 to the Departments of State and Treasury.
Two pages. Classified CONFIDENTIAL under E.O. 12958, Sections
1.4(b) and (d). Denied in part. Exemption (b)(1) and (b)(6).

This telegram contains the text of an embassy translation
of an informal paper given to the Embassy in confidence by a
German counterterrorism official whose identity has been
excised. The German official constitutes a confidential
source. Disclosure of his identity could damage relations
with that government and inhibit the ability of the U.S. to
obtain such information in the future. His name and other
identifying information are properly classified CONFIDENTIAL
under Section 1.4(d) of E.O. 12958 and are therefore exempt
from release under FOIA exemption (b)(1). The paper contains
information about the subject of the FOIA request, Mr. Slahi,
that was provided by several sources who are identified in the
translated paper. Their names and information that could
identify them have been withheld as release would both reveal
the identity of confidential human sources who could be
endangered, and also inhibit the ability of the United States
to obtain such information in the future. This information is
therefore properly classified CONFIDENTIAL under Section
1.4(d) of E.O. 12958. Additionally, release of the above
information and other information in this document that was

provided by the foreign government official would compromise our relationship and ability to get such information in the future.  Accordingly, this information is properly classified CONFIDENTIAL under Section 1.4(b) of E.O. 12958.  This classified information is therefore exempt from release under FOIA exemption (b)(1).  Since release of this identifying information would likely subject the sources to harassment and probable physical danger, its release would constitute a clearly unwarranted invasion of personal privacy and is therefore also exempt from release under FOIA exemption (b)(6).  As all of the information redacted pertains to the individuals and information described above, there is no additional information that may be declassified, segregated and released in this telegram.

Document No. D5 is Embassy Dakar telegram No. 01932 dated August 17, 2004 to Embassy Paris, the Department of State, and the FBI.  One page.  Originally marked Sensitive But Unclassified.  Withheld in part.  Exemption (b)(2).

This telegram has been released in full with the exception of an FBI case number.  The withheld information relates to an internal FBI administrative matter (an internal case number) of no substantive value or legitimate public interest.  The information is therefore exempt from disclosure under FOIA exemption (b)(2).  As only the case

number has been redacted, there is no additional information
that may be segregated and released in this document.

    Documents D6 and D7:

    Document No. D6 is Embassy Dakar telegram No. 04413
dated October 19, 2000 to the Department of State. Four
pages. Originally classified SECRET citing Section 1.6(d)(6)
of E.O. 12958 (1995), currently classified SECRET under
Sections 1.4(b) and (d) of E.O. 12958 as amended by E.O.
13292. Denied in full. FOIA Exemption (b)(1).

    Document No. D7 is Embassy Dakar telegram No. 01363
dated March 21, 2000 to the Department of State. Four pages.
Originally classified SECRET citing Section 1.6(d)(6) of E.O.
12958 (1995), currently classified SECRET under Sections
1.4(b) and (d) of E.O. 12958 as amended by E.O. 13292.
Denied in full. Exemption (b)(1).

    These two telegrams contain biannual reports in the form
of questionnaire answers on the security environment in
Senegal. The reports contain information about the law
enforcement activities of another government which was given
to us in confidence by that government. Release of that
information would harm our relations with that government and
damage our ability to get such information in the future. The
assessments otherwise provide a detailed and frank assessment
of the security situation, the extent of political violence,

the capabilities of the host government and local law enforcement, the likelihood of support for transnational terrorism, and other security-related subjects.  Release of these candid assessments could damage our relations with important elements of that country and, by revealing the extent of our knowledge, damage our counterterrorism efforts in Senegal.  The information is properly classified under Sections 1.4(b) and (d) of E.O. 12958 and therefore exempt from release under FOIA exemption (b)(1).  As the entire telegrams consist of the security reports, there is no information that may be declassified, segregated and released in these telegrams.

Document No. D8 is Embassy Nouakchott telegram No. 01024 dated September 8, 2005 to the Department of State. Two pages. Originally and currently classified SECRET under E.O. 12958, Section 1.4(d).  Denied in part.  FOIA exemption (b)(1).

