IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


MOHAMMEDOU OULD SLAHI,

        Plaintiff,

        vs.

U.S. DEPARTMENT OF DEFENSE,

        Defendant.
_____

CA No. 06-597
Washington, DC
May 5, 2008
10:30 a.m.


MOHAMMEDOU OULD SLAHI,

        Plaintiff,

        vs.

FEDERAL BUREAU OF INVESTIGATION,

        Defendant.

CA No. 07-2239
Washington, DC
May 5, 2008
10:30 a.m.

_____


TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Plaintiff:        SYLVIA ROYCE, ESQUIRE
                        Law Office of Sylvia Royce
                        5505 Connecticut Avenue, NW #340
                        Washington, DC  20015
                        (202) 362-3445

Appearances continued on next page

For the Plaintiff:              THERESA M. DUNCAN, ESQUIRE
                                Freedman, Boyd, Hollander,
                                Goldberg & Ives, PA
                                20 First Plaza, Suite 700
                                Albuquerque, NM  87102
                                (505) 842-9960


For the Defendant               JEAN LIN, ESQUIRE
Department of Defense:           U.S. Department of Justice
                                Civil Division
                                20 Massachusetts Avenue, NW
                                Washington, DC  20001
                                (202) 514-3716


For the Defendant               MARCIA KAY SOWLES, ESQUIRE
FBI:                             U.S. Department of Justice
                                Civil Division
                                20 Massachusetts Avenue, NW
                                Room 7108
                                Washington, DC  20001
                                (202) 514-4960


Also present:                   ELIZABETH J. SHAPIRO, ESQUIRE
                                U.S. Department of Justice
                                Civil Division
                                20 Massachusetts Avenue, NW
                                Room 7152
                                Washington, DC  20001
                                (202) 514-5302


                                TERRY M. HENRY, ESQUIRE
                                U.S. Department of Justice
                                Civil Division
                                20 Massachusetts Avenue, NW
                                Room 7212
                                Washington, DC  20001
                                (202) 514-4107

Court Reporter:                    Lisa M. Hand, RPR
                                   Official Court Reporter
                                   U.S. Courthouse, Room 6706
                                   333 Constitution Avenue, NW
                                   Washington, DC  20001
                                   (202) 354-3269

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1              P R O C E E D I N G S

2         COURTROOM DEPUTY:  Civil Action 06-597.  Civil

3    Action 07-2239.  Mohammedou Ould Slahi versus United States

4    Department of Defense and Federal Bureau of Investigation.

5    For the plaintiff we have Sylvia Royce and Theresa Duncan, and

6    for the defendant we have Jean Lin, Elizabeth Shapiro and

7    Marcia Sowles.

8         THE COURT:  It's the government's motion.  Who's

9    going to argue for the government?

10        MS. LIN:  I will, Your Honor.

11        THE COURT:  All right.  I'll be happy to hear your

12   argument.

13        MS. LIN:  May it please the Court, my name is Jean

14   Lin.  I represent the Department of Defense or DOD in this

15   case involving a FOIA request by a Guantanamo detainee, Mr.

16   Slahi, seeking all documents relating to him.  Before this

17   Court is DOD's motion for partial summary judgment for

18   information withheld from documents located in the United

19   States Southern Command, which encompasses joint task force

20   Guantanamo where Mr. Slahi is currently detained as an enemy

21   combatant.

22        THE COURT:  Is there another motion for summary

23   judgment behind this one?

24        MS. LIN:  Yes, there is, it's currently due

25   May 30th.  And that relates to information withheld from all

1   other DOD components, organizations and offices.

2         THE COURT:  Okay.  Go ahead.

3         MS. LIN:  Through the declaration of the Commander

4   of Guantanamo, Rear Admiral Mark Buzby, DOD has demonstrated

5   that it has conducted an adequate search that was reasonably

6   calculated to discover all potentially responsive documents,

7   and has withheld only information falling within a specified

8   FOIA exemption.

9         Before this Court is a challenge by plaintiff now

10  to four categories of the withheld information.  And, more

11  specifically, for each of those categories plaintiff wants a

12  disclosure of only those documents that would reflect DOD's

13  and its personnel's alleged illegal conduct, including the

14  alleged illegal capture and transfer of Mr. Slahi to

15  Guantanamo, and any other alleged abuse and torture of Mr.

16  Slahi while in DOD custody.

17        And as we have explained in our brief, this is not

18  the proper forum for assessing Mr. Slahi's claims of

19  illegality.  The only issue before the --

20        THE COURT:  What is the proper forum?

21        MS. LIN:  Your Honor, I believe there are statutory

22  schemes provided for Guantanamo detainees challenged to their

23  enemy combatant designations.

24        THE COURT:  You're telling me the enemy, the CSRT,

25  is the proper venue for raising issues of illegality?

1          MS. LIN:  Your Honor, the Detainer Treatment Act

2     provides for review of the CSRT, which Your Honor is referring

3     to.  That proceeding, obviously, relates to whether the enemy

4     combatant is properly so designated, and that's the --

5          THE COURT:  I thought I just heard you saying that

6     that was the venue for challenging torture.  Did I hear you

7     correctly?

8          MS. LIN:  No, what I was referring to was -- this

9     is not the proper venue for assessing any claims of

10    illegality.

11         THE COURT:  But my question is:  What is the proper

12    venue for assessing claims of illegality?

13         MS. LIN:  The CSRT -- the DTA process is one in

14    which the detainee can challenge the designation of enemy

15    combatant, and if they want to raise claims of illegality, I

16    believe that would be the appropriate forum, but I do not know

17    --

18         THE COURT:  But illegality about what?  This is

19    illegality about interrogation methods that he's talking

20    about?

21         MS. LIN:  That is correct.

22         THE COURT:  Are you telling me that challenges to

23    the illegality of interrogation methods are properly presented

24    before a Combatant Status Review Tribunal?

25         MS. LIN:  I don't know, Your Honor.

1          THE COURT:  So, you know that this is not the right

2   forum, but you really can't tell me what the right forum is.

3          MS. LIN:  That's correct, Your Honor.  But I do

4   believe that detainees can raise certain defenses during the

5   DTA process.  And if the evidence is procured through -- in

6   proper methods, I believe they potentially could raise those

7   defenses.

8          THE COURT:  Well, the plaintiff's problem here is,

9   he's trying to find the records of what those improper methods

10  are so that he can assert the claim somewhere.  How is he

11  going to find the records?

12         MS. LIN:  Your Honor, I believe in the DTA process

13  there is a method whereby records -- certain record is shared

14  with plaintiff's counsel in that context.

15         THE COURT:  Can you point to where in the Detainee

16  Treatment Act there is such a provision?

17         MS. LIN:  In --

18         THE COURT:  Or in the regulations or the rules or

19  anything else?