This message responds to a Department instruction concerning Mr. Slahi.  We have withheld the identity of a sensitive source and a paragraph in which the Embassy explains certain sensitive aspects of the Mauritanian domestic political scene that suggests a variation on the procedures proposed by the Department for obtaining the requested information.  Disclosure of this information would adversely impact bilateral relations with the host country and is

17

therefore currently classified under the 1.4(d) category of

E.O. 12958.  It is thus exempt from disclosure under FOIA

exemption (b)(1).  Only the sensitive source and three

sensitive sentences have been withheld; there is no additional

information that may be declassified, segregated and released

in this document.

Document No. D10 is Embassy Nouakchott telegram No. 00494

dated July 8, 2003 to the Department of State. Three pages.

Originally and currently classified SECRET under E.O. 12958

under Section 1.4(d), misstated in the telegram as 1.5(b).

Denied in part.  FOIA exemption (b)(1).

This telegram is a detailed analysis of the reasons for

and significance of the firing of three senior Mauritanian

officials.  The analysis draws on Embassy contacts with the

fired officials, knowledge of the local scene, and the

information provided by confidential human sources.  In the

sole, passing reference to the subject of the FOIA request,

the telegram notes that the Embassy dealt with one of the

three former officials on a number of sensitive issues,

including that of Mr. Slahi.  Release of the withheld

information in this document would compromise confidential

sources and harm U.S. relations with the host government.  The

information is therefore properly classified under Section

1.4(d) of E.O. 12958 and therefore exempt from release under

FOIA exemption (b)(1). There is no additional information that may be declassified, segregated and released in this document.

Document No. D11 is Embassy Nouakchott telegram No. 00535 dated April 19, 2001 to the Department of State. One page. Originally and currently classified CONFIDENTIAL under E.O. 12958 Sections 1.4 (b) and (d). Denied in part. FOIA exemption (b)(1).

The information withheld in this document is the name and identifying information of a confidential source and the foreign government information provided by the source. Release of this information could endanger the welfare and possibly the life of the source, and could harm U.S. relations with the foreign government and the ability of the United States to obtain vital terrorism information in the future. The information is properly classified under Sections 1.4(b) and (d) of E.O. 12958 and therefore exempt from release under FOIA exemption (b)(1). As only the name and information that could be used to identify the source have been withheld, there is no additional information that may be declassified, segregated and released in this telegram.

Case Number 200801670

Document No. D1 is Embassy Nouakchott telegram No. 00132 dated February 27, 2002 to the Department of State. Two pages of an incomplete document. Currently classified CONFIDENTIAL under E.O. 12958, Sections 1.4 (b) and (d), originally classified under Sections 1.5(b) and (d) of E.O. 12958 (1995). Denied in part. FOIA exemption (b)(1).

This incomplete document entitled "Mauritania: A 2002 Snapshot and Balance Sheet" is a report from the U.S. Ambassador on the state of Mauritania's foreign and domestic political scene. It has been largely released, including the entirety of the information about Mr. Slahi. Portions of two paragraphs have been withheld. The first of these excisions is a description, based upon information from a foreign government, of Mauritania's complex relations with two countries of importance to Mauritania. Such information is not responsive to plaintiff's FOIA request. Moreover, release of this information would risk damage to Mauritania's relations with those countries and harm our relations with Mauritania. It would also hamper our ability to obtain this kind of information essential to our ability to prepare analyses necessary to the formulation of U.S. foreign policy. The second excision describes an aspect of U.S.-Mauritanian relations in a manner that might be offensive to a foreign

government and therefore harm our relations with that country.
The withheld information is currently and properly classified
under E.O. 12958, Sections 1.4(b) and (d).  It is therefore
exempt from release under FOIA exemption (b)(1).  It is also
not responsive.  There is no additional information that may
be segregated, declassified and released.

I declare under penalty of perjury that the foregoing is
true and correct to the best of my knowledge.

Executed this ___30th___ day of July, 2008.