20         MS. LIN:  Your Honor, we're assuming that the

21  interrogation methods are illegal -- or that the interrogation

22  methods have been used with respect to Mr. Slahi are illegal.

23         THE COURT:  Are illegal?

24         MS. LIN:  Are illegal.

25         THE COURT:  Illegal?

1          MS. LIN:  That's right.

2          THE COURT:  You're saying illegal?

3          MS. LIN:  That's an assumption that is --

4          THE COURT:  For purposes of this motion.

5          MS. LIN:  Let me clarify, Your Honor.  The request

6   that the plaintiff is now making is that the -- that they only

7   want information that reflects illegal interrogation methods.

8          THE COURT:  Right.

9          MS. LIN:  And documents that reflect any alleged

10  abuse or torture.  It's a characterization that is impossible

11  for DOD to apply in terms of searching for documents and

12  disclosing responsive information because we do not believe

13  that there was such illegality exists with respect to Mr.

14  Slahi.

15         So what is before the Court -- the issue is whether

16  DOD has put forth reasonable justifications for the

17  withholding of the information.  Meaning, the four categories

18  that are currently under challenge, including documents

19  relating to interrogation methods, interrogation techniques,

20  the dates of those interrogations, and the circumstances and

21  capture of his -- the circumstances of his capture and

22  transfer to Guantanamo, as well as the DOD personnel that --

23  who's personally identifying information are contained in the

24  responsive records.  And I'll go through those categories.

25         THE COURT:  Okay.  But before -- and I am -- fine,

1    I think that -- I think you're right, those are the issues

2    that are before me.  But just before we go any further, I'd

3    like to try to pin down -- try once more to pin down what it

4    is you're saying about the right venue, the wrong venue.

5              You're saying FOIA is the wrong vehicle.  This

6    Court is the wrong venue for discovering that information,

7    because you say there's another place for the defendant -- or

8    for Slahi to get this information.  Is that what you're saying

9    to me, that there's another way for him to get this

10   information and it's not through FOIA?

11             MS. LIN:  Your Honor, let me clarify.  I can't say

12   for certain whether there's another forum where he could

13   receive -- he could obtain information of the nature that he

14   describes, but all I'm saying is that we can only -- the FOIA

15   request here is all documents relating to him.  And we did a

16   search to locate such documents -- all documents relating to

17   him.  Then we broke down the kind of information we received

18   into interrogation methods and capture and circumstances of

19   his transfer.

20             The narrowed FOIA request by plaintiff now is based

21   on the idea that there are certain conduct by DOD and its

22   personnel that are illegal and/or there was misconduct, and

23   that there was alleged abuse and torture.  And that is the

24   kind of characterization that we cannot, in this forum, either

25   assess that, yes, there are such documents, or no, that there

1   are no such documents.  All we are presented with is whether

2   the documents that we're withholding can properly be justified

3   under a specified FOIA exemption.

4         THE COURT:  Okay.  Go ahead.

5         MS. LIN:  The first category of information that's

6   under challenge is the interrogation methods and techniques.

7   And the specific argument by the plaintiff here is that the

8   withholding of information relating to past application of a

9   legal or now discontinued interrogation methods is improper.

10  And as we have demonstrated in the brief, there are two

11  reasons why this argument is insupportable.

12        First, that certain interrogation methods and

13  techniques that are discontinued today do not mean that they

14  were previously illegal when used.  There has been an

15  evolution of the standards relating to interrogation methods

16  and techniques.  And, so, that evolution does not suggest that

17  previously used interrogation techniques are necessarily

18  illegal or in some way improper.

19        And the second reason is that --

20        THE COURT:  Well, is your argument -- are both

21  sides imprisoned by the questions being asked here?  If the

22  question is for documents about previous interrogation

23  techniques that were illegal, you're saying that that's --

24  that question begs another question of whether they were

25  illegal or not.  But you say since they were not -- since the

1    evolution to new interrogation techniques or evolution which

2    abandons old interrogation techniques doesn't necessarily

3    render the old ones illegal.  That's your point.  But suppose

4    the question is:  Well, we want to know about interrogation

5    techniques that were used that are no longer used, whether

6    illegal or not.

7            MS. LIN:  Your Honor, that information is

8    publicly -- a lot of the interrogation methods and techniques

9    are publicly available through the field -- the Army Field

10   Manual as well as other publicly available DOD documents.

11   What we are withholding here is the connection between linking

12   any interrogation methods and the interrogation plans with a

13   particular detainee, and in this particular case, Mr. Slahi.

14           And this linkage of information is what is properly

15   classified because of the potential likelihood of causing

16   damage to national security, because this linkage will reveal

17   several things that are not available if you simply look at

18   the interrogation methods and the general information about

19   interrogation techniques.  And the linkage would reveal, for

20   example, the perceived value of the detainee to the United

21   States, and the circumstances that would give rise to --

22           THE COURT:  You mean the more valuable the detainee

23   the harsher the interrogation techniques?  Is that the linkage

24   that you're suggesting?

25           MS. LIN:  I do not know what the -- what type of

1   treatment -- what type of interrogation techniques would

2   necessarily be used of a detainee of certain value to the

3   United States.  All, Your Honor, I'm trying to state is simply

4   that it would reflect certain value --

5          THE COURT:  How?  How does the application of

6   Technique A, B or C in some way suggest the intelligence value

7   of the detainee?  How would that work?

8          MS. LIN:  Well, because, for example, a detainee

9   possessing certain characteristics with -- a knowledgeable

10  person would be able to piece together those characteristics

11  matched with the type of interrogation methods used on that

12  particular detainee.  And in the FOIA context, if we reveal

13  that information as to all detainees who might have filed or

14  might be filing a FOIA request, we would present a very clear

15  picture of DOD's interrogation operations.  And there is --

16  this is the information that has consistently been withheld by

17  DOD as classified because of the reasonable justification by

18  the defendant here as to the potential damage to national

19  security.

20         THE COURT:  So, your argument is, what we do is

21  well-known, it's public, it's in the Army manual, right?

22         MS. LIN:  Yes, Your Honor.

23         THE COURT:  What we did to or with any individual

24  detainee is classified because somehow it would disclose the

25  intelligence value of the individual detainee.  Is that what

1  you're telling me?

2       MS. LIN:  That's correct.  As well as what type of

3  circumstances and what characteristics that a detainee might

4  possess to give rise to the interrogation methods.

5       THE COURT:  You mean, like if he's afraid of dogs,

6  we'll use dogs.  And if he's not trained in waterboarding, we

7  can use waterboarding.  Those are inflammatory questions, and

8  they are not intended to be, I'm just trying to understand

9  what your argument is here.  If he's Muslim, we would behave

10  in a certain way.  If he's not Muslim, we would behave in a

11  different way.  Is that what you're saying to me?