_____
/ Margaret P. Grafeld

21

**Exhibit 6**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMEDOU OULD SLAHI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 06-CV-0597 (JR) |
| v. ) | |
| ) | DECLARATION OF |
| ) | MICHAEL A. NOLL |
| UNITED STATES DEPARTMENT OF ) | |
| DEFENSE, ) | |
| Defendant. ) | |

Pursuant to 28 U.S.C. §1746, I, MICHAEL A. NOLL, Director of Intelligence, North American

Aerospace Defense Command (NORAD) and United States Northern Command

(USNORTHCOM), declare as follows:

1. I am a Defense Intelligence Agency (DIA) Defense Intelligence Senior Executive Service

(DISES) employee. I currently serve as Director of Intelligence for NORAD and

USNORTHCOM, located at Peterson Air Force Base in Colorado Springs, Colorado, and have

held this position since 2002. As such, I am directly responsible for the successful execution of

the Directorate of Intelligence and Joint Intelligence Operations Center – North (JIOC-N)

mission to operate as the Commands' lead for conducting intelligence operations, providing

predictive and actionable threat characterization, warning of worldwide threats, and leveraging

intelligence capabilities in support of NORAD and USNORTHCOM missions. Prior to my

current assignment, I served in the United States Navy as a career Naval Intelligence Officer, and retired as a Captain in 2004.

2. In my capacity as Director of Intelligence, I oversee all personnel assigned to JIOC-N. I am familiar with the procedures followed by JIOC-N personnel in responding to requests for access to JIOC-N records and information pursuant to the Freedom of Information Act (FOIA) and Executive Order (EO) 12958, as amended. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations made in accordance therewith.

3. My responsibilities as Director of Intelligence for NORAD and USNORTHCOM include the review of JIOC-N information for classification purposes as mandated by EO 12958, as amended, and the preparation of declarations in support of Exemption 1 withholdings under the FOIA. As the Director of Intelligence for NORAD and USNORTHCOM, I review all materials classified material of NORAD and USNORTHCOM for which a FOIA request is made and make recommendations to the Commander of NORAD and USNORTHCOM, who has been designated by the Under Secretary of the Defense for Intelligence as an Original Secret Classification Authority and a declassification authority pursuant to EO 12958, as amended, regarding release and or declassification of requested documents.

**Purpose of this Declaration**

4. The purpose of this declaration is to explain the basis for USNORTHCOM's Command's recommendation that two classified documents, identified by the Defense Intelligence Agency

during its search for documents responsive to the subject FOIA request filed by Sylvia Royce, the attorney for Mohammedou Ould Slahi ("plaintiff"), that were originated by this command, not be released or declassified. Pursuant to FOIA exemption 1, 5 U.S.C. § 552(b)(1).

### Search for Responsive Documents

5. Plaintiff's counsel submitted a FOIA request on May 26, 2005, requesting records relating to plaintiff. The request seeks all "memoranda, inter-agency communications, case summaries, notes, indexes, jottings, message slips, letters, facsimile transmissions, diaries, e-mails and calendars." In July 2007, the Department of Defense Office of Freedom of Information and Security Review ("OFOI") tasked the Defense Intelligence Agency (DIA) with conducting a search and providing records responsive to this FOIA request. During its search for responsive documents, DIA discovered two documents responsive to the search criteria that were originated by the USNORTHCOM Directorate of Intelligence. On 26 July 2007, those two documents were sent to this commend by DIA with a request to review them for declassification and release pursuant to the subject FOIA request. The request to review the two documents was received by USNORTHCOM and tasked to the Joint Intelligence Operations Center – North as FOIA number 07Aug20USN-48 to conduct a classification review of the documents for release under the subject FOIA request.

### Justification for Withholding USNORTHCOM's Documents Under Exemption 1

6. The two classified documents referred to USNORTHCOM which are the subject of this declaration are requests for additional information, based on the contents of classified documents received from JTF-GTMO. The classification of both documents identified in the DIA search

responsive to subject FOIA request that originated in this command were classified based on

derivative classification authority. The information contained in each USNORTHCOM

originated document is based on and derived from information that was classified by a different

original classification authority than USNORTHCOM, namely the former Commander of JTF-

GTMO. Review of the information originating from USNORTHCOM and contained in the two

documents indicates that the information is properly classified pursuant to Executive Order

12958 as amended.


7. FOIA Exemption (b)(1) allows for the withholding of information that (A) is specifically

authorized under criteria established by an Executive Order to be kept secret in the interest of

national defense or foreign policy and (B) is in fact properly classified pursuant to such

Executive Order. The two documents originated by USNORTHCOM satisfy those requirements.

The information relates to intelligence activities and intelligence sources concerning plaintiff.