12       MS. LIN:  Your Honor, those are possibilities, and

13  I'm not trained in intelligence assessment, but the linkage

14  does reveal somewhat of a much clearer picture.  And I think

15  one more --

16       THE COURT:  You know, excuse me, Counsel, but

17  you're talking in formulaic ways, characteristics would reveal

18  something, which -- but you can't back up any of those big

19  Latinate words with facts.  I don't know what you're telling

20  me.  It's like chapter headings with no content, is the

21  argument that you're making to me here.  Certain

22  characteristics.  What do you mean by certain characteristics?

23  Linkage.  What do you mean by linkage.?

24       MS. LIN:  Because the information is classified,

25  what we're -- what the test before the Court and what the

1    Court needs to assess is whether there are reasonably --

2    reasonable and facially valid justifications provided by the

3    defendant.  And the idea about revealing potential value of a

4    detainee, given the type of interrogation methods used on the

5    detainee, it is a facially valid justification.

6         THE COURT:  The words make sense, but they don't --

7    they're not connected to any examples or any facts.

8         MS. LIN:  One example comes to mind, Your Honor, is

9    that there was publicly available documents by DOD that

10   revealed that in 2002 or early on, it was determined that many

11   of the detainees at Guantanamo were well-trained in many of

12   the interrogation methods used by DOD.  And, particularly,

13   there was a document that was uncovered in England called

14   the -- commonly known as the Manchester document, that had a

15   lengthy chapter on interrogation techniques.

16        And certain detainees, in their behavior during

17   interrogation, revealed that they were well-versed in the

18   entire or the counter-interrogation methods used there.  So,

19   the idea is that there are these interrogation methods that

20   the detainees may be or may not be aware of.  But, in any

21   event, the linkage of what interrogation methods are therefore

22   used subsequently will reveal information that is not

23   otherwise available, such as the idea that this -- any

24   particular detainee might have already been trained in certain

25   interrogation methods, and the linkage might be shown that

 1   such a detainee had been trained and was at least well-versed

 2   in the al-Qaida document.

 3          THE COURT:  All right.  Well, I think that's all

 4   the facts I'm going to get.  Go on.

 5          MS. LIN:  Just one more thing, Your Honor.

 6          THE COURT:  What's the second reason?

 7          MS. LIN:  The second reason is that --

 8          THE COURT:  Are you going to talk to me about

 9   mosaic theory?

10          MS. LIN:  Well, the mosaic theory was -- and I

11   referenced it earlier, Your Honor, is that if every detainee

12   is able to obtain this information about interrogation methods

13   used on them, and that's made publicly available, then there

14   would be a very clear picture --

15          THE COURT:  Are there any other FOIA actions

16   pending by detainees, that you know of?

17          MS. LIN:  I don't know how many there are, but I

18   believe there are many FOIA requests by detainees.  And I know

19   at least at the time Mr. Slahi filed his FOIA request, there

20   were then pending 55 other FOIA requests by detainees from

21   Guantanamo.

22          THE COURT:  Okay.

23          MS. LIN:  And the second reason, Your Honor, if I

24   could just clarify, is the idea that -- the fact that certain

25   interrogation methods are discontinued, could also be because

1  they were not effective on certain detainees.  So, that

2  doesn't mean that DOD wouldn't use them again, vis-a-vis,

3  another detainee population later.  The second --

4         THE COURT:  Whoa, whoa, whoa, whoa, whoa, stop.

5  Discontinue but subject to being hauled out and dusted off if

6  you think they might work on another detainee.  Is that what

7  you're saying to me?

8         MS. LIN:  I'm suggesting that that's a possibility

9  as well as why certain detainee -- that certain interrogation

10  methods were discontinued could also be because the lack of

11  effectiveness on a certain detainee or detainee population.

12         THE COURT:  You don't mean discontinued in general,

13  you mean just not used any longer on that particular detainee?

14         MS. LIN:  That's correct.  And I guess I'm

15  addressing plaintiff's argument that if these techniques are

16  no longer used on the plaintiff, why not disclose it, what

17  harm could there be?  And I'm simply addressing the potential

18  harms that exists.

19         THE COURT:  Okay.  Go on.

20         MS. LIN:  The second category of challenged

21  information is the information relating to the dates of

22  interrogation and to planned future interrogations or

23  documents discussing or analyzing interrogation.  And these

24  documents or the information that we've held under Exemptions

25  1 and 2 -- with respect to Exemption 1, the justification is

1  that the disclosure of these dates could reveal the frequency,

2  duration and the pattern interrogation relating to plaintiff,

3  and possibly the detainee population in general.

4         And the second concern is that knowledgeable

5  persons could discern the timing of when certain intelligence

6  information is obtained from any particular detainee or just

7  the timing itself.  Then the additional justification under

8  Exemption 2 is relating to the security of the Guantanamo

9  Detention Camp.  Knowledgeable persons could potentially

10  connect the interrogation dates with the major events or

11  disturbances at the camp and determine what reaction DOD takes

12  and what detainees the DOD selected to interrogate, and which

13  detainees might have cooperated in that process, and what

14  relevant information might have been obtained from those

15  detainees.

16         THE COURT:  What has been turned over to Slahi?

17         MS. LIN:  We have turned over heavily redacted

18  documents that relate to Mr. Slahi.  That's the scope of the

19  FOIA request, and a lot of the withheld information are simply

20  redacted from certain pages.  And, so, essentially in terms of

21  relating to interrogation, we have turned over heavily

22  redacted pages of interrogation plans, memorandum for records

23  discussing his interrogation, and essentially all documents

24  relating to his interrogation, to the extent that it's not

25  classified or withheld -- otherwise withheld under Exemptions

1   2 and 7 we have disclosed.

2           THE COURT:  Okay.

3           MS. LIN:  We have also withheld certain dates in

4   the intelligence records, including the dates that those

5   records were created under Exemption (b)(2), because a

6   disclosure would reveal procedures relating to the handling

7   and the transmission of sensitive information, particularly,

8   the timeliness and the time lines of such transmission.  And

9   they would also reveal internal guidelines relating to the

10  sequence of how the intelligence records were transmitted.

11          With respect to the next category of challenged

12  information is the personally identifying information of DOD

13  personnel.  Plaintiffs here has requested that we reveal

14  information that would reflect the personnel involved in

15  alleged abuse and torture of Mr. Slahi.  And, again, we

16  dispute that there was such abuse and torture, but in any

17  event, that is not relevant in this forum.  And the personally

18  identifying information of DOD personnel is covered by both

19  Exemptions 3 and 6.

20          And, specifically, Exemption 3 is based on a

21  statute that specifically allowed the Secretary of Defense to

22  withhold personally identifying information regarding any

23  member of the armed forces assigned to an overseas unit, which

24  Guantanamo is one.

25          So, under Exemption 3 the calculation of privacy

1   interest versus public interest in information has already

2   been determined by Congress, and we believe that the

3   information is properly withheld under that.  Under Exemption

4   6 there is a balancing that DOD's declaration has fully done

5   to justify that the disclosure of DOD personnel, who are

6   connected in the detention operation or in the interrogation

7   of detainees who are enemy combatants, could potentially cause

8   unwarranted invasion of their privacy and potential

9   harassment.  And any public interest in their information is

10  outweighed because there's no nexus between these personal

11  identifying information with what kind of conduct DOD has been

12  conducting relating to its interrogation operation and how it

13  has been performing its statutory duties.