This information is specifically authorized to be kept secret in the interest of national defense

under Executive Order 12958, as amended. In accordance with Section 1.1(a) of that Executive

Order, (1) this information has been classified by a prior commander of JTF-GTMO, who

exercised original classification authority, (2) the information is owned, produced by and for,

and is under the control of the United States government, (3) the information concerns

"intelligence activities (including special activities), intelligence sources or methods, or

cryptology," under Section 1.4 of the Executive Order, and (4) this Command is aware of no

change in the position of the current Commander, JTF-GTMO, who maintains that classification,

regarding the classification of the information upon which USNORTHCOM relied in its

derivative classification of the two documents produced by USNORTHCOM that are the subject

of this declaration.  Furthermore, review of the information contained in the two documents

originating from USNORTHCOM indicates that they are properly classified pursuant to the

Defense HUMINT Classification Guide dated March 2002.   Therefore the information is denied

in its entirety under 5 U.S.C. § 552(b)(1).

I declare under penalty of perjury that the foregoing is true and correct.

Date: _____

_____
MICHAEL A NOLL, DISES, DIAC
Director of Intelligence
NORAD and USNORTHCOM

**Exhibit 7**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MOHAMMEDOU OULD SLAHI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civil Action No. 06-CV-0597 (JR) |
| v. | ) |
| | ) DECLARATION OF |
| | ) ROBERT J. COTELL |
| UNITED STATES DEPARTMENT OF | ) |
| DEFENSE, | ) |
| Defendant. | ) |
| | ) |

Pursuant to 28 U.S.C. §1746, I, Robert J. Cotell, declare as follows:

1. I am a Colonel in the United States Army, with 19 years of active duty service. I currently serve as a prosecutor in the Office of Military Commissions-Prosecution (OMC-P). I have held this position since July, 2006. I am responsible for prosecuting various detainees currently at Guantanamo Bay before Military Commissions. Prior to assuming this position I served as the deputy of the US Army Criminal Law Division.

2. In my position at the OMC-P, I have assumed the additional duty of responding to requests made pursuant to the Freedom of Information Act (FOIA) for records and information in the possession of the OMC-P.. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations made in accordance therewith.

**Purpose of this Declaration**

1

3. The purpose of this declaration is to describe the search for documents responsive to the FOIA request filed by Sylvia Royce, the attorney for Mohammedou Ould Slahi ("plaintiff"), and to explain the bases for withholding information from responsive records pursuant to FOIA exemptions 1, 5, and 7, 5 U.S.C. § 552(b)(1), (5), and (7). Information that reasonably can be segregated has been produced.

### Search and Processing of Responsive Documents

4. In November 2007 I received a tasker from the Department of Defense Office of the Freedom of Information (OFOI) indicating that a FOIA Request had been submitted by the Plaintiff. This request was made in a letter sent by plaintiff's counsel, dated May 26, 2005, and it seeks "records relating to Mohamedou Ould Slahi aka Mohammedou Ould Salahi, born in Mauritania in approximately 1970." The request for records includes "memoranda, inter-agency communications, case summaries, notes, indexes, jottings, message slips, letters, facsimile transmissions, diaries, E-Mails and calendars."

5. I determined that there were two locations within the OMC-P files that were reasonably likely to contain potentially responsive documents. A file containing hardcopies of documents for each OMC-P prosecution is maintained within the OMC-P office. In addition OMC-P maintains an electronic computer database of all electronic records that have been received and retained by the OMC-P since creation of the database. The database includes computer scanned copies of documents pertaining to detainees, attorney documents, e-mails, court filings and other documents relevant to military commissions' prosecutions. Many of the documents in the hardcopy prosecution files have been scanned and are also included in the computer database.

2

6. I personally retrieved and copied responsive documents from the hardcopy file. I also directed an OMC-P staff member who is responsible for the maintenance of all electronic files at OMC-P to conduct a search of the electronic files for responsive documents, and supervised this search. Both classified and unclassified records were searched during this process. The search was conducted using the detainee's name and detainee number as electronic search terms when scanning all the electronic files.