14         If I may move on to the last category of

15  information under challenge, it is the intelligence data

16  concerning the dates and circumstances of Mr. Slahi's capture

17  and transfer to Guantanamo.  Again, the request is based on

18  the idea that there was alleged illegality.  The only question

19  here is whether -- and, by the way, this information is

20  withheld under Exemption 1.  And the question before the Court

21  is whether DOD has put forth logical justifications for its

22  determination that the disclosure of this information could

23  reasonably cause damage to national security.

24         And the justifications that have been put forth are

25  that the disclosure of this information could potentially

1   threaten relations with foreign allies who may have provided

2   material assistance in the capture of enemy combatants.  And

3   it may also identify intelligence sources or foreign allies

4   and discern their assistance to the United States.

5         And, finally, there would -- the information

6   potentially would allow people to map out the operation

7   relating to the capturing and the transfer of detainees, and

8   reflect how they come into U.S. custody.  And we believe, Your

9   Honor, that the justifications provided in the Commander of

10  Gitmo's declaration fully provide a reasonable explanation as

11  to the predicted harm that could potentially -- could be

12  caused by the disclosure of the information.

13        THE COURT:  All right.  Thank you, Ms. Lin.

14        MS. ROYCE:  May it please the Court, the government

15  has the burden in a FOIA case to justify its withholding of

16  documents.  The withholding must be justified under a set of

17  very well-defined exemptions.  There may certainly be

18  documents within these 1864 pages or whatever it is.  There

19  may certainly be pages in which redactions are appropriate and

20  justified under the law.  There may be entire pages, there may

21  be entire documents which may be appropriately withheld from

22  Mr. Slahi under the FOIA.

23        But the burden is on the government to show that it

24  has properly made these redactions.  That it has properly made

25  these decisions to withhold these documents.  And we would

1   submit that they have utterly, utterly failed to carry their

2   burden to show that these exemptions have properly been

3   applied.  The Court asked my opponent what the Department of

4   Defense had supplied to Mr. Slahi.  The answer is a fairly

5   brief one.  He has received his own medical records.  He has

6   received perhaps seven or eight pages of his own biographical

7   information.  And virtually every other page within this

8   production has been entirely blacked out.

9           If the Court will look at our Exhibit Numbers K and

10  L, I believe it is, to our opposition to this motion for

11  summary judgment, the Court will see what Mr. Slahi has

12  gotten.  Those are fairly representative of what has been

13  supplied.  If the Court looks at Admiral Buzby's declaration,

14  the Court will see how conclusory the descriptions of the

15  documents are, and indeed, some of them are even marked

16  classified.  Over and over and over the description of the

17  document is exactly the same, because that is the only part of

18  the page that has not been blacked out.

19          There will be documents over and over and over that

20  say Mr. Slahi was arrested in Nouakchott or he claims

21  Mauritanian citizenship, and the rest of the page is blacked

22  out.  It is entirely possible that these redactions are

23  proper, but that isn't supported by the affidavit in the case,

24  and it isn't supported by the case law on Exemption 1,

25  Exemption 2, 7, 6.  It is simply unsupported here.

1          We're asking the Court to look at this material in

2     camera.  If the Court wishes to look first at a subset of the

3     material in camera, we would ask the Court to consider

4     material with dates roughly between June and November of 2003.

5     Our request for the dates was largely to narrow the request

6     enough so that we could invite the Court's attention to

7     certain documents.  But since we never got the dates, we can't

8     do that here.

9          If the Court agrees with us that there is too

10    much here that was not properly segregated, the segregability

11    requirement was not met, that the (b)(1) exemption is not

12    justified under the law.  And I believe the Court has a duty

13    to consider de novo each of the exemptions which are argued to

14    justify a withholding under a given exemption, or in some

15    cases, under several exemptions.  Then the Court may wish to

16    expand its examination of the material in camera to look at

17    the entire body of material.

18         But what we have here are very, very general

19    arguments unsupported by facts in the declaration.

20    Unsupported by facts in the pleadings.  It's simply not proper

21    to allow the government to withhold this kind of information

22    of wrongdoing.  This much information of this kind of

23    wrongdoing under a (b)(1) exemption.  Normally under a (b)(1)

24    exemption, the affidavit that the government has put in is

25    entitled to substantial weight.  Entitled, I think the case

1   law says, to substantial deference by the District Court

2   Judge.

3              But in this case, I would submit to the Court,

4   that it's not entitled to the slightest deference at all,

5   because there is so much evidence of torture, abuse.  Such a

6   clear intent to cover up what has happened at Guantanamo.

7   That the conclusory aspect of all of this, very clearly,

8   should cause the Court to look at this material in camera with

9   a jaundiced eye.  And that is what we fundamentally are asking

10  the Court to do.

11             We don't think that the government has met its

12  obligation to release segregable portions of some of these

13  documents.  We don't think they have properly claimed any of

14  the exemptions which they have cited.  And I'll be glad to

15  discuss any of the particular exemptions that the Court would

16  like to hear about.  And, in particular, we think that the

17  Government's search for the interrogation logs goes a long way

18  toward showing its bad faith in this case.  There surely were

19  interrogation logs.

20             The interrogation logs tends to be extremely

21  detailed in showing what was done to a detainee.  What he did

22  in response.  What was done next.  How long he was allowed to

23  sleep.  Whether he was shackled.  Where he was tied up.  How

24  many people were in the room with him at the same time.  Where

25  he was taken.  Whether he was struck.  Whether he was required

1   to put on different kinds of clothing.  How he was addressed.

2   These interrogation logs are extremely detailed.  When Randall

3   Schmidt and --

4          THE COURT:  Are you suggesting that the

5   government's position is that we don't find them or that

6   they're -- or that they have been withheld under maybe an

7   Exemption 1?

8          MS. ROYCE:  What the government says, I think

9   toward the last page of its reply, is that they have not found

10  the interrogation logs and they refuse to state whether they

11  looked for them in what is called the Schmidt-Furlow report

12  files.  Now, the interrogation logs are generated within the

13  Southern Command, so they're very clearly created there, and

14  there is no reason to think that there is not still a copy

15  there.