7. The search revealed 1770 pages responsive to the FOIA request. However, only 45 of the 1770 pages originated at the OMC-P. An additional 16 pages were foreign government documents that were included in the OMC-P files. An additional 251 pages were records deemed part of the OMC-P files for purposes of responding to the FOIA request. The remainder of the documents were originated within other US government agencies. All these documents from other agencies were labeled and placed on a computer disk and forwarded to OFOI. I have been informed that those documents have been forwarded to the other agencies for their review under the FOIA. Hardcopies were made of the 45 pages originating within OMC-P, and the 267 additional pages deemed part of the OMC-P file and recommended redactions were made pursuant to the relevant FOIA exemptions.

8. In addition to my search above I subsequently received from the Department of Defense General Counsel (DOD OGC) an additional set of hardcopy documents believed to have originated at the OMC-P and believed to pertain to the Slahi case. I reviewed these additional documents. Based upon my knowledge of the case I determined that 140 pages applied to Slahi. Of this number 53 pages had previously been identified in my earlier search and were among the

3

pages previously given to OFOI. Of the remaining 87 I determined that 68 originated within other US government agencies. Copies of these documents had previously been delivered to OFOI by DOD OGC. I have been informed that OFOI forwarded those additional 68 pages to the other US government agencies for their review. The remaining 17 pages had originated with OMC-P. I reviewed the documents and made recommended redactions pursuant to the relevant FOIA exemptions.

9. Beyond the two locations discussed above, I am aware of no remaining places within OMC-P reasonably likely to have records responsive to plaintiff's request.

### Justification For Withholding Foreign Government Information Under Exemption 1

10. Some of the documents were withheld in full under (b)(1) pursuant to Section 1.4 (b) and (d) of Executive Order 12958, as amended which provides for the protection of foreign government information when such information is provided to the United States government by a foreign government or international organization of governments, with the expectation that the information, the source of the information, or both, are to be held in confidence. These documents contain information provided by a foreign government regarding information obtained from certain individuals and about organizations operating within the foreign country Based on my review of these documents, this information was provided to the United States government with the understanding it would be kept in confidence and not revealed publicly. Our ability to receive this type of information from foreign governments is essential to the formulation and successful implementation of U.S. foreign policy and our efforts to fight terrorism around the world. Disclosure of such foreign government information voluntarily by

4

the Department of Defense or through an order of a U.S. court would cause foreign officials and

organizations to believe that U.S. officials are not able or willing to observe the confidentiality

expected in such interchanges. Governments and organizations would become less willing in the

future to furnish information important to the conduct of U.S. foreign relations, and in general be

less disposed to cooperate with the United States in the achievement of foreign policy objectives

of common interest, including fighting international terrorists. Retaining our ability to have

confidential relationships and exchanges of information with foreign allied governments is

critical to our intelligence gathering system. The unauthorized disclosure of this information

reasonably could be expected to cause serious damage to the national security, as described

above. This exemption was applied to the following pages: 3915 to 3918; and 4239 to 4250

### Justification For Withholding Information That Would Reveal Intelligence Activities, Sources, and Methods Under Exemption 1 and 2

11. Some of the withheld information includes intelligence data compiled about plaintiff as well

as information that would reveal intelligence sources and methods. Intelligence data included in

this category of withholdings typically describes plaintiff's activities and his affiliations with

individuals and organizations of intelligence interest. The intelligence data in this category also

includes information about other persons and organizations. Exemption b(1) was applied to the

following pages: 3857 to 3858; 3860 to 3861; 3863 to 3864; 3867; 3869 to 3870, 3872 to 3874;

3876 to 3878; 3883 to 3886; 3890 to 3892; 3895 to 3897; 3903; 3912; 3919 to 3922; and    4251

to 4502.

12. These categories of information about plaintiff have been withheld under FOIA Exemption

b(1), which exempts from release matters that are "specifically authorized under criteria

5

established by an Executive order to be kept secret in the interest of national defense or foreign policy and … [that] are in fact properly classified pursuant to such Executive order." Section 1.4(c) of EO 12958, as amended, permits the classification of "intelligence activities (including special activities), intelligence sources or methods, or cryptology," recognizing that the disclosure of intelligence activities and sources can cause harm to national security.

13. If the United States publicly released classified information about our intelligence concerning plaintiff, including his affiliations with certain individuals and organizations, how those affiliations came about, and the actions he took while associated with those individuals and organizations, this would reveal information about the United States' intelligence sources and activities. The potential damage caused by such revelations would be exacerbated, given that the intelligence could be pieced together with other information that has entered the public domain to reveal a considerable amount of detail about our intelligence concerning certain individuals and organizations.