16         And the Schmidt-Furlow report was fairly damaging

17  to the government.  There are quite a number of places where

18  the Schmidt-Furlow report criticized, although too mildly in

19  my opinion, but criticized the government's conduct of the

20  interrogations of Mr. Slahi.  And there are many, many places

21  where it is crystal clear that Mr. Slahi is the subject of the

22  so-called second special interrogation plan.  The subject of

23  the first special interrogation plan, having been Mohammed

24  al-Qatani.

25         These interrogation plans were picked up in the

1   review of detainee allegations of torture and abuse in the

2   Schmidt-Furlow report.  And the Schmidt-Furlow report cites to

3   the interrogation logs in general, and to the interrogation

4   logs of Mr. Slahi over and over and over.  To say that they

5   will not -- that they cannot find the interrogation logs in

6   the files that they have searched in in the Southern Command,

7   and that they won't say whether they asked Schmidt and/or

8   Furlow for the interrogation logs is most disingenuous.

9          THE COURT:  Well, it's not -- it's sort of a Glomar

10  response.  We refuse to confirm or deny, meaning, of course,

11  it's there but we're not going to tell you it's there.

12         MS. ROYCE:  But their obligation under the FOIA --

13  we asked for all documents.  They have broken them up into

14  separate areas where they would like to look.  They recognize

15  that the interrogation logs should be within the Southern

16  Command, but they refuse to say whether they looked in the

17  Schmidt-Furlow files.

18         THE COURT:  What do you think is the volume of --

19  if I were to get in -- if I were to begin in camera inspection

20  of these documents, what do you think is the volume of the

21  documents that I would be inspecting?

22         MS. ROYCE:  In the Southern Command in this motion?

23         THE COURT:  Yeah.

24         MS. ROYCE:  1,864 pages.

25         THE COURT:  That's a lot.

1          MS. ROYCE:  It is, Your Honor.  And for that
2   reason, I mean, our original idea in asking for the dates was
3   not to simply produce a laundry list of dates on which Mr.
4   Slahi was interrogated.  Certainly, we knew that he was
5   interrogated virtually every day, but we were trying to
6   narrow -- to narrow the scope of the challenge here.  We can't
7   do that for the Court, as things stand now.  But, certainly,
8   the worst of the abuse of Mr. Slahi took place between June
9   and November.

10          Probably the worst of the conduct would have peaked
11  around July and August of 2003.  It was that conduct in July
12  and August of 2003, which I think is what caused the military
13  commission prosecutor, Colonel Couch, to conclude that Slahi
14  had indeed been tortured, and that he, Colonel Couch, would
15  not have anything further to do with the case.  He returned
16  the case to his superior and refused to have anything further
17  to do with it.

18          THE COURT:  Respond, if you will, to Ms. Lin's
19  argument -- her opening argument that this just isn't really a
20  FOIA case, that there is another venue somewhere.  I don't
21  think I ever learned where -- where Mr. Slahi can get the
22  information he wants.

23          MS. ROYCE:  There may well be other schemes under
24  which we will receive other documents.  If the Department of
25  Defense decides to disregard Colonel Couch's view that the

1   case is patently unprosecutable at this point, and brings Mr.

2   Slahi to military commission, we may get some of it in

3   something akin to criminal discovery.  We may get something of

4   it under what's called the Government Information in the

5   Detainee Treatment Act cases.  We have a Detainee Treatment

6   Act petition pending in the Circuit Court at this time.

7          But whether we do or we don't get the information

8   in the documents there, we're clearly entitled to them under

9   the FOIA.  The FOIA favors disclosure.  He's made the basic

10  FOIA case.  They've acknowledged that he has made an

11  appropriate FOIA request.  They've produced some documents,

12  although as Ms. Lin put it, heavily redacted, which is

13  something of an understatement.  But the FOIA is a separate

14  scheme.

15         If he is entitled to the documents because the

16  exemptions don't apply, then he gets the documents now under

17  the FOIA.  If (b)(1) correctly applies, if (b)(2), (b)(7), if

18  any of these -- if any of the exemptions justify withholding

19  them, he doesn't get them no matter how helpful they would be

20  or how much we would want them.  But it is a separate scheme

21  of disclosure.  It favors disclosure.  The government has not

22  made out its case in terms of summary judgment based upon this

23  affidavit.  And we think it's basically irrelevant whether he

24  would or would not get them under any other scheme, he's

25  entitled to them under the FOIA.

1          THE COURT:  Well, it may be irrelevant, but it

2    bears on my thinking about this.  What is the status of the

3    matter before the Court of Appeals?  Do you have a habeas

4    petition or a substitute habeas petition, or whatever it's

5    called, before the Court of Appeals.

6          MS. ROYCE:  We have a Detainee Treatment Act

7    petition that was filed last June 1, that is 11 months ago, in

8    the Court of Appeals.  We included within our appendix to the

9    DTA petition a number of admittedly classified materials, and

10   a number of other documents which were part of the public

11   record, as was -- virtually all of our brief was suitable for

12   filing on the public record.  The matter has sat there.  The

13   Court of Appeals would perhaps like to hear the Supreme

14   Court's decision in Boumediene before it decides what it is

15   going to do with some of these cases --

16         THE COURT:  That's what we think.

17         MS. ROYCE:  What is somewhat distressing to Mr.

18   Slahi and to counsel is that, although the protective order

19   that was entered in those cases very clearly requires the

20   government to work with us to produce a document suitable for

21   filing on the public record.  The government has in fact

22   refused to do so.  So that the entire petition, the entire

23   brief, the entire appendix is all tied up as a classified

24   document.  Not available to the public, not available to

25   journalists, not available to us to share with foreign

1   counsel, not available to us to talk to each other on the

2   phone about.  It's all being kept under seal, under wraps.

3   This is where the government wants the Guantanamo cases to

4   stay.

5          And I would submit to the Court that if -- if the

6   government is allowed to justify its withholding of many of

7   these documents or portions -- all portions of all of these

8   documents under (b)(1), the lid will remain on Guantanamo.

9   You know, some of the exemptions, I guess it's (b)(7), having

10  to do with law enforcement material, some of that will

11  eventually come out.  That's a temporal kind of exemption when

12  the enforcement proceedings are over, then the materials can,

13  in most cases, then be released to the public.  But if they're

14  held back on Exemption (b)(1) they remain under wraps for a

15  very, very long period of time, perhaps forever.

16         Could I turn to some of the other specific

17  exemptions?

18         THE COURT:  Please, yes.

19         MS. ROYCE:  The government has sought to withhold

20  several documents or many documents also under (b)(2), that

21  is, they argue that disclosure might facilitate circumvention

22  of a legal requirement.  It is certainly possible that that is

23  true, but we cannot tell it from the declaration.  We cannot

24  tell it from the Vaughn index.  There is a kind of a logical

25  problem with their argument, in that many of the techniques

1   have already been disclosed, over the government's objection,

2   to be sure.  But many of them have been disclosed, of the

3   illegal ones, or the extra legal ones, or however you would

4   like to express the idea of the interrogations that are no

5   longer authorized under the Army Field Manual on

6   interrogations.