14. Revealing the extent of intelligence gathered concerning plaintiff would show, among other things, what the United States knows about certain individuals and organizations; what the government does not know; and the leads it followed or did not follow based on the intelligence it obtained. Those critical facts would also be revealed through disclosure of withheld intelligence data concerning other individuals and organizations.

15. Ultimately, release of the information described above would aid persons hostile to the United States in hiding their activities and finding other means to thwart our intelligence-

6

gathering efforts, evade capture by U.S. authorities, and otherwise thwart U.S. counterterrorism efforts.

16. Additionally, public release of such intelligence data, given that it would result in revealing sources of our intelligence about plaintiff and other persons and organizations, would have a chilling effect on human intelligence collection and would substantially impede DoD's ability to gather actionable intelligence from other sources, including current Guantanamo detainees. Releasing this type of information would reveal publicly who has cooperated with interrogators at Guantanamo and elsewhere and the information they provided. Such public identification of intelligence sources would place those sources, or individuals who are perceived by others as sources, at risk of retribution and deter other sources from cooperating with ongoing intelligence collection efforts.

17. Human intelligence is the most essential piece of the strategic intelligence being gathered in the GWOT. Because of the nature of terrorist organizations, such as al Qaeda, the terrorist organizations' methods of operation, and the affiliations between terrorist organizations, human intelligence is the most effective source of actionable information for the anticipation and interdiction of terrorist activity.

18. The cooperation of human intelligence sources in gathering actionable information is an indispensable requirement in the fight against terrorist activity. The process of gaining actionable intelligence from a human intelligence source is built around trust and confidentiality. Cooperating subjects will not provide information if they believe that, in so doing, they will

7

jeopardize their own safety, or the safety of their families and loved ones. A key part of their comfort in providing information is a sense of anonymity. The release of information that a given source provided to the U.S. government would eliminate any anonymity the source expected or had when he decided to provide information.

19.   In some cases, disclosure of intelligence data in this category would reveal that the intelligence source is or was a Guantanamo detainee. Some detainees have specifically voiced concerns for their families' safety, as well as their own, as a result of their cooperation or perceived cooperation with the U.S. government. In fact, some of the detainees have used multiple names and aliases in the past to conceal their real identities. Detainees who have provided information to the U.S. government have an implicit, and in many cases explicit, expectation that their identities and statements will not be revealed to the general public. Detainees who provide information to U.S. government personnel often request that they not be associated with the information they are providing or identified as the source of this information, based on a fear of retaliation, embarrassment, and harm to themselves and members of their family.

20.   While such concerns arise in a variety of settings in which the government relies on cooperating witnesses, they are particularly acute in the context of sources linked to terrorist activity. Intelligence sources can be expected to furnish information only when confident that they are protected from retribution by the secrecy surrounding their relationship to the U.S. government. Alleviating cooperating individuals' perceived or genuine concerns about reprisal is an essential part of developing human intelligence sources and gathering useable information.

8

Releasing information provided by these sources would dissuade them, and future sources, from cooperating.

21. Even where certain information provided to intelligence officials is publicly available in another form, the fact of a source's cooperation with intelligence officials and the specific information provided to such officials remains sensitive, because of its potential to dissuade the source and other sources from cooperating in the future. Further, when factual information is contained within a document setting forth intelligence assessments, conclusions or recommendations, the selection of and emphasis on particular facts reveals information about the analyst's thought processes, the guidelines being applied to analyze the intelligence data, and the limits of or gaps in available intelligence. Accordingly, such factual information remains sensitive, even if the same or similar information has been publicly revealed in a different context.

22. Based on information obtained in the performance of my official duties, I have determined that the intelligence data about plaintiff and other individuals and organizations described the foregoing paragraphs reveals details about intelligence we have gleaned regarding individuals and organizations of intelligence interest and also that this information reveals the sources of our intelligence. At the time of plaintiff's FOIA request, this intelligence data was classified at the SECRET level through the action of the Commander of JTF-GTMO. Based on information obtained in the performance of my official duties, I determined that this information remains properly classified, and that its release reasonably could be expected to cause serious damage to the national security because it would reveal information concerning intelligence

9

sources, the specific information obtained from such sources, or both. Accordingly, this information was and is properly classified at the SECRET level, pursuant to Section 1.4(c) of EO 12958, as amended.