7           But we can't tell that the exemptions have been

8   properly -- had been properly applied, we don't think the

9   Court can tell either, looking at the affidavit, looking at

10  the pleadings.  Many of these -- many of these interrogation

11  techniques have already come out.  Many of the others are

12  publicly disclosed in the Army Field Manual.  Many of the

13  interrogation techniques -- I mean, the idea is that if these

14  interrogation techniques are revealed, it may somehow make it

15  possible for enemies to understand what is coming up next and

16  to prepare themselves for it.

17          As to the more reasonable interrogation techniques,

18  the ones that appear in the Army Field Manual, that material

19  is already out there, it's public.  As to the more extreme

20  interrogation techniques, the ones we would submit were

21  illegal always, from the first day of the Republic, and remain

22  illegal today.  I'm not sure that people can really steel

23  themselves against being treated that way.  I don't think

24  that's a logical argument.

25          There have been a number of -- of sort of gimmicky

1   TV programs or other kinds of public displays where people

2   volunteer to undergo waterboarding as an experiment.  They

3   panic, they totally panic, even though they know it's an

4   experiment, even though they're not going to drown, even know

5   they know their friends are going to stop doing it when they

6   give the signal.  There is some things you cannot steel

7   yourself against.  And I would submit to the Court that there

8   may be a kind of a logical problem with the government's

9   invocation of (b)(2).

10           (B)(3) would specifically -- would allow the

11   government to withhold material that is specifically exempted

12   from disclosure by another statute.  And I believe here the

13   government has invoked tenuous code, Section 130(b), and we

14   have conceded that that is a proper -- that is a proper use of

15   that statute.  But under the statute, the government has to

16   show that the material, the personally identifying

17   information, comes from people within three discreet

18   categories.

19           The government at first was rather vague about

20   which category it wanted to invoke, and it's now apparently

21   settled on the overseas category.  But Guantanamo is not

22   entitled to be called an overseas category.  Guantanamo is

23   completely and totally under U.S. command.  The idea that a

24   person in an overseas unit would be somehow in particular

25   danger if his identifying information were to be revealed

1   simply doesn't apply to Guantanamo at all.  There is no

2   socializing off base at Guantanamo Bay.  No airmen, no Navy

3   sailor, no Army person goes off that base to go and socialize

4   over there.

5            And I think that Rasul v. Bush and some of the

6   other cases that have addressed the status of Guantanamo under

7   the treaty, have made it very clear that it is really not an

8   overseas unit, so that they are not entitled to withhold that

9   information under (b)(3).

10           THE COURT:  Aren't we all waiting for some filigree

11  on that whole Rasul thing?  Isn't the Supreme Court -- doesn't

12  Boumediene depend in some part on what they really meant when

13  they said that in Rasul?

14           MS. ROYCE:  Well, I don't think that -- Your Honor,

15  I don't believe they're going to go back and revisit the

16  conclusion that detainees held at Guantanamo were entitled to

17  some kind of process within the U.S. courts.  The question is,

18  exactly what is the extent of the process to which they are

19  going to be entitled.  What kind of information the government

20  has to present in order to sustain its conclusion that a

21  person is properly held as an enemy combatant under the CSRTs.

22           I don't do believe that any points were briefed in

23  the Boumediene case as to the status of Guantanamo.  I think

24  the government will concede that it lost that point.

25           THE COURT:  Okay.

1          MS. ROYCE:  The identifying information, it would

2   seem to us, is also not properly withheld under Exemption 6.

3   Exemption 6 is the exemption which allows the government to

4   withhold information from personnel medical files and similar

5   files.  Here the argument is apparently that it is a similar

6   file to show what the names and ranks were of the people that

7   participated in these interrogations, and what we would submit

8   is the abuse of Mr. Slahi.

9          If, and only if, the names and ranks are held to be

10  properly withheld under, quote, similar files, then there is a

11  balancing test which the Court applies, as Ms. Lin stated, in

12  which the individual's right to privacy is balanced against

13  the public's need to know.  I'm sure that the people who were

14  involved in this would very much like to see their privacy

15  respected, would like to see their names and ranks withheld,

16  but I don't think they are entitled to in this case.

17         There have been very few matters that have come

18  before -- that have entered the national debate in the history

19  of the Republic that have generated as much controversy and as

20  much public interest as the interrogations and the treatment

21  of the detainees at Guantanamo Bay.  The interest simply could

22  not be higher.  I think the interest, although, to flesh out

23  the complaints of the detainees, to flesh out the position of

24  those who believe that what has happened at Guantanamo is

25  wrong, we need to have the names and the serial numbers and

1  the ranking, we need to have that kind of information.  It

2  doesn't exactly stop there.

3        It seems that the public would have a very keen

4  interest in understanding what kinds of sanctions were imposed

5  against the people who thought it was okay to do a lap dance

6  with a detainee.  What kinds of sanctions were imposed upon

7  the people who thought it was okay to deny somebody the right

8  to go to the bathroom for hours and hours, perhaps at some

9  point, days at a time.  What kinds of people -- who thought it

10 was a good idea to put somebody on a boat and drive them

11 around and tell them that he was going to die.

12        What kinds of people, and who specifically, would

13 have done some of the other things that were done, such as

14 presenting Mr. Slahi with a forged letter that said his mother

15 and his other family members had been taken into custody and

16 were going to be mistreated as well.

17        I think the public has a very keen interest in

18 understanding what sanctions were imposed upon people who

19 conducted these sorts of interrogations.  What sanctions were

20 imposed upon people who beat him.  And I don't think that we

21 can know that until we know who the people are who were

22 involved in it.  So, we feel that this material should be

23 released under (b)(6).  If the Court wanted to take a more

24 conservative approach in that, the Court might decide that

25 only those who were involved of a certain rank or higher or a

1   certain GS level or higher, that their identifying information

2   was going to be revealed.  Certainly, we already have the

3   identifying information of the people who were at the very

4   top.  What is missing are the lieutenant commanders, the

5   majors, the captains, the lieutenants.  We think there is a

6   very keen public interest in having that information.

7          THE COURT:  Would you accept the adjective, more

8   tailored approach, instead of more conservative approach?

9          MS. ROYCE:  Certainly, Your Honor.  With respect to

10  the few documents that have been withheld under (b)(5), we

11  would simply seek to remind the Court that if it is

12  deliberative process which is being invoked under (b)(5), it

13  is -- the only things which are entitled to be withheld are --

14         THE COURT:  I'm sorry, what is the (b)(5) -- (b)(5)

15  is invoked for what categories?