23. Additionally, information reflecting intelligence methods used by JTF-GTMO personnel in gathering, analyzing, and coordinating intelligence data was withheld under FOIA Exemption (b)2. Included in this category of withholdings are: interrogation techniques and plans; tools and methods for analyzing intelligence data; tools and requirements for coordinating intelligence gathering and analysis among DoD components and other agencies of the government; and plans for further intelligence gathering based on specific data obtained from intelligence sources. The withholding of information reflecting intelligence methods used by JTF-GTMO personnel in gathering, analyzing, and coordinating intelligence data pursuant to Exemption b(2) is taken on information contained on pages: 3869 to 3870; 3888; 3893; 3894; 3901

24. At the time of plaintiff's FOIA request, the Withheld Information reflecting intelligence methods described in the preceding paragraph was classified at the SECRET level through the action of the Commander of JTF-GTMO.

25. Based on information obtained in the performance of my official duties, I have determined that release of the information pertaining to intelligence methods remains properly classified and that its release reasonably could be expected to cause serious damage to national security. Intelligence methods are the means by which the Joint Intelligence Group (JIG) at JTF-GTMO and other intelligence agencies collect intelligence data to support military operations and to

10

assess, and counter, terrorist and military threats. These methods and practices must be protected because their public release would be of material assistance to those who would seek to penetrate, detect, prevent, avoid or otherwise damage the intelligence operations of the United States. The actual loss to the United States if such methods are revealed is not only the cost of developing the initial methods, but also the loss of intelligence while new methods are developed to replace those lost.

26. In particular, public disclosure of specific methods used with sources of human intelligence, whose identities are themselves classified as described above, would allow individuals of intelligence interest to anticipate and immunize themselves from those methods. Of particular concern is an individual's ability to anticipate particular interrogation techniques. The Withheld Information includes interrogation techniques used in connection with sources of human intelligence.

27. Also withheld is information that would reveal the US government's methods of coordinating intelligence gathering and analysis among agencies and components that is also central to its effort to counter acts of terrorism and support military operations. Effective military and counterterrorism strategy depends on the coordination of intelligence gathering among agencies and components responsible for gathering and analyzing intelligence data. Revealing the nature of that coordination and how agencies and components work together could reveal their areas of relative competence, or the distinct intelligence tools they employ, thereby permitting persons of interest to the United States to tailor their behavior and adopt means to thwart the agencies' efforts.

11

28. Section 1.4(c) of EO 12958 recognizes that the disclosure of intelligence methods can cause harm to national security. I have determined that release of the Withheld Information pertaining to intelligence methods described in the preceding paragraphs remains properly classified at the SECRET level and that its release could reasonably be expected to cause serious damage to the national security.

## Justification for Withholding of Full Internment Serial Numbers
## Under Exemption 2

29. Internment serial numbers, or "ISNs," are identifying numbers unique to a detainee, analogous to a social security number. A full ISN is a 12-digit alpha numeric identifier that incorporates certain abbreviated information about the detainee. DOD also uses shortened ISNs consisting of 3 or 4 digits to identify detainees. The shortened ISNs are still unique to the detainee. This exemption was applied to the following pages: 3911 to 3912.

30. The full ISN of plaintiff is found on several documents produced to plaintiff's counsel. Only the shortened ISN was provided to plaintiff's counsel and the other digits and numbers comprising the full ISN were withheld under FOIA Exemption 2. Based on information obtained in the performance of my official duties, I have determined that the full ISN should be withheld under Exemption (b)(2)(high) as the non-numeric portion of this number contains information specific to the detainee that is used to identify certain information pertinent to detainee operations and intelligence-gathering operations. Furthermore, the full ISN is often used in intelligence message traffic and reports to identify a particular detainee as a source for information. Disclosure of the full ISN to the public could allow persons to potentially access information concerning detainees from DoD databases and other sources and then cross-reference these detainee numbers with other information in the public domain to identify specific

12

detainees, DoD personnel associated with detainee operations and intelligence gathering activities, and other individuals mentioned in other DoD documents. Access to this information, much of it classified, would have the effect of impeding JTF-GTMO detention and intelligence gathering operations.