16         MS. ROYCE:  It's sort of scattered throughout the

17  Vaughn index, Your Honor.  I'm not sure I can identify quickly

18  exactly which documents --

19         THE COURT:  Well, give me an example.

20         MS. ROYCE:  Could I have the Court's indulgence for

21  a moment?

22         THE COURT:  Sure.  The defendant said it has

23  invoked Exemption 5 to protect assessments of plaintiff's

24  intelligence value and threat level and so forth.  That's

25  probably a built-in suspenders invocation of Exemption 5

1    because they don't need Exemption 5 to protect that kind of

2    information, do they?

3            MS. ROYCE:  I don't think so, Your Honor.  I do see

4    that Exemption (b)(5) is pleaded a number of places in the

5    series of documents that's around 1100 -- 1124 through 1139.

6    I took it to mean that they were pleading deliberative process

7    there.  But, certainly, in order to justify that exemption,

8    they would have to show that they deliberated over things

9    which then did not become official policy.  If the document --

10   if the discussion then became policy or they acted on it, then

11   it's no longer deliberative process.

12           THE COURT:  Did you get all the medical records?

13           MS. ROYCE:  With a few redactions, we got the

14   medical records, yes, Your Honor.

15           THE COURT:  Would the medical records allow you to

16   assess physical mistreatment, as you allege?

17           MS. ROYCE:  To a certain extent they confirmed it.

18   They were not everything that we expected them to show.  I

19   think they may have been cleaned up a bit.  I think there may

20   have been a decision made not to document all of the medical

21   information that could have been documented.  But they did

22   confirm his abuse to a certain extent.  Yes, sir.

23           I mean, we don't have to look at the medical

24   records to decide whether he was abused.  We can look at the

25   article that appeared in the Wall Street Journal by just

1  reading --

2           THE COURT:  Oh, there's -- okay.

3           MS. ROYCE:  The Conscience of the Colonel.  I

4  believe it's Exhibit J to our pleading.

5           THE COURT:  Medical records have a certain status

6  in court that Wall Street Journal articles don't.

7           MS. ROYCE:  That is certainly correct, Your Honor.

8  But I think it's -- this is a very, very unusual article.

9  Colonel Couch reentered the military in order to serve as a

10  prosecutor in the military commissions.  He had lost a close

11  friend in 9/11.  He was very eager, I think his words were, to

12  put his skill sets to use in prosecuting those who were

13  culpable in 9/11.  And he became very suspicious at the

14  appearance of some of the documents that were being fed to him

15  in Arlington.

16           He went down to Guantanamo where he very briefly

17  witnessed the abuse of another prisoner, and was told by those

18  conducting the interrogations to move on down the hall, not to

19  pay attention to what was going on behind that door.  And then

20  he and a Naval investigator looked at the whole set of other

21  documents, which probably included the interrogation logs, and

22  decided that -- although, he felt Mr. Slahi was very culpable,

23  that what had happened to him was unconscionable, it violated

24  American law, it violated international law, and that he

25  wasn't going to have anything to do with it.

1          So that he went ahead -- Colonel Couch went ahead

2     and prosecuted and contributed to some of the other cases that

3     are pending action before the military commissions.  He's not

4     what you would consider to be a -- I think his words were, a

5     poster child for the human rights movement.  But he was

6     appalled at what he saw, and he wouldn't have anything further

7     to do with it.

8          THE COURT:  Tell me this.  If I were to call for

9     these documents or some subset of them for in camera review,

10    how would you suggest that I evaluate the government's mosaic

11    theory?  How does a judge know or can a judge know how many

12    pixels on the screen are disclosed by this information versus

13    that information?  What standard of review do you think I

14    should apply, if I were to do that?

15         MS. ROYCE:  Well, it's a de novo standard of

16    review.

17         THE COURT:  I know that.  But the argument is,

18    Judge, if you release this piece of information, it will give

19    aid and comfort to the enemy, which is putting together a

20    jigsaw puzzle or mosaic or whatever you want to call it, and

21    that this piece of information will be useful to them -- to

22    the other.  How am I supposed to evaluate that?

23         MS. ROYCE:  That's very difficult, Your Honor.

24    I've never been a party to one of these in camera

25    presentations, so I am not sure exactly what goes on there.  I

1    understand that there is some back and forth between the

2    District Court Judge and the government lawyers, that perhaps

3    even the affiant, the declarant himself, is present and that

4    there can be some back and forth like that.  Certainly,

5    counsel and I have the necessary security clearances, we would

6    be very pleased --

7              THE COURT:  You would like to be in the in camera?

8              MS. ROYCE:  Yes.  Yes, Your Honor.

9              THE COURT:  Uh-huh.

10             MS. ROYCE:  The mosaic theory is very well

11   established under the case law.  And the Court, I would

12   submit, is quite correct to be very concerned about how to

13   establish where the mosaic theory is going to apply and what

14   needs to be withheld under the mosaic theory.  But a great

15   deal of this information has already been released in one form

16   or another.  So that if we, Slahi's counsel, have any sense at

17   all of what's in the documents, we may be able to point the

18   Court to places where the information is already out there,

19   and that all that is being withheld under (b)(1) is not the

20   information itself but the sort of embarrassing surrounding

21   commentary.

22             That may be one thing that the Court can bear in

23   mind as it looks at some of this.  That while material that

24   has been marked classified properly does fall under (b)(1) if

25   the classification was made to prevent embarrassment to shield

1   people from criminal or civil liability, it doesn't belong

2   under (b)(1).  But having seen so little of the documents, I

3   can't convincingly argue to the Court how one would go about

4   evaluating them.  To us, they're just blackened pages.

5           THE COURT:  Okay.  Well, blackened pages, a black

6   box, black subject, black history, a very difficult case.

7           MS. ROYCE:  It is a difficult case, Your Honor.

8   But certainly if the rule of law means anything, it means that

9   these detainees need to either be brought to trial or

10  released, and that hiding the documents having to do with

11  their treatment in the hope of holding onto them longer and

12  hope of keeping counsel and in the dark longer, is not

13  something that I would think that the Court would want to be

14  putting its imprimatur on.

15          THE COURT:  Well, the imprimatur that I'm concerned

16  about is the imprimatur that's already been put on this by the

17  Court of Appeals.  And the fundamental question is, it seems

18  to me, you and other people who are representing these

19  detainees -- did you see Bill Safire in the New York Times

20  yesterday on the subject of the word detainee, by the way?