### Justification for Withholding of Internal matters of No Public Interest Under Exemption 2

31. FOIA Exemption 2, found at 5 USC 552 (b)(2)(Low), exempts from disclosure material of internal matters of a relatively trivial nature which have no general public interest i.e. phone numbers and e-mail addresses. This exemption was applied to the following pages: 3859 to 3862; 3875 to 3877; 3880, 3882 to 3883; 3887; 3889; 3895; 3896; 3898; 3900

### Justification for Withholding Records or Information Under Exemption b(5) – Deliberative Process Privilege

32. Certain information was withheld from documents pursuant to Exemption (b)(5) because this information was part of the DoD deliberative process. This information includes email about the classification of information pertaining to the plaintiff and his interrogation. These conversations were integral to DoD's deliberative process with respect to each of these issues and helped the individuals involved make assessments and come to certain conclusions. To publicly release this information would discourage open and frank discussion. If these assessments and recommendations are made public, it would have a chilling effect. DoD employees and other U.S. government employees that participate in the planning and consultation that contributes to certain policy decisions must be able to engage in open and frank discussions. Release of the withheld information would seriously erode the necessary free exchange of information. This

13

exemption was applied to the following pages: 3857 to 3858; 3860 to 3861; 3863 to 3870; 3872 to 3874; 3877 to 3898; 3902-3903; 3905 to 3909; 3911 to 3914; 3919 to 3922.

## Justification for Withholding Records or Information Under Exemption b(5) – Attorney Work-Product Privilege

33. Furthermore, information contained in some of the emails and memoranda is protected by the attorney work-product privilege and was withheld pursuant to Exemption b(5). This exemption was applied only to information prepared by attorneys at DoD OGC for matters where litigation is contemplated. The litigation contemplated is criminal in nature as OMC-P is responsible for prosecuting enemy combatants at military commissions. The plaintiff is potentially subject to being charged with offenses that would be triable by a military commission. The information that was redacted as attorney work-product pursuant to Exemption b(5) pertains to the criminal case the US government may pursue against the plaintiff in a military commission. This exemption was applied to the following pages: 3857 to 3858; 3860 to 3861; 3863 to 3870; 3872 to 3874; 3877 to 3898; 3902-3903; 3905 to 3909; 3911 to 3914; 3919 to 3922

## Justification for Withholding Identifying Information About DoD Personnel Under Exemption 6

34. DoD has also withheld the names and other personally identifying information of its employees from the responsive records. This information was withheld pursuant to FOIA Exemption (b)(6). Exemption (b)6 permits the government to withhold information about individuals when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." This exemption was applied to the following pages: 3857 to 3858; 3860 to 3861; 3863 to 3870; 3872 to 3914.

14

35.   I have determined that the names of DoD employees' and other personally identifying information in the responsive documents, should be withheld under Exemption (b)(6) as its release would constitute a clearly unwarranted invasion of the personal privacy of these individuals. These individuals have a legitimate privacy interest and personal safety interest that would be threatened if this information was publicly disclosed and there is no public interest in having this information disclosed.  The public release of the names and other identifying information would not shed any light on how DoD performed its statutory duties relative to plaintiff.

### Justification for Withholding Records or Information Compiled for Law Enforcement Purposes Under Exemption b(7)(A)

36.   Exemption b7(A) permits the withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information…could reasonably be expected to interfere with enforcement proceedings." Information withheld under this exemption relates to an on-going law enforcement proceeding or open investigation.  This exemption was applied to the following pages:  3857 to 3858; 3860; 3861; 3863 to 3870; 3872 to 3922.


37.   This category of information was compiled for law enforcement purposes because it was gathered during investigations of GTMO detainees for suspected war crimes or other prosecutable acts of terrorism.  Trial by military commission remains a possibility for the plaintiff.  Release of this information would potentially compromise the interests of the United States, including interests related to investigation of the terrorist attack of September 11th as well as other ongoing terrorism-related investigations and trials.  It would give interested parties improper insight into the techniques and guidelines used during investigations and prosecutions,

15

allowing them to manipulate the outcomes of these investigations the military commission. It may also reveal information from which it could be deduced that a particular detainee is still under investigation or being considered for trial by military commission.

I declare under penalty of perjury that the foregoing is true and correct.

Date: _31 July 2008_        _Reel J. Cell_

ROBERT J. COTELL,
Colonel, United States Army

16