21          MS. ROYCE:  No, I didn't, Your Honor.  I saw

22  another piece in the New York Times about the shame of

23  Guantanamo, but I missed that one.

24          THE COURT:  Well, it was this -- Safire is just

25  talking about words.  He says the word detainee is -- he

1  agrees with, of all people, Ralph Nader, that the word

2  detainee is misused here.  The detainees -- the use of the

3  word detainee is to -- implies something temporary.  Then

4  Nader says, what's wrong with the word prisoner.

5           MS. ROYCE:  I agree with that.

6           THE COURT:  At any rate, that's an aside.  The

7  question is whether the Freedom of Information Act is the

8  right siege weapon here to assault this -- to assault

9  Guantanamo.  The imprimatur that has been put on this so far

10  by the Court of Appeals suggests that it is not a very

11  effective one, but I will consider your arguments.  I want to

12  hear again from Ms. Lin to see if she has any reply.  Thank

13  you very much.

14           MS. LIN:  Your Honor, I want to first address the

15  idea that the DOD is somehow trying to withhold interrogation

16  logs, and that such logs exist as to the type that was

17  described by the FOIA requests.  Just to give the Court some

18  background, we received the alleged interrogation log relating

19  to another detainee that was published in the Times from

20  plaintiff's counsel.  Plaintiff's counsel requested that we

21  search for interrogation logs of that nature, and we did so.

22           A Guantanamo commander tasked the unit that is --

23  whose primary mission is to conduct interrogation and

24  interrogation assessments of detainees, did both a manual and

25  electronic search of the type of interrogation log that was

1  presented to us, and they found no interrogation log of that

2  type.  And it was a --

3         THE COURT:  What do the words 'of that type' mean?

4         MS. LIN:  The type that was published in the Times

5  that plaintiff's counsel had provided to us.

6         THE COURT:  Is there something else that somebody

7  might call an interrogation log?

8         MS. LIN:  That was our speculation because since we

9  found nothing that looked like the kind that was in the press

10  article, and that allegedly existed with respect to another

11  detainee.  What we did provide was old documents that were the

12  summary interrogation reports, the interrogation plans,

13  memorandum for record, memorandum for record discussing

14  interrogation, and there is certainly a lot of documents of

15  that nature, and which we have disclosed during this process,

16  subject to the appropriate redactions.

17         THE COURT:  Subject to the appropriate redactions.

18         MS. LIN:  That is right.  The second challenge is

19  the idea that the so-called Schmidt-Furlow report refers to

20  interrogation logs, as Your Honor recognized we have asserted,

21  Glomar, with respect to that.  But we also want to remind the

22  Court that any nonexempt information is already publicly

23  available with respect to the Schmidt-Furlow report.  It is in

24  DOD's reading room available electronically.

25         One premise of plaintiff's argument is that there

1  was a finding or evidence of abuse and torture of Mr. Slahi.

2  And that even the Schmidt-Furlow report itself reached no such

3  conclusion.   There were -- what the finding was, was that in

4  the 24,000 interrogation sessions that were conducted at Gitmo

5  over a three-year period, there were three unauthorized

6  interrogation acts committed by two female interrogators.   And

7  those two female interrogators have since been disciplined,

8  and they are of mid or low level rank.

9          And that finding was -- and another finding of that

10  report was that the Gitmo commander in 2002 didn't properly

11  monitor interrogation.   And this is all in Exhibit G to

12  plaintiff's opposition brief.   These findings, in addition,

13  were confirmed by other publicly available DOD documents, one

14  of which is not before the Court, but I would just reference

15  it, it's called the Church report, which confirms that there

16  were only three unauthorized interrogation acts committed.

17          So, the idea that there were gross abuse or torture

18  or anything of that nature that was committed against Mr.

19  Slahi is certainly not the issue here, nor is it supported by

20  any available information.   And another reference was the

21  certain types of interrogation methods were illegal.   Again,

22  that was discussed in the Church report, specifically,

23  referencing, for example, the technique of waterboarding,

24  which was specifically not -- was specifically disavowed in

25  the Church report in terms of its usage against any Guantanamo

1  population.

2        THE COURT:  What is the government's position on in

3  camera review?

4        MS. LIN:  Your Honor, it's certainly within your

5  discretion to do so.  The difficulty, as Your Honor pointed

6  to, was what is the standard for Your Honor to determine what

7  any piece of intelligence information -- how that fits with

8  the rest of the picture.  And I think that is the difficulty

9  inherent in this type of prediction of potential harm to the

10  national security.

11        And I think for that reason, that's why the D.C.

12  Circuit has said that in the context of national security, and

13  particularly in the FOIA context, as long as the agency's

14  justifications are logical and plausible, and there's no

15  evidence of bad faith, then the District Court should give the

16  prediction of potential future harm substantial weight because

17  it is ultimately speculative in nature.

18        THE COURT:  Okay.  Anything further?

19        MS. LIN:  Yeah, if I could just quickly address the

20  issue of Exemption 3 about the status of Guantanamo and

21  whether we properly asserted the Exemption 3 under 10 U.S.C.

22  130(b).  The issue of whether Guantanamo is a sovereign

23  territory of the United States is not the relevant issue here.

24  What is relevant is whether Gitmo, as a duty location, is an

25  overseas unit, which it is.  And, again, the D.C. Circuit said

1    that once the statutory -- once the document arguably falls

2    within this particular statute permitting exemption, then the

3    Court's de novo review is at an end.

4              As to the argument about Exemption 6, the idea that

5    because certain personnel might have committed unauthorized

6    interrogation acts that therefore would contribute to the

7    public interest as to DOD's detainee interrogation operations,

8    that is certainly not supported by the case law.  The case law

9    specifically requires, and the Supreme Court says in the

10   Reporters Committee case that there must be nexus between the

11   personally identifying information and the duties or the

12   statutory responsibility that the government agency is charged

13   to perform.

14             If the personally identifying information doesn't

15   reflect the performance of statutory duties, then that

16   information -- there's no public interest in a disclosure.

17             THE COURT:  Is there -- are any documents withheld

18   solely on Exemption 5 grounds, or am I correct that that's

19   sort of a belt and suspenders?

20             MS. LIN:  Exemption 5, Your Honor, is asserted with

21   a -- it's a subset.  There are no documents -- my

22   understanding is there are no documents withheld purely under

23   Exemption 5.

24             THE COURT:  That is what I thought.  Okay.

25   Anything further, Ms. Lin?

1          MS. LIN:  Thank you, Your Honor.

2          THE COURT:  I think the motion is submitted, I will

3     consider it, and we'll have a decision for you as soon as we

4     can.  Thank you very much, Counsel.  We're adjourned.

5     END OF PROCEEDINGS AT 11:55 A.M.

6

7

8

9                    C E R T I F I C A T E

10          I, Lisa M. Hand, RPR, certify that the

11     foregoing is a correct transcript from the record of

12     proceedings in the above-titled matter.

13

14

15                              /s/ Lisa M. Hand

16                              _____

17                              Lisa M. Hand, RPR

18

19

20

21

22

23

24

